**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No.: 2025-CV-80826

AMANDA ZACHMAN, an individual.

      Plaintiff,

v.

MARKEL AMERICAN INSURANCE COMPANY, a foreign corporation,
 and
HOUSTON SPECIALTY INSURANCE COMPANY, a foreign corporation.

      Defendants.

---

**PLAINTIFF, AMANDA ZACHMAN'S SECOND AMENDED VERIFIED EXPEDITED MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**

---

Plaintiff, Amanda Zachman ("Zachman"), by and through her undersigned counsel, hereby files this Second Amended Expedited Verified Expedited Motion for Preliminary Injunction (the "Motion") against Defendants, Markel American Insurance Company ("Markel") and Houston Specialty Insurance Company ("HSIC") (collectively, "Defendants"), pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Rule 6.02 and 7.1(d)(2). In support thereof, Zachman states as follows:

**Expedited Request**. A ruling on this Motion is needed on or before September 5, 2025, as Zachman seeks ongoing defense costs as every day she faces the irreparable harm of being unrepresented as a defendant in state actions where counsel has already withdrawn and in additional states where counsel is in the process of withdrawing their representation.

## I.     <u>Introduction</u>

Zachman is an officer of the Florida limited liability company known as MV Realty PBC, LLC, which is a wholly owned subsidiary of MV Realty Holdings, LLC.  Defendants Markel and HSIC each issued policies to MV, which would, among other things, afford insurance coverage, more specifically the duty to defend Zachman for claims associated with alleged wrongful acts in her capacity as officer for MV. Various legal actions in states across the county have been brought against Zachman in her capacity as officer for MV, with notice of same having been provided to Defendants.  Defendants have inexplicably failed to provide Zachman with a defense, leaving her with an obligation to pay significant legal fees she is unable to pay while being exposed to liability as a result of inevitable impending default judgements against her in jurisdictions across the country.  Zachman's position is dire because her defense counsel has already withdrawn in numerous jurisdictions and is in the process of withdrawing from representing Zachman in legal actions as a result of non-payment. The failure to provide a defense to Zachman is without a legitimate basis, and contrary to the plain duty to defend found in each of the Defendants' policies. As a result, Zachman faces the risk of up to hundreds of millions of dollars in default judgements, reputational damages, collateral estoppel/issue and claim preclusion prejudice across multiple jurisdictions with similar state claims, as well as the potential loss of her due process rights as a result of not having representation. Zachman seeks only ongoing defense costs necessary to maintain counsel for her ongoing defense, not a complete resolution of all claims at issue.

## II. <u>Statement of Facts</u>

Zachman incorporates by reference the allegations contained in the Verified Complaint previously [ECF No. 1] as if fully stated herein. The defined terms set forth in the Verified Complaint have the same meanings herein below.

Further, by her signed verification below, Zachman states that she is unable to afford the costs of her defense in the Various State Actions. Zachman further states that her counsel is in the process of withdrawing. See attached Ex. A & B.

**III.    Plaintiff Has Complied With The Procedural Requirements of Fed. R. Civ. P. 65**

Federal Rule of Civil Procedure 65(a), provides that the Court has authority to issue a preliminary injunction on notice to the adverse party. Defendants will be served with a copy of the instant application though the Court's CM/ECF filing system when filing of same.

**IV.    Legal Standard**

In addition to satisfying the procedural prerequisites for a preliminary injunction, Plaintiff satisfies all of the legal requirements that entitle her to preliminary injunctive relief. To obtain a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest." *Superior Consulting Servs. v. Shaklee Corp.*, 710 F. App'x 850, 853 (11th Cir. 2017). "Likelihood of success on the merits is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (internal citations omitted).

The law recognizes both prohibitory and mandatory injunctions. A prohibitory injunction restrains a responsible party from taking further action. *In re Fundamental Long Term Care, Inc.*, 2022 WL 17076771 (Bankr. M.D. Fla. 2022). The purpose and effect of a prohibitory injunction is to preserve the status quo among the parties. *Id.* "Generally, a mandatory injunction orders a responsible party to take a specific action or actions." *Id.* "A mandatory injunction directs the party to take action that alters, rather than maintains, the status quo." *Id.* "Where a mandatory injunction

is sought, courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief." *Delivery.com Franchising, LLC v. Moore*, 2020 WL 3410347 (S.D. Fla. 2020) As described below, whether the Court deems Zachman's instant application to be a prohibitory or mandatory injunction, she is entitled to the injunctive relief sought because either standard can be readily established.

This relief requested preserves—not upends—the status quo. As the former Fifth Circuit explained in *Canal Authority of the State of Florida v. Callaway*, "[i]t must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." And "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties … or by the issuance of a mandatory injunction." *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Requiring Markel/HSIC to fund Zachman's defense pending full adjudication of all claims, including indemnification obligations, simply returns the parties to that "last uncontested status quo" and preserves the Court's ability to render a meaningful decision, rather than allowing the refusal-of-coverage posture (the precipitating controversy) to persist. *Id.*

Even if characterized as "mandatory," the heightened standard is met. Florida law makes the duty to defend immediate and broad: if the complaint alleges facts that "fairly and potentially" bring the suit within coverage, the insurer must defend, and if any count is potentially covered, the insurer must defend the entire action. That is black-letter 11th Circuit/Florida law. *Id*. See *Hartford Accident & Indem. Co. v. Beaver,* 466 F.3d 1289, 1292–96 (11th Cir. 2006) (duty triggered by

allegations; doubts resolved for the insured. An insurer seeking to avoid defending a potentially covered claim bears the burden to show the complaint is cast "solely and entirely" within an exclusion with no other reasonable reading—a burden not met here.

## V. <u>Argument</u>

### A.  Zachman Is Entitled To A Preliminary Injunction Requiring Defendants To Perform Their Contractual Obligations Under the Applicable Insurance Policies and Defend Zachman in the Various State Actions

While certain facts differ, the *WorldCom* court granted a preliminary injunction against an insurer requiring it to pay the costs of defense for a former chairman of the board of directors ("Officer") as he incurred them pursuant to a D&O policy.  See *In re WorldCom, Inc. Securities Litigation*, 354 F.Supp.2d 455 (S.D. N.Y. 2005). In *WorldCom,* the carrier contended that the applicable policy had been rescinded due to the submission of allegedly false financial statements with an application for insurance. *Id*. The insured officer requested that the court require the carrier to immediately advance the costs of defending him against claims filed in a host of lawsuits. *Id.*

The court in *WorldCom* held that the insured officer's request was deemed to be a prohibitory injunction (despite the insurer never having made prior advancement of legal fees) in that the relief requested would result in only part of the relief to which a movant would be entitled to on the merits and required a party "to do what is should have done earlier."  *Id.* at 463. In *WorldCom,* as is the case here, a request is being made for only part of the benefits under the subject policies, i.e., the duty to defend by advancing of defense costs and to do what is should have done earlier. The court in *WorldCom* held that such a scenario would still permit the insurance carrier, if ultimately successful on the merits, to reserve questions of insurer liability to pay for judgments or other consequences flowing therefrom. *Id.* Hence the heightened standard for mandatory injunctions would not apply. *Id.* Nevertheless, the *WorldCom* court held that even if

the heightened standard for mandatory injunctions did apply, the insured officer had established a clear and substantial likelihood of showing that he was entitled to defense costs prior to the adjudication of the issues that the insurance carrier asserted for denying same, and irreparable injury if those costs are not paid as they are incurred. *Id.*

In the instant action, Zachman is entitled to the same relief, i.e., compelling the Defendants to defend her in the Various State Actions while reserving other questions for trial. Defendants' duty to defend is explicit and clearly defined in both of the subject policies and provides for coverage in the exact scenario present here. On this basis, Zachman moves for a preliminary injunction on the breach of contract claim, Count II of the Verified Complaint [ECF 1]. Zachman is highly likely to prevail on her claim that both Defendants, or alternatively one of them, must provide her a legal defense or advance her defense costs under the subject policies. The relevant facts are largely undisputed and the law is clear that the policy language supports enforcement of the insurer's duty to defend/advance in these circumstances.

Put simply, a carrier who owes a coverage obligation and does not honor it does not create a status quo in favor of non-payment. Market and HSIC cannot credibly argue that the status quo permits them to continue to refuse to provide Zachman a defense where an insurer's duty to defend obligation is clear, as it is here. In this context, because a preliminary injunction grants only part of the relief to which Zachman should have been entitled on the merits it requires the defendants to do what it should have done earlier. *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988). Thus, with a showing that there is a clear coverage obligation, the status quo is the preservation of Zachman's rights and her defense by obligating Defendants to cover defense costs as they should have done from the outset. Based on Florida law and the subject policies, Zachman is owed a defense (while preserving the indemnity issue) by enforcing the parties' contractually bargained-

for terms as set forth in the subject policies pending the outcome of their coverage dispute. *See*

*Rochester Drug Co-Operative, Inc. v. Hiscox Insurance Company, Inc.*, 466 F.Supp.3d 337

(W.D.N.Y. 2020).

**B.    Zachman Has a Substantial Likelihood of Success on the Merits of its Claims
Against Defendants.**

**a.   The Markel Policy**

The Markel Policy provides broad coverage for Ms. Zachman as an officer, as well as an

express duty to defend. *See* Ex. C, p. 10, "Coverage Part Duty to Defend | Yes". Thus, non-

excluded claims asserted against Zachman trigger a duty to defend her. Further, The Markel Policy

provides, in relevant part:

> "The Insurer shall have the right and duty to defend any Claim covered under such
> Coverage Part, even if any of the allegations are groundless, false or fraudulent."

*Id*. at Section IV(A)(1).

As observed by Markel in coverage correspondence, the Markel Policy contains an

endorsement labelled "Consumer Protection Exclusion" which provides, in relevant part:

> "The Insurer shall not be liable under any purchased Coverage Part to pay any **Loss** on
> account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:
> Based upon, arising out of, or in any way involving any **Wrongful Act** or **Interrelated
> Wrongful Acts** that violate(s) or is(are) alleged to violate any federal or state consumer
> protection statute, law, rule, ordinance or regulation including, but not limited to…."

While Zachman disputes that the endorsement even applies to Zachman due to the failure

to expressly incorporate that endorsement into the Markel Policy as described more fully in the

Complaint, even assuming arguendo the endorsement does apply, Markel is nonetheless required

without question to provide a defense to Zachman for non-excluded claims.

Markel improperly relies on the Consumer Protection Endorsement as a basis to deny a

defense for **<u>all</u>** claims brought against Zachman, even though the Various State Actions include

claims that indisputably fall outside of the Consumer Protection Endorsement. Numerous claims

across almost all jurisdictions **do not** assert a violation of any federal, state or local consumer protection statute, law, rule, ordinance or regulation. Rather, multiple jurisdictions assert independent and standalone claims separate and apart from any consumer protection related claim. By way of example, multiple states assert allegations specific to: (i) unlawful lending related conduct, (ii) unlawful title recording, and (iii) unlawful prohibited contractual terms, all of which are not asserted under any consumer protection law. By way of example, multiple states assert non-consumer protection claims in the context of lending:

    i.      Florida asserts allegations of violations of Florida's lending limitations regarding interest rates and other lending terms, including usury.  See Ex. D, ¶53, 72, 92;

    ii.     New Jersey asserts allegations of violations of its mortgage lending statutes. See Ex. E, ¶103 – 110, ¶115, ¶118. New Jersey also asserts allegations relating to usurious mortgage lending; see ¶119-123; ¶153;

    iii.    Georgia asserts allegations of violations of interfering with refinancing and reverse mortgages. Ex. F ¶128;

    iv.    North Carolina asserts allegations related to violation of statutory maximum interest rates for money loaned. Ex. G ¶172, ¶185;

Multiple states also assert claims related to violation of title recording laws unrelated to consumer protection. By way of example:

    i.      Florida asserts allegations of recording improper liens or void instruments. See Ex. D, ¶22, 26, 37-41, 46, 57

    ii.     New Jersey asserts allegations of clouding title. See Ex. E, ¶63-65;

    iii.    Georgia asserts allegations of violations of statutes governing improper recording and slander of title. See Ex. F ¶112-113. Georgia also asserts violations of statutes prescribing format and execution of recordable instruments. See Ex. F ¶107-108, ¶111, ¶114;

Markel relies heavily on its Consumer Protection Exclusion in taking the position that no duty to defend is triggered as to **any claim at all** regardless of whether such claim is an excluded consumer protection claim or a non-excluded claim unrelated to consumer protection. Moreover, Markel ignores the non-excluded claims and does not squarely address them in its coverage

correspondence. See attached Ex. H. Nevertheless, unable to address how the consistent presence of an array of non-excluded claims justify their refusal to honor their indisputable duty to defend, Markel refuses to provide the defense for its insureds, including Zachman. This position is wholly inconsistent with Florida law and the express terms of the Markel Policy.  The coverage Markel refuses to provide was explicitly provided for in the Markel Policy and paid for by the insureds.

Separately, Markel contends, inter alia, that its exclusion for Broad Professional Liability precludes coverage and excuses Markel's refusal to provide a defense. The Markel Policy's Broad Professional Liability exclusion provides, in relevant part:

> "The Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services."

Ex. C, p. 59.

Critically, none of the claims identified hereinabove implicate rendering or a failure to render a professional service. Rather, the above referenced allegations in the Various State Actions all above fall outside of each state's statutory framework regulating professional real estate brokerage services. These referenced allegations do not implicate any rendering or failure to render a professional service. Thus, Markel's reliance on its Broad Professional Liability exclusion is also misplaced and unsupportable by the plain language of its Policy.

### b.  The HSIC Policy

The HSIC Policy is a professional liability policy. It contains an express duty to defend under Section I(B)(1) which provides, in relevant part:

> "The **Company** will have the right and duty to defend any **Claim** to which this insurance applies**,** including the right to select and appoint legal counsel, even if the allegations are groundless, false or fraudulent."

HSIC concluded that it had a right and duty to defend the HSIC Policy given the duties it owed the insureds under the HSIC Policy.[1] However, HSIC has provided no defense.

HSIC's refusal to provide a defense to Ms. Zachman hinges on its assertion that a "Wrongful Act" must involve an allegation regarding misconduct "solely in the performance of, or failure to perform, Professional Services." Of course, the Various State Actions asserted various alternative theories and claims. HSIC largely ignores express claims that insureds allegedly violated real estate brokerage license law. By way of example,

By way of example, multiple states assert non-consumer protection claims in the context of lending:

    i.     New Jersey asserts express allegations of violations of its New Jersey Real Estate License Act governing New Jersey Real Estate Agents. See Ex. E, ¶129-132. ¶149,

    ii.    North Carolina asserts allegations related to a failure to provide services and assistance necessary to perform as a licensee. See Ex. G, ¶86.

    iii.   Florida specifically asserts allegations of violations of its business and licensing statutes relating to real estate brokers, including § 475.25(1)(r) relating to limitations on listing contract terms. See Ex. D, ¶22, 26, 58.

These claims allege misconduct in the performance of professional real estate brokerage services. Based on these allegations, the HSIC Policy's duty to defend is triggered under both Florida law and the plain language of the HSIC Policy.

### c. The Duty to Defend is Clearly Triggered under Both Policies

The subject policies unequivocally cover claims that fall outside of the cited exclusions. There is no genuine dispute that claims against Zachman in the underlying Various State Actions fall within the Defendants insuring agreements. Zachman is undisputedly an "Insured Person" and

---

[1] HSIC's coverage correspondence set forth "defense arrangements" under which HSIC would provide a defense to the Florida, Ohio and North Carolina actions. However, HSIC inexplicably reneged on this position and rejected its duty to defend. See Exs. I, J & K.

the Various State Actions which allege "Wrongful Acts" by Zachman in her capacity as an officer of the company. Lastly, these actions were first filed during the policy period for both of the subject policies, squarely triggering coverage.

Neither carrier has raised any legitimate policy exclusion that would even potentially preclude coverage of these non-excluded claims. The broad coverage grant and, specifically, the subject policies' duty to defend, therefore, applies.

Under Florida law, if the complaint alleges facts that "fairly and potentially" bring the suit within coverage, the insurer must defend, and if any count is potentially covered, the insurer must defend the entire action. *Hartford Accident & Indem. Co. v. Beaver,* 466 F.3d 1289, 1292–96 (11th Cir. 2006) See also *Jones v. Fla. Ins. Guar. Ass'n*, 908 So. 2d 435, 443 (Fla. 2005) (insurer's duty to defend arises if the underlying complaint's allegations fall within policy coverage, even if facts later show otherwise). Put simply,  the insurer must pay defense costs as they are incurred, so long as the claims are at least *potentially* covered, leaving any coverage disputes, including indemnity obligations, to be resolved later with appropriate reimbursement, if any, as necessary. Further, where, as here, a complaint alleges covered and non-covered claims, the insurer's duty to defend is triggered and obligates the insurer to defend the entire suit. See *Travelers Indemnity Company of Illinois v. Royal Oak Enterprises, Inc. et al.*  429 F.Supp.2d 1265 (citing *Trizec Prop., Inc. v. Biltmore Constr. Co*. 767 F.2d810,811 (11th Cir.1985). Thus, both carriers have an obligation to provide Zachman with a defense to each lawsuit as they contain covered claims.

Markel and HSIC also apparently blame each other for their respective failure to honor coverage obligations. Markel contends that its policy's Broad Professional Liability Endorsement precludes coverage because of the Various State Actions focus on or involve allegations of professional real estate brokerage services which Markel contends fall under its exclusion set forth

11

in the Professional Liability Endorsement.  Conversely, HSIC has asserted that the claims made against Zachman do not assert claims for conduct solely in the performance of or a failure to perform Real Estate and Property Management Services, as defined by the HSIC Policy. The positions taken by both Markel and Houston Specialty are without merit, as well as inconsistent with the other's coverage position. Clearly coverage is owed jointly and severally under both policies as the Complaints against Zachman contain numerous claims both related to and unrelated to professional services, thus invoking coverage from both Markel and HSIC.

Defendants' refusal to advance ongoing defense costs is an obvious breach of their contractual duty. Where an insurer has contracted to advance defense costs, it must do so if the claim is at least arguably covered, "just as an insurer with a duty to defend would have to defend if a claim is potentially covered". *See, e.g.*, *Nat'l Union Fire Ins. Co. v. Brown*, 787 F. Supp. 1424, 1430 (S.D. Fla. 1991), *aff'd*, 999 F.2d 1532 (11th Cir. 1993). The Defendants' continued refusal to afford Zachman coverage in light of the foregoing means Zachman has a very high likelihood of success in proving a breach of contract.  Defendants' refusal to defend is nothing more than an attempt to avoid coverage obligations negotiated and paid for at the time the policies were issued.

### C. Zachman Will Suffer Irreparable Harm if a Preliminary Injunction Is Not Issued.

Irreparable harm is present where refusal to fund an ongoing defense threatens the integrity of that defense. While money damages usually aren't irreparable, courts, including the 11th Cir., look to whether the harm "cannot be undone" later. When defense costs are being incurred now, loss of counsel-of-choice, strategic prejudice, and litigation defaults cannot be retroactively repaired with a damages award years later—precisely why Florida law makes the defense obligation immediate and resolves doubts in favor of defending. See *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991).

In order to demonstrate irreparable harm to warrant the granting of injunctive relief, a party must demonstrate that it has no adequate remedy at law, meaning its injury "cannot be undone through monetary remedies." *VAS Aero Services, LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1362 (S.D. Fla. 2012). Here, Zachman's ongoing injury is plainly one that cannot be remedied through monetary means. For example, in *Freedom Specialty Ins. Co. v. Platinum Management (NY), LLC, No. 653584/2016*, 2017 WL 6610417 (N.Y. Sup. Ct. Dec. 27, 2017), a New York trial court granted a preliminary injunction requiring excess D&O insurers to advance defense costs in a high-stakes criminal and civil enforcement matter. The court found that the insurers' failure to advance funds was causing a "direct, immediate and irreparable injury" to the insureds because without those funds the insureds could not mount an adequate defense to pending criminal charges. Key pre-trial motions were due and massive discovery was ongoing, but the insureds lacked resources for expert witnesses and other defense needs. The court reasoned that the inability to properly defend against the criminal indictment would have permanent consequences, whereas the insurers only stood to lose money temporarily (since they could recoup if coverage ultimately failed). Thus, irreparable harm was established and an injunction was warranted. Likewise, in *Dupree v. Scottsdale Ins. Co.*, 96 A.D.3d 546 (N.Y. App. Div. 2012), an insurer refused to advance defense costs for an insured facing criminal prosecution. The appellate court upheld an injunction, with Justice Kornreich observing that forcing an insured to defend himself without policy funds would irreparably "sap" the insured's ability to defend and potentially leave him facing conviction or other outcomes that money cannot later undo. *The Dupree* court emphasized that once a defense is compromised or counsel is lost, "the bell cannot be un-rung" by a later award of damages.

Federal courts have reached similar conclusions. In *Emons Industries, Inc. v. Liberty Mut. Ins. Co.*, 747 F. Supp. 1079 (S.D.N.Y. 1990), an insured company demonstrated irreparable harm

where it showed it would be unable to finance its defense in ongoing litigation if the insurer did not continue to pay defense costs. The court found the threatened inability to defend to be irreparable injury and granted injunctive relief, noting the insured had made a "convincing argument that it [would] be unable to finance the defense of the underlying lawsuit" without the insurer's payments, which would leave it exposed to an adverse judgment by default or an unprepared defense (747 F. Supp. at 1084). Similarly, in *Montgomery v. Aetna Plywood, Inc.*, a case in the Northern District of Illinois, the court held that the *absence of adequate liability insurance coverage* to fund a defense constitutes irreparable harm. Loss of counsel where an insured is unable to afford to pay legal fees in an underlying litigation and where defense counsel will withdraw for lack of payment qualifies as irreparable harm. See *Rochester Drug Co-Operative, Inc. v. Hiscox Insurance Company, Inc*. 466 F.Supp3d 337 (W.D.N.Y. 2020)

Once a defendant's ability to contest a lawsuit is gutted due to lack of funds, any judgment against him – or other legal detriment – cannot be fully remedied after the fact. *See also Stanford v. Federal Ins. Co.*, 2011 WL 13047447 (S.D. Tex. Jan. 20, 2011) (in the Stanford Financial D&O coverage litigation, enjoining insurers to advance defense costs because otherwise defendants in SEC and criminal actions would be unable to defend themselves, which is irreparable harm; noting that litigation costs and potential incarceration or liability were at stake, far beyond mere monetary loss). The irreparable harm here is even more pronounced because we are not dealing with just one lawsuit, but a barrage of cases in multiple jurisdictions. If Zachman goes without counsel, she risks multiple defaults or adverse rulings across the country. Each one of those is a bell that cannot be un-rung: for example, if a state court enters a default judgment for millions of dollars and injunctive relief banning Zachman from certain business activities, that result will stand regardless of whether Zachman later wins her insurance case. The Defendants' money might eventually pay

14

the judgment (if coverage is found), but Zachman's rights to mount a defense against these allegations and protect her reputation (and possibly her personal assets) would have been irreparably damaged by the unchallenged judgment.

Zachman must file responsive pleadings, produce documents and prepare for the matters now. However, her counsel has begun the process of withdrawing for lack of payment. Without counsel, she will essentially be unrepresented at a proceeding in which a state Attorney General is seeking to impose injunctive relief that could severely impact her business and legal rights. Many cases identifying Zachman as defendant in her corporate capacity have similar imminent deadlines. In all of these, opposing counsel will not pause their prosecution simply because Zachman loses her lawyer. On the contrary, they may attempt to capitalize on her unrepresented status. The potentially likely prejudicial outcomes include default judgments or court orders sanctioning Zachman for non-compliance, or worse.

No post hoc award of damages against Defendants can restore Zachman's ability to defend these cases. Courts have repeatedly held that having to participate in litigation without insurance coverage is an irreparable harm in itself, because insurance is purchased to protect against exactly that scenario. As one court put it, delaying defense funding until after a coverage trial would give the insurer an "unreasonably favorable" position – the directors and officers would have to shoulder all defense costs (or go without a defense) during the interim, while the insurer holds onto its money and defers any payment for years. That situation is obviously prejudicial and contrary to the purpose of D&O coverage, and in particular a policy that includes a duty to defend.  A later claim for recovery of losses is antithetical to plain meaning of Markel and HSIC's duty to defend.[2]

---

[2] Not all insurance policies include a duty to defend. Rather, it is bargained for term for which insureds pay premiums. Both subject policies contain a bargained for express duty to defend benefit.

Here, Zachman cannot fund a defense out-of-pocket exceeding hundreds of thousands of dollars. Zachman **cannot** proceed with a defense unless the insurer performs. [3]Courts have found irreparable harm especially compelling on such facts. In sum, absent an injunction, Zachman faces irreparable harm in the form of lost counsel, unopposed litigation, and default liability, all harms which simply cannot be undone. An injunction would restore that status quo and prevent irreparable harm. These factors weighs heavily in favor of relief.

### D. The Balance of the Harms Weighs in Favor of a Preliminary Injunction.

Here, the balance of the harms weighs heavily in favor of Zachman. When weighing the harms between the parties, the balance of equities tips decisively in Zachman's favor. Granting the preliminary injunction will prevent severe, irreparable injury to Zachman (as described above) while imposing at most a temporary and compensable burden on Defendants. By contrast, denying the injunction would subject Zachman to catastrophic personal and legal consequences, whereas Defendants would suffer little to no legitimate harm by paying what they contractually owe pending a final decision. Even if one of Markel or HSIC is correct in terms of whether their professional services exclusion applies, the dispute between them does not excuse denying Zachman a defense. Rather, the respective carriers could provide a defense while pursuing resolution of their coverage dispute in this action and recoup defense costs from the non-prevailing carrier.

### E. The Public Interest and Florida Law Support The Enforcement of Valid Contracts

The final prong of the analysis of whether to grant a temporary restraining order is whether "the restraining order would not be adverse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001)). Granting the requested injunction will serve

the public interest. There are several layers to the public interest at stake: enforcement of contracts, the integrity of the insurance system (particularly D&O insurance), the proper administration of justice in the underlying actions, and the broader public policies of jurisdictions involved in her dispute. All considerations point to an injunction as the correct result.

Enforcing contractual promises and holding insurers to their obligations is itself in the public interest. The efficient operation of insurance markets depends on insureds having confidence that insurers will pay when obligated. If insurers could freely renege on defense obligations until a final court order compels them, insureds (and their defense counsel) would be left in limbo, which would undermine the very purpose of liability insurance. By issuing an injunction, the Court reinforces that contracts – especially insurance policies which affect third-party interests – must be adhered to, and that *self-help* breaches by one party will not be tolerated. Thus, an injunction would promote fair dealing and honesty in the insurance industry.

Specifically in the D&O insurance context, the public has a strong interest in ensuring that corporate officers and directors can rely on the "safety net" of defense coverage. Such coverage encourages qualified individuals to serve in leadership roles without undue fear that they will be personally ruined by litigation over their management decisions (so long as they act in good faith). If D&O insurers do not promptly pay defense costs, the utility of these policies is severely diminished. Executives would either refuse to serve or would be left defenseless when claims arise, which in turn can harm shareholders, markets, and consumers. The public interest favors an outcome where D&O insurers keep the promise of providing "litigation insurance." As one court noted, *"the purpose of D&O insurance is to provide advancement of defense fees and costs to directors [and] officers… in the event claims are made against them for alleged wrongful acts."* Allowing an insurer to withhold that protection pending a protracted coverage fight subverts the

purpose. An injunction here upholds the insurance product's purpose and, by extension, the public interest in corporate governance stability.

Moreover, the public interest in the underlying litigations is advanced by ensuring Zachman can participate and defend himself. Those cases – many brought by state Attorneys General – involve important questions of consumer protection and possibly allegations of unlawful business practices. The public interest is not served by having one side (the government or plaintiffs) steamroll to victory by default because the defendant could not afford a lawyer. Rather, the public interest lies in reaching a just outcome on the merits, with both sides adequately represented. In the case where an insured has viable defenses or mitigating evidence (which Zachman has here), the courts hearing those cases should be able to consider it, which requires Zachman to have counsel. An injunction enabling her to defend fosters the truth-seeking function of the courts and helps avoid unjust windfall judgments. Conversely, if Zachman truly has no defense, the plaintiffs can still prevail – but at least the process will have been fair. Thus, ensuring a proper defense aligns with the public's interest in fair litigation outcomes.

Additionally, multiple states' public policies strongly condemn the practice of insurers dragging their feet on defense obligations. For instance, the underlying cases involve states like Florida, Massachusetts, California, New Jersey, and others. Each of these jurisdictions has laws or precedents reflecting that insurers should not abandon their insureds. Florida has a robust Bad Faith statute, Fla. Stat. § 624.155, which embodies a public policy that insurers must act fairly and promptly in settling claims and providing defenses when liability is reasonably clear. Florida's Claims Administration Statute, Fla. Stat. § 627.426, imposes strict requirements on insurers to timely notify insureds of coverage defenses and, if they want to contest coverage, to seek a declaratory judgment promptly – otherwise they may be estopped from denying coverage. These

laws illustrate Florida's public interest in preventing insurers from "delay and deny" tactics. Here, Defendants' behavior is exactly the kind of conduct that these statutes and public policies aim to deter. Granting the injunction vindicates those state policies by effectively requiring Defendants to comply with their obligations rather than profiting from delay. As highlighted above, a carrier cannot create a status quo in favor of non-payment simply by not paying where such carrier is obligation to cover defense costs.

Other states echo this stance. New Jersey law deems it an unfair claims practice for an insurer to fail to promptly acknowledge and act on claims or to not attempt in good faith to effectuate prompt, fair settlements (N.J. Stat. Ann. § 17:29B-4). In the D&O context, that includes promptly providing a defense. New Jersey courts have recognized that an insurer's failure to advance defense costs when required can violate these standards. The public interest there (and generally) is that insurers should not abandon their insureds, especially when only the insurer's resources stand between the insured and legal disaster. Massachusetts, likewise, through its consumer protection law (Mass. G.L. c.93A) and insurance fair practices (c.176D), deters insurers from withholding owed defense payments. Indeed, in a recent coverage lawsuit related to defense cost advancement (*Argonaut Ins. Co. v. Windsor*, D. Mass., 2019), the court found that the insurer's unjustified failure to defend could constitute an unfair trade practice, exposing the insurer to extra-contractual liability. This underscores a public interest in insurers doing what Defendants have refused to do. New York recognizes a common-law duty of good faith such that extreme delay in defending could give rise to consequential damages beyond the policy. All these jurisdictions count on the availability of recoupment to protect insurers if coverage is lacking, rather than countenancing an insurer's unilateral decision to withhold funds at the insured's peril. Put simply, there is a strong public interest nationwide in holding insurers to their defense duties

and using remedies like recoupment or after-the-fact damages to sort out disagreements, as opposed to letting insurers unilaterally undermine an insured's defense in real time.

Finally, issuing the injunction furthers the public interest by sending a message that bad faith conduct will not be rewarded. Defendants' refusal to pay even the amounts it knows are covered is, on its face, unreasonable. If the Court were to deny relief and Defendants' tactic succeeded, it could encourage other insurers to withhold payments in hopes that insureds will be forced to settle or abandon their claims, thus reducing insurer liability without ever having a court rule on coverage. That kind of perverse incentive is directly contrary to the public's interest in good faith claim handling. On the other hand, granting the injunction would reinforce insurers that if they have a legitimate coverage dispute, the proper approach is to pay now and litigate later, using tools like reservations of rights and reimbursement, rather than choking off the insured's defense as leverage. Ther promotes fairness in the insurance system and ultimately benefit all policyholders and courts.

Therefore, because Zachman's requested injunctive relief is to protect its valid contractual rights, which are rights are afforded strong protection under Florida law, public policy strongly favors protection of enforcing the Agreements.

### VI.    The Court Should Order No More Than $10,000 Security For The Preliminary Injunction.

Federal Rule of Civil Procedure 65(c) allows a court to issue a preliminary injunction, provided the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The Court has broad discretion regarding the amount of an injunction bond and may elect to require no

security at all. *Title v. Omega Nat'l Title Ag., LLC*, 2023 U.S. Dist. LEXIS 90467, at *7 (N.D. Fla. Apr. 14, 2023) (requiring $10,000.00 bond).

Here, a bond is unnecessary in light of the clear evidence of Defendants' blatant breach of their obligations. However, to the extent the Court requires any security, it should be $10,000.

### VII.    Conclusion

For the foregoing reasons, Zachman respectfully requests the Court grant her Preliminary Motion for a Preliminary Injunction with the relief sought in the proposed Order attached hereto as **Exhibit L**.

### Verification

I declare under the penalty of perjury under the laws of the State of Florida that the foregoing answers are true and correct.

08/11/2025
Date:

Amanda Zachman

State of Florida
County of _Palm Beach_
Signed and sworn to [or affirmed] before me on _11th of August_____, 2025
by _Amanda Zachman_          (name(s) of individual(s) making statement).

(Notary's official signature)

_05-30-2029_
(Commission Expiration)

[seal]

Dated: August 12, 2025.


ANNETTE COLLADO
MY COMMISSION # HH681514
EXPIRES: May 30, 2029

21

Respectfully submitted,

*/s/ Jeffrey M. Glotzer*
Jeffrey M. Glotzer, #184489
Frascona, Joiner, Goodman & Greenstein, P.C.
4750 Table Mesa Drive
Boulder, CO 80305
303-494-3000
jeff@frascona.com
*Attorney for Plaintiff, Amanda Zachman*