**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 9:25-CV-80826-DMM**

AMANDA ZACHMAN, an individual,

    Plaintiff,

v.

MARKEL AMERICAN INSURANCE
COMPANY, a foreign corporation, and
HOUSTON SPECIALTY INSURANCE
COMPANY, a foreign corporation,

    Defendants.
_____/

**DEFENDANT MARKEL AMERICAN INSURANCE COMPANY'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF'S SECOND AMENDED VERIFIED
<u>EXPEDITED MOTION FOR PRELIMINARY INJUNCTION</u>**

KAPLAN ZEENA LLP
2 South Biscayne Boulevard, Suite 3050, Miami, Florida 33131
Tel: (305) 530-0800 Fax: (305) 530-0801

Defendant, Markel American Insurance Company ("MAIC"), by and through undersigned counsel and pursuant to S.D. Fla. Local Rule 7.1 files this Memorandum of Law in Opposition to Plaintiff, Amanda Zachman's ("Plaintiff" or "Zachman") Second Amended Verified Expedited Motion for Preliminary Injunction [D.E. 18] (the "Motion"), stating as follows:

## INTRODUCTION

This insurance coverage action arises out of various actions and regulatory proceedings brought against Plaintiff based on her activities in connection with an ongoing consumer fraud conducted by MV Realty Holdings, LLC ("MV Realty") throughout the United States. D.E. 18, p. 2; D.E. 1, ¶ 23. Specifically, "[i]n her capacity as an officer for MV Realty PBC, LLC, Zachman has been named in multiple legal actions throughout the United States including, but not limited to North Carolina, Ohio, Massachusetts, New Jersey, Minnesota, California ("Various State Actions")." D.E. 1, ¶ 23. Plaintiff's Motion requests injunctive relief—namely, the provision of a legal defense or the advancement of Plaintiff's defense costs—on the basis that defendants MAIC and Houston Specialty Insurance Company ("HSIC") (collectively, "Defendants") have failed to provide Zachman with a defense, leaving her with an obligation to pay significant legal fees that she contends she is unable to pay. The instant action therefore involves a determination of the scope and duties imposed on MAIC under the policy at issue. Accordingly, through her Motion, Plaintiff is seeking an early adjudication on the merits of this case and to upend the status quo by forcing the Defendants to make payments on policies where coverage has been disclaimed.

The Motion should be denied because Plaintiff fails to carry her burden as to any of the four prerequisites needed for the issuance of a preliminary injunction. In particular, Plaintiff has failed to demonstrate that she is likely to succeed on the merits; that she will suffer irreparable harm if injunctive relief is not granted; that the harm she claims she will suffer outweighs the harm that MAIC will suffer; or that the relief sought will not harm the public interest. Notably, as to her failure to demonstrate that she is likely to succeed on the merits, Plaintiff asserts that there is a duty to defend but does not explain how or why the subject policy provides coverage.

For these reasons, and the reasons discussed below, Plaintiff has not met her heavy burden to prove entitlement to a mandatory injunction.

## RELEVANT FACTUAL BACKGROUND

A.   **The MAIC Policy.**

MAIC issued a For Profit Management Liability Policy bearing policy number MKLM2MML000716 to MV Realty Holdings, LLC for the policy period of August 28, 2022 to August 28, 2023 (the "MAIC Policy"). Subject to its terms, conditions, exclusions, and endorsements, the MAIC Policy's Coverage Part A. (Directors and Officers and Company Liability) contains liability limits of $3,000,000 Each Claim and in the Aggregate. D.E. 1-1, p. 10 of 73. Within Coverage Part A, Insuring Agreement C: Company Liability is subject to a $50,000 Each Claim Retention and a 08/14/2020 Pending or Prior Date. *Id*.

The Insuring Agreements for the Directors and Officers and Company Liability Coverage Part of the MAIC Policy state, in part, as follows:

**DIRECTORS AND OFFICERS AND COMPANY LIABILITY COVERAGE PART**

**SECTION I – INSURING AGREEMENTS**

A.   **INSURED PERSON LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

B.   **COMPANY REIMBURSEMENT COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** for which the **Company** grants indemnification to the **Insured Persons**, as permitted or required by law, and which the **Insured Persons** have become legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

C.   **COMPANY LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** which the **Company** becomes legally obligated to pay on account of any **Claim** first made against the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

….

D.E. 1-1, p. 32 of 73.

The MAIC Policy's Definitions in the Directors and Officers and Company Liability Coverage Part provide, in pertinent part:

**SECTION III – DEFINITIONS**

When used in this Coverage Part, the following terms are defined as follows:

….

F.  **Insured Person**, whether in the singular or plural, means:

   **1.** Any natural person who was, now is or shall during the **Policy Period** become a duly elected or appointed director, trustee, governor, **Manager**, officer, advisory director, or member of a duly constituted committee or board of the **Company** or their functional equivalent;

   **2.** Any natural person not described in Item 1. above who was, now is or shall during the **Policy Period** become an **Employee** of the **Company**; and

   **3**. Any natural person described in Item 1. above while serving in an **Outside Position**;

   Provided that an **Employee** described in Item 2. above shall not be considered an **Insured Person** for purposes of SECTION II B., OUTSIDE POSITION COVERAGE, of this Coverage Part and EXCLUSIONS C. or D. in SECTION IV of this Coverage Part.

….

I.  **Loss** means the total amount the **Insured** becomes legally obligated to pay on account of covered **Claims** made against them, including, but not limited to, damages (including punitive, exemplary or multiple damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, **Claim Expenses** and civil money penalties assessed against an **Insured**: **(i)** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2(g)(2)(B); or **(ii)** for a violation of any federal, state, local or foreign law if such violation is not knowing or willful.

   The insurability of such punitive, exemplary or multiple damages and civil money penalties shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured**, including without limitation the jurisdiction in which the **Company**, the **Insured Person**, the Insurer, this policy or such **Claim** is located.

   Solely with respect to INSURING AGREEMENTS D, **Loss** only means **Investigative Costs**.

   **Loss** does not include any of the following:

> **1**. Any amount not indemnified by the **Company** for which the **Insureds** are absolved from payment by reason of any covenant, agreement or court order;
>
> **2**. Taxes, sanctions, fines or penalties imposed by law, other than civil money penalties expressly referenced above;
>
> **3**. Any amount incurred by the **Company** that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by a **Company** in connection with its purchase of any securities or assets;
>
> **4**. Any amount incurred by the **Company** to comply with any injunctive or other non-monetary relief or any agreement to provide such relief;
>
> **5**. Any disgorgement or restitution of ill-gotten gain or rescissionary damages; or
>
> **6**. Matters uninsurable under the law pursuant to which this policy is construed.
>
> **N.** **Wrongful Act** means:
>
> **1**. Any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by any **Insured Person** in their capacity as such or in an **Outside Position**, or with respect to Insuring Agreement C, by the **Company**; or
>
> **2**. Any matter claimed against any **Insured Person** solely by reason of their serving in such capacity or in an **Outside Position**.

D.E. 1-1, pp. 33-36 of 73.

The MAIC Policy contains an Endorsement titled "Consumer Protection Exclusion", which provides:

**CONSUMER PROTECTION EXCLUSION**

This endorsement modifies all insurance provided under the following for which a check mark (X) appears:

[X]  DIRECTORS AND OFFICERS LIABILITY COVERAGE PART

[ ]  DIRECTORS AND OFFICERS AND ORGANIZATION LIABILITY COVERAGE PART

[X]  EMPLOYMENT PRACTICES AND THIRD PARTY DISCRIMINATION LIABILITY COVERAGE PART

[ ]  FIDUCIARY LIABILITY COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that SECTION IV – EXCLUSIONS is amended by the addition of the following exclusion

The Insurer shall not be liable under any purchased Coverage Part to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

Based upon, arising out of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts** that violate(s) or is(are) alleged to violate any federal or state consumer protection statute, law, rule, ordinance or regulation including, but not limited to:

**1.** The Telephone Consumer Protection Act of 1991 (TCPA), any amendment thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

**2.** The CAN-SPAM Act of 2003, any amendment thereof or any similar or related federal or state statute, law, rule, ordinance or regulation;

**3.** Any federal, state or local statute, law, rule, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 and their amendments and additions, that addresses, prohibits, or limits the printing, interception, dissemination, disposal, collecting, recording, sending, transmitting, communicating, distribution or receiving of private material, private communications or private information.

All other terms and conditions remain unchanged.

D.E. 1-1, p. 61 of 73.

The MAIC Policy also contains an Endorsement titled "Exclusion – Broad Professional Liability", which provides:

### EXCLUSION - BROAD PROFESSIONAL LIABILITY

This endorsement modifies all insurance provided under the following for which a check mark appears:

[X]  DIRECTORS AND OFFICERS LIABILITY COVERAGE PART

[X]  EMPLOYMENT PRACTICES AND THIRD PARTY DISCRIMINATION LIABILITY COVERAGE PART

[ ]  FIDUCIARY LIABILITY COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

**1.** With respect to the above marked Coverage Part(s), **SECTION - EXCLUSIONS** is amended by the addition of the following exclusion:

> The Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services.
>
> This exclusion shall not apply to any **Insured Person** against whom a **Claim** is made alleging such **Insured Person** failed to supervise the rendering of or failure to render any professional services excluded above. However, the Insurer's liability for **Loss** for such covered **Claim** shall be limited to **Loss** arising from the failure to supervise the rendering of or failure to render professional services only.
>
> ….
>
> All other terms and conditions remain unchanged.

D.E. 1-1, p. 59 of 73.

### B. The Allegations.

The Complaint alleges Zachman is an officer of a Florida limited liability company known as MV Realty PBC, LLC. D.E. 1, ¶ 9. Zachman has been an officer of MV Realty PBC, LLC since at least August of 2014. *Id*. at ¶ 11. According to the Complaint, Ms. Zachman has also held a real estate license and has acted in the capacity as Chief Sales Officer for MV Realty PBC, LLC and its subsidiaries. *Id*. at ¶ 12.

Various legal actions in states across the county have been brought against Zachman in her capacity as officer for MV. D.E. 18, p. 2 of 22. Specifically, the Plaintiff, as well as other officers of MV Realty, are currently being sued and investigated by the Attorneys General in various jurisdictions across the country, including, but not limited to, Florida, Indiana, California, and South Carolina,[1] for their actions as officers of MV Realty and its subsidiaries. The Florida Attorney General has described the scheme as follows:

> 1. Defendants engage in a complex and deceptive scheme that attempts to skirt existing Florida law with the goal of swindling consumers out of their home equity.
>
> 2. Defendants offer consumers $300-$5,000 cash as a "loan alternative" but without requiring consumers to take out a loan. In exchange, consumers enter into a misleading and confusing Homeowner Benefit Program ("HBP") which includes

---

[1] The Florida Attorney General has alleged that the Defendants are harming consumers in Florida and at least 3 other states across the country. D.E. 18-4, ¶ 6.

signing a contract, the "Homeowner Benefit Agreement" ("HBA"), that requires consumers to use MV Realty as their exclusive real estate listing broker for a period of 40 years. During the course of the 40-year term of the HBP, if the consumer lists the property for sale but does not use MV Realty as its listing broker, or if the home is foreclosed upon, heirs try to sell the home, or consumers simply wish to cancel the deal, Defendants will seek to be paid 3% of the property's value, a value that, pursuant to the terms of the HBA, is determined by Defendants.

3. The HBA contract that consumers must enter into as part of the HBP, is unfair and unconscionable. A lien created by recording a memorandum of the HBA ("Memoranda of HBA") facilitates Defendants taking a substantial portion of any equity in the home to satisfy contractual penalties. Defendants' practice of recording liens against homeowners also prevents many consumers from unlocking the equity in their homes through refinancing, reverse mortgages, home equity lines of credit, and other financial tools.

D.E. 18-4, ¶¶ 1-3.

## MEMORANDUM OF LAW

**A.  Legal Standard.**

To obtain a preliminary injunction, Plaintiff must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be adverse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (citation omitted). A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites. *U.S. v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotations omitted). "In other words, the grant of a preliminary injunction is the exception rather than the rule." *Grimshaw v. Metropolitan Life Ins. Co.*, No. 11-14165-CIV-GRAHAM/LYNCH, 2011 WL 13319574 (S.D. Fla. July 5, 2011) (citations omitted). Importantly, failure to meet even one of the elements of the test dooms the request for a preliminary injunction. *Wreal LLC, v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2018).

"The purpose of a preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (citing *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). *See also Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) ("The chief function of a

preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.") (quoting *Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990)). Preliminary injunctions are either prohibitive or mandatory. The typical injunction falls into the prohibitive category and requests that the court prevent a party from taking certain action in order to maintain the status quo pending resolution of the case on the merits. *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1192 (S.D. Fla. 2011). In contrast, a mandatory injunction "seeks to force one party to act" rather than to maintain the status quo. *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1260 (S.D. Fla. 2011).

An order directing an insurer to defend is a mandatory injunction. *See, e.g.*, *Allstate Ins. Co. v. Arvida Corp.*, 421 So. 2d 741 742-43 (Fla. 4th DCA 1982); *Hanover Ins. Co. v. Vemma Int'l Holdings Inc.*, 2016 WL 4059606, at *5 (D. Ariz. July 29, 2016) (construing insureds' motion for a preliminary injunction requiring insurer to pay defense costs as a mandatory injunction). Mandatory injunctive relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Powers*, 691 F. App'x at 583 (quoting *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). The movant must demonstrate that "a clear legal right has been violated, irreparable harm has been threatened, and there is a lack of an adequate remedy at law." *Fernandez v. Bal Harbour Vill.*, 49 F. Supp. 3d 1144, 1151 (S.D. Fla. 2014) (citation omitted).

Despite her assertion that "[the] relief requested preserves—not upends—the status quo" (D.E. 18, p. 4), Plaintiff seeks a mandatory injunction that would clearly *not* maintain the status quo as it would require MAIC to immediately "provide her a legal defense or advance her defense costs" (D.E. 18, p. 6 of 22) in an undisclosed amount, but potentially up to the $3,000,000 million limit but not to other insureds who have been similarly sued. The Motion states that "[e]ven if characterized as "mandatory," the heightened standard is met." D.E. 18, p. 4. Regardless of the label attributed to the injunctive relief sought in the Motion, Plaintiff has failed to meet the burden of entitlement to injunctive relief.

### B.     Plaintiff Fails to Establish Any of the Criteria for Injunctive Relief.

#### 1. *Plaintiff Has Not Shown a Substantial Likelihood of Success on the Merits of Her Claims.*

In her Motion, Plaintiff states that she only seeks ongoing defense costs necessary to maintain counsel for her ongoing defense, not a complete resolution of all claims at issue." D.E. 18, p. 2 of 22. However, the Motion contains no support for Plaintiff's contention that the "duty to defend is explicit and clearly defined in both of the subject policies and provides for coverage in the exact scenario present here." *Id*. at p. 6 of 22. While Plaintiff relies on *In re WorldCom, Inc. Securities Litigation*, 354 F.Supp.2d 455 (S.D. N.Y. 2005), this opinion is wholly inapposite to this case.

Plaintiff argues that "[w]hile certain facts differ, the *WorldCom* court granted a preliminary injunction against an insurer requiring it to pay the costs of defense for a former chairman of the board of directors ('Officer') as he incurred them pursuant to a D&O policy." D.E. 18, p. 5 of 22. However, Plaintiff's statement that "while certain facts differ" is a gross understatement of the facts in *Worldcom*, which are actually the opposite of those in the instant case. First, the *Worldcom* court pointed out that with respect to defense costs, "[t]he first page of the National Union renewal policy for 2002 states in bold letters 'NOTICE: ... THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.'" 354 F.Supp.2d at 459. Even more significant (and distinguishable), the *Worldcom* court found that, "[f]or its part, Continental [the insurer] does not dispute that the claims against WorldCom and its directors fall within the policies' definition of covered claims. Nor does it contest that the insurance policies entitle Roberts to defense costs. Continental argues, however, that the policies were issued in reliance on WorldCom's false financial statements and were therefore properly rescinded and are void *ab initio*." *Id.* at 462. Moreover, although the insurer opposed the preliminary injunction (and its admitted defense cost obligation under the policy) based upon its contention that the policy was rescinded, the court further held that under New York law, "[u]ntil the issue of rescission is adjudicated, a contract of insurance remains in effect and the duty to pay defense costs is enforceable." *Id*. at 465. Hence, to summarize the facts in *Worldcom* that "differ," the policy in *Worldcom* required that defense costs be advanced prior to the disposition of a claim; the insurer did not dispute that the claim was covered; and the insurer did not dispute that the insured was entitled to defense costs. The sole issue was whether the insurer could avoid its admitted payment obligation while litigating the issue

of rescission, which it could not do, as a matter of law. It was only under these unique facts and circumstances that the *Worldcom* court held that a party would be required "to do what it should have done earlier" (*id*. at 463), and that the plaintiff carried his burden of demonstrating that he will succeed on the merits of entitlement to defense costs prior to resolution of the insurer's rescission claim (*id*. at 466).

More on point (and dispositive) is the 2024 case of *Daileader v. Certain Underwriters at Lloyds Syndicate 1861*, 96 F.4th 351 (2d Cir. 2024), in which the Second Circuit affirmed an order denying an insured's motion for preliminary injunction, and in the process also distinguished the *Worldcom* case. The plaintiff (Daileader) sought a preliminary injunction to force his insurer (Syndicate 1861) to defend him in a bankruptcy adversary proceeding. Like the circumstances here, the insurer denied plaintiff's claim (*Id*. at 354) and the parties disputed whether the policy covers the claim (*Id*. at 355). The court discussed the standard for issuing a preliminary injunction depending upon whether the injunction sought was "mandatory" or "prohibitory" as follows:

> In some situations, the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (emphases added) (internal quotation marks and citations omitted). One situation when this heightened standard applies is when the plaintiff "seeks a so-called 'mandatory injunction,'" *JTH Tax*, 62 F.4th at 667, rather than a "prohibitory" one, *N. Am. Soccer League*, 883 F.3d at 36. At their most basic, the former typically requires the non-movant to take some action, whereas the latter typically requires the non-movant to refrain from taking some action. *See id.*
>
> Whether an injunction is "mandatory" or "prohibitory" is sometimes unclear. In "borderline cases," essentially identical injunctions "can be phrased either in mandatory or prohibitory terms." *Id.* at 36 n.4 (internal quotation marks and citation omitted). We have therefore explained that "[p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* at 36. In this context, the "status quo" is really the "status quo *ante*" – that is, "the last actual, peaceable[,] uncontested status which preceded the pending controversy." *Id.* at 37 & n.5 (internal quotation marks and citation omitted).

*Id*. at 356. The Court agreed with the insurer that the injunction being sought was mandatory:

> By contrast, Syndicate 1861 observes that it "never paid defense costs to Daileader and ... consistently denied coverage." Appellees' Br. 11. Thus, it contends that being compelled to pay Daileader's defense costs would alter *that* status quo.

> We agree with the Syndicate. The Syndicate has never paid for any of Daileader's defense costs. Therefore, the "actual" status quo *ante* between the parties to this lawsuit was one of non-payment. *N. Am. Soccer League*, 883 F.3d at 37 (internal quotation marks omitted). This status quo was also "peaceable" and "uncontested." *Id.* (internal quotation marks omitted). It is true that Landmark had paid for Daileader's expenses. But Landmark's payment decision could not bind the Syndicate. Nor did the Syndicate ever agree that its policy would cover Daileader's costs in the adversary proceedings. The parties' rights and obligations under the policy were therefore unsettled. Accordingly, Daileader's suggestion that an injunction would only "enforce what Syndicate 1861 already was obligated to do" is unpersuasive. Appellant's Br. 24. Rather, what the Syndicate was "obligated to do" is precisely what the parties could have disputed then and still dispute now. Injunctions to enforce such contested duties will very often involve "commanding some positive act" and therefore will be mandatory, not prohibitory.[4] *Tom Doherty Assocs.*, 60 F.3d at 34. This case presents no exception.[5]
>
> Daileader notes some cases suggesting a contrary result, but they do not alter our conclusion. Like this case, *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005), involved a preliminary injunction to enforce an insurer's duty to defend. There, the district court found the injunction to be prohibitory because it would require the defendant only "to do what it should have done earlier." *Id.* at 463 (internal quotation marks and citation omitted). But the insurer in *WorldCom* did not dispute that it owed the claimant a duty to defend. Rather, the insurer argued that the policy was void *ab initio* due to the policyholder's alleged fraud. *See id.* at 466–67. The insurer's denial thus represented a departure from the presumed contractual status quo, not an extension of it. Syndicate 1861's actions here cannot be similarly characterized.
> ….
>
> In sum: Daileader seeks a preliminary injunction to require the Syndicate to pay for his defense costs. But the last, peaceable status quo between the two parties was one in which the Syndicate had never paid those costs. We must therefore evaluate Daileader's preliminary-injunction motion under the more stringent standard applicable to "mandatory" relief.

*Id*. at 357-358.

In *Manchester v. Endurance Assurance Corp.*, 9:25-cv-80761-DMM (S.D. Fla. Aug. 13, 2025), wherein this Court entered an Order denying a Motion for Preliminary Injunction in a related matter, this Court explained:

> Plaintiff's current Motion for Preliminary Injunction essentially seeks an early adjudication of the merits of this case. Plaintiff demands Defendant pay him the

> policy limits now, arguing that he will be irreparably harmed by the economic burden of having to self-fund his own legal defense in the various lawsuits, citing his defense counsel's impending withdrawal from his representation due to overdue legal bills. (DE 20 at 2). *See Miami Beach Federal Sav. and Loan Ass'n v. Callander*, 256 F.2d 410, 416 (5th Cir. 1958) ("We have repeatedly held that an order for a temporary injunction does not and cannot decide the merits of the case.").
>
> Plaintiff contends his relief sought is not extraordinary in that he seeks to "maintain the status quo by [Defendant] continuing to fund his legal defense[s]" in the litigation against him around the country. (DE 20 at 3). But I think this misses the mark, as the current status quo is Defendant having ceased payment under the policy. Thus, in reality, Plaintiff's Motion does not seek to maintain the status quo, but instead seeks to force Defendant to pay out the benefits of the disputed policy before the scope and duties of the policy have been determined, which as I discuss below, includes various factual disputes that will have to be fleshed out in the course of litigation.

This same analysis applies here. Plaintiff is not seeking to maintain the status quo, or to require MAIC "to do what it should have done earlier." Rather, she is seeking to compel MAIC "to pay out the benefits of the disputed policy before the scope and duties of the policy have been determined." She is, for all practical purposes, seeking a summary judgment on the merits. Therefore, she must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm."

In her Motion, Plaintiff makes a weak attempt to avoid the policy's "Consumer Protection Exclusion"[2] which provides, in relevant part, that "[t]he Insurer shall not be liable under any purchased Coverage Part to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**: Based upon, arising out of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts** that violate(s) or is(are) alleged to violate any

---

[2] Plaintiff has not even addressed the other bases for the denial of coverage under the MAIC Policy. For example, the coverage letter attached as Exhibit "H" to the Motion, explained that "MAIC anticipates that for the same reasons detailed in the undersigned's letters dated February 22, 2023, May 12, 2023, September 5, 2023 and July 2, 2024 discussing the Florida, Massachusetts, Pennsylvania, Ohio, NC, NJ, Illinois, Colorado, Indiana, California, Missouri, and Georgia Actions, MAIC anticipates that coverage for the CID will similarly be precluded pursuant to the Endorsement titled "Exclusion – Broad Professional Liability." D.E. 18-8, p. 6 of 8. A copy of MAIC's January 10, 2023 Coverage Disclaimer letter is attached as **Exhibit "A"**.

federal or state consumer protection statute, law, rule, ordinance or regulation.…" D.E. 1-1, 61 of 73. Zachman lists seven "examples" of state claims that she contends fall outside of the consumer protection exclusion. D.E. 18, p. 8 of 22. However, on their face, each example clearly "aris[es] out of, or in any way involve[es] any **Wrongful Act** or **Interrelated Wrongful Acts** that violate(s) or is(are) alleged to violate any federal or state consumer protection statute, law, rule, ordinance or regulation."

In fact, the "examples" listed by Plaintiff in her Motion—as well as the exhibits attached thereto—further buttress the conclusion that the Consumer Protection Exclusion applies to bar coverage. The examples include "violation of Florida's lending limitations..."; "violations of its mortgage lending statutes…"; "violations of interfering with refinancing and reverse mortgages…"; "violation of statutory maximum interest rates for money loaned…"; "recording improper liens or void instruments"; "clouding title"; and "violations of statutes governing improper recording and slander of title." D.E. 18, p. 8 of 22. Accordingly, these examples plainly belie Plaintiff's contention that these laws are unrelated to consumer protection.

The allegations in the underlying lawsuits which are attached as exhibits to the Motion make crystal clear that the entire basis of the lawsuits filed by the various states is that MV Realty operated an ongoing consumer fraud and engaged in unfair and deceptive business practices. Indeed, the causes of action asserted against MV Realty allege numerous consumer protection statute violations. For example, the first paragraph of the Complaint for Injunctive and Other Statutory Relief filed by the Florida Attorney General states, "[d]efendants engage in a complex and deceptive scheme that attempts to skirt existing Florida law with the goal of swindling consumers out of their home equity." D.E. 18-4, p. 2 of 42. Likewise, the Complaint filed by the Attorney General of the State of New Jersey and the Acting Director of the New Jersey Division of Consumer Affairs asserts, "[t]he Attorney General and the Director commence this action to hold Defendants accountable for their unconscionable commercial practices, deceptive conduct and misrepresentations in the advertisement, offer for sale and sale of the HBP to consumers in New Jersey in violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -227, and the regulations promulgated thereunder…." D.E. 18-5, p. 3 of 56. Similarly, the State of Georgia through its Attorney General alleges "MV Realty uses this cash payment, which is in essence a promotion fee, to unfairly and deceptively lure consumers into signing an agreement that

contains one-sided and onerous terms that will result in consumers owing MV Realty many times the promotion fee and will bind consumers and potentially their heirs for 40 years." D.E. 18-6, p. 2 of 45. The State of North Carolina, ex. rel. Attorney General, filed a Complaint and Motion for Preliminary Injunction stating, "[t]he Attorney General's Office has received numerous complaints from North Carolina consumers who have been deceived and misled by MV Realty into signing a Homeowner Benefit Agreement." D.E. 18-7, p. 5 of 228. Further, the North Carolina Complaint requests that "the Court order Defendants to make restitution to their North Carolina consumers, as provided in N.C. Gen. Stat. § 75-15.1 and§ 24-2[.]" D.E. 18-7, p. 72 of 228.

On September 24, 2024, the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida entered partial summary judgment in the Florida Attorney General's favor as to liability and injunctive relief. *See* Order on Cross-Motions for Summary Judgment ("SJ Order"), attached as **Exhibit "B."** In its SJ Order, the Circuit Court included a detailed explanation of MV Realty's scheme:

> In October of 2018, MV Realty began marketing and implementing its Homeowner Benefit Program enticing homeowners with an upfront cash payment in return for an agreement to use MV Realty as their real estate agent should the homeowner sell their home in the future. MV Realty locked thousands of Florida homeowners into Homeowner Benefit Agreements ("HBAs"). Between 2018 and November 2022, Defendants executed approximately 9,303 HBAs with Florida consumers. Nationally, in the same period, Defendants and their subsidiaries originated 34,000 HBAs. The HBAs had a term of forty (40) years and provided that if a homeowner breached the HBA, MV Realty would be entitled to collect three percent (3%) of the market value of the property (the "Early Termination Fee"). The HBA also gave MV Realty the right to record in the public records a "Memorandum of Homeowner Benefit Agreement" (the "Memoranda") which MV Realty promptly recorded with county registrars in every instance without exception. The HBA also included a provision whereby consumers conceded the HBA constituted a covenant running with the land binding successors in interest in title.

Ex. A, ¶ 7 (citations omitted).

The Circuit Court explained in its SJ Order that ""Defendants hid, downplayed—or altogether omitted—the burdensome terms that made the HBA a virtually inescapable obligation to ultimately pay MV Realty at least 3% of the property's value knowing homeowners would be 'held over a barrel' at closing." *Id.* at ¶ 9. Further, …Defendants told consumers that in exchange for an immediate, up-front payment that would never need to be repaid, consumers were merely

giving MV Realty an opportunity to act as their real estate broker if they ever decided to sell their homes. Contrary to what the typical sales pitch suggested, the HBA was far more than just a simple promise to use a certain realty company exclusively in exchange for a cash payment or 'loan alternative.' Rather, the HBA severely restricted and hampered how consumers could tap or utilize the equity in their property absent [MV Realty's] express consent, and was designed to guarantee one way or another—that MV Realty would harvest 3% of the property's value." *Id.* The Circuit Court determined that "the HBAs and associated Memoranda are both procedurally and substantively unconscionable and thereby unenforceable." *Id.* at ¶ 14. Accordingly, the Circuit Court granted partial summary judgment in the Florida Attorney General's favor as to Count I. *Id*.

The Circuit Court similarly concluded the Florida Attorney General was entitled to summary judgment as to Count II, which alleged that MV Realty's telemarketing campaign was a *per se* FDUTPA violation. The Circuit Court explained record evidence established that: (1) MV Realty "misrepresented material aspects" of the HBA; (2) MV Realty failed to transmit its "telephone number and name to caller identification services used by call recipients"; (3) "MV Realty called consumers that previously stated that they do not wish to receive outbound telephone calls from MV Realty"; (4) "MV Realty called telephone numbers on the [Do Not Call ("DNC")] Registry without obtaining an express agreement to be called"; (5) "MV Realty initiated outbound telephone calls that delivered prerecorded messages to consumers who did not consent to receive such calls" or "do not recall" requests; and (6) "MV Realty failed to purchase access to the DNC Registry" for area codes into which MV Realty placed outbound calls. *Id.* at ¶ 16.

In addition, the Circuit Court granted summary judgment in part as to Count III of the Complaint, finding, *inter alia*, that "Zachman executed virtually every HBA into which MV Realty entered" and "personally responded to consumer complaints surrounding the HBA and Memoranda and managed brokerage services when necessary." *Id.* at ¶ 19.c. The Circuit Court concluded that "the evidence . . . demonstrates that each of the three Individual Defendants had the requisite involvement in the unconscionable acts and practices, so as to warrant the entry of summary judgment as to their liability." *Id*. at ¶ 19.

Based upon the foregoing, it is respectfully submitted that Plaintiff has not carried—and can never carry—her burden of establishing that the allegations against her are not "[b]ased upon, arising out of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts** that

violate(s) or is(are) alleged to violate any federal or state consumer protection statute, law, rule, ordinance or regulation ….." *See* D.E. 18-3, p. 61 of 73. As such, Plaintiff has not demonstrated that the Consumer Protection Exclusion does not apply to bar coverage under the MAIC Policy.

In sum, Plaintiff has not offered any authority or support to meet her heavy burden to establish that she is substantially likely to succeed on the merits. Accordingly, it is respectfully submitted that the Motion must be denied on this basis alone.

### 2. *Plaintiff Has Not Shown Irreparable Harm.*

Plaintiff argues that her "ongoing injury is plainly one that cannot be remedied through monetary means." D.E. 18, p. 13 of 22. In support of her contention that she will be irreparably harmed if her ongoing defense is not funded through the payment of the subject policies, Plaintiff relies on *Freedom Specialty Ins. Co. v. Platinum Mgmt. (NY), LLC, No. 653584/2016*, 2017 WL 6610417 (N.Y. Sup. Ct. Dec. 27, 2017), *Dupree v. Scottsdale Ins. Co.*, 96 A.D.3d 546 (N.Y. App. Div. 2012), and *Emons Industries, Inc. v. Liberty Mutual Ins. Co.*, 749 F. Supp. 1289 (S.D.N.Y. 1990). *Id.*, pp. 13-14 of 22. However, these cases are distinguishable and inapplicable here.

Specifically, in *Freedom Specialty Ins. Co.*, the insureds showed a likelihood of success on the merits. 2017 WL 6610417 at *3. Likewise, *Emons Industries* is distinguishable because it involved the insurer's interference with the insured's choice of law firm and the insurer's continued payment for the services of the law firm chosen by the insured. 749 F. Supp. at 1293. Additionally, in *Emons*, the court granted a prohibitive injunction—not a mandatory injunction like Plaintiff seeks here. *Id.* at 1295. It also bears mention that the court found that "Emons has presented evidence of its financial condition." *Id.* at 1293.

Here, as set forth above, MAIC has presented evidence demonstrating the applicability of several defenses and, therefore, is substantially likely to demonstrate that there is no coverage for the subject lawsuits. Additionally, Plaintiff has not provided any evidence sufficient to meet her burden to demonstrate irreparable harm. That is, Plaintiff does not demonstrate that she is in fact unable to pay defense costs for the pending cases. Instead, Plaintiff simply states that she "cannot fund a defense out-of-pocket exceeding hundreds of thousands of dollars." D.E. 18, p. 16 of 22. However, Plaintiff fails to include any support for her alleged inability to pay or for her statement that the defense will exceed hundreds of thousands of dollars. *See, e.g.*, *Daileader v. Certain Underwriters at Lloyd's London - Syndicate 1861*, 670 F. Supp. 3d 12, 38 (S.D.N.Y. 2023), *aff'd*

96 F.4th 351 (2d Cir. 2024) ("to demonstrate irreparable harm – an insured seeking a preliminary injunction requiring an insurer to pay defense costs must demonstrate an inability to pay defense costs absent payment from the insurer."); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (reversing preliminary injunction where "no witnesses or other evidence was submitted on the issue of irreparable injury"); *Jordan v. Def. Fin. & Acct. Servs.*, No: 8:15-cv-391-T-36TBM, 2015 WL 6166578, at *2 (M.D. Fla. Oct. 20, 2015) ("Because the Plaintiff has not presented any evidence that he is at risk of irreparable harm, his motion for preliminary injunction must be denied."); *McPeek v. Travelers Cas. & Sur. Co. of Am.*, No. 2:06-cv-114, 2006 WL 1308087, at *5 (W.D. Pa. May 10, 2006) ("some actual *evidence* of irreparable harm, *e.g.,* an affidavit, testimony or documents, is required to support a finding of irreparable harm in such a situation as this.").

Indeed, with respect to the irreparable harm criteria, the Motion states "Zachman's rights to mount a defense against these allegations and protect her reputation (and possibly her personal assets) would have been irreparably damaged by the unchallenged judgment." *Id.* at p. 15 of 22. This begs the question: why is Plaintiff unable to utilize said assets for the payment of defense expenses? Moreover, Plaintiff fails to mention that Endurance Assurance Corporation has already paid $1M of its Aggregate Limit if Liability towards Plaintiff's defense expenses under its policy. Case No. 9:25-cv-80761-DMM, D.E. 17 at p. 6 of 21. Further, as to Plaintiff's contention that an injunction would restore the status quo, as discussed above, an injunction would not maintain the status quo as it would require MAIC to immediately tender a defense to the Plaintiff or advance her defense costs.

Finally, it is significant that "mere litigation expense, even substantial and unrecoupable costs, does not constitute irreparable injury." *Miss. Chem. Corp. v. E.E.O.C.*, 786 F.2d 1013, 1018 (11th Cir. 1986) (quoting *Fed Trade Comm'n v. Std. Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)); *see also Allstate Ins. Co. v. Preston*, 842 F. Supp. 1441, 1445 (S.D. Fla. 1992) (denying injunction where "the only irreparable injury plaintiff has alleged is the litigation costs it will incur in defending the state court action"). *See also Grimshaw*, 2011 WL 13319574 at *2 (plaintiff's request for injunctive relief failed because "[a] harm is not irreparable if redress can be made through monetary damages, and it is exactly monetary damages that the [p]laintiff seeks here."); *Daileader*, 670 F. Supp. 3d at 33-34 ("Because financial harm alone is generally insufficient to

establish irreparable harm, litigation costs do not constitute irreparable harm for purposes of a preliminary injunction.") (citations omitted).

For each of these reasons, Plaintiff has not proven that she will be irreparably harmed absent injunctive relief.

### 3. *The Balance of Harms Does Not Favor Injunctive Relief.*

Plaintiff offers no authority to show that the balance of harm weighs in favor of injunctive relief. Plaintiff simply repeats her argument that "denying the injunction would subject Zachman to catastrophic personal and legal consequences, whereas Defendants would suffer little to no legitimate harm by paying what they contractually owe pending a final decision." D.E. 18, p. 16 of 22. As set forth above, Plaintiff has not adduced any evidence to support her extraordinary request.

Conversely, MAIC will be substantially harmed if the Court grants the requested relief because MAIC will be highly unlikely to recoup any amounts it is ordered to pay now should MAIC ultimately prevail on the merits. Accordingly, requiring MAIC to pay defense costs for which it is not liable, shows that the balance of harms favors MAIC.

### 4. *The Public Interest Does Not Favor Injunctive Relief.*

Finally, Plaintiff must demonstrate that the preliminary injunction would not be adverse to the public interest. Plaintiff dedicates a significant portion of her Motion to this element. Plaintiff argues that "[e]nforcing contractual promises and holding insurers to their obligations is itself in the public interest"; "the public interest in the underlying litigations is advanced by ensuring Zachman can participate and defend himself"; "multiple states' public policies strongly condemn the practice of insurers dragging their feet on defense obligations"; and "issuing the injunction furthers the public interest by sending a message that bad faith conduct will not be rewarded." D.E. 18, pp. 17-20 of 22.

Notwithstanding her contentions, Plaintiff has not demonstrated that there is a contractual promise that has been broken. These issues must first be litigated in this action. Further, issuing the mandatory injunction would not serve the public interest because, as the Attorneys General of the various states have shown, Zachman and MV Realty have preyed upon the unsuspecting public for years defrauding consumers out of millions (or tens or hundreds of millions) of dollars. An injunction, after all, is the quintessential equitable remedy. For Zachman to seek the aid of a court

of equity while contending that her application is not adverse to the public interest, shows that Zachman is willing to do or say anything to get her way—with the exception of accepting accountability for her own conduct.

## CONCLUSION

For each of the reasons set forth herein, Markel American Insurance Company respectfully requests that the Court deny Plaintiff's Second Amended Verified Expedited Motion for Preliminary Injunction and Memorandum of Law [D.E. 18].

DATED this 9th day of September 2025.

Respectfully submitted,

**KAPLAN ZEENA LLP**
*Attorneys for Defendant,*
*Markel American Insurance Company*
2 South Biscayne Blvd., Suite 3050
Miami, Florida 33131
Telephone: (305) 530-0800
Facsimile: (305) 530-0801

By: */s/ James M. Kaplan*
JAMES M. KAPLAN
Florida Bar No.: 921040
james.kaplan@kaplanzeena.com
KIMBERLY S. HEIFFERMAN
Florida Bar No.: 055996
kimberly.heifferman@kaplanzeena.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of September 2025, I electronically filed the foregoing document with the Clerk of Court via CM/ECF system, which will automatically send email notification of such filing to the attorneys of record.

By: */s/ James M. Kaplan*
JAMES M. KAPLAN