# EXHIBIT "A"

Page 1

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                    CASE NO.:  9:25-CV-80826-DMM

    AMANDA ZACHMAN, an individual, and MV REALTY PBC,
    LLC, a Florida limited liability company,

         Plaintiffs,

     vs-

     MARKEL AMERICAN INSURANCE COMPANY, a foreign
     corporation, and HOUSTON SPECIALTY INSURANCE
     COMPANY, a foreign corporation,

         Defendants.
     _____/
    MARKEL AMERICAN INSURANCE COMPANY, et al.,

         Defendants/Counter-Plaintiffs,

     vs-

    AMANDA ZACHMAN, MV REALTY PBC, LLC, MV REALTY HOLDINGS,
    LLC, ANTONY MITCHELL, DAVID MANCHESTER, DAVID REINER,
    STEVEN SCOTT, and DARRYL COOK,

         Counter-Defendants.
      _____/

        VIDEOTAPED
        DEPOSITION OF:  JESUS ENRIQUE CUZA

        DATE:           Monday, July 6, 2026

        TIME:           9:00 a.m. - 1:06 p.m.

        PLACE:          REMOTE PROCEEDING - FLORIDA
                        Miami, Florida 33131

        STENOGRAPHICALLY
        REPORTED BY:    VANESSA OBAS, RPR

Page 2

A P P E A R A N C E S:

KYLE HANKEY, ESQUIRE
OF:  AXS LAW GROUP, PLLC
     1054 31st Street, N.W.
     Suite 200
     Washington, D.C. 20007
     kyle@axslawgroup.com
     APPEARING ON BEHALF OF THE PLAINTIFF(s) and
     COUNTER-DEFENDANT(s)
     (Appearing via ZOOM)


PETER PRIETO, ESQUIRE
OF:  PODHURST ORSECK, P.A.
     2525 Ponce De Leon Boulevard
     Suite 700
     Coral Gables, Florida 33134
     pprieto@podhurst.com
     APPEARING ON BEHALF OF JESUS CUZA
     (Appearing via ZOOM)

JAMES MILLER KAPLAN, ESQUIRE
OF:  KAPLAN ZEENA LLP
     2 S Biscayne Boulevard
     Suite 3050
     Miami, Florida 33131
     james.kaplan@kaplanzeena.com
     APPEARING ON BEHALF OF MARKEL AMERICAN INSURANCE
     COMPANY
     (Appearing via ZOOM)

ALSO PRESENT:

     REAMON JADON, VIDEOGRAPHER
     MATT WEINSHALL, ESQUIRE

                     -  -  -

Page 3

I N D E X

PAGE

TESTIMONY OF JESUS ENRIQUE CUZA

DIRECT EXAMINATION BY MR. HANKEY                    6

CERTIFICATE OF OATH OF WITNESS                    127
REPORTER'S DEPOSITION CERTIFICATE                128
ERRATA SHEET                                     130

Page 4

E X H I B I T S

|  | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiffs' Exhibit Number 1 | Biography Page | 10 |
| Plaintiffs' Exhibit Number 2 | Engagement Letter | 17 |
| Plaintiffs' Exhibit Number 3 | May 2nd, 2022, e-mail | 41 |
| Plaintiffs' Exhibit Number 4 | April 29, 2022, memorandum | 42 |
| Plaintiffs' Exhibit Number 5 | February 18, 2022, e-mail | 60 |
| Plaintiffs' Exhibit Number 6 | February 21, 2022, draft letter | 61 |
| Plaintiffs' Exhibit Number 7 | Consumer Protection Subpoena Duces Tecum | 98 |
| Plaintiffs' Exhibit Number 8 | Florida subpoena | 101 |
| Plaintiffs' Exhibit Number 9 | Attorney General's Office Subpoena Duces Tecum | 108 |
| Plaintiffs' Exhibit Number 10 | Civil Investigative Demand | 115 |
| Plaintiffs' Exhibit Number 11 | Investigative Demand | 118 |

REPORTER'S NOTE:  Exhibits mentioned above were retained by Kyle Hankey, Esquire, at the conclusion of the deposition

------

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

------

Page 5

P R O C E E D I N G S

*********

THE VIDEOGRAPHER:  Good morning.  My name is Reamon Jadon, videographer.  We are now on the video record.

Please be aware the microphones are sensitive and can pick up whispering, private conversations, and cellular interference.  Please silence all cell phones or place them away from the microphone, as they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

We're here recording live as a remote proceeding for the video deposition of Jesus Cuza.  The time is 9:04 Eastern Time.  The date is July 6th, 2026.

Would all counsel please state their appearance for the record, and the witness will be sworn.

MR. HANKEY:  Good morning.  This is Kyle Hankey.  I'm counsel for the plaintiffs in this matter as well as the counter-defendants.

MR. KAPLAN:  Good morning.  Jim Kaplan.  I represent Markel American Insurance Company as the defendant/counter-plaintiffs.

MR. PRIETO:  Good morning.  My name is Peter

Page 6

Prieto of the law firm of Podhurst Orseck, and both myself and my partner, Matt Weinshall, are here on behalf of nonparty witness Jesus Cuza.

THE COURT REPORTER:  Okay.  Good morning, Mr. Cuza.  Please raise your right hand.

Do you solemnly swear or affirm the testimony you will give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THEREUPON

JESUS ENRIQUE CUZA

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MR. HANKEY:

Q.   Good morning, Mr. Cuza.

A.   Good morning.

Q.   Can you please spell your name for the record.

A.   It's Jesus, J-E-S-U-S, and Cuza is C-U-Z-A.

Q.   Mr. Cuza, where do you currently work?

A.   Holland & Knight.

Q.   And what's your title?

A.   I'm partner.

Q.   How long have you been practicing law?

Page 7

A.   I graduated in 1989.  Started working in 1989. I took the bar and passed it and was barred in 1990.

Q.   And you've been practicing law throughout since then?

A.   Yes, I have.

Q.   What are your areas of practice, Mr. Cuza?

A.   I do litigation.  Mostly commercial litigation.

Q.   Have you ever represented insurers in your practice?

A.   I -- yes, I have.  Insurers as opposed to insurance.

Q.   Which insurance companies have you represented?

A.   MetLife.

Q.   Any others?

A.   Right now, the one that I remember is MetLife. I'm sure that I have some others.

Q.   In what type of matters have you represented MetLife?

A.   The matter that I recall specifically had to do with a -- fraud claims filed by MetLife against individuals.

Q.   Have you ever represented an insurance company in a coverage dispute?

A.   Not that I can remember.

Q.   Have you ever represent- -- represented an

Page 8

insured in any type of matter?

MR. PRIETO:  You know, I'm going to -- Mr. Hankey, I'm going to object and instruct the witness not to answer.  I mean, this deposition is being taken -- and I don't want to make a speaking objection, but I think you asked for preliminaries.

You know, this deposition is being taken pursuant to a court order entered on June 12th of this year, Docket Entry 138, and it focuses with respect to your client on four issues -- four discrete issues.  And I have no problem you asking generally for background from Mr. Cuza, but now we're delving not only into what -- what kind of work he did and clients he represented but those that he did not.

So, you know, I will -- I'll give you some leeway, but this is beyond the scope of the Court's order.

MR. HANKEY:  Mr. Prieto, these are questions that are fair game for purposes of establishing the foundation for further questions that are within the scope of the Court's order.  So they are clearly within the scope of the order, and I'd ask you to reconsider your decision to instruct your client not to -- not to answer these questions.

Page 9

MR. PRIETO:  I'll let you go ahead with a few more -- a couple more questions on this topic, but I'm not going to -- I'm -- pursuant to the Court's order, I will not permit my client to say what -- what his experience is versus what it is not.

That's not -- that's not what we're here for.

BY MR. HANKEY:

Q.   Mr. Cuza, let's shift gears to a different topic.

Please describe your professional relationship with Mr. Tony Mitchell.

A.   The -- Tony and I started working together when he was at Peachtree.  And that dates back to the early 2000s, to the -- and since then, until probably -- I want to say August or September of 2023, I've represented either Mr. Mitchell or companies that Mr. Mitchell has been affiliated with.

Q.   Can you please list those companies for me.

A.   I can -- I could certainly mention some of them, but -- but I'm sure that there -- there are more.

The -- Peachtree, Imperial, MV Realty.  There are a number of companies -- right? -- that Tony has together with David Herring.  Ed Warburg, he's one that comes to mind.  Tim Reyes is another one that comes to mind.  And, again, I'm sure that there are others, but

Page 10

they're the ones that I remember right now.

Q.   Do you have any current clients that you've represented longer than you've represented Mr. Mitchell or any of his companies?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

MR. HANKEY:  Again, it's foundational.

MR. PRIETO:  Mr. Hankey, with all due respect, you're way beyond the foundational questions that you should be permitted to ask for the purposes of this particular deposition.

(Plaintiffs' Exhibit Number 1, Biography Page, was marked for Identification.)

BY MR. HANKEY:

Q.   Mr. Cuza, I'm going to show you what I've marked as Exhibit 1 of this deposition.  Stand by as I place it on the screens.

Mr. Cuza, are you able to see the PDF that I've displayed on the screen?

A.   I can -- yes, I can see it through the -- if you could make it bigger, that would be good.

Q.   Are you able to read the words?

A.   Yes.

Q.   Does Exhibit 1 appear to be the biography page from your website?

Page 11

A.   Is it the current one?  I -- I don't know. The -- apparently, it appears to be.

Q.   Does it appear to be at least one version of it, Mr. Cuza?

A.   It certainly appears to be, but --

Q.   I'm showing you the list of representative matters on your bio.

Do you see at the bottom of the list where it says "represented former officers and board members of companies that have been investigated by the federal government"?

A.   Yes.

Q.   Was that a matter with Mr. Mitchell?

MR. PRIETO:  You can -- you can -- let me just instruct you.  You can limit it only to Mr. Mitchell.  Anything else, I will instruct you not to answer.

THE WITNESS:  The -- in -- I don't -- I can't answer that because the other matters come to mind. The -- this matter does not involve Mr. Mitchell.

BY MR. HANKEY:

Q.   I'm showing you the second paragraph of Exhibit 1 where it reads "Over the last 26 years, Mr. Cuza has represented numerous prestigious and well-known individuals and private and public companies

Page 12

as lead counsel in civil actions filed in Florida, Puerto Rico...."  And then it goes on to list a number of states.

And then it says "Mr. Cuza has also been in charge of matters being handled in the United Kingdom, Canada and Spanish-speaking jurisdictions such as Colombia, Dominican Republic, Honduras, Nicaragua and Costa Rica."

Do you see the paragraphs that I just read from, Mr. Cuza?

A.   Yes.

Q.   Was the UK matter referenced here Mr. Mitchell?

A.   Certainly there have been UK matters representing Mr. Mitchell or parties affiliated.

Q.   And did you represent Mr. Mitchell's companies in Canada?

A.   I don't recall if we handled certain matters for Mr. Mitchell or Mr. Herring in Canada.  Mr. Herring lived -- lived or lives in Canada.

Q.   How about in Nicaragua?

A.   Nicaragua is a matter involving a company that Mr. Herring was an investor.

Q.   Was there one involving a company in California?

A.   Are -- are you asking have I represented

Page 13

parties affiliated to Mr. Mitchell in California?

Q.   Yes.

A.   Chances are that we have.

Q.   Mr. Mitchell and his companies, they were one of your most important clients; is that correct?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   And Mr. Mitchell, in particular, he's one of your most important clients; is that correct?

MR. PRIETO:  Objection.  Same instruction.

BY MR. HANKEY:

Q.   Mr. Cuza, did you have a personal friendship with Mr. Mitchell?

A.   I absolutely did.

Q.   Do you still consider him to be a friend?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

MR. KAPLAN:  What's the grounds, Peter?

MR. PRIETO:  It's beyond the scope of the order.  This order is a very limited order, Mr. Kaplan, as you know.  And we're -- I don't know why we're spending so much time on this topic.  But you're -- you're free to spend the 3 1/2 hours however you wish, but I will not permit our client

Page 14

to answer questions that are beyond the scope of the Court's order.

MR. KAPLAN:  We're 12 minutes into the deposition, a bulk of it being involved in colloquy and objections initiated by you.  This is an innocuous question, and it's a follow-up to the question that he previously answered.

MR. PRIETO:  Mr. Kaplan, if the --

MR. KAPLAN:  So the rest --

MR. PRIETO:  -- witness is asked -- are you finished, Mr. Kaplan?  I don't mean to interrupt. And I don't mean to, but I will not permit the witness to answer any questions that are beyond the scope of this order, which is very narrow and very limited as to what the witness can say.

MR. KAPLAN:  We disagree about what's beyond the scope of the order.  You're limited in your ability to instruct the witness not to answer to grounds of privilege.  If you persist, you're running the risk that we terminate the deposition and seek a ruling.

This is background matter, so I don't want to get into it too deeply, but only as to the substance.  That's going to be our position.

So are you going to allow the witness to answer

Page 15

the question?

MR. PRIETO:  The last question?

MR. KAPLAN:  Yes.

MR. PRIETO:  No, I will not, based on the Court's order.

MR. HANKEY:  Okay.  I'll continue asking questions.  Mr. Prieto, these are foundational questions.  They are allowed on that basis, but you're free to object.  And then we'll --

MR. PRIETO:  Mr. Hankey, I understand.  I do not believe -- I think they go beyond the foundation, but -- and background, but, again, we'll go question by question.

BY MR. HANKEY:

Q.   Mr. Cuza, how long have you known Mr. Mitchell?

A.   I met Mr. Mitchell -- again, when I started working for Mr. Mitchell, the first litigation involving Peachtree -- over 20 years.  So early 2000s.

Q.   And for how long have you been personal friends with Mr. Mitchell?

A.   He -- Mr. Mitchell and I became friends soon after we started working together.

Q.   Do you consider Mr. Mitchell to be an honest person?

MR. PRIETO:  Objection.  I'll instruct the

Page 16

witness not to answer.

BY MR. HANKEY:

Q.   Mr. Cuza, was Mr. Mitchell forthcoming to you as a client?

MR. PRIETO:  Same objection.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   Same grounds for asking.

Mr. Cuza, do you make it a practice to instruct your clients to be forthcoming to you as a condition of your representation of them in -- in their matters?  I'm talking about general practices.  I'm not asking for specific attorney-client communications.

Is that a general practice of yours?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer based on the Court's order.

BY MR. HANKEY:

Q.   Mr. Cuza, do you recall a time when Mr. Mitchell was not forthcoming to you as a client?

MR. PRIETO:  Same objection.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   Mr. Cuza, do you recall a time when the -- your client, MV Realty, was not forthcoming to you as a client?

Page 17

MR. PRIETO:  Same objection.  I'm instructing the witness not to answer based on the Court's order.

BY MR. HANKEY:

Q.   Mr. Cuza, do you believe that MV Realty provided all the information you needed in order to conduct your representation of MV Realty when it was your client?

MR. PRIETO:  Same objection based on the Court's order.

(Plaintiffs' Exhibit Number 2, Engagement Letter, was marked for Identification.)

BY MR. HANKEY:

Q.   Mr. Cuza, I'm showing you what I've marked as Exhibit 2.  Take a minute to look at this exhibit.  I'll blow it up.

Is that large enough for you to read it, Mr. Cuza?

A.   Yes.

Q.   Can you identify Exhibit 2 for me, please.

A.   Yes.  It's -- it's an engagement letter signed by me, dated November 13th, 2018, and addressed to Anthony Mitchell as CEO of MV Realty PBC, LLC.

Q.   And I couldn't quite hear you there.

What was the client identified in this letter?

Page 18

A.    MV Realty PBC, LLC.

Q.    Thank you.

Mr. Cuza, first of all, what's the date on this letter?

A.    November 13th, 2018.

Q.    Is this the initial engagement letter with MV Realty?

A.    I -- I wouldn't -- I wouldn't know.

Q.    You don't know if this is the first engagement letter between Holland & Knight and MV Realty?

A.    And that, I can't remember.

Q.    Now, do you see in this letter that you agreed to represent MV Realty PBC with respect to its general, corporate, and regulatory matters?

A.    Yes.

Q.    Can you please describe the general corporate work that you did for MV Realty.

A.    At the beginning, when we started working with Tony and -- and I believe Jonathan Neuman, he was part of it early on.  It all had to do with renewing a business that they had ongoing.  The -- and Tony and Jonathan were -- to my understanding -- and I never knew the details of this.

Tony and -- and Jonathan were partners, co-owners with other parties.  One of them,

Page 19

Mr. Schiff -- the -- so initially when they -- they called me is to work on matters regarding that business that they had and market them.

The -- what was the initial matter is that we dealt with specifically, you know, that.  I can't recall specifically what it started with.  The -- I remember having conversations with Tony and Jonathan about a potential dispute with Mr. Schiff, and that ended up in -- in litigation.

We also reviewed the -- the agreement that they had in place.  The -- I think it was called the opti agreement, but that's how it starts.  The -- now, it starts with Tony and Jonathan calling to ask questions about the program that they had ongoing.  We had --

Q.   Could you reidentify the name of that agreement.  I didn't hear the first word.

A.   I think that there's a -- there's an agreement that they were working with, and I think it's -- it's opti-something.  The -- but I don't specifically remember the name, but it's a -- it's titled.  I think it's opti-something.

Q.   Was there an agreement within the MV Realty business called the homeowner benefit agreement?

A.   That's a -- the HBA is something that starts with that agreement that I'm mentioning.

Page 20

Q.   Okay.

A.   And then it -- eventually, it becomes where it's worked on, and then it becomes the --  the HBA.

Q.   So let's see.  You've covered the initial part of Holland & Knight's representation of MV Realty.

Can you take us to the next phase of the representation and describe what corporate or regulatory matters Holland & Knight handled for MV Realty.

A.   The -- I can tell you -- what I'm going to tell you is based on the general recollection.  The -- clearly, there are time sheets; right?  So if you want to know the work that we did for MV, the place -- the best place to go is just go to our time sheets, you know.

The -- the -- but if you want to -- if you want to structure it kind of in phases of sorts, my -- my recollection is that it starts with the matters regarding this agreement that I'm mentioning.  My recollection is that at some particular point in time -- I think it's early on.  It might have been a little bit later.  But I think it was early on.

There were the disputes -- the differences with Mr. Schiff.  The -- then we started working on what eventually became the HBA, which, again, it starts with this agreement that I am mentioning.  The -- as a result

Page 21

of our involvement, there were initially -- as I recall, there were four individuals that got involved, including myself.

There was research done. There were some modifications to the document. Eventually, it was named the HBA. I think -- I think that Jonathan Neuman is the one that came up with the name. The -- I remember there being conversations with agencies in Tallahassee, and for that, we involved one of our attorneys in Tallahassee that had to do with the HBA.

I also remember at some point in time there were some complaints that were received. The -- I don't remember if it was specifically to MV or if it was against some of the people that were working at MV via the -- we handled those complaints. They -- they were not litigation. They were administrative matters.

And I also remember that there were issues with the real estate association. I don't know what the name is. I don't recall what the name is. And there were -- there was -- I remember at least one area that we as a firm handled. The -- initially, it was all Florida.

So -- but initially the work that we did before they started expanding, it -- it was -- it was focused on -- on Florida. The -- there were a lot of conversations regarding the -- the program and what is

Page 22

it that Jonathan and Toni wanted to see in the program.
The -- the -- Jonathan was more vocal than Tony.  Tony
was involved, but Jonathan was the one that was pretty
much directing what is it that they wanted to see as
part of the program.

Q.   And what were those things that -- strike that.

You said the name Jonathan.  What's Jonathan's
last name?

A.   Neuman.  Jonathan Neuman.

Q.   And what were the things that Jonathan Neuman
and/or Tony Mitchell wanted to see in the program that
you're referring to?

A.   So the -- the things that come to mind, the --
the 40-year pro- -- the years -- right? -- so the term
of the program.  The -- yeah, my recollection is that
that was certainly discussed.  The -- the -- so that's
one aspect.  The -- there's no question that the other
issue wasn't an issue for it because it's really topics.

The starting point -- right? -- one has to go
back and look at the agreement that I am mentioning that
we start; right?  So you would look at -- look at that
agreement, and then we would work on the agreement.  And
then that's how we end up with the -- with the HBA.

The -- obviously, every single provision in
that agreement was discussed; right?  Yeah.  And I'm

Page 23

talking about initially; right?  I'm talking about the initial phase when we got involved.  That's what I mean by "initial phase," which is after that they were running their business.

Q.   You referred to "that agreement" at the end of your answer.  Which agreement were you referring to, Mr. Cuza?

A.   Remember, they start the -- what I call the opti agreement -- I don't know what -- if you can get me the name so we can use the right name, that would be wonderful.  We start with they have a business of -- a running business; right?

They come to us; right?  We start advising them on matters regarding the business.  The -- including working on what became the HBA back then, because the HBA was amended as a result of requirements by third parties.

So, yeah, I think I answered your question.  If I haven't, please let me know.

Q.   So, then, Mr. Neuman was particularly vocal about certain topics.  Was he vocal about the 40-year term topic?

A.   There's no question that the 40-year term -- right -- I don't remember.  This is why I don't remember it.  And one would have to go look at a -- I'm working

Page 24

in motions.

I don't remember what years that they wanted to start with -- right? -- but there's no question that the period of time was looked at.  There's also no question that there was more work done -- research.

MR. PRIETO:  Okay.  I'm just going to --
Mr. Hankey, I'm going to let the witness answer this question, and then -- you know, we're going, again, beyond the scope of the Court's order.  And I don't want the argument to be "Well, Mr. Cuza volunteered this information; therefore, I can follow up."

But I'm going to let the witness answer this question, but I want to make clear that the order says the Court will not permit the parties to ask the two attorneys their opinions as to whether the plaintiffs violated any law or regulation, made any misrepresentations, or acted knowingly and willfully.

So with that caveat, I'm going to let him finish that question, and then we can go on to the next question.

THE WITNESS:  Is it okay to answer?

MR. PRIETO:  Sure.

THE WITNESS:  The -- so your question was about the 40-year.  There's no question like that.  The --

Page 25

a period of time was discussed.  I don't remember if they wanted -- how long -- I don't remember the details, but, again, I suspect there's going to be confrontation on this.

The period of time was discussed.  Research was done --

MR. PRIETO:  Well -- but -- so listen.  I'm just going to instruct you not to discuss anything that were -- any opinion or advice that was given as to whether the law was valid or not valid, lawful or not lawful -- any provision was lawful or unlawful.

THE WITNESS:  Understood.

MR. HANKEY:  I agree.

MR. PRIETO:  That's per the Court's order.

MR. HANKEY:  Sorry to interrupt.

MR. PRIETO:  That's what I think.

BY MR. HANKEY:

Q.   I agree.  We're not asking for that.

What -- Mr. Cuza, all that I've been following up on is you said that Mr. Neuman was particularly vocal about certain topics related to the initial corporate work, and I'm following up on that statement.  I want to know which topics you were referring to in that answer.

MR. PRIETO:  And that's -- we'll move on.

THE WITNESS:  When I use the word "vocal" --

Page 26

right? -- so let's -- what I mean is Jonathan is the one that's pushing things.

BY MR. HANKEY:

Q.   Right.

A.   The -- the -- the -- Jonathan is the one that has an agenda, whether -- Jonathan has an agenda. Jonathan pushes it, if you will, his agenda.

The -- the -- but in terms of -- again, with- -- without getting into what Mr. Prieto told me I can get into, in terms of the process, no question -- right? -- there were discussions.  No question there was research done.

And -- and so I think with regards to the instructions that I have, that's as much as I can tell you.

MR. HANKEY:  Okay.  So, Mr. Prieto, you're -- are you instructing your client not to answer the questions on which topics Mr. Neuman was vocal about?

MR. PRIETO:  Yes, Mr. Hankey.  I mean, again, I don't want to bela- -- I don't want to beat a dead horse.  But I have the order in front of me, and this order is very limited.

So, yes, I'm instructing the witness not to answer.  Because I think he's already answered most

of that question anyway.  So I'm instructing the witness not to answer any further questions about what Mr. Neuman was vocal about or was not.

BY MR. HANKEY:

Q.   Mr. Cuza, the engagement, you said, related to both general, corporate, and regulatory matters.  What does regulatory matters encompass in that engagement scope?

A.   So back then the -- you know, we were looking at matters regarding -- it -- it was specifically regarding, obviously, the agreement and their business.  And the -- like I mentioned -- right? -- there were calls with agencies -- state agencies in Tallahassee.

The -- that -- that's as much as I can tell you right now, because I can't --

Q.   Is there any --

A.   And I'm not -- but, Mr. Hankey, I am --

MR. PRIETO:  There's no question pending, although I think he's about to ask another one.

THE WITNESS:  Go ahead.

BY MR. HANKEY:

Q.   Was there any limitation on what Holland & Knight's representation as to regulatory matters would encompass?

A.   The issues that we were dealing with were the

Page 28

issues that we got trapped, so -- but the -- are there any limitations?  Yeah, of course, there is; right?  So there are regulatory matters that we didn't handle -- right? -- that did arise -- right? -- where they worked with other firms.

So the -- the -- what we're talking about is, you know, with regards to that letter -- right? -- or the general, corporate, and regulatory matters that we were handling at that particular point in time. Would/could -- and any new issues he added, the answer is yes.  We didn't -- we didn't handle all the issues for it.

And we did -- there's no question that we did represent and be a -- on a number of matters.  There's no question that issues that they would bring to us -- right? -- we would handle, but they were -- we weren't the only firm that was representing them.

Q.   And at that time, back in 2018, what issues that could be brought to you were foreseeable given your understanding of the business at the time?

MR. PRIETO:  Objection.  Instructing the witness not to answer.

MR. HANKEY:  Again, it's foundational, Mr. Prieto.

MR. PRIETO:  Mr. Hankey, you've been almost an

Page 29

hour asking foundational questions.  That's not reasonable.

And, again, your questions are beyond the scope of this order.  I don't mean to be difficult, but the order says what it says.  And, remember, this is not a party who's being deposed.  It's a third-party non- -- it's a nonparty witness in this case in an insurance coverage dispute.

MR. HANKEY:  Mr. Prieto, I'm trying to get through my foundational questions, but your objections are taking up over half the time -- of the time we've taken.  And the longer that you go at this, the more time that will be taken up and the more time we'll have to request from the Court later for a subsequent session with Mr. Cuza.

MR. PRIETO:  All I'm saying, Mr. Hankey, is, if you ask the right questions pursuant to the Court's order, I would permit the witness to answer it.

MR. KAPLAN:  I'll keep this brief.

If we keep going, I think, Peter, there's going to be a motion.  We're going to look to bring the witness back.  You're taking the Court's order, and you're using it to the cut shot.  You're stretching it beyond the breaking point.

MR. PRIETO:  I'll be shorter.

Page 30

Mr. Kaplan, I disagree with you, with due respect.

MR. KAPLAN:  I appreciate you being short. Let's continue.

BY MR. HANKEY:

Q.   Mr. Cuza, the time that the engagement letter was signed by you, what regulators did you foresee dealing with?

A.   Like -- like I -- I mentioned, yeah, early on we were a -- we were working things out.  What I fore- -- I need to correct it.  I need to make sure that you understand.

It's not about foreseen.  It's what we're dealing with at that particular point in time; right? So one has to go back in time.  One has to go back to November 13th, 2018, and look at the specific issues that we're dealing with at that particular point in time; right?  Specific issues that we were dealing with at that particular point in time; right?

The -- number one, they're going to be in the time sheets; right?

And, number two -- right? -- the people that we contacted and that we worked with in terms of regulators -- right? -- the -- it's going to be explained, if you will, or it's going to become obvious

Page 31

from the documentation.

So it's not about foreseen.  It's what is it that we're actually doing at that particular point in time?  And I assume that you know this, Mr. Hankey, but the -- when they come to us, like I mentioned -- right? -- they already had an ongoing business.  The -- they have -- they already had an ongoing business -- right? -- where they had clients.

They had an agreement.  People advised them on that ongoing business.  And -- and I don't know -- I don't know that I even ever asked.  The -- but there's no question -- right? -- the -- in terms of general, corporate, and regulatory matters -- right? -- we were addressing at that particular point in time.

Number one, it had to do with Florida.

And, number two, there were -- let me give you an example.  There was an issue that had to do with as to whether the agreement fell within the -- what would be a real estate transaction.  And we dealt with that issue.

The -- the -- and -- so what -- Mr. Hankey, whatever issues we dealt with, these are the ones that I -- that I remember, you know, but I am -- there's no question that they're going to be documented.  But the ones that I remember, I -- I covered.

Page 32

Q.   So when you say that "There's no question that they're going to be documented," what do you mean by that, Mr. Cuza?

A.   Mr. Hankey, there's going to be our time sheets; right?  They're going to be -- right? -- our communications with the -- the agencies or the governmental entities that we were dealing with.

Q.   When -- so would you say, Mr. Cuza, that your time entries describe the work that you performed for MV Realty?

A.   I would say that our time entries generally describe the work that we performed.  And, again, remember, it's -- it's -- it's my time entry and then the others that I actually worked on.

Q.   Would there have been any work that you personally did for MV Realty that would not be reflected in time entries?

A.   I -- I -- I don't -- and, again, we bill for our time; right?  So the -- I would think that it's there, but you're asking me a question that's almost impossible to answer.

Q.   And is -- why is that question impossible to answer?

A.   Because you're asking me to -- literally to verify if every time sheet that I issued fully describes

Page 33

everything that we did or didn't do.

Q.   Based on your general practice, do you feel confident that the vast majority of the work that you did for MV would be captured in your time entries?

A.   I -- I feel that in -- comfortable that we generally describe -- I generally describe in my bills what I do, so the answer is yes.  If you want to know what I did, the best place to go would be my time sheets.  And, obviously, I have to review them to refresh my recollection to be specific about whatever's in the time sheets.

Q.   Mr. Cuza, did Holland & Knight ever limit the scope of its representation of MV Realty?  In other words, were there certain scopes of advice that Holland & Knight explicitly decided it was not providing to MV Realty?

MR. PRIETO:  Objection.  Beyond the scope of the Court's order.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   Mr. Cuza, was it your understanding that MV Realty was hiring Holland & Knight to ensure that its business practices were completely legal?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer pursuant to the Court's order.

Page 34

BY MR. HANKEY:

Q.   Now, Mr. Cuza, I just want to finish up these preliminaries with some questions about your general practices of representing clients at MV Realty.  And let's -- let's focus specifically on MV.

When you communicated something important to the MV Realty client, how would you typically do that?  Would you do it by e-mail? memorandum? phone call?  What was your general practice with MV?

A.   It's impossible for me to answer that question.

Q.   And why is that question impossible?

A.   Because I need to -- you're asking me to give a spec- -- right?  You want to ask me a specific question about a specific fact, I'm happy to answer.

Q.   Well, Mr. Cuza, I'm asking about your general practice, which is something you should be familiar with.  It's not asking for speculation.

So, again, my question is, When you impor- -- communicated something important to the MV client, how would we -- you typically do it based on your general practices with the client?  Would you do that by e-mail --

A.   And I'm telling you -- I'm telling you the -- I cannot be specific unless we're talking about a specific incident; right?  I can absolutely tell you -- right? --

Page 35

the dictations and the dialogue that I have with my clients are pretty open, but in -- how am I going to be communicating (a) with clients?  It's -- it depends.  It depends on -- on what's happening at that particular point in time.  It depends on the relationship.  There are so many variances.

Q.   What are the different ways that you did communicate important matters to MV Realty?

A.   I've -- so I -- Tony Mitchell and I conversed a lot.

Q.   Conversed outside of --

A.   Tony --

Q.   -- communication?  Is that what you mean?  What do you mean by "conversed a lot"?

A.   Tony with me -- Tony and I would speak almost on a -- probably almost on a daily basis.  And, like, Tony and I would text constantly via -- there's no question that we would send e-mails as well, you know.  The -- the -- so you have those three forms of communications, and Tony and I -- we met pretty frequent.  That's still after COVID, but certainly frequent.

Q.   If you had advised MV Realty about a significant risk of litigation on the horizon, would you expect that advice to be reflected somewhere in your

Page 36

file?

MR. PRIETO:  Objection.  I'm going to instruct the witness not to answer per the Court's order.

MR. HANKEY:  On what specific part of the Court's order, Mr. Prieto?

MR. PRIETO:  On the paragraph that says "However, the Court will not permit plans for any other party to seek a -- obtain opinion testimony from the two attorney deponents, as they are merely fact witnesses to the limited factual issues permitted by the Court.

"And as the Court will not permit the parties to ask the two attorneys their opinions as to whether the plaintiffs violated any law or regulation, made any misrepresentations, or acted knowingly and willfully.  The two attorneys are merely fact witnesses to very discrete and limited issues in this insurance coverage dispute."

MR. HANKEY:  Mr. Prieto, I think you misunderstood my question.  The order permits questioning about what Holland & Knight advised MV regarding the claims from the regulatory body -- so the AGs -- prior to August 28, 2022, and a number of other matters related to those claims.

So I'll ask the question again in case you

Page 37

misunderstood it, Mr. Prieto.  I wasn't asking for any opinion.

BY MR. HANKEY:

Q.   Mr. Cuza, it -- when you and the other lawyers at Holland & Knight advised MV Realty about important matters related to upcoming litigation, would that advice be reflected in Holland & Knight's files somewhere?

A.   So, Mr. Hankey, this is a perfect example; right?  I don't remember -- right?  I don't remember us becoming involved in a lot of litigation involving MV; right?  So MV had counsel; right?  For example, Florida. MV had counsel in Florida -- right? -- that was the one that was to be handling the litigation.

The -- the one thing that we did -- one of the things that MV was doing that we told them they had to stop doing that -- right? -- had to do with filing lawsuits, filing lis pendens, and then not serving their clients.

We specifically told them, if they're going to file that lawsuit, they're going to file a lis pendens. They have to serve the clients.  Their response was, among other things, they didn't want to serve the client because they didn't want to spend the money.  We told them, and they would rely on -- right?  Under the Rules

Page 38

of Civil Procedure, you have X amount of time to serve the clients, of course.

And we told them if they're not going to serve the clients, at a very minimum, they have to send a letter that the client knows that they're suing the client, and they're filing the lis pendens.  You will see -- right? -- that they start suing clients.  They don't serve clients; right?  We learn about it, not because we're involved in the litigation.

And we drafted a letter for them to use.  And at that particular point in time, the -- I think that they were using it, but that's something -- you know, once again, that the -- those that were representing MV in the -- in the MV litigation, and I think one internally would know the details, but I do think -- like, I'm not sure.  I do think that they started using the letter afterwards.

Q.   I'm sorry.  I missed that last part.

You do think that they started --

A.   What I said is -- I'm -- Mr. Hankey, we've -- I said I think they started using the letter, but we're not involved there in the operational part.

And, once again, you mentioned litigation; right?  We did represent MV.  The -- I recall at least one litigation.  The -- in fact, I -- I recall at least

Page 39

two litigations.  The -- but we weren't representing MV on -- on litigation matters all the time.  And so the -- but there's no question we did represent MV on some litigation.

Q.   So let's -- let's stick with that example of your advice regarding filing lawsuits and lis pendens without serving clients.

Would you expect that advice to be reflected somewhere in Holland & Knight's file as it relates to the MV matter?

A.   And that's what I'm telling you.  I don't remember -- right? -- is there a memo; right?  The -- behind -- I -- I have to believe -- right? -- the -- that that's a conversation that I would have had -- right? -- with Tony and specifically with Jonathan as well; right?  I was always trying to push the envelope and -- and then play with a gray line.  The -- the -- but is it going to be in writing, Mr. Hankey?  I don't -- I don't remember.  Possible, possible not.

But what I will tell you is in -- we did draft a form letter, if you will.

Q.   And approximately when did that advice occur?

A.   I'm going to have to go back and look at -- look at the documents.

Q.   Is that because you don't recall?

Page 40

A.   Oh, yes.  Yes, of course.

Q.   And you -- you testified that Mr. Neuman was -- I can't recall the specific words.

A.   Always trying to push the envelope.

Q.   Always trying to push the gray line or -- what did you mean by that testimony, Mr. Cuza?

MR. PRIETO:  And I'm just -- look, again, this is beyond the scope of the Court's order.  I'm going to instruct the witness not to answer.

MR. HANKEY:  Mr. Prieto, now we're getting into -- not only -- this is not only foundational, but this goes to Mr. Cuza's potential for bias as it relates to this proceeding and this testimony.  And so it's a completely fair area to -- to press into and explore both for purposes of understanding potential areas of bias and also for purposes of potential cross-examination if it becomes necessary.

MR. PRIETO:  I stand on my objection and instruction.

MR. KAPLAN:  So, Kyle, I don't know how useful it's going to be to continue in lieu of these objections.  I would be in favor of suspending and seeking a ruling.  And depending upon how the Court rules, we'll bring Mr. Cuza back another time.

MR. PRIETO:  You do as you wish.  We've been

Page 41

here an hour now.

MR. KAPLAN:  I wasn't speaking to you.

MR. PRIETO:  I'm sorry?

MR. KAPLAN:  I wasn't speaking to you.  I was speaking to Kyle.

MR. PRIETO:  Do as you wish, but we've been -- we've been here an hour.

MR. HANKEY:  Why don't we -- let's go off the record, please.

THE VIDEOGRAPHER:  We are off the record at 10:01.

(Thereupon, a recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER:  We are on the record at 10:15.

MR. HANKEY:  Thank you.

(Plaintiffs' Exhibit Number 3, May 2nd, 2022, e-mail, was marked for Identification.)

BY MR. HANKEY:

Q.   Mr. Cuza, I'm going to ask you about a document that I've marked as Exhibit 3.

Do you see an e-mail from Rebecca Canamero to John Neuman, S. Scott, Antony Mitchell, and copying you on it?

A.   Yes.

Page 42

Q.   May 2nd, 2022?

A.   Yes.

Q.   And do you see where it reads "As requested, please find attached a summary of the work currently being performed by HK related to MV"?

A.   Yes.

(Plaintiffs' Exhibit Number 4, April 29, 2022, memorandum, was marked for Identification.)

BY MR. HANKEY:

Q.   I want to take us to what I'm marking as Exhibit 4.

Do you see a memorandum, dated April 29, 2022, regarding a summary of current work by HK?

A.   Yes.

Q.   Let me give you a moment to look at this, Mr. Cuza.  And let me know when you either want me to scroll through it or when you're ready.  I'm going to be asking you about Item Number 1, which is titled "Regulatory Matters," and I will also ask you about miscellaneous matters.

MR. PRIETO:  Would you blow it up a little bit, please.

MR. HANKEY:  Yes.

MR. PRIETO:  And, Mr. Hankey, just for the purposes of clarification, Exhibit 3 is a cover

Page 43

e-mail that has Exhibit 4 attached?

MR. HANKEY:  That is correct, Mr. Prieto.

MR. PRIETO:  Thank you.

BY MR. HANKEY:

Q.   Mr. Cuza, will you let me know when you're ready.

A.   Yes.

Q.   Okay.

A.   So what is going to be your question?

Q.   I'm sorry?

A.   You can go ahead and ask.

Q.   Who drafted this memorandum?

A.   It was drafted -- and it would probably be on the same thing.  I can't tell you who drafted it.  I think it's a -- it was certainly Rebecca.  And it wasn't -- but they made effort.

Q.   I'm sorry.  Mr. Cuza, sometimes you're trailing off at the end, so I have a hard time understanding you.

Can you just repeat your last answer.

A.   Correct.  I said I can't tell you specifically who drafted the document, and there's no question that Rebecca knew -- that Rebecca was involved, but it -- in the -- in preparation of the document.

Q.   And would you have been involved in either drafting or reviewing this prior to its issuance?

Page 44

A.   And I -- without remembering specifically, he -- highly likely that I -- I would be.

Q.   I want to go through this first section of it, titled "Regulatory Matters," and ask you some questions about it, Mr. Cuza.

A.   Okay.

Q.   It starts by saying "Holland & Knight is currently assisting MV with regulatory matters and complaints, both on a defensive and proactive basis."

Do you agree with that statement?

A.   That's what it says, yes.

Q.   Do you agree that that statement is true or was true?

A.   The -- the answer is yes.  The answer is yes. Again, you have to --

MR. PRIETO:  You've answered the question.  Let Mr. Hankey ask the next question.

BY MR. HANKEY:

Q.   Okay.  When that statement says that "Holland & Knight is assisting MV with regulatory matters and complaints on a defensive and proactive basis," what does mean in that context to be defensive, and what does it mean to be proactive?

A.   Without remembering specifically -- right? -- the -- I assume that defensive means working on matters

Page 45

relating where there have been complaints.  The proactive basis had to do with taking steps to present to the defense a state attorney's officer at the attorney general's office the program, which would be done by Stephen Cobb and Jim Schultz, and Tony participated in that as well.

Q.   Do you see the next sentence that reads "Holland & Knight" -- or "HK is facilitating meetings and conversations with attorneys general throughout the country, for S. Cobb and J. Schultz (and is involved in preparing the client for such meetings and any materials that need to be gathered or reviewed)"?

A.   Yes.

Q.   Do you agree that that statement was true?

A.   Yes.

Q.   Who are S. Cobb and J. Schultz?

A.   At the time, they were two partners at the firm.  Stephen was, I think, in the D- -- D.C. office. I'm pretty sure he was in the D.C. office.  And then Jim Schultz was in the Delray office.

Q.   And what were their roles in connection with Holland & Knight's representation of MV Realty?

A.   They worked on matters regarding attorney generals' offices and, basically, some of the investigations.  They got involved in assisting MV

Page 46

during those investigations.

Q.   Mr. Prieto, prior to Holland & Knight sending its bills to MV Realty, would you review those bills for accuracy and otherwise prior to those bills being issued?

MR. PRIETO:  Mr. Hankey, you said "Mr. Prieto." You're saying Mr. Cuza; correct?

MR. HANKEY:  I'm sorry.  Yes.  Mr. -- let me repeat my question.

BY MR. HANKEY:

Q.   Mr. Cuza, before Holland & Knight would send its invoices or bills to MV Realty for Holland & Knight's work, would you review those invoices for accuracy?

A.   I review the invoices, yes.

Q.   Would you review them for accuracy?

A.   I reviewed the invoices to make sure that they're correct to the best of my knowledge, yes.

Q.   I'm sorry.  What was the last part of that, Mr. Cuza?  I didn't understand.

A.   I said I would review those invoices to make sure that they're correct to the best of my knowledge.

Q.   Thank you.

And, to -- to the best of your knowledge, do you believe that those invoices accurately represent

Page 47

both the type of work that Mr. Cobb and Mr. Schultz performed and the duration of hours spent on the matter?

A.   I would have to see each invoice to be specific.  I mean, I would assume that the answer is yes.

Ask me that question again.

Q.   Do you have any reason to believe that the invoices do not accurately reflect the time and effort spent by those two attorneys on the MV Realty matter?

A.   No, not at all.  The -- I don't remember if, in that case, it was a PDF across to a -- by them.

Q.   Now, still focusing on the work that's described in the sentence that we just reviewed, the HK is facilitating meetings, did you personally have any role in those meetings and conversations with attorneys general around the country?

A.   I personally didn't participate.

Q.   Did any other attorneys participate besides Messrs. Cobb and Schultz?

A.   It's possible -- it's possible that an attorney may have participated in one -- more than one, so -- but I don't remember.

Q.   Now, the next sentence reads "Initially, this process was targeted at those states where there have been regulatory complaints by consumers or members of

Page 48

the public."

Did I read that correctly?

A.   Yes.

Q.   Do you agree that that statement was accurate?

A.   To the best of my recollection, yes.

Q.   Can you describe what a "regulatory complaint by a consumer or a member of the public" means?

A.   So there would have been times where there was a client that had a complaint.  They -- having a way -- the specific contract that the client signed, that client at times would involve the attorney general's office.

Q.   At times it would involve the attorneys general.

Is that what your testimony was?

A.   Yes.  And the attorney general or any other -- it's possible that there were other governmental agencies that were involved.

MR. HANKEY:  And we could take this exhibit down for now.  I don't know if I need to do that myself, but I tried to do it earlier, but it wouldn't go down.

MR. PRIETO:  It's not me, Kyle.

MR. HANKEY:  Did it go down?

MR. PRIETO:  Yes.

Page 49

MR. HANKEY:  Okay.  Good.  Thank you.

BY MR. HANKEY:

Q.    So I want to focus for now on consumer complaints, Mr. Cuza.

Did MV receive complaints from -- strike that.

Generally speaking, tell me what you recall about the consumer complaints that MV Realty received from either customers or members of the public.

A.    So I recall some customers having specific complaints about not knowing what was in the arrangements, and they misrepresented the information.

Q.    What was Holland & Knight's role in addressing consumer complaints?

A.    So I think it's going to depend on whether it has to be specific to a consumer complaint; right? The -- like, I personally did get involved in a few. The -- I remember at least two where we would reach out to the clients.  We would interview the clients.  We would talk to the clients.

The -- the -- in those two occasions, I specifically remember we were able to obtain sworn declarations from the clients.  That actually -- they were assisting with the initial complaints.  So the matters that we got involved that I remember, those were done successfully there.  The -- when I say "we," I'm

Page 50

talking about, A, specifically right now.  Or, A, where I am.

Q.   Besides you and Ms. Canamero, who else from Holland & Knight was involved in addressing consumer complaints?

A.   It would depend -- if it's in Florida, it would -- it would probably be me or Rebecca or both.  If it's out of Florida, then you have to go to the specific state; right?  If we have attorneys that were admitted in that state, then an attorney from PA and that's admitted in that state would be Antony in those matters.

I don't really recall specifically.  In Philadelphia, Pennsylvania.  I recall in -- I recall Massachusetts as well.  But there is -- there was more than that.  Other attorneys had actions.

Q.   Would any of the attorneys involved in addressing consumer complaints, specialists or otherwise, have as a typical part of their practice the practice of addressing consumer complaints or working with companies in addressing consumer complaints?

MR. PRIETO:  Oh, wait.

MR. HANKEY:  Okay.

MR. PRIETO:  I'll let you answer that question.  You can answer.

THE WITNESS:  Were there any attorneys?  The

Page 51

answer is yes.

BY MR. HANKEY:

Q.   Which attorneys would those have been?

A.   So I recall in our Philadelphia office, there's one attorney that -- and worked for -- on these matters. And he had a role, to my recollection, on similar matters for experts.

Q.   And what was the attorney's name?

A.   I don't remember.

Q.   Any other partners with that particular area of practice in their background that you recall working on MV consumer complaints?

A.   And, again -- again, right now, I don't remember the answer.  I just don't know.

Q.   Now, during Holland & Knight's work on addressing consumer complaints for MV, who at MV would Holland & Knight involve in that process?

A.   I -- it depends; right?  So I'm totally unaware -- right? -- of exactly who would Holland & Knight involve.  It's the -- right?  MV is the one that actually selected -- right? -- who would be doing this -- work with -- with these clients.

But there's not a specific name.  The -- there's no question that at times Jonathan -- I can see Jonathan.  He was involved in many restrictions to the

Page 52

member involved and telling me I would keep him a --

telling him more.  The rest of the matters that we

were -- that I was involved in, in general, with the

rest -- that I wouldn't even know.

I was under the impression that when it comes

to -- in Philadelphia, my impression -- and I can't --

more involvement than she would have, for example, here

in Florida and the other -- the other states.  I

don't -- I can't be specific, but -- certainly, Tony

would be aware of what's going on, and Jonathan would be

aware, because we were not.

Steve Scott -- the -- he -- Steve Scott is one

more -- Steve's not making decisions.  It's -- he's more

keeping things, from an administrative point of view,

organized.

The -- but, again, I can't tell you

specifically, you know, who -- in our other offices, who

specifically they were -- they conversed with --

right? -- on a frequent basis.

THE COURT REPORTER:  I'm sorry.  This is the

reporter.  So sorry.

I am having difficulty hearing and

understanding the witness well.  I am using my phone

as an enhancer to hear him, but I would appreciate

if the witness could maybe have a laptop in front of

Page 53

him so the audio would come from the laptop so I could accurately capture his testimony.

MR. HANKEY:  Can we go off the record.

THE COURT REPORTER:  Thank you.

THE VIDEOGRAPHER:  We are off the record at 10:35.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are on the record at 10:37.

BY MR. HANKEY:

Q.   Mr. Cuza, what was your general advice to MV about handling consumer complaints?

A.   There isn't such a thing as a general advice; right?  It's the -- I'd have to weigh the matters on an issue-by-issue basis, on a case-by-case basis, on a topic-by-topic basis.  The -- we -- we did -- you can -- you can kind of cover it; right?  The -- I'm not going to say; right?  So the bottom line is on a case-by-case basis.  If you ask me about a specific case and if I remember, I'm happy to cover it.

Q.   Is it your testimony that you never advised MV Realty on the approach it should take to consumer complaints generally?

A.   Reviewing the consumer -- the way that we dealt with it -- the way that I dealt with -- let's talk about

Page 54

the hand- -- the cases that I handled; right?  We receive a consumer complaint.  We -- we -- I understand what the consumer complaint is; right?  We would -- I understand the facts internally.  If we have to introduce someone at MV, we would.

And we would generally speak to the consumer. I had dialogue with the consumer.  We work on the matters that -- that was important to the consumers; right?  And my recollection is -- right? -- that we successfully addressed the issue that -- and resolve the issues that we were handling.  And when I'm talking about "we," I'm talking about me and Rebecca, but there was -- it's not a written process -- right? -- but it's just the way that -- that we do things; right?

So is there a -- that's how I can answer your question.  If you think I'm not answering your question, then just tell me.

Q.   Well, it's a yes-or-no question.  So was that a "yes"?

A.   No.  No.  My answer is what's in the record.

Q.   Yes or no, did you ever advise MV Realty on the approach it should take to address any consumer complaints beyond specific case-by-case advice?

A.   I advised MV on the issues that I had in front of me; right?  So that, I can certainly tell you.

Page 55

Q.   Now, when there were efforts to address consumer complaints at MV Realty, do you recall that some consumer complaints were determined to be unsupported or invalid?

A.   I don't know what you mean by "unsupported or invalid," but I can tell you that -- I think this is what you are trying to get at.

I can tell you that in the examples that I made reference to, when we were involved -- right? -- the -- we were able to work with the consumer and resolve the issue.  And the -- on at least two occasions -- right? -- we -- the consumer agreed -- right? -- to issue sworn declarations.  And those sworn declarations were favorable to MV.

Q.   Are you testifying, Mr. Cuza, that you don't have awareness of any consumer complaint resolutions beyond the two that you yourself handled?

A.   You're talking about -- I have awareness of consumer complaints.  There's no question about it.  I have awareness of consumer complaints -- right? -- that in -- did not end up going well for MV; right?  And one that comes to mind, for example, is one in Massachusetts.  The -- I have awareness of a -- consumer complaints in -- in Philadelphia, for example.

A -- a -- so do I have awareness of consumer

Page 56

complaints beyond the ones that either I worked on or Rebecca worked as well?  The answer is yes, but the --

Q.   How would you describe the volume of consumer complaints that Holland & Knight would see?

A.   The -- there's no question that there were consumer complaints.  There's no question that the firm was working with consumer complaints in terms of volume. In fact, I think we have to go back and look at the records.

Q.   Did you ever communicate anything to anyone at MV about the volume of consumer complaints as it relates to MV Realty's overall business?

A.   I don't remember.

Q.   I'm going to return to the exhibit marked as Exhibit 4.

Can you see Exhibit 4 again, Mr. Cuza?

A.   Yes, I can.

Q.   The third paragraph of Exhibit 4 reads "HK is also in charge of receiving and reviewing any regulatory complaints that are filed against MV, whether with divisions of real estate, attorneys general, local real estate associations, or other agencies."

Is that statement accurate, Mr. Cuza?

A.   Well, yes, with -- the word "in charge" -- right? -- and we receive what MV sends to us; right?  By

Page 57

the time that it comes to us, it goes to MV.  It's the other way around.

Q.   Are you saying that Holland & Knight was not in charge of receiving or reviewing any regulatory complaints?

A.   Whatever was sent to us was sent to us by mail. Whatever was sent to us we actually worked on.

Q.   And, then, was the firm in charge of receiving and reviewing those?

A.   That's what it says.  I'm clarifying how the process worked.  So --

Q.   Let me go and -- I'm sorry, Mr. Cuza.  Go ahead.

A.   No, no, no.  Go ahead and ask me.

Q.   It goes on to say "HK" --

That's Holland & Knight; correct?

A.   Yes.

Q.   -- Holland & Knight, "reviews those complaints and confers with the client and MV HS employees involved to establish a timeline of relevant events."

Is that accurate?

A.   I believe so.

Q.   "HK also gathers any relevant documents."

Is that accurate?

A.   I -- I believe so.

Page 58

Q.   And then it continues by saying "Holland & Knight then drafts the responses to those complaints and either files those responses or works with local counsel in those states to do so."

Is that statement accurate?

A.   It's accurate with regards to the ones that we worked on.

Q.   It goes on to say "Holland & Knight is also involved in meetings and conversations with the regulatory agencies."

Is that statement accurate?

A.   In my -- it's generally accurate, yes.

Q.   Were you involved in any such meetings or conversations with the regulatory agencies?

A.   I recall -- and it could have been more, but I recall conversations with -- one -- in one of the cases that I told you that we obtained a sworn statement, and then -- and someone from the attorney general's office, they got involved.  The -- I recall, once we obtained the declaration, that issue was resolved, and I did speak to the attorneys.

And I do recall -- I recall speaking to -- it's either an investigator -- it's a -- probably an investigator relating to -- in Florida, relating to the initial complaints in Florida that Rebecca and I got

Page 59

involved with.

I recall, when the subpoena was received from the State of Florida, Tony calling me and I reaching out to the attorney who chartered that investigation and -- and to obtain an extension of time and to produce documents.

I recall as well having at least one conversation with someone from the State of New Jersey.

Q.   Do you recall which agency in New Jersey?

A.   No, I don't recall the agency, but I do recall having a conversation with that person.

Q.   In which year?

A.   That, I can't tell you.  It's going to be documented somewhere.

Q.   It -- I'm sorry.  What was that last statement?

A.   I said, "It's going to be documented somewhere."

Q.   Now, setting aside the interaction that you had with the State of Florida, how would you describe the outcome of the regulatory matters that you became involved in?

A.   The matters that we handled -- so I mentioned -- right? -- when we -- when -- the ones in Florida that were initially filed, I remember resolving them all. And how many were they?  I don't remember.  I think it

Page 60

was in -- I have --

Q. And when you say "resolved," what do you mean by that, Mr. Cuza?

A. It was in -- either dismissed -- right? The outcome was beneficial to MV. When I -- when I became involved working directly with -- in the few matters that I became involved working on the -- with the consumers, my recollection is that we resolved it favorably for MV as well.

Q. Now, with respect to this Exhibit 4 that we're looking at, the third paragraph goes on to say "To the extent necessary, Holland & Knight represents MV or its agents at hearings before those agencies (e.g., local real estate boards)."

Is that statement accurate?

A. That's accurate with regards to the specific matters for MV, yes.

Q. It goes on to state "Holland & Knight also works with local counsel to facilitate conversations with individuals/attorneys who occupy higher rank at those agencies."

Is that statement accurate?

A. That's correct with regards to the matters that we worked on, yes.

(Plaintiffs' Exhibit Number 5, February 18,

Page 61

2022, e-mail, was marked for Identification.)

(Plaintiffs' Exhibit Number 6, February 21,

2022, draft letter, was marked for Identification.)

BY MR. HANKEY:

Q. I'm going to show you what I have marked as Exhibit 5.

And I'm going to show you what I've marked as Exhibit 6, which is the attachment to Exhibit 5.

Do you see that Exhibit 5 is an e-mail from Ms. Canamero to sscott@mv, dated February 18, 2022?

A. Yes.

Q. And it's also to Amanda at MV?

A. Yes.

Q. Would that be Amanda Zachman?

A. Yes.

Q. Do you see that it attaches a draft response to the division of occupational licensing related to the DOL complaint?

A. I see that.

Q. Let me show you what's been marked as 6.

Do you see that this is a -- what appears to be a letter or a draft letter on Holland & Knight letterhead, dated February 21, 2022?

A. Yes.

Q. Do you see that the letter says at the

Page 62

beginning "We are in receipt of" the -- "of your correspondence to Amanda Zachman and the complaint filed by Crystal Doe attached thereto"?

A.   I do.  Can you make it a little bit bigger, please.

Q.   Yes.

Is that better?

A.   Yes.  I can see it.

Q.   And then it goes on to say "Our law firm represents Ms. Zachman and MV of Massachusetts, LLC."

Do you see that?

A.   I do.

Q.   Was that accurate with respect to this particular matter?

A.   Yes.

Q.   Do you see where you write -- excuse me.

Do you see where the author of this document writes, "Nevertheless, it is our intent to continue to work with you to ensure that we fully address all of your questions and that we all have a meaningful opportunity to discuss the law and how MV's business is fully compliant with the laws of the Commonwealth of Massachusetts"?

A.   Yes.

Q.   And I'm taking you to Page 2 of this draft

Page 63

letter.  I'd like you to read the first two full paragraphs of the letter.  Let me know when you're ready.

MR. PRIETO:  Mr. Hankey, can you scroll down so we can see who the author of this letter is.

MR. HANKEY:  Yes.

MR. PRIETO:  Okay.  So there's no -- at least at this point, there's no author.

Thank you.

THE WITNESS:  And you're -- can you put it back up, please.  Go up a little bit more.

That's too much.

BY MR. HANKEY:

Q.   Okay.

A.   That's too much.  You're --

Q.   That's -- I think that's about the best I can do.

Can you see that?

A.   Yes, I can.  I can see that.

Can you scroll down, please.

Q.   Yes.

A.   Okay.

Q.   Mr. Cuza, can you describe what the draft letter here is attempting to do with respect to what it's describing in the paragraphs that you read.

Page 64

A.   So what is it attempting to do?  It's attempting to describe the facts that we understand took place when the client was being penetrated to the agreement.

Q.   And what would the purpose of sending this draft letter to Mr. Scott and Ms. Zachman have been?

A.   Mr. Hankey, we would have to read specifically what was the complaint and what is it that the letter's addressing.  He -- right?  And so -- and so without doing that -- go ahead.

Q.   I'm going to take you back to what's been marked as Exhibit 5.

Does this refresh your recollection at all, Mr. Cuza?

A.   No, I -- I understand that there's no question that it's a response to -- right? -- the complaint only -- that was received.  I don't disagree with it. What -- what I'm telling you is the -- to answer your prior question -- right? -- we would have to review the complaint.  What this letter is doing is what it says there.  It's responding to the complaint.  What it was --

Q.   So what I'm trying to get at is -- no, go ahead, Mr. Cuza.

A.   Oh, no, keep on going.

Page 65

Q.   Here's what I'm trying to get at.  Did -- did Holland & Knight make it a regular practice to send draft correspondence to the MV client prior to issuing the correspondence to a regulator?

A.   My understanding is that -- yes.  My understanding is that even before a response, it would be -- it would be sent.  And the client would review, but, once again, one has to look at the specific facts involving the specific case.

Q.   Okay.  I'm going to direct you to the second full paragraph on Page 2 of Exhibit 6.

A.   Okay.

Q.   Do you see where it says "Complainant also ignores that she had a full opportunity to review the agreement and terms prior to signing, and the self-proclaimed failure to do so is legally irrelevant under Massachusetts law"?

A.   Yes.

Q.   Can you explain what the letter is pointing out there to -- in this draft to the regulator?

A.   So the letter speaks for itself; right?  But the -- if what we were told -- if the facts were correct -- right? -- then the client had the opportunity to review the complaint.  And that's what it says; right?

Page 66

And then, in addition to that, that discusses -- right? -- the law, as we understand it, based on the research that was done, in Massachusetts. That's applicable to the issue.

Q.   And what's the -- what's the point of providing this legal position in the cited cases to the regulator in Massachusetts?

A.   That's what I'm telling you.  We would have to look at the complaint -- right? -- because -- this is a response to the complaint; right?  It's in there for a reason; right?  I don't know the reason until I look at -- at the complaint.  Clearly, it's there.  And there's no question -- right? -- that the objective is to share with the regulator our belief with regards to this particular point.

Q.   Why was it relevant that the complainant had a full opportunity to review the agreement and terms prior to signing?

A.   So the -- among other things, had they -- it would be worked free on a contract; right?  If a party to a contract -- right? -- is aware of the contract that he or it are entering into -- right? -- that's important.

Q.   And with respect to these regulatory complaints that -- strike that.

Page 67

With respect to complaints that were lodged against MV Realty that involved regulators, was that a concept that you explained to the MV client as being relevant from the perspective of addressing those regulatory matters?

MR. PRIETO:  I'm just going to object to the form, Mr. Hankey.

MR. HANKEY:  And let me -- let me rephrase. As -- can you just expand on your objection, please.

MR. PRIETO:  Yeah.  I mean, I -- I have a problem understanding broad and vagueness.

MR. HANKEY:  Okay.  Let me -- let me rephrase.

BY MR. HANKEY:

Q.   The con- -- the legal premise that you just described, Mr. Cuza, did you explain that legal premise to the client -- to any one of the client within the context of evaluating and addressing regulatory matters such as this?

A.   In -- in -- it's in writing; right?  Hankey -- Mr. Hankey, the -- so they saw it.

The -- the concept of an -- the importance of consumers being informed and having an opportunity -- right? -- to review the contract, that was discussed with them.

Q.   With whom was that discussed?

Page 68

A.   That was discussed with -- and the -- I can tell you it was discussed with Tony.  It was discussed with Jonathan.  It was discussed with -- with Steve and the -- so -- and others.  I'm sure Amanda, but -- and, you know, we -- so I tend to know what you mean.  But not that frequently.  We had conversations.  One more with Tony, Jonathan, Steve --

Q.   Please describe the --

A.   Because they were all --

Q.   Go ahead and explain it -- I'm sorry, Mr. Cuza.  Go ahead and finish your question [sic].

A.   Okay.  Then, what I was saying, that -- but from my recollection, those are the three that I principally had conversations with.

Q.   And please describe the general nature of that conversation.

A.   The -- I don't understand the question, Mr. Hankey, because you're asking me about a conversation -- I'm not specific- -- talking about a specific conversation; right?  I'm talking about, you know, communicating to them -- right? -- that they needed to make sure that the -- the clients were informed -- right? -- the -- it happened, and it happened repeatedly; right?

        We even told them to record the conversations.

Page 69

So -- but if you're asking me to make reference to a specific conversation, you know, right now I can't tell you on this particular date I had this particular conversation with any -- and three others.  The -- right?  I'm sure that if I looked through the documents, I will find examples.

And, like I said, I just gave one example, and I'm sure it's in writing -- right? -- that we told them that they needed to record the conversations.

Q.   You stated either --

MR. HANKEY:  What was the answer?  Can you just read the answer back.

THE COURT REPORTER:  Sure.

(Thereupon, the requested testimony was read back by the reporter as above recorded.)

BY MR. HANKEY:

Q.   Mr. Cuza, in those conversations that you had with those three individuals, did you explain to them the concept of a party to a contract is assumed to have read and understood its terms as decided here in this letter -- draft letter?

A.   Yes; right?  Again, it's going to be on a state-by-state basis; right?  The answer's yes.

Q.   And what was the significance of that legal principle that you explained to your client within the

Page 70

context of these regulatory matters?

A.   I need to give the clients a fair opportunity to read the agreements.  Clients need to make a proven contract -- right? -- and informed decisions; right?  But if a client chooses not to read a contract -- right? -- contract -- the law holds -- a contract responsive -- I mean, the client responsible, not the contract.

The -- the -- so it's really within that context.

Q.   Do you see here where the letter quotes a Massachusetts case in saying "In the absence of fraud, one who signs a written agreement is bound by its terms, whether he reads and understands it or not or whether he can read or not."

Do you see that quoted?

A.   Yes, I see that.

Q.   Is that also a concept that you explained to the MV client within the context of addressing regulatory issues?

MR. PRIETO:  Mr. Hankey, I'm going to let him answer that, but you're -- you're getting real close to the prohibition of the Court's order to not ask about legal opinions or legal advice.  But I will permit Mr. Cuza to answer that.

Page 71

MR. HANKEY:  Well, let me -- let me just rephrase it in the context of the Court's order, which allows questions about Holland & Knight advising MV regarding the claims from the regulatory bodies and the AGs prior to August 28th.

MR. PRIETO:  Right.  And I -- and I understand that.  But that -- that topic is qualified by the next paragraph in the order where they're here to probably -- to simply give fact testimony and not opinion testimony.  But, like I said, I'll let him answer that, but we'll go from there.

MR. HANKEY:  Okay.

BY MR. HANKEY:

Q.   Well, just so we're clear, I'm asking for historical facts and not for your opinion, Mr. Cuza.

Do you understand?

A.   I understand.

Q.   Okay.  So the question is, This statement here in the letter that's quoted from the Massachusetts court, it says "In the absence of fraud, one who signs a written agreement is bound by its terms, whether he reads and understands it or not or whether he can read or not."

Is that a legal concept that you discussed with the MV client in connection with addressing regulatory

Page 72

investigations or complaint matters involving regulatory bodies?

MR. PRIETO:  Yes-or-no answer.

Do you remember discussing it? is my understanding of what the question is.

THE WITNESS:  Listen, we discussed it; right? The -- there's no question that we discussed it. The -- you're saying the context of regulatory matters -- the -- I can tell you it was discussed.

The -- the -- the answer is clearly this is a regulatory matter.  It's in that letter.  So the answer would -- would have to be yes.  But -- but the bottom line is that we did discuss it; right? That concept was -- was being discussed.

BY MR. HANKEY:

Q.   And when you discussed it with the MV client, did you share it as a principle that exculpated the client from liability with respect to the regulatory investigations?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

MR. HANKEY:  On what basis, Mr. Prieto?

MR. PRIETO:  Again, you're asking for a legal opinion couched in words that don't sound like an opinion.  So I'm instructing the witness not to

Page 73

answer.

MR. HANKEY:  What I'm asking your client, Mr. Prieto, is to describe his advice to MV Realty as it relates to investigations, advice that would inform their understanding of those regulatory matters and whether or not there was a likelihood of any regulatory suit that could develop from them. And this line of questioning and this specific question goes directly to that issue.

So I ask you to reconsider your instruction to your client.

MR. PRIETO:  I appreciate that, Mr. Hankey, but I'm not -- I've reconsidered it, and I'm still instructing the witness not to answer based on the Court's order.

MR. HANKEY:  All right.  You know what?  I think this is a good time for our -- our next break. We've been going for about an hour.  And we'll shift topics from here.

So why don't we take -- is five minutes sufficient for you, Mr. Cuza and Mr. Kaplan and the court reporter, or should we take ten?  No?

MR. PRIETO:  And, Mr. Hankey, I have the total -- I have the total deposition time of two hours.

Page 74

THE VIDEOGRAPHER: We're going to go off the record real quick.

We are off the record at 11:15.

(Thereupon, a recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We are on the record at 11:23.

BY MR. HANKEY:

Q. Mr. Cuza, did you ever communicate to anyone at MV that you thought that one or more of the regulatory complaints that MV received would lead to litigation to the regulator?

I'm sorry. If you answered it, I couldn't hear it.

MR. PRIETO: No. Mr. Hankey, I'm trying to determine if that's applicable or appropriate to the order.

Ms. Court Reporter, can you please repeat the question by Mr. Hankey.

THE COURT REPORTER: Sure.

(Thereupon, the question was read back by the reporter as above recorded.)

MR. PRIETO: Mr. Hankey, I'm going to permit --
if the question is simply posed to Mr. Cuza and what he -- what he communicated, I'm going to permit this

Page 75

question, but I think it's -- it's likely -- likely runs afoul of the Court's order about providing legal opinions.  But I'll permit the -- I'll permit that question to be answered.

MR. HANKEY:  It definitely does not run afoul of the Court's order.

BY MR. HANKEY:

Q.   Mr. Cuza, I'm not asking for any legal opinion.

Do you need that question read back to you again, Mr. Cuza?

A.   No.

Q.   Okay.  You can answer.

A.   So I specifically was present in meetings where others communicated that to MV.

Q.   Communicated what, Mr. Cuza?

A.   That there could be litigation with -- with the regulators.

Q.   Okay.  You faded out a little bit there.  Just can you repeat your answer again.  I could -- I'm not sure I heard it correctly.

A.   I -- I did participate in a -- conversations, meetings where that was specifically discussed with MV.

Q.   With which specific individuals at MV?

A.   The -- let me tell you who.  These are meetings involving Massachusetts.  We had meetings where a --

Page 76

Steve Cobb and -- and Steve is involved.

The -- there's no question that -- again, do I remember -- Jonathan had to be there. Tony had to be there. I don't know that anyone else would be there. I remember the discussion with them. I don't remember exactly who -- who was present. And, then, that's a topic that Jim would have had covered with them as well.

Q.   You said "Jim"?

A.   Yes.

Q.   Jim who?

A.   Schultz.

Q.   Steve Cobb and Jim Schultz?

A.   Yes. With -- again, with regards to the issues that we were handling.

Q.   "We," is that Holland & Knight?

A.   Right. So it is Steve Cobb, Jim Schultz; right? They were handling specific issues -- right? -- in regard to Massachusetts -- right? -- because Steve was involved in the -- in Massachusetts at the beginning. The -- so as part of a -- there being conversations with -- in -- Tony and Jonathan, the -- or one or the other, and the potential litigation was actually discussed.

Q.   Let's start with the conversation or conversations involving the Massachusetts matter.

Page 77

Was that -- which regulatory body in Massachusetts was involved in that discussion?

A.   I don't remember the right regulatory body.  I think it's the attorney general's office -- right? -- but there are -- Steve was involved.  Steve was speaking to the -- Kurt Schwartz at the attorney general's office.  This -- Steve was then speaking to more and more of the attorneys.  And Steve had conversations, and I participated in some of them with Tony and Jonathan in discussing those matters.

Q.   Multiple con- --

A.   And --

Q.   Multiple conversations related to the Massachusetts matter?

A.   Yes, it's multiple conversations.

Q.   And what information was conveyed to the MV client in those conversations?

A.   That, yeah, we're going to have to look at documents.  Let me -- I'm going to have to review documents to refresh my recollection.

But there were meetings and, if I remember, PowerPoint presentations being -- being prepared.  The --

Q.   Mr. Cuza, if you remember, the question was whether at any point you or others at Holland & Knight

Page 78

advised MV Realty that you believed that one or more regulatory complaints would lead to litigation with the regulator.

A.    Would lead or could lead to litigation.

Q.    Okay.  Can you explain that.

A.    And yes; right?  So, again, you have -- and Jim and Steve are working with specific matters regarding these regulatory matters, specifically attorney generals; right?  And Jim is working on the issues specifically among other states.  In Pennsylvania, the -- in the -- in their conversation with D. Maurstad -- and Tony I remember flying into Pennsylvania -- into Philadelphia to meet with -- with Jim.

The -- so -- and then, separate and apart -- right?  And I don't remember if Jim participated in any of the conversations regarding Massachusetts; right?  And Steve did -- and -- and we did have conversations with Steve and -- and Tony and Jonathan regarding Massachusetts.

Q.    And with respect to the Massachusetts matter, just sticking with that one, what precipitated those conversations about the fact that the Massachusetts matter could lead to litigation?  What precipitated those conversations?

A.    Ending up with the -- I have to go back to the

Page 79

documents -- right? -- to be -- because I'm -- to refresh my recollection in terms of the specifics.  So there's no question -- right? -- that there is -- and there's a complaint that's filed, and Steve's communicating with the office of the -- the attorney general's office.

I don't know what's the name of the -- the official name of the office in Massachusetts; right?  And Steve's communicating with them.  He's coming back to us with -- with the information.  We're having conversation with it -- Tony and Jonathan.  It's within that context that there are discussions.

And then, separate and apart from that -- right? -- there are discussions where Jim and Stephen are and having conversations -- right? -- that had to do with -- with the specific matters that -- that we were handling that they specifically were handling.

Q.   Okay.  And I heard you refer to the Massachusetts matter and a Pennsylvania matter.  Any other matters in which that conversation would have occurred with anyone from MV Realty?

A.   You mean a conversation where we're telling them specifically about the possibility of litigation?

Q.   Yes.

A.   The -- not that I -- I remember.  But it could

Page 80

have happened, but I don't -- these are the ones that I have a -- I have recollection of the possibility of litigation.

Q.   You said that you were present in those meetings.

Besides Mr. Schultz, Mr. Cobb, who else would have been present for Holland & Knight in those meetings?

A.   Mr. Hankey, I was present in the meetings that I was present; right?  So there are conversations -- right? -- that they also had where I necessarily didn't have to be present.  The -- the -- but they -- Rebecca and -- and -- Rebecca highly likely could have been present and, obviously, Steve and -- and Jim.

Q.   You said there were documents that would aid in your recollection of the specifics about those discussions.  Which documents are you referring to?

A.   So for Massachusetts, documents were -- were prepared.  I'll give you an example.  A PowerPoint presentation; right?  When -- when these conversations are taking place -- right? -- there -- there are e-mails in there, documents, but the -- I'd have to go back and read -- right? -- to help refresh my recollection.

Q.   Would there have been any discussions with MV Realty that involved advice from Holland & Knight that

Page 81

MV could be sued as a result of regulatory matters where those discussions are not in some way reflected either in e-mails, presentations, or the billing records?

A.   Yes, of course.  There could have been conversations; right?

Q.   Let me rephrase my question.

So there -- we're referring to discussions around the Massachusetts matter, discussions around the Pennsylvania matter.  With respect to any other discussions around any particular matter -- right? -- besides those two, would you expect those discussions to be reflected in some way in -- in writing somewhere?

MR. PRIETO:  Mr. Hankey, I'm going to object to the form.  It was -- I mean, it's form and it's compound.  I mean, it's -- if you don't mind rephrasing it.  It's a little bit wordy.

MR. HANKEY:  Sure.  That's fair.

BY MR. HANKEY:

Q.   All right.  So setting aside the Massachusetts regulatory matters that Mr. Cobb was involved in and advised on, we just talked about setting aside the Pennsylvania matters Mr. Schultz was involved and advising on.

Do you recall there being discussions about any other matters besides those two?

Page 82

A.   You're talking about the potential of litigation?

Q.   Yes.

A.   Possible Colorado.  It's possible.  Arizona, a -- for Arizona, the issue was successfully addressed. I'm talking about the ones where, again -- that I personally have some recollection.

Q.   And with respect to the advice given to MV about whether it could be sued by either the Colorado regulatory agency or the Arizona regulatory agency, would you expect to find some documentation of those discussions that could help refresh your recollection about the details of them?

A.   Oh, in Arizona, we dealt with the law firm named -- I think it's Lewis & Roca.

Q.   Uh-huh.

A.   The -- all right.  There were these -- there's some -- and there's no question there would be some documentation going back and forth between us and Lewis Roca, and that would go to MV.

Q.   All right.

A.   Colorado, it's -- it's -- and my recollection is Colorado is the -- we were somewhat involved.  I'm pretty sure Nelson Mullins was heavily involved in that one, but I do recall in- -- and Stephen Cobb having some

Page 83

involvement.  The -- and deemed was he supporting Nelson Mullins when they -- the interaction between -- with Nelson Mullins and -- and Steve, when engaged, they were doing in Colorado.  I know they --

Q.  You expect there would be documentation somewhere in e-mails, PowerPoints, letters that would reflect Holland & Knight's advice to MV about whether either those Colorado or Arizona matters could lead to litigation?

A.  It was never the -- the potential of litigation -- the -- when they're investigating, they're investigating; right?  They're the ones that actually in -- in -- are in control of what they're going to do; right?

Our involvement in representing MV was to try to help MV resolve matters; right?  But in terms of the -- the expectation of litigation -- right? -- Tony always knew that there was an expectation of litigation. Jonathan always knew that there was an expectation of litigation.  The -- the -- so -- and it's --

Q.  Mr. Cuza --

A.  So, again, I'm trying to answer, Mr. Hankey, your question.

Q.  Okay.  You haven't --

A.  I'm going to object to the one, because I think

Page 84

it starts -- starts from the wrong premise.

Q.   Well, you haven't answered my question, but let me ask you this way.

A.   Okay.

Q.   You just testified that Mr. Mitchell, Mr. Neuman always knew that there was, I believe you said, a possibility or anticipation of litigation?

A.   Yes.

Q.   On what basis do you make that statement?

A.   Because both of them are experienced with litigation.  Both of them have a lot of experience in litigation.  Both of -- a lot of them -- both of them have experience with -- and regulators getting involved in businesses and then pursuing litigation and suing them.

The -- both of them -- the -- and Jonathan is much more litigious than -- than -- than Tony, but both of them in -- in -- are familiar with litigation.  Litigation is not something that's warranted.  Either one of them.

Q.   So what I'm now hearing is that you specifically advised them on that topic?

A.   I'll give --

MR. PRIETO:  Just -- just objection.  Asked and answered.

Page 85

You can answer again.

THE WITNESS:  The -- litigation is a word that was absolutely used.  You're trying to -- your question, Mr. Hankey, which I'm trying to answer, you're referring to if I'm advising them in terms of litigation.

The potential of litigation was there, and they're both very familiar with litigation, and they're both very familiar with regulators, and they're both very familiar as -- right?  If regulators want to litigate, they can and will.

So -- and to -- when you use the word "advice" is where you lose me a little bit, but is the word "litigation" a part of -- in -- in meetings and conversations?  Yes.  Is the potential litigation part of those meetings and conversations?  Yes.

BY MR. HANKEY:

Q.   Before November 2022, did you ever tell anyone at MV that you thought that MV was about to be sued by any of its regulators?

MR. PRIETO:  So objection.  It's beyond the scope of the order, which the date of the order, where it ends, is August 28th of 2022.

MR. HANKEY:  So I'll amend my -- I'll amend my question.

Page 86

BY MR. HANKEY:

Q.   Before August 28, 2022, did you ever tell anyone at MV that you thought that they were going to be sued by a regulator?

A.   The -- in terms of dates, I don't remember dates.  I said you would have to go back -- right?  You would have to go to the timeline, look at the documents when we're dealing with Massachusetts; right?  Look at the documents when we're dealing with -- with Pennsylvania.  And in two examples.

In the -- so I can't -- I can't answer your question; right?  So -- but it -- I can't answer your specific question, like I said.  The word "litigation" is a word that was not uncommon.

Q.   Mr. Cuza, do you recall -- yes or no, sitting here right now, do you recall ever telling anyone at MV prior to August 28, 2022, that you thought they were going to be sued by one of its regulators?

MR. PRIETO:  Wait.

MR. HANKEY:  Mr. Prieto, I'm just asking him if he recalls.  Yes or no.

MR. PRIETO:  You're asking for a legal -- you're asking whether he gave them a legal opinion about whether they were going to be sued.

So I'm instructing him not to answer.

Page 87

MR. HANKEY:  It's squarely within the Court's order.  It's one of the four items that it lists on Page 8, Mr. Prieto.

MR. PRIETO:  Number one -- no.  And all I'm saying is -- Mr. Hankey, is the Court was pretty clear after those four topics in saying that the Court will not permit the parties to ask the two attorneys their opinions as to whether the plaintiffs violated any law or regulation, made any misrepresentations, or acted willingly and willfully.  The two attorneys are merely fact witnesses to very discrete and limited issues in this insurance coverage case.

MR. KAPLAN:  You're misreading the order. We're not allowed to ask the witness his opinions on those points.  We're absolutely allowed to ask the witness what he spoke to, advised, and communicated to the client on those points.

MR. PRIETO:  He's held that --

MR. KAPLAN:  I'm telling you now I'm not letting this go.  And if you stand on your objection, we are going to take it to the next scope.  Your choice.

MR. PRIETO:  I stand by my objection.

MR. KAPLAN:  See you in court.

Page 88

MR. PRIETO:  I'll see you there.  Hopefully, you're on time this time.

MR. KAPLAN:  I know you meant that in the nicest possible way.  I'll be sure to respond to that.

MR. PRIETO:  I did.  I did.

MR. KAPLAN:  I can tell.

BY MR. HANKEY:

Q.   Mr. Cuza, you testified about meetings that involved Stephen Cobb related to the Massachusetts matter in which MV, including Mr. Neuman and Mr. Mitchell, were informed that they could be sued by a regulator in Massachusetts.

Do you recall if those discussions occurred before or after August 28, 2022?

A.   No, I don't.

Q.   It's your testimony that we can look at e-mails, presentations, and other documents to determine the dates of those meetings?

A.   It's my testimony that to refresh my recollection I would have to go back and read and look at documents.

MR. PRIETO:  I don't think that's Mr. Hankey's question, though.

I think Mr. Hankey's question is -- and you --

Page 89

I mean, you could repeat it, or I can -- but I don't want to interrupt your question, Mr. Hankey.

MR. HANKEY:  I'll repeat it.  I'll repeat it.

BY MR. HANKEY:

Q.   Mr. Cuza, is it your testimony -- strike that.

To determine -- could you determine the date in which those discussions involving Stephen Cobb about the Massachusetts matter, the potential for litigation occurred based on documentation like e-mails and PowerPoints?

A.   Could I determine more -- more or less the time that it happened by looking at documents?  Yes, I could.

Q.   Okay.  Same question as to the discussions involving Jim Schultz in Pennsylvania that we discussed earlier.

A.   The -- I would have to look at documents to see when -- Jim's involvement in matters regarding Pennsylvania.  The -- but I think that Jim was involved in more than one matter, or I heard something.

Q.   And just so the record's clear -- I haven't asked this specific question.  Do you recall whether or not those meetings involving Jim Schultz and the Pennsylvania regulatory matters in which the MV client was told that they could be sued by a regulator -- do you recall whether those occurred before or after

Page 90

August 28, 2022?

A.   I have to look against the --

        MR. PRIETO:  The question is "Do you recall?"

        THE WITNESS:  Well, then, the answer is no.

BY MR. HANKEY:

Q.   And who from the MV client would have been involved in those Jim Schultz/Pennsylvania meetings?

A.   And my recollection is that Jim was working mostly with -- with Tony, but I don't -- it's possible that he had conversations with Jonathan as well.  I don't know.  I don't remember.

Q.   And you were -- you were present for one or more of those Pennsylvania meetings, Mr. Cuza?

A.   No.  I'm coming from one or more -- I was never present at a meeting with a regulator.

Q.   Whether or not -- let me read -- my question was bad, Mr. Cuza.

        With respect to the -- the meetings -- and maybe my understanding of your testimony earlier is flawed, but my understanding, Mr. Cuza, was that you were testifying that Mr. Schultz and MV met outside the presence of the regulators in Pennsylvania and discussed the potential for litigation with the Pennsylvania regulators.

        Is my understanding correct?

Page 91

A.   What I'm saying is -- yeah, it being Jim's meeting -- and this applies to Stephen as well; right? They had general discussions -- right? -- with Tony.  In terms of Massachusetts specifically, I remember Jonathan being there; right?  About -- about matters that they were handling regarding the -- the -- there are meetings -- right?

That Tony would have meetings with Jim -- right? -- the -- where I'm not there.  Tony would fly -- vaguely, I remember Tony flying at least once to Pennsylvania to meet with Jim.  The -- so I don't -- I mean, what's your question so I could specifically answer it? because I don't know what else to tell you in regards to that.

Q.   Did you observe anyone telling MV Realty that there could be litigation with the Pennsylvania regulators?

A.   I do.  I don't remember participating in conversations with those that were handling the consumer complaints, but I am fairly certain -- right? -- that those that were handling the consumer complaints did tell MV about the potential of litigation.

Q.   Is that based on your own observation of them doing that or on something else?

A.   I -- no.  I think it's -- it's based on my --

Page 92

and potentially in documents.  So do I remember being present at a meeting where they're telling them this particular matter's going to go into litigation?  No.  I remember they -- they were reading a document back then where the matters weren't going to settle -- right? -- and, obviously, the next step would be litigation.

Q.   And it's reading those documents that gives you the understanding that someone from your firm communicated to MV Realty that they could be sued?

A.   Again, it was never a question; right?  The possibility of litigation was always there.

Q.   That was in -- in your mind, Mr. Cuza.  But was it -- was that potential for litigation in MV Realty's knowledge?

A.   Mr. Hankey, I'm telling you -- right? -- that Tony knows about the potential litigation.  Jonathan knows about the potential litigation.  We've been litigating for years.  For years.

Q.   At what point did you first believe that MV Realty could be sued by one of its regulators?

A.   I think the -- I think the first lawsuit that we -- that we bring -- and, again, this is all from memory.  I think the first lawsuit that we bring -- brought it up -- I think it was the Massachusetts lawsuit.

Page 93

Q.   Which Massachusetts agency are you referring to?

A.   I think it was the attorney general's office, assuming that's the name in Massachusetts.

THE COURT REPORTER:  I'm sorry.  Which office?

THE WITNESS:  Massachusetts.

THE COURT REPORTER:  Thank you.

BY MR. HANKEY:

Q.   Okay.  I'm going to ask some questions about advice that Holland & Knight may or may not have given to MV about disclosures to insurance companies.  And I want to start with a series of background questions before I get to the questions related directly to the policies here.

Mr. Cuza, as a litigation attorney, have you -- I'm not asking for specific companies, but have you represented companies that have made insurance claims in the course of your representation of those companies?

MR. PRIETO:  And -- hold on.

MR. HANKEY:  I can rephrase.

MR. PRIETO:  You can answer that question.

Mr. Hankey, I mean, I'm going to take these on a question-by-question basis.  Again, I don't think these are permitted.  Unless it -- at least this specific question is permitted by the Court's order.

Page 94

You've went on for about an hour in terms of background, but I'll let him -- I'll permit him to answer this particular question.

BY MR. HANKEY:

Q.   Do you need me to repeat it, Mr. Cuza?

A.   Mr. Hankey, I -- I -- I have represented clients on -- in matters against insurance companies involving coverage.

Q.   Have you ever advised a client on whether or not to submit an insurance claim related to litigation that you've been handling?

A.   Not that I recall.

Q.   Did you ever advise MV Realty to submit it -- an insurance claim in connection with -- let's start with consumer complaints.  What are -- strike that question.  Let me rephrase it.

Mr. Cuza, did you ever advise MV Realty to submit an insurance claim in connection with one or more consumer complaints submitted to MV Realty?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   Mr. Cuza, did you ever tell MV Realty to -- that it should consider submitting an insurance claim in connection with any non-AG regulatory agency inquiry

Page 95

that MV Realty was subpoenaed in?

MR. PRIETO:  Objection.  I'm instructing the witness not to answer.

BY MR. HANKEY:

Q.   Mr. Cuza, did you ever tell MV Realty that it should consider submitting an insurance claim in connection with any attorneys general office CID subpoena or investigation?

MR. PRIETO:  Objection.  Instructing the witness not to answer.

MR. HANKEY:  And, Mr. Prieto, again, what is the basis for those three objections?

MR. PRIETO:  Again, it's -- it is the four issues that the Court permitted MV Realty to ask about, and this is not one of them.  And you are fully aware -- I think that you are -- that Mr. Cuza did not participate in the policies at issue -- giving advice on the policy at issue.

So this -- it's -- I believe this is beyond the scope of the order, and it's a fishing expedition as to other potential malpractice claims that your client has threatened.

MR. HANKEY:  Mr. Prieto, it's directly related to the first two items of the enumerated items on Page 8 -- top of Page 8 of the Court's order.  And

Page 96

it's directly relevant to the litigation here.  So I -- I just fail to understand why we're even talking about this and wasting time with this.  And, again, it's something that we'll have to raise with the Court.  I request you reconsider it.

MR. PRIETO:  Again, I think you're asking general questions, and I think, you know, if you -- the topics that are -- are the four topics -- I haven't seen that within that first topic.  I do see topics third and fourth, which you have yet to cover, and those are appropriate whether he advised on his -- on the policies here at issue.  And I don't see any questions concerning that.  Your -- your questions are beyond the scope of the four questions permitted by the Court.

MR. HANKEY:  Mr. Prieto, on Page 7, the Court said more specifically what Holland & Knight told plaintiffs about the AG's investigations.  They are claims made prior to August 28, 2022.  If anything, it's arguably relevant to rebut the defense's affirmative defense on argument the plaintiffs should have disclosed this information on our count earlier.

It's not asking for a legal opinion.  It's asking for what he did and did not tell MV Realty.

Page 97

MR. PRIETO:  That phrase that you read, Mr. Hankey, is qualified where it says in the argument that plaintiffs should have disclosed this information to Markel earlier or that the investigations for claims fall outside Markel's policy coverage period.

MR. HANKEY:  Right.  That -- that's just the Court describing the defense.  That's not -- that's not the Court describing what we can and can't ask about.  It -- it's the Court's description of why this line of questioning is relevant.  I'll ask you to read it again.

MR. PRIETO:  I'll stand by the objection and the instruction not to answer.

MR. HANKEY:  Okay.

BY MR. HANKEY:

Q.  All right.  Mr. Prieto, I'm going to show you another document.

MR. PRIETO:  I think you meant Mr. Cuza, but I'm following.  That's fine.

MR. HANKEY:  Thank you.

BY MR. HANKEY:

Q.  Mr. Cuza, do you see that document on your screen?

A.  I do.

Page 98

Q.    Can you describe -- strike that.

(Plaintiffs' Exhibit Number 7, Consumer Protection Subpoena Duces Tecum, was marked for Identification.)

MR. HANKEY:  I'm marking this as Exhibit 7.

BY MR. HANKEY:

Q.    Mr. Cuza, can you please describe for the record what you see at Exhibit 7.

A.    Consumer protection subpoena duces tecum. Addressed to MV Realty PBC, LLC, from the Office of the Attorney General, State of Florida.

Q.    What is this --

A.    4631 Atlantic Avenue.

Q.    What is this consumer protection subpoena duces tecum?

A.    It's -- it's a subpoena being served on the company regarding to the -- asked to review it --

Q.    I'm looking at Page 2.  Can you see the date on which this subpoena was issued?

A.    Yes.  May 11th, 2021.

Q.    And back on Page 1, do you see whether the subpoena identifies the statute under which it was issued?

A.    Yes, it does.

Q.    And what statute is that?

Page 99

A.    FDUTPA.

Q.    What's FDUTPA?

A.    It's a statute in Florida that involves unfair practices -- Florida deceptive and unfair practices.

Q.    Again on Page 2, do you see a signature of Ellen Lyons?

A.    I do.

Q.    Which division does she work in?

A.    Consumer protection division.

Q.    I'm going to take us to Page 3 of this exhibit. Can you tell me what's attached to the subpoena on Page 3 and beyond?

A.    Statutes.  Copies of statutes. And when you say "beyond," the things that I have in front of me?

Q.    That's fair, Mr. Cuza.  So just on Page 3, what do you see attached?

A.    It makes reference to two -- two separate statutes.

Q.    And was the -- what is the title of the first statute that's referenced?

A.    It's the unlawful acts and practices, and the other one is investigative powers of enforcing authority.

Q.    Was Holland & Knight involved in MV's response

Page 100

to this particular subpoena from Florida?

A.   The -- and -- and my only question is that we gathered documents -- we helped gather documents.  It's possible that -- that I mentioned -- and I believe it says earlier in this deposition; right?  A -- this might have been when Tony calls me.  He -- we had a discussion.  I do call the attorney and to get an extension, as I recall.

Q.   What, if any, advice did you personally give to MV regarding the subpoena?

A.   Well, I'm not too sure that we represented in the subpoena or in writing regarding the attorney general from -- for the State of Florida.  The -- at some point in time, I remember calling Bill Shepherd.  A -- at the part of the -- a law firm that I had approached with any -- and then the -- was the law firm of Richard Doran.  I don't know where he is right now.

Q.   Did Holland & Knight play any role in the representation of MV in connection with the Florida AG's investigation of MV?

A.   Not that I recall, I think.  Other than me making the call that I earlier stated that I made, I don't recall any with Holland & Knight.  May involve other than a -- they had -- I'm pretty sure that we helped jazz it up.

Page 101

Q.   Was the Florida AG's investigation inside or outside the scope of Holland & Knight's legal representation of MV Realty?

MR. PRIETO:  Well, time-out.

You can answer.

THE WITNESS:  Didn't discuss -- you're questioning my intent, but we didn't represent them.  Like, they would have started an investigation with Richard Doran.

(Plaintiffs' Exhibit Number 8, Florida subpoena, was marked for Identification.)

BY MR. HANKEY:

Q.   I'm showing you what I'm marking as Exhibit 7.

MR. KAPLAN:  So you identified Exhibit 7.

MR. HANKEY:  Excuse me.  You're right, Mr. Kaplan.  This is 8.  Thank you.

MR. PRIETO:  I'm sorry.  Which -- which is 7?

MR. KAPLAN:  Well, it starts with --

MR. HANKEY:  7 is on the screen now, and it -- it was the initial Florida subpoena.

MR. PRIETO:  And what is 8, Mr. Hankey?

MR. HANKEY:  8 is a subsequent Florida subpoena.  This is 8.

Why don't I ask --

MR. PRIETO:  Yes, I'm sorry.  I was confused

Page 102

about the exhibit, but it's to that.

BY MR. HANKEY:

Q.   Mr. Cuza, I'm showing you what I'm marking as Exhibit 8.  Can you describe what you see on your screen.

A.   Okay.  And this is in the -- is this the same document that you showed me before?

Q.   It is not.

A.   Okay.  So this is another subpoena.  Consumer protection subpoena duces tecum addressed to MV Realty PBC, LLC, slash -- yeah, Degand and MV Realty.

Q.   And on Page 2, do you see a date of issuance of the subpoena?

A.   Yes.  In the -- March 22nd, 2022.

Q.   And is it the same representative issuing it from the Florida Attorney General's Office?  The slides --

A.   Yes.  Yes, it's the same attorney.

Q.   And back on Page 1, can you tell us who's identified as being investigated pursuant to this subpoena.

A.   Antony Mitchell and Amanda Zachman.

Q.   Mr. Cuza, did you provide any advice to MV Realty regarding the subpoena?

A.   I didn't represent MV Realty regarding the

Page 103

investigation that was being conducted by the attorney general's office in Florida.  A -- like I mentioned, subject to the point in time, Mr. Doran and -- is the one that's actually representing the company.

And during the call, like I mentioned, in -- me picking up the phone -- now, I don't know if it's for this subpoena or the prior subpoena.  Me picking up the phone and calling Ms. Lyons -- and I just asked for her extension, and I do believe that we gathered documents.

Q.   Did you ever tell MV Realty that Holland & Knight was not representing the company in connection with the Florida AG investigation?

A.   I didn't.  MV Realty knew that Holland & Knight was not representing the company with regards to an investigation by the attorney general's office in Florida; right?  They're the ones that told me that it was going to be Richard Doran; right?

And I mentioned -- right? -- that when the -- and whoever came on, I picked up the phone and called Bill Shepherd.  The -- and I was told by -- by Tony that we were not going to represent.  And -- and we had wanted it to be Richard Martin.

Q.   Just so I'm -- I'm clear on this, Mr. Cuza, can you recall Mr. Mitchell or anyone else telling Holland & Knight that Holland & Knight was not representing MV in

Page 104

the Florida AG investigation?

A.    The answer's no.  I specifically told them Richard Doran is the one that's going to be retained, and he's the one that actually did the work.  Regarding these particular matters, it was Richard Doran.

Q.    Were you ever told that Holland & Knight -- notwithstanding the fact that -- strike that.

I understand the answer to the last question being that you were told that Richard Doran was going to represent MV Realty.  My question is, Were you ever told by anyone at MV Realty that Holland & Knight was not to represent MV Realty in the Florida AG investigation?

A.    We were never told that we were to represent MV.  We were told that Richard Doran was the one that's going to represent them.

Q.    Mr. Cuza, my question is different.

A.    And I'm answering your question.

Q.    Let me ask the question again.

Mr. Cuza, did anyone at MV Realty ever tell you or anyone else at Holland & Knight that Holland & Knight was not to represent MV Realty in the Florida AG investigation?

A.    What they're telling us is that in -- Bill Shepherd is not going to be the one representing MV.  It's going to be Richard Doran.  It's exactly what

Page 105

they're communicating.

Q.    Other than that communication, do you recall any other communication in which Holland & Knight -- excuse me, MV Realty told Holland & Knight that Holland & Knight was not representing MV in the Florida investigation?

A.    I'm going to give you the same answer because there's no other answer to this.

Matters regarding the Florida investigation was being handled by Richard Doran; right?  The -- if they needed help gathering documents, we would gather documents.

But the -- but we weren't -- like I said, other than that call that I told you I had with -- with Tony initially, in the -- MV never came to us, whether it would be Tony, Jonathan, or anyone else, quote/unquote -- and Jonathan or anyone else to ask us to represent MV with matters regarding the attorney general's office.  The investigation.  Subsequently, they did ask -- ask us to represent them in the litigation.

Q.    Mr. Cuza, it's a yes-or-no question.

A.    And I just gave you an answer.

Q.    Excuse me.  Let me finish my question.

A.    Go ahead.

Page 106

Q.   Yes or no, were you ever told by MV Realty that you were not representing MV Realty in the Florida AG's investigation?

A.   It's -- and the way that's going to answer -- this term, and -- right?  If you want me to try to, again -- again, do I recollect a specific conversation when -- where they're using the precise words that we're using, I can't.  I can't -- simply can't do that.  I can absolutely allude to the facts that I alluded to in the -- in the record.

Q.   Why can't you not answer that yes-or-no question?

A.   Mr. Hankey, yeah, I know I'm not the attorney; right?  And so I don't want to be the attorney.  I'm going to respond just to your pending question separately.

And I've already told you -- right? -- the attorney and law firm representing the MV in matters regarding the investigation was Mr. Doran.

When MV needed a -- a -- the firm to help them with documents, we did that; okay?  We would represent MV only on matters that MV asked us to represent MV.

With regards to that investigation, that was not one of them; right?  Some particular point in time, when the issue arose -- right? -- I picked up the phone

Page 107

and called a -- Bill Shepherd.  The response was Bill Shepherd is not going to be the one representing MV. It's going to be Richard Doran.

Q.  Okay.  Mr. Cuza, I'm going to ask you the question one more time, and then I'll move on --

A.  Okay.

Q.  -- but this is your last opportunity.  Again, we go to the Court and we ask for more time.  We're going to specifically ask for time to address these ques- -- this specific question with you.  So I'll ask it one more time, and you can tell me either you're not going to answer it, or you're going to give the same response you did last time, or you can answer it yes or no.

Did anyone from MV Realty tell you that Holland & Knight was not to invest- -- not to represent MR Realty in the Florida AG lawsuit?

A.  What I discovered is what I already established for the record.  That's what I just told you.

Q.  Mr. Cuza, will Holland & Knight's billing records reflect that Holland & Knight did not represent MV Realty in the Florida AG investigations?

A.  What -- now, what the billing record is going to reflect is -- it should reflect that when gathering documents, it certainly has got to reflect that we're

Page 108

having communication with the attorney general's office or involved in that investigation; right?

The -- so if -- if Richard's office picks up the phone and he calls someone at Holland & Knight to ask for documents, of course we give them the documents.

Q.   Notwithstanding your prior testimony, Mr. Cuza, did you ever tell Mr. Mitchell or anyone else at MV Realty that MV Realty could be sued by the State of Florida in connection with the AG investigation?

A.   Mr. Mitchell, they all knew that they could be sued by the State of Florida.

Q.   Yes-or-no question, Mr. Cuza.

A.   I've given you the answer.

Q.   Did you personally tell Mr. Mitchell or anyone else at MV Realty that it could be sued in connection with the Florida AG investigation?

A.   Do I recall having a conversation with Tony specifically about the Florida Attorney General Office as a result of the investigation prior to '22 and telling them they're not going to sue you?  I don't recall that ever happened.

(Plaintiffs' Exhibit Number 9, Attorney General's Office Subpoena Duces Tecum, was marked for Identification.)

Page 109

BY MR. HANKEY:

Q. All right. I'm going to show you what I'm marking as Exhibit 9.

MR. PRIETO: Mr. Hankey, just to let you know where we're at, we're at over three hours now.

BY MR. HANKEY:

Q. Okay. Mr. Cuza, can you see a document on your screen in front of you?

A. I can, but can you make it bigger, please.

Q. Turning to Page 3 of Exhibit 9, can you tell us what you see at Exhibit 9.

A. Yes. This is a subpoena duces tecum from the attorney general's office -- acting attorney general -- somewhere in Fair Lawn, New Jersey.

Q. Okay.

A. Okay. And it's addressed to MV Realty of New Jersey, LLC.

Q. And to whom was MV Realty of New Jersey, LLC, to produce records?

A. Can you rephrase your question. I don't understand.

Q. Oh, to -- to whom -- to have to produce.

A. The records?

Q. Yes.

A. Okay. So up in this --

Page 110

Q.   Can you --

A.   The New Jersey Division of Consumer Affairs.

Q.   And by what date?

A.   May 9th in 2022.

Q.   Did Holland & Knight represent MV Realty in connection with the New Jersey Attorney General's investigation of MV Realty?

A.   We did, together with local counsel.

Q.   Did you or anyone else at Holland & Knight -- and I'll ask about local counsel in a minute.  But did you or anyone else at Holland & Knight tell anyone at MV that MV could be sued by the State of New Jersey in connection with the investigation involving this subpoena?

A.   I don't remember the question of "Can we be sued?" coming up.

Q.   I'm sorry.  You faded out at the very beginning of that, Mr. Cuza.  Can you repeat that.

A.   Sure.  I said, "I don't remember the question 'Can we be sued?' coming up."

Q.   And I asked that question specifically as it relates to Holland & Knight.

You referenced local counsel.  Who was the local counsel in this investigation?

A.   Pashman Stein.

Page 111

Q.   Do you recall hearing about or seeing -- observing Pashman Stein telling MV Realty that it could be sued by the State of New Jersey in connection with this investigation?

A.   I don't recall one way or the other.  The -- like I said, you know, litigation was always a possibility.

Q.   Do you recall ever telling any individual employee or officer of MV Realty that they could be sued in their individual capacity by the State of New Jersey in connection with this investigation?

A.   Litigation was always a possibility; right?  So the -- and individuals accused of doing -- acting inappropriately could obviously be sued as well.

Q.   Okay.  Mr. Cuza, let me ask you just a simple yes-or-no question.

Do you recall ever telling any individual at MV Realty that they could be sued in their individual capacity in connection with any AG investigation?

MR. PRIETO:  Just going to -- you know what?  Sir, I'm going to object and instruct the witness not to answer.  It's beyond the scope of the four issues.

MR. HANKEY:  Let me rephrase my question.

Page 112

BY MR. HANKEY:

Q.   With respect to AG investigations that Holland & Knight knew about prior to August 28, 2022, did you or anyone from Holland & Knight ever advise an individual MV Realty employee or officer that they could be sued in their individual capacities?

A.   I'm going to make reference to my prior answers.  The -- a -- I don't recall ever telling anyone that they cannot be sued.  And litigation was absolutely always a possibility.

Q.   Mr. Cuza, do you recall telling anyone that they could be sued in their individual capacity?

A.   In --

MR. PRIETO:  You know what, Mr. Hankey?  I'm going to instruct the witness not to answer.  It's beyond the scope of this order.

I mean, I've given you a lot of -- I mean, I've given you a lot of leeway, in my opinion, concerning the questions you're permitted to ask so that you could have your time, but it's -- it's beyond the scope of this order and this dispute.  This is a discrete insurance coverage dispute, and all these questions, frankly, are beyond -- not only beyond the scope of the order, but they're really irrelevant to this kind of dispute.

Page 113

MR. HANKEY:  Well, I completely disagree.  It's clear that they're within the scope of the order. Individuals at MV Realty were sued.  Claims were submitted on their individual -- in their individual capacity to the insurance companies.  Those claims were denied.  They were denied on the basis of the defenses that are at issue in this litigation and also referenced specifically in the Court's order.

Questions about what individuals knew and when are directly relevant to rebutting the defenses that the defendants in this case, the insurance companies, have raised.

So I'll ask you, Mr. Prieto, in the interest of trying to get some things done today, before we have to come back later, to reconsider your position.

MR. PRIETO:  I've reconsidered, and I'll stand by my objection and the instruction.

MR. HANKEY:  Mr. Kaplan, I know we're coming to the point where Mr. Prieto will tell us that we're out of time.  I'm not finished with my outline, but I'm happy to yield the rest of the time to you if you have questions that you would like to ask.

MR. KAPLAN:  I've got questions, but I would just save them for trial, because either we're going to come back or not, and a magistrate will decide

Page 114

that.  I don't want -- I don't think I'll be any quicker on the record, so, by all means, finish up.

MR. HANKEY:  Okay.

MR. KAPLAN:  Peter, what's your position on how much time Kyle has left?

MR. PRIETO:  Kyle has -- from what I understand, Mr. Kaplan, he's got 20 minutes left.

MR. KAPLAN:  Okay.  Does anyone mind if we take about five minutes now?

MR. HANKEY:  I don't mind.

MR. PRIETO:  Of course not.  If you need another five, that's fine.  But I really -- it's 3 1/2 hours per the Court's order.  That's -- that's sort of what we're going to stick to.

MR. HANKEY:  Well, Mr. Prieto, we -- I think we agree that we weren't counting break times.

MR. PRIETO:  Mr. Hankey, I wasn't counting breaks.

MR. HANKEY:  Okay.  Got it.

MR. PRIETO:  All right.

MR. HANKEY:  I was confused by your last statement.

All right.  We can go off the record and be back in -- why don't we come back at 12:45?

MR. PRIETO:  Yes, sir.

Page 115

MR. KAPLAN:  That's fine with me.

THE VIDEOGRAPHER:  We are off the record at 12:36.

(Thereupon, a recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER:  We are on the record at 12:46.

(Plaintiffs' Exhibit Number 10, Civil Investigative Demand, was marked for Identification.)

BY MR. HANKEY:

Q.   Okay.  Mr. Cuza, I am going to show you what I'm marking as Exhibit 10.

Do you see a civil investigative demand on your screen, Mr. Cuza?

A.   I do.

Q.   Can you tell me what we're looking at.

A.   A civil investigative demand.  It's served by certified mail and addressed to MV of Massachusetts, LLC.

Q.   What date was it issued?

A.   On May 20th, 2022.

Q.   And which office issued it?

A.   Massachusetts.  The --

Q.   Do you know --

Page 116

A.   Wait.  Wait.

Q.   Go ahead, Mr. Cuza.

A.   AGO's office in Massachusetts.

Q.   Did Holland & Knight represent MV Realty in connection with the response to this CID?

A.   My recollection is that it did.

Q.   And you see the reference at the end of the first paragraph of this first page of Exhibit 10 to the investigation of whether MV Realty's homeowner benefit agreements violated GL 93A, Section 2.

The question is, Do you see the reference to that at the end of the first paragraph?

A.   Yes.

Q.   Did Holland & Knight represent MV Realty in connection with that investigation throughout the investigation, not just in connection with the initial response to the CID?

A.   And at some particular point in time, another law firm of Massachusetts stepped in and took the lead.

Q.   And what law firm was that?

A.   I don't remember.

Q.   Do you know what GL 93A, Section 2, refers to?

A.   Not specifically.  And, obviously, it's a statute, one that was -- I assume it's a statute of the law from Massachusetts; right?

Page 117

Q. Did you or anyone else at Holland & Knight advise MV Realty that it was likely to be sued in connection with this attorney general's investigation out of Massachusetts?

A. And they knew of the possibility of being sued. And, like I mentioned, there were conversations with Steve Cobb about this.

Q. You just testified you would imagine that there were conversations with Steve Cobb about this.

Can you expand on what you mean by that.

A. I didn't say anything -- on the contrary. I didn't say "imagine"; right? I said, "Like I mentioned" -- right? -- "there were conversations with Steve Cobb about this."

Q. Before August 28, 2022, did you or Holland & Knight advise MV Realty that it was likely to be sued? Not just could possibly be sued, but did -- did you or anyone at Holland & Knight advise MV that it was likely to be sued by the attorney general's office of Massachusetts?

MR. PRIETO: I'm instructing the witness not to answer based on the order.

BY MR. HANKEY:

Q. All right. Mr. Cuza, with respect to any regulatory investigation, did you or anyone at Holland &

Page 118

Knight ever tell anyone at MV Realty prior to August 28, 2022, that MV was likely to be sued by one of those regulatory bodies?

MR. PRIETO:  Same objection.  Same instruction, Mr. Hankey.

BY MR. HANKEY:

Q.   Mr. Cuza, earlier we talked about discussions with Mr. Cobb, Mr. Schultz involving investigations in Massachusetts, Pennsylvania.  Did any of those discussions involve a communication to anyone at MV Realty that MV was likely to be sued by an attorney general's office?

MR. PRIETO:  Same instruction.  Same objection.

(Plaintiffs' Exhibit Number 11, Investigative Demand, was marked for Identification.)

BY MR. HANKEY:

Q.   Mr. Cuza, I'm going to mark and show to you Exhibit 11.

Do you see Exhibit 11 on your screen, Mr. Cuza?

A.   I do.

Q.   What is 11?

A.   It's called an investigative demand from the State of Georgia, the Fair Business Practices Act.  And it's addressed to MV Realty PBC, LLC, through an André Hendrick from Holland & Knight out of our Georgia

Page 119

office.

Q.   Who is André Hendrick?

A.   André is in -- an attorney at our Georgia office.

Q.   Why was this CID directed to MV Realty PBC through Mr. Hendrick?

A.   Because the -- our Georgia office had the -- by the time our Georgia office was communicating with the state attorney -- it's the state attorney's office.

Q.   And what's the response date on this CID?

A.   Show me again.  I can't see it.

MR. PRIETO:  He can't see it.  Can you please blow it up.

BY MR. HANKEY:

Q.   Do you see it in the box there, Mr. Cuza?

A.   Okay.  July 22nd, 2022.

Q.   Okay.  Did Holland & Knight represent MV Realty in connection with the investigation underlying this CID?

A.   We did.

Q.   Were you involved in that representation?

A.   I was aware of the representation.  I was working with the counsel in our Georgia office.

Q.   In what ways were you involved in the investigation?

Page 120

A.   I would communicate with them.  I would communicate with MV.  The -- so I was part of it. The -- if you want specific ways, I would have to look at -- at what we did.  I'm definitely aware of it. Definitely worked on it, but I wasn't the one having any true communications with -- with the -- with the State.

Q.   Did you provide any updates to the MV client regarding the status of this investigation?

A.   I -- I'm sure I did.

Q.   And to whom would you have likely provided those updates?

A.   Certainly Tony, Jonathan Neuman as well, and possibly Steve Cobb.

Q.   Before August 28, 2022, did you ever tell MV Realty that it was likely to be sued in connection with the investigation reflected in this CID?

MR. PRIETO:  Objection to the -- objection. And I'm instructing the witness not to answer based on the Court's order.

BY MR. HANKEY:

Q.   Mr. Cuza, do you know of anyone advising MV Realty that it was likely to be sued in connection with this -- the investigation reflected in this CID?

MR. PRIETO:  Same objection.  Same instruction, Mr. Hankey.

Page 121

BY MR. HANKEY:

Q.   I'm going to take this exhibit down.

Mr. Cuza, were you aware that MV Realty had a directors and officers insurance policy?

A.   That -- was I specifically aware?  I don't remember specifically being aware, but I would assume -- assume that that was the case.

Q.   Did you ever advise anyone at MV Realty that it should consider notifying its insurance companies -- any one of its insurance companies or its broker about any attorney general-led investigation prior to August 28, 2022?

MR. PRIETO:  Objection to the form.

MR. HANKEY:  I'll rephrase.

MR. PRIETO:  Thank you.

BY MR. HANKEY:

Q.   Mr. Cuza, prior to August 28, 2022, did you ever advise anyone at MV Realty to consider notifying its insurance carrier or broker of the AG investigations that existed at that time?

A.   I don't remember ever the question ever being asked -- being asked, number one.  I remember representing MV with regards to matters that had to do with its insurance carriers.

I do remember -- but this -- this was from

Page 122

Tony.  I do remember in- -- Tony using content for matters regarding the insurance company.

Q.   Just so I have the record clear, Mr. Cuza, did Holland & Knight give MV Realty any advice about making any disclosures under any of its insurance policies during the time period you've been talking about?

MR. PRIETO:  I'm just going to object, Mr. Hankey, that that question is woefully wry.

The order says, and I quote, "Any advice H&K gave MV about what disclosures to make when obtaining the insurance policies at issue in this lawsuit."  So it involves the two policies at issue from Markel and for this discussion table.

So if limited in that way, I have no objection.

MR. HANKEY:  No.  The question relates to the first two items, that list of four that you're referring to, Mr. Prieto.

So let me just rephrase my question, and I'll allow you to object, or the witness can answer.

MR. PRIETO:  Understood.

BY MR. HANKEY:

Q.   Did Holland & Knight ever advise MV Realty to notify its insurance companies regarding any regulatory matter during the time period leading up to August 28, 2022?

Page 123

A.   I really don't remember pulling my -- they gave me a call in the matter regarding what to notify or not to notify on insurance.

Q.   Mr. Cuza, at any point, did you advise MV Realty -- strike that.

At any point prior to August 28, 2022, did you ever advise MV Realty that it could be sued under a consumer protection statute?

MR. PRIETO:  Objection.  Instruct the witness not to answer.

BY MR. HANKEY:

Q.   Similar question:  At any point prior to August 28, 2022, did you advise MV Realty that it was likely to be sued under any consumer protection statute?

MR. PRIETO:  Same objection.  Same instruction.

BY MR. HANKEY:

Q.   And at any point prior to August 28, 2022, to your knowledge, did Holland & Knight advise any individual at MV Realty that it could be sued in their individual capacity under any consumer protection statute prior to August 28, 2022?

MR. PRIETO:  Same instruction.  Same objection.  Same instruction.

BY MR. HANKEY:

Q.   Mr. Cuza, did you provide any advice -- strike

Page 124

that.

Mr. Cuza, to your knowledge, did anyone at Holland & Knight provide any advice to MV Realty about what disclosures to make when obtaining the insurance policies at issue in this lawsuit?

A.   Not that I recall.

Q.   And bear with me one moment.  I may be finished.

MR. HANKEY:  Mr. Kaplan, do you have any questions before we wrap up?

MR. KAPLAN:  About a half hour or 40 minutes.  I don't think it's going to be allowed.

MR. HANKEY:  Okay.

BY MR. HANKEY:

Q.   Mr. Cuza, besides you, Ms. Canamero, Mr. Cobb, Mr. Schultz, were there any other Holland & Knight attorneys who were substantially involved in representing MV Realty in connection with attorneys general lawsuits prior to August 28, 2022?

MR. KAPLAN:  Object to the form.  I don't think there were any actual lawsuits by that time.

MR. HANKEY:  I'll rephrase.

MR. KAPLAN:  Thanks.

BY MR. HANKEY:

Q.   Mr. Cuza, besides you, Ms. Canamero, Mr. Cobb,

Page 125

Mr. Schultz, were there any other Holland & Knight attorneys substantially involved in the representation of MV Realty in any attorney general law- -- investigations prior to August 28, 2022?

A.   And so my -- the -- absolutely -- and the word "substantial," I don't agree with it; right? "Substantial" is a matter of -- it's going to have to be defined.

Q.   Just let me ask it --

A.   I'm going to answer your question.

Q.   Okay.

A.   All right?  The -- on a state-by-state basis, there were people that worked on certain matters -- specific matters, regarding specific issues and matters, including some attorney generals' offices.  Just show me the document that related to the Georgia investigation. The -- and two of our attorneys in Georgia worked on that for us.

So it is probably -- it's possible that there were other attorneys that worked on matters relating to one of the attorney general's offices of one of the states.

MR. HANKEY:  Okay.  I have no further questions.

Mr. Prieto, did you want to ask any questions

Page 126

before we go off the record?

MR. PRIETO:  No, sir.

MR. HANKEY:  Okay.  All right.  We can go off the record.

THE VIDEOGRAPHER:  Okay.  We're going off the record at 1:06.

(Thereupon, the videotaped deposition was concluded at 1:06 p.m.)

Page 127

CERTIFICATE OF OATH OF WITNESS


STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE      )


    I, VANESSA OBAS, RPR, Notary Public in and for the State of Florida at Large, certify that the witness, JESUS ENRIQUE CUZA, appeared before me via Zoom videoconference on July 6, 2026 and was duly sworn by me.

    WITNESS my hand and official seal this July 10, 2026.


        VANESSA OBAS, RPR
        Notary Public, State of Florida
        at Large
        Notary #HH428338
        My commission expires:  3/13/2027


Produced Identification
Type of Identification Produced:  Driver's License

Page 128

REPORTER'S DEPOSITION CERTIFICATE

I, VANESSA OBAS, RPR, certify that I was authorized to and did stenographically report the deposition of JESUS ENRIQUE CUZA, the witness herein on July 6, 2026; that a review of the transcript was requested; that the foregoing pages numbered from 1 to 130 inclusive is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED this July 10, 2026.

VANESSA OBAS, RPR

Page 129

PETER PRIETO, ESQUIRE

pprieto@podhurst.com

                                    July 10, 2026

RE: ZACHMAN, AMANDA and MV REALTY PBC, LLC v. MARKEL
AMERICAN INSURANCE COMPANY AND HOUSTON SPECIALITY
INSURANCE COMPANY

                  WITNESS:  JESUS ENRIQUE CUZA

TAKEN: July 6, 2026     ASSIGN.#:  FLA 8300095


The above-referenced transcript is available for review.

The witness should read the testimony to verify its
accuracy.  If there are any changes, the witness should
note those with the reason on the attached Errata Sheet.

The witness should date and sign the Errata Sheet and
e-mail it to the deposing attorney as well as to
Veritext at transcripts-fl@veritext.com and copies will
be emailed to all ordering parties.

It is suggested that the completed errata be returned 30
days from receipt of testimony, as considered reasonable
under Federal rules*, however, there is no Florida
statute to this regard.

If the witness fails to do so, the transcript may be
used as if signed.

          Yours,

          Veritext Legal Solutions


*Federal Civil Procedure Rule 30(e)/Florida Civil
Procedure 25 Rule 1.310(e).

Page 130

RE:  ZACHMAN, AMANDA and MV REALTY PBC, LLC v. MARKEL
AMERICAN INSURANCE COMPANY AND HOUSTON SPECIALITY
INSURANCE COMPANY
DEPO OF:  JESUS ENRIQUE CUZA
TAKEN:  July 6, 2026        ASSIGN.#:  FLA 8300095

E R R A T A   S H E E T

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

PAGE _____| LINE _____| CHANGE _____

_____

REASON FOR ABOVE CHANGE:_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.


_____          _____
Date                    JESUS ENRIQUE CUZA

**[& - 28]**

| & | 1 |
|---|---|
| **&**  6:22 18:10 20:5,8 27:22 33:12,15,22 36:21 37:5,7 39:9 44:7,19 45:8,22 46:2 46:11,12 49:12 50:4 51:15,17 51:19 56:4 57:3,16,18 58:1,8 60:12 60:18 61:22 65:2 71:3 76:15 77:25 80:7,25 82:15 83:7 93:10 96:17 99:25 100:18,23 101:2 103:10 103:13,24,25 104:6,11,20,20 105:3,4,5 107:16,20,21 108:4 110:5,9 110:11,22 112:3,4 116:4 116:14 117:1 117:15,18,25 118:25 119:17 122:4,22 123:18 124:3 124:16 125:1 | **1**  4:3 10:12,16 10:24 11:23 42:18 98:21 102:19 128:7 **1.310**  129:21 **1/2**  13:24 114:13 **10**  4:3,14 115:8 115:13 116:8 127:11 128:18 129:3 **101**  4:11 **1054**  2:3 **108**  4:12 **10:01**  41:11 **10:15**  41:15 **10:35**  53:6 **10:37**  53:9 **11**  4:15 118:14 118:18,19,21 **115**  4:14 **118**  4:15 **11:15**  74:3 **11:23**  74:7 **11th**  98:20 **12**  14:3 **127**  3:5 **128**  3:6 **12:36**  115:3 **12:45**  114:24 **12:46**  115:7 |

| | |
|---|---|
| **12th**  8:8 **130**  3:6 128:7 **138**  8:9 **13th**  17:22 18:5 30:16 **17**  4:3 **18**  4:6 60:25 61:10 **1989**  7:1,1 **1990**  7:2 **1:06**  1:19 126:6 126:8 | 86:17 88:15 90:1 96:19 102:14 110:4 112:3 115:22 117:15 118:2 119:16 120:14 121:12,17 122:25 123:6 123:13,17,21 124:19 125:4 **2023**  9:15 **2026**  1:18 5:16 127:9,11 128:5 128:18 129:3,6 130:3 **20th**  115:22 **21**  4:7 61:2,23 **22**  108:19 **22726**  127:15 128:22 **22nd**  102:14 119:16 **25**  129:21 **2525**  2:9 **26**  11:23 **28**  36:23 86:2 86:17 88:15 90:1 96:19 112:3 117:15 118:1 120:14 121:11,17 122:24 123:6 123:13,17,21 124:19 125:4 |

| 2 |
|---|
| **2**  2:15 4:3 17:11,15,20 62:25 65:11 98:18 99:5 102:12 116:10 116:22 **20**  15:18 114:7 **200**  2:4 **20007**  2:4 **2000s**  9:14 15:18 **2018**  17:22 18:5 28:18 30:16 **2021**  98:20 **2022**  4:4,5,7,8 36:23 41:17 42:1,7,12 61:1 61:3,10,23 85:18,23 86:2 |

**[28th - admitted]**

**28th**  71:5 85:23
**29**  4:5 42:7,12
**2nd**  4:4 41:17
42:1

**3**

**3**  4:4 13:24
41:17,21 42:25
99:10,12,16
109:10 114:12
**3/13/2027**
127:17
**30**  129:14,21
**3050**  2:15
**31st**  2:3
**33131**  1:21
2:16
**33134**  2:10

**4**

**4**  4:5 42:7,11
43:1 56:15,16
56:18 60:10
**40**  22:14 23:21
23:23 24:25
124:11
**41**  4:4
**42**  4:5
**4631**  98:13

**5**

**5**  4:6 60:25
61:6,8,9 64:12

**6**

**6**  1:18 3:4 4:7
61:2,8,20
65:11 127:9
128:5 129:6
130:3
**60**  4:6
**61**  4:7
**6th**  5:16

**7**

**7**  4:9 96:16
98:2,5,8
101:13,14,17
101:19
**700**  2:10

**8**

**8**  4:11 87:3
95:25,25
101:10,16,21
101:22,23
102:4
**80826**  1:2
**8300095**  129:6
130:3

**9**

**9**  4:12 108:22
109:3,10,11
**93a**  116:10,22
**98**  4:9
**9:00**  1:19
**9:04**  5:15

**9:25**  1:2
**9th**  110:4

**a**

**a.m.**  1:19
**ability**  14:18
**able**  10:18,22
49:21 55:10
**above**  4:17
69:15 74:22
129:8 130:7,10
130:13,16,19
130:22
**absence**  70:12
71:20
**absolutely**
13:15 34:25
85:3 87:16
106:9 112:9
125:5
**accuracy**  46:4
46:14,16
129:10
**accurate**  48:4
56:23 57:21,24
58:5,6,11,12
60:15,16,22
62:13
**accurately**
46:25 47:8
53:2
**accused**  111:13
**act**  118:23

**acted**  24:17
36:15 87:10
**acting**  109:13
111:13
**action**  128:16
**actions**  12:1
50:15
**acts**  99:22
**actual**  124:21
**actually**  31:3
32:14 49:22
51:21 57:7
76:23 83:12
103:4 104:4
**added**  28:10
**addition**  66:1
**address**  54:22
55:1 62:19
107:9
**addressed**
17:22 54:10
82:5 98:10
102:10 109:16
115:19 118:24
**addressing**
31:14 49:12
50:4,17,19,20
51:16 64:9
67:4,17 70:19
71:25
**administrative**
21:16 52:14
**admitted**  50:9
50:11

**[advice - answer]**

**advice** 25:9
33:14 35:25
37:7 39:6,8,22
53:11,13 54:23
70:24 73:3,4
80:25 82:8
83:7 85:12
93:10 95:18
100:9 102:23
122:4,9 123:25
124:3
**advise** 54:21
94:13,17 112:4
117:2,16,18
121:8,18
122:22 123:4,7
123:13,18
**advised** 31:9
35:23 36:21
37:5 53:21
54:24 78:1
81:21 84:22
87:17 94:9
96:11
**advising** 23:13
71:4 81:23
85:5 120:21
**affairs** 110:2
**affiliated** 9:17
12:14 13:1
**affirm** 6:6
**affirmative**
96:21

**afoul** 75:2,5
**ag** 94:25
103:12 104:1
104:12,21
107:17,22
108:9,16
111:19 112:2
121:19
**ag's** 96:18
100:19 101:1
106:2
**agencies** 21:8
27:13,13 32:6
48:18 56:22
58:10,14 60:13
60:21
**agency** 59:9,10
82:10,10 93:1
94:25
**agenda** 26:6,6
26:7
**agents** 60:13
**ago's** 116:3
**agree** 5:12
25:13,18 44:10
44:12 45:14
48:4 114:16
125:6
**agreed** 4:21
18:12 55:12
**agreement**
19:10,12,16,17
19:22,23,25
20:18,25 22:20

22:22,22,25
23:5,6,9 27:11
31:9,18 64:4
65:15 66:17
70:13 71:21
**agreements**
70:3 116:10
**ags** 36:23 71:5
**ahead** 9:1
27:20 43:11
57:13,14 64:10
64:24 68:10,11
105:25 116:2
**aid** 80:15
**al** 1:10
**allow** 14:25
122:19
**allowed** 15:8
87:15,16
124:12
**allows** 71:3
**allude** 106:9
**alluded** 106:9
**amanda** 1:4,13
61:12,14 62:2
68:4 102:22
129:4 130:1
**amend** 85:24
85:24
**amended** 23:16
**american** 1:7
1:10 2:17 5:23
129:4 130:1

**amount** 38:1
**andré** 118:24
119:2,3
**answer** 8:4,25
10:6 11:17,19
13:7,18 14:1
14:13,18,25
16:1,6,16,21
17:2 23:6 24:7
24:12,22 25:23
26:17,25 27:2
28:10,22 29:18
32:21,23 33:7
33:19,25 34:10
34:14 36:3
40:9 43:19
44:14,14 47:4
50:23,24 51:1
51:14 54:15,20
56:2 64:18
69:11,12 70:22
70:25 71:11
72:3,10,12,21
73:1,14 75:12
75:19 83:22
85:1,4 86:11
86:12,25 90:4
91:13 93:21
94:3,21 95:3
95:10 97:14
101:5 104:8
105:7,8,23
106:4,11
107:12,13

108:13 111:22
112:15 117:22
120:18 122:19
123:10 125:10
**answer's** 69:23
104:2
**answered** 14:7
23:18 26:25
44:16 74:13
75:4 84:2,25
**answering**
54:16 104:17
**answers** 112:8
**anthony** 17:23
**anticipation**
84:7
**antony** 1:14
41:23 50:11
102:22
**anyway** 27:1
**apart** 78:14
79:13
**apparently**
11:2
**appear** 10:24
11:3
**appearance**
5:17
**appeared** 127:8
**appearing** 2:5
2:6,11,12,17,18
**appears** 11:2,5
61:21

**applicable** 66:4
74:16
**applies** 91:2
**appreciate** 30:3
52:24 73:12
**approach**
53:22 54:22
**approached**
100:16
**appropriate**
74:16 96:11
**approximately**
39:22
**april** 4:5 42:7
42:12
**area** 21:20
40:14 51:10
**areas** 7:6 40:16
**arguably** 96:20
**argument**
24:10 96:21
97:3
**arizona** 82:4,5
82:10,14 83:8
**arose** 106:25
**arrangements**
49:11
**aside** 59:18
81:19,21
**asked** 8:6 14:10
31:11 84:24
89:21 98:17
103:8 106:22
110:21 121:22

121:22
**asking** 8:11
12:25 15:6
16:8,12 25:18
29:1 32:20,24
34:12,15,17
37:1 42:18
68:18 69:1
71:14 72:23
73:2 75:8
86:20,22,23
93:16 96:6,24
96:25
**aspect** 22:17
**assign** 129:6
130:3
**assisted** 128:10
**assisting** 44:8
44:20 45:25
49:23
**association**
21:18
**associations**
56:22
**assume** 31:4
44:25 47:4
116:24 121:6,7
**assumed** 69:19
**assuming** 93:4
**atlantic** 98:13
**attached** 42:4
43:1 62:3
99:11,17
129:10

**attaches** 61:16
**attachment**
61:8
**attempting**
63:24 64:1,2
**attorney** 4:12
16:13 36:9
45:4,23 47:20
48:11,16 50:10
51:5 58:18
59:4 77:4,6
78:8 79:5 93:3
93:15 98:11
100:7,12
102:16,18
103:1,15
105:18 106:13
106:14,18
108:1,18,22
109:13,13
110:6 117:3,19
118:11 119:3,9
121:11 125:3
125:15,21
128:14,16
129:12
**attorney's** 45:3
51:8 119:9
**attorneys** 21:9
24:15 36:13,16
45:9 47:9,15
47:18 48:13
50:9,15,16,25
51:3 56:21

**[attorneys - board]**                                           Page 135

58:21 60:20 77:8 87:8,11 95:7 124:17,18 125:2,17,20
**audio** 5:10,11 53:1
**august** 9:15 36:23 71:5 85:23 86:2,17 88:15 90:1 96:19 112:3 117:15 118:1 120:14 121:11 121:17 122:24 123:6,13,17,21 124:19 125:4
**author** 62:17 63:5,8
**authority** 99:24
**authorized** 128:3
**available** 129:8
**avenue** 98:13
**aware** 5:6 52:10,11 66:21 95:16 119:22 120:4 121:3,5 121:6
**awareness** 55:16,18,20,23 55:25
**axs** 2:3
**axslawgroup....** 2:5

**b**

**b** 4:1
**back** 9:13 22:20 23:15 27:9 28:18 29:22 30:15,15 39:23 40:24 56:8 63:10 64:11 69:12,15 74:21 75:9 78:25 79:9 80:22 82:19 86:6 88:21 92:4 98:21 102:19 113:15 113:25 114:24 114:24
**background** 8:12 14:22 15:12 51:11 93:12 94:2
**bad** 90:17
**bar** 7:2
**barred** 7:2
**based** 15:4 16:16 17:2,9 20:10 33:2 34:20 66:3 73:14 89:9 91:23,25 117:22 120:18
**basically** 45:24

**basis** 15:8 35:16 44:9,21 45:2 52:19 53:15,15,16,19 69:23 72:22 84:9 93:23 95:12 113:6 125:12
**bear** 124:7
**beat** 26:21
**becoming** 37:11
**beginning** 18:18 62:1 76:20 110:17
**behalf** 2:5,11 2:17 6:3
**bela** 26:21
**belief** 66:14
**believe** 15:11 17:5 18:19 39:13 46:25 47:7 57:22,25 84:6 92:19 95:19 100:4 103:9
**believed** 78:1
**beneficial** 60:5
**benefit** 19:23 116:9
**best** 20:13 33:8 46:18,22,24 48:5 63:16

**better** 62:7
**beyond** 8:17 10:9 13:20 14:1,13,16 15:11 24:9 29:3,24 33:17 40:8 54:23 55:17 56:1 85:21 95:19 96:14 99:12,14 111:22 112:16 112:20,23,23
**bias** 40:12,16
**bigger** 10:21 62:4 109:9
**bill** 32:18 100:14 103:20 104:23 107:1,1
**billing** 81:3 107:20,23
**bills** 33:6 46:3 46:3,4,12
**bio** 11:7
**biography** 4:3 10:12,24
**biscayne** 2:15
**bit** 20:20 42:21 62:4 63:11 75:18 81:16 85:13
**blow** 17:16 42:21 119:13
**board** 11:9

**boards** 60:14
**bodies** 71:5
  72:2 118:3
**body** 36:22
  77:1,3
**bottom** 11:8
  53:18 72:13
**boulevard** 2:9
  2:15
**bound** 70:13
  71:21
**box** 119:15
**break** 73:17
  114:16
**breaking** 29:24
**breaks** 114:18
**brief** 29:19
**bring** 28:15
  29:21 40:24
  92:22,23
**broad** 67:11
**broker** 121:10
  121:19
**brought** 28:19
  92:24
**bulk** 14:4
**business** 18:21
  19:2,23 23:4
  23:11,12,14
  27:11 28:20
  31:6,7,10
  33:23 56:12
  62:21 118:23

**businesses**
  84:14

          **c**

**c** 2:1 5:1 6:20
**california**
  12:24 13:1
**call** 23:8 34:8
  100:7,22 103:5
  105:14 123:2
**called** 6:12 19:2
  19:11,23
  103:19 107:1
  118:22
**calling** 19:13
  59:3 100:14
  103:8
**calls** 27:13
  100:6 108:4
**canada** 12:6,16
  12:18,19
**canamero**
  41:22 50:3
  61:10 124:15
  124:25
**capacities**
  112:6
**capacity**
  111:10,19
  112:12 113:5
  123:20
**capture** 53:2
**captured** 33:4

**carrier** 121:19
**carriers** 121:24
**case** 1:2 29:7
  36:25 47:11
  53:15,15,18,18
  53:19 54:23,23
  65:9 70:12
  87:13 113:11
  121:7
**cases** 54:1
  58:16 66:6
**caveat** 24:19
**cell** 5:8
**cellular** 5:8
**ceo** 17:23
**certain** 12:17
  23:21 25:21
  33:14 91:20
  125:13
**certainly** 9:19
  11:5 12:13
  22:16 35:21
  43:15 52:9
  54:25 107:25
  120:12
**certificate** 3:5,6
  127:1 128:1
**certified**
  115:19
**certify** 127:7
  128:3,13
**chances** 13:3
**change** 130:5,7
  130:8,10,11,13

  130:14,16,17
  130:19,20,22
**changes** 129:10
**charge** 12:5
  56:19,24 57:4
  57:8
**chartered** 59:4
**choice** 87:23
**chooses** 70:5
**cid** 95:7 116:5
  116:17 119:5
  119:10,19
  120:16,23
**cited** 66:6
**civil** 4:14 12:1
  38:1 115:8,14
  115:18 129:21
  129:21
**claim** 94:10,14
  94:18,24 95:6
**claims** 7:20
  36:22,24 71:4
  93:17 95:21
  96:19 97:5
  113:3,5
**clarification**
  42:25
**clarifying**
  57:10
**clear** 24:13
  71:14 87:6
  89:20 103:23
  113:2 122:3

**[clearly - concept]** Page 137

**clearly** 8:22 20:11 66:12 72:10

**client** 8:10,24 9:4 13:25 16:4 16:13,19,24,25 17:8,25 26:17 34:7,19,21 37:23 38:5,6 45:11 48:9,10 48:11 57:19 64:3 65:3,7,23 67:3,16,16 69:25 70:5,7 70:19 71:25 72:16,18 73:2 73:11 77:17 87:18 89:23 90:6 94:9 95:22 120:7

**clients** 8:14 10:2 13:5,10 16:10 31:8 34:4 35:2,3 37:19,22 38:2 38:4,7,8 39:7 49:18,18,19,22 51:22 68:22 70:2,3 94:7

**close** 70:22

**cobb** 45:5,10 45:16 47:1,19 76:1,12,16 80:6 81:20

82:25 88:10 89:7 117:7,9 117:14 118:8 120:13 124:15 124:25

**colloquy** 14:4

**colombia** 12:7

**colorado** 82:4,9 82:22,23 83:4 83:8

**come** 11:19 22:13 23:13 31:5 53:1 113:15,25 114:24

**comes** 9:24,24 52:5 55:22 57:1

**comfortable** 33:5

**coming** 79:9 90:14 110:16 110:20 113:18

**commercial** 7:7

**commission** 127:17

**commonwealth** 62:22

**communicate** 35:8 56:10 74:9 120:1,2

**communicated** 34:6,19 74:25 75:14,15 87:17

92:9

**communicating** 35:3 68:21 79:5,9 105:1 119:8

**communication** 35:13 105:2,3 108:1 118:10

**communicati...** 16:13 32:6 35:20 120:6

**companies** 7:12 9:16,18,22 10:4 11:10,25 12:15 13:4 50:20 93:11,16 93:17,18 94:7 113:5,12 121:9 121:10 122:23

**company** 1:4,7 1:8,10 2:17 5:23 7:22 12:21,23 98:17 103:4,11,14 122:2 129:4,5 130:1,2

**complainant** 65:13 66:16

**complaint** 48:6 48:9 49:15 54:2,3 55:16 61:18 62:2 64:8,16,20,21 65:24 66:9,10

66:12 72:1 79:4

**complaints** 21:12,15 44:9 44:21 45:1 47:25 49:4,5,7 49:10,13,23 50:5,17,19,20 51:12,16 53:12 53:23 54:23 55:2,3,19,20,24 56:1,4,6,7,11 56:20 57:5,18 58:2,25 66:24 67:1 74:11 78:2 91:20,21 94:15,19

**complete** 128:8

**completed** 129:14

**completely** 33:23 40:14 113:1

**compliant** 62:22

**compound** 81:15

**computer** 128:10

**con** 67:14 77:11

**concept** 67:3,21 69:19 70:18 71:24 72:14

[concerning - couple]

Page 138

concerning
  96:13 112:18
concluded
  126:8
conclusion   4:17
condition   16:10
conduct   17:7
conducted
  103:1
confers   57:19
confident   33:3
confrontation
  25:4
confused
  101:25 114:21
connected
  128:16
connection
  45:21 71:25
  94:14,18,25
  95:7 100:19
  103:11 108:9
  108:15 110:6
  110:13 111:3
  111:11,19
  116:5,15,16
  117:3 119:18
  120:15,22
  124:18
consider   13:16
  15:23 94:24
  95:6 121:9,18
considered
  129:14

constantly
  35:17
consumer   4:9
  48:7 49:3,7,13
  49:15 50:4,17
  50:19,20 51:12
  51:16 53:12,22
  53:24 54:2,3,6
  54:7,22 55:2,3
  55:10,12,16,19
  55:20,23,25
  56:3,6,7,11
  91:19,21 94:15
  94:19 98:2,9
  98:14 99:9
  102:9 110:2
  123:8,14,20
consumers
  47:25 54:8
  60:8 67:22
contacted
  30:23
content   122:1
context   44:22
  67:17 70:1,10
  70:19 71:2
  72:8 79:12
continue   5:11
  15:6 30:4
  40:21 62:18
continues   58:1
contract   48:10
  66:20,21,21
  67:23 69:19

70:4,5,6,6,8
contrary
  117:11
control   83:13
conversation
  39:14 59:8,11
  68:16,19,20
  69:2,4 76:24
  78:11 79:11,20
  79:22 106:6
  108:17
conversations
  5:7 19:7 21:8
  21:25 45:9
  47:15 58:9,14
  58:16 60:19
  68:6,14,25
  69:9,17 75:21
  76:21,25 77:8
  77:13,15,17
  78:16,17,22,24
  79:15 80:10,20
  81:5 85:15,16
  90:10 91:19
  117:6,9,13
conversed   35:9
  35:11,14 52:18
conveyed   77:16
cook   1:14
copies   99:13
  129:12
copying   41:23
coral   2:10

corporate
  18:14,16 20:7
  25:21 27:6
  28:8 31:13
corporation
  1:8,8
correct   13:5,10
  30:11 43:2,20
  46:7,18,22
  57:16 60:23
  65:23 90:25
correctly   48:2
  75:20
corresponden...
  62:2 65:3,4
costa   12:8
couched   72:24
counsel   4:22
  5:17,20 12:1
  37:12,13 58:3
  60:19 110:8,10
  110:23,24
  119:23 128:14
  128:16
count   96:22
counter   1:11,15
  2:6 5:21,24
counting
  114:16,17
country   45:10
  47:16
county   127:4
couple   9:2

**[course - decision]**

**course** 28:2 38:2 40:1 81:4 93:18 108:5 114:11

**court** 1:1 6:4 6:14 8:8 24:14 29:14 36:7,11 36:12 40:23 52:20 53:4 69:13 71:20 73:22 74:18,20 87:5,7,25 93:5 93:7 95:14 96:5,15,16 97:8,9 107:8

**court's** 8:17,22 9:3 14:2 15:5 16:16 17:2,10 24:9 25:14 29:17,22 33:18 33:25 36:3,5 40:8 70:23 71:2 73:15 75:2,6 87:1 93:25 95:25 97:10 113:8 114:13 120:19

**cover** 42:25 53:17,20 96:11

**coverage** 7:23 29:8 36:18 87:13 94:8 97:6 112:22

**covered** 20:4 31:25 76:7

**covid** 35:21

**cross** 40:17

**crystal** 62:3

**current** 10:2 11:1 42:13

**currently** 6:21 42:4 44:8

**customers** 49:8 49:9

**cut** 29:23

**cuza** 1:17 2:11 3:3 5:14 6:3,5 6:11,17,20,21 7:6 8:12 9:8 10:15,18 11:4 11:24 12:4,10 13:13 15:15 16:3,9,18,23 17:5,14,18 18:3 23:7 24:10 25:19 27:5 29:15 30:6 32:3,8 33:12,21 34:2 34:15 37:4 40:6,24 41:20 42:16 43:5,17 44:5 46:7,11 46:20 49:4 53:11 55:15 56:16,23 57:12 60:3 63:23

64:14,24 67:15 68:10 69:17 70:25 71:15 73:21 74:9,24 75:8,10,15 77:24 83:21 86:15 88:9 89:5 90:13,17 90:20 92:12 93:15 94:5,17 94:23 95:5,16 97:19,23 98:7 99:16 102:3,23 103:23 104:16 104:19 105:22 107:4,20 108:6 108:12 109:7 110:18 111:15 112:11 115:12 115:15 116:2 117:24 118:7 118:17,19 119:15 120:21 121:3,17 122:3 123:4,25 124:2 124:15,25 127:8 128:5 129:5 130:2,25

**cuza's** 40:12

**cv** 1:2

**d**

**d** 3:1 5:1 45:18 78:11

**d.c.** 2:4 45:18 45:19

**dade** 127:4

**daily** 35:16

**darryl** 1:14

**date** 1:18 5:15 18:3 69:3 85:22 89:6 98:18 102:12 110:3 115:21 119:10 129:11 130:25

**dated** 17:22 42:12 61:10,23 128:18

**dates** 9:13 86:5 86:6 88:19

**david** 1:14,14 9:23

**days** 129:14

**de** 2:9

**dead** 26:21

**dealing** 27:25 30:8,14,17,18 32:7 86:8,9

**dealt** 19:5 31:19,22 53:24 53:25 82:14

**deceptive** 99:4

**decide** 113:25

**decided** 33:15 69:20

**decision** 8:24

**[decisions - dispute]**

decisions  52:13
  70:4
declaration
  58:20
declarations
  49:22 55:13,13
declare  130:22
deemed  83:1
deeply  14:23
defendant  2:6
  5:24
defendants  1:9
  1:11,15 5:21
  113:11
defense  45:3
  96:21 97:8
defense's  96:20
defenses  113:7
  113:10
defensive  44:9
  44:21,22,25
defined  125:8
definitely  75:5
  120:4,5
degand  102:11
delray  45:20
delving  8:13
demand  4:15
  4:16 115:9,14
  115:18 118:15
  118:22
denied  113:6,6
depend  49:14
  50:6

depending
  40:23
depends  35:3,4
  35:5 51:18
depo  130:2
deponent  4:22
deponents  36:9
deposed  29:6
deposing
  129:12
deposition  1:17
  3:6 4:18,23
  5:10,14 8:4,7
  10:11,16 14:4
  14:20 73:24
  100:5 126:7
  128:1,4,9
describe  9:10
  18:16 20:7
  32:9,12 33:6,6
  48:6 56:3
  59:19 63:23
  64:2 68:8,15
  73:3 98:1,7
  102:4
described
  47:13 67:15
describes  32:25
describing
  63:25 97:8,9
description  4:2
  97:10
details  18:23
  25:3 38:15

82:13
determine
  74:16 88:18
  89:6,6,11
determined
  55:3
develop  73:7
dialogue  35:1
  54:7
dictations  35:1
differences
  20:22
different  9:8
  35:7 104:16
difficult  29:4
difficulty  52:22
direct  3:4 6:15
  65:10
directed  119:5
directing  22:4
directly  60:6
  73:9 93:13
  95:23 96:1
  113:10
directors  121:4
disagree  14:16
  30:1 64:17
  113:1
disclosed  96:22
  97:3
disclosures
  93:11 122:5,10
  124:4

discovered
  107:18
discrete  8:11
  36:17 87:12
  112:22
discuss  25:8
  62:21 72:13
  101:6
discussed  22:16
  22:25 25:1,5
  67:23,25 68:1
  68:2,2,3 71:24
  72:6,7,9,14,16
  75:22 76:23
  89:14 90:22
discusses  66:2
discussing  72:4
  77:10
discussion  53:7
  76:5 77:2
  100:7 122:13
discussions
  26:11 79:12,14
  80:17,24 81:2
  81:7,8,10,11,24
  82:12 88:14
  89:7,13 91:3
  118:7,10
dismissed  60:4
displayed
  10:19
dispute  7:23
  19:8 29:8
  36:18 112:21

112:22,25
**disputes** 20:22
**district** 1:1,1
**division** 61:17
  99:8,9 110:2
**divisions** 56:21
**dmm** 1:2
**docket** 8:9
**document** 21:5
  41:20 43:21,23
  62:17 92:4
  97:18,23 102:7
  109:7 125:16
  130:23
**documentation**
  31:1 82:11,19
  83:5 89:9
**documented**
  31:24 32:2
  59:14,16
**documents**
  39:24 57:23
  59:6 69:5
  77:19,20 79:1
  80:15,17,18,22
  86:7,9 88:18
  88:22 89:12,16
  92:1,7 100:3,3
  103:9 105:11
  105:12 106:21
  107:25 108:5,5
**doe** 62:3
**doing** 31:3
  37:16,17 51:21

64:10,20 83:4
  91:24 111:13
**dol** 61:18
**dominican** 12:7
**doran** 100:17
  101:9 103:3,17
  104:3,5,9,14,25
  105:10 106:19
  107:3
**draft** 4:8 39:20
  61:3,16,22
  62:25 63:23
  64:6 65:3,20
  69:21
**drafted** 38:10
  43:12,13,14,21
**drafting** 43:25
**drafts** 58:2
**driver's** 127:19
**duces** 4:10,13
  98:3,9,14
  102:10 108:23
  109:12
**due** 10:8 30:1
**duly** 6:12 127:9
**duration** 47:2

**e**

**e** 2:1,1 3:1 4:1,5
  4:7 5:1,1 6:20
  34:8,22 35:18
  41:18,22 43:1
  61:1,9 80:21
  81:3 83:6

88:18 89:9
  129:12,21,21
  130:4,4,4
**e.g.** 60:13
**earlier** 48:21
  89:15 90:19
  96:23 97:4
  100:5,22 118:7
**early** 9:14
  15:18 18:20
  20:20,21 30:9
**eastern** 5:15
**ed** 9:23
**effort** 43:16
  47:8
**efforts** 55:1
**either** 9:16
  42:16 43:24
  49:8 56:1 58:3
  58:23 60:4
  69:10 81:2
  82:9 83:8
  84:19 107:11
  113:24
**ellen** 99:6
**emailed** 129:13
**employee** 111:9
  112:5 128:14
  128:15
**employees**
  57:19
**encompass**
  27:7,24

**ended** 19:8
**ends** 85:23
**enforcing**
  99:23
**engaged** 83:3
**engagement**
  4:3 17:11,21
  18:6,9 27:5,7
  30:6
**enhancer** 52:24
**enrique** 1:17
  3:3 6:11 127:8
  128:5 129:5
  130:2,25
**ensure** 33:22
  62:19
**entered** 8:8
**entering** 66:22
**entities** 32:7
**entries** 32:9,11
  32:17 33:4
**entry** 8:9 32:13
**enumerated**
  95:24
**envelope** 39:16
  40:4
**errata** 3:6
  129:10,11,14
**esquire** 2:2,8
  2:14,21 4:17
  129:1
**establish** 57:20
**established**
  107:18

**[establishing - firm]** Page 142

establishing
  8:20
estate  21:18
  31:19 56:21,22
  60:14
et  1:10
evaluating
  67:17
events  57:20
eventually  20:2
  20:24 21:5
exactly  51:19
  76:6 104:25
examination
  3:4 6:15 40:17
example  31:17
  37:9,12 39:5
  52:7 55:22,24
  69:7 80:19
examples  55:8
  69:6 86:10
exculpated
  72:17
excuse  62:16
  101:15 105:4
  105:24
exhibit  4:3,3,4
  4:5,6,7,9,11,12
  4:14,15 10:12
  10:16,24 11:23
  17:11,15,15,20
  41:17,21 42:7
  42:11,25 43:1
  48:19 56:14,15

56:16,18 60:10
60:25 61:2,6,8
61:8,9 64:12
65:11 98:2,5,8
99:10 101:10
101:13,14
102:1,4 108:22
109:3,10,11
115:8,13 116:8
118:14,18,19
121:2
exhibits  4:17
existed  121:20
expand  67:9
  117:10
expanding
  21:23
expect  35:25
  39:8 81:11
  82:11 83:5
expectation
  83:17,18,19
expedition
  95:20
experience  9:5
  84:11,13
experienced
  84:10
experts  51:7
expires  127:17
explain  65:19
  67:15 68:10
  69:18 78:5

explained
  30:25 67:3
  69:25 70:18
explicitly  33:15
explore  40:15
extension  59:5
  100:8 103:9
extent  60:12

**f**

facilitate  60:19
facilitating
  45:8 47:14
fact  34:14
  36:10,17 38:25
  56:8 71:9
  78:22 87:11
  104:7
facts  54:4 64:2
  65:8,22 71:15
  106:9 130:23
factual  36:10
faded  75:18
  110:17
fail  96:2
fails  129:16
failure  65:16
fair  8:20 40:14
  70:2 81:17
  99:16 109:14
  118:23
fairly  91:20
fall  97:5

familiar  34:16
  84:18 85:8,9
  85:10
favor  40:22
favorable
  55:14
favorably  60:9
fdutpa  99:1,2
february  4:6,7
  60:25 61:2,10
  61:23
federal  11:10
  129:15,21
feel  33:2,5
fell  31:18
file  36:1 37:21
  37:21 39:9
filed  7:20 12:1
  56:20 59:24
  62:2 79:4
files  37:7 58:3
filing  37:17,18
  38:6 39:6
find  42:4 69:6
  82:11
fine  97:20
  114:12 115:1
finish  24:20
  34:2 68:11
  105:24 114:2
finished  14:11
  113:20 124:8
firm  6:1 21:21
  28:17 45:18

**[firm - general's]**                                          Page 143

56:6 57:8 62:9
82:14 92:8
100:15,16
106:18,20
116:19,20
**firms**  28:5
**first**  6:12 15:17
   18:3,9 19:16
   44:3 63:1
   92:19,21,23
   95:24 96:9
   99:20 116:8,8
   116:12 122:16
**fishing**  95:20
**five**  73:20
   114:9,12
**fl**  129:12
**fla**  129:6 130:3
**flawed**  90:20
**florida**  1:1,4,21
   1:21 2:10,16
   4:11 12:1
   21:21,24 31:15
   37:12,13 50:6
   50:8 52:8
   58:24,25 59:3
   59:19,23 98:11
   99:3,4 100:1
   100:13,19
   101:1,10,20,22
   102:16 103:2
   103:12,16
   104:1,12,21
   105:5,9 106:2

107:17,22
108:9,11,16,18
127:3,7,16
129:15,21
**fly**  91:9
**flying**  78:12
   91:10
**focus**  34:5 49:3
**focused**  21:23
**focuses**  8:9
**focusing**  47:12
**follow**  14:6
   24:11
**following**  25:19
   25:22 41:13
   74:5 97:20
   115:5
**follows**  6:13
**fore**  30:11
**foregoing**
   128:7 130:23
**foreign**  1:7,8
**foresee**  30:7
**foreseeable**
   28:19
**foreseen**  30:13
   31:2
**form**  39:21
   67:7 81:14,14
   121:13 124:20
**former**  11:9
**forms**  35:19
**forth**  82:19

**forthcoming**
   16:3,10,19,24
**foundation**
   8:21 15:12
**foundational**
   10:7,9 15:7
   28:23 29:1,10
   40:11
**four**  8:10,10
   21:2 87:2,6
   95:13 96:8,14
   111:22 122:16
**fourth**  96:10
**frankly**  112:23
**fraud**  7:20
   70:12 71:20
**free**  13:24 15:9
   66:20
**frequent**  35:21
   35:22 52:19
**frequently**  68:6
**friend**  13:16
**friends**  15:19
   15:21
**friendship**
   13:13
**front**  26:22
   52:25 54:24
   99:15 109:8
**full**  63:1 65:11
   65:14 66:17
**fully**  32:25
   62:19,22 95:16

**further**  8:21
   27:2 125:23
   128:13

g

**g**  5:1
**gables**  2:10
**game**  8:20
**gather**  100:3
   105:11
**gathered**  45:12
   100:3 103:9
**gathering**
   105:11 107:24
**gathers**  57:23
**gears**  9:8
**general**  16:12
   16:14 18:13,16
   20:10 27:6
   28:8 31:12
   33:2 34:3,9,15
   34:20 45:9
   47:16 48:14,16
   52:3 53:11,13
   56:21 68:15
   91:3 95:7 96:7
   98:11 100:13
   108:18 109:13
   121:11 124:19
   125:3
**general's**  4:12
   45:4 48:11
   58:18 77:4,6
   79:6 93:3

**[general's - hankey]**

102:16 103:2 103:15 105:19 108:1,23 109:13 110:6 117:3,19 118:12 125:21

**generally** 8:12 32:11 33:6,6 49:6 53:23 54:6 58:12

**generals** 45:24 78:9 125:15

**georgia** 118:23 118:25 119:3,7 119:8,23 125:16,17

**getting** 26:9 40:10 70:22 84:13

**give** 6:7 8:16 31:16 34:12 42:15 70:2 71:9 80:19 84:23 100:9 105:7 107:12 108:5 122:4

**given** 25:9 28:19 82:8 93:10 108:13 112:17,18

**gives** 92:7

**giving** 95:18

**gl** 116:10,22

**go** 5:12 9:1 15:11,13 20:13 20:13 22:19 23:25 24:20 27:20 29:12 30:15,15 33:8 39:23 41:8 43:11 44:3 48:22,24 50:8 53:3 56:8 57:12,12,14 63:11 64:10,23 68:10,11 71:11 74:1 78:25 80:22 82:20 86:6,7 87:21 88:21 92:3 105:25 107:8 114:23 116:2 126:1,3

**goes** 12:2 40:12 57:1,15 58:8 60:11,18 62:9 73:9

**going** 8:2,3 9:3 10:15 14:24,25 20:9 24:6,7,8 24:12,19 25:3 25:8 29:20,20 29:21 30:20,24 30:25 31:24 32:2,4,5 35:2 36:2 37:20,21 38:3 39:18,23

40:8,21 41:20 42:17 43:9 49:14 52:10 53:17 55:21 56:14 59:13,16 61:5,7 64:11 64:25 65:10 67:6 69:22 70:21 73:18 74:1,23,25 77:18,19 81:13 82:19 83:13,25 86:3,18,24 87:22 92:3,5 93:9,22 97:17 99:10 103:17 103:21 104:3,9 104:15,24,25 105:7 106:4,15 107:2,3,4,9,12 107:12,23 108:20 109:2 111:20,21 112:7,15 113:24 114:14 115:12 118:17 121:2 122:7 124:12 125:7 125:10 126:5

**good** 5:3,19,22 5:25 6:4,17,18 10:21 49:1 73:17

**government** 11:11

**governmental** 32:7 48:17

**graduated** 7:1

**gray** 39:17 40:5

**grounds** 13:19 14:19 16:8

**group** 2:3

**h**

**h** 4:1 130:4

**h&k** 122:9

**half** 29:11 124:11

**hand** 6:5 54:1 127:11

**handle** 28:3,11 28:16

**handled** 12:5 12:17 20:8 21:15,21 54:1 55:17 59:22 105:10

**handling** 28:9 37:14 53:12 54:11 76:14,17 79:17,17 91:6 91:19,21 94:11

**hankey** 2:2 3:4 4:17 5:19,20 6:16 8:3,19 9:7 10:7,8,14 11:21 13:8,12

**[hankey - holland]**

15:6,10,14
16:2,7,17,22
17:4,13 24:7
25:13,15,17
26:3,16,20
27:4,17,21
28:23,25 29:9
29:16 30:5
31:4,21 32:4
33:20 34:1
36:4,19 37:3,9
38:20 39:18
40:10 41:8,16
41:19 42:9,23
42:24 43:2,4
44:17,18 46:6
46:8,10 48:19
48:24 49:1,2
50:22 51:2
53:3,10 61:4
63:4,6,13 64:7
67:7,8,12,13,19
67:20 68:18
69:11,16 70:21
71:1,12,13
72:15,22 73:2
73:12,16,23
74:8,15,19,23
75:5,7 80:9
81:13,17,18
83:22 85:4,17
85:24 86:1,20
87:1,5 88:8
89:2,3,4 90:5

92:15 93:8,20
93:22 94:4,6
94:22 95:4,11
95:23 96:16
97:2,7,15,16,21
97:22 98:5,6
101:12,15,19
101:21,22
102:2 106:13
109:1,4,6
111:24 112:1
112:14 113:1
113:18 114:3
114:10,15,17
114:19,21
115:11 117:23
118:5,6,16
119:14 120:20
120:25 121:1
121:14,16
122:8,15,21
123:11,16,24
124:9,13,14,22
124:24 125:23
126:3
**hankey's** 88:23
88:25
**happened**
68:23,24 80:1
89:12 108:21
**happening** 35:4
**happy** 34:14
53:20 113:21

**hard** 43:18
**hba** 19:24 20:3
20:24 21:6,10
22:23 23:15,16
**hear** 17:24
19:16 52:24
74:13
**heard** 75:20
79:18 89:19
**hearing** 52:22
84:21 111:1
**hearings** 60:13
**heavily** 82:24
**held** 53:7 87:19
**help** 80:23
82:12 83:16
105:11 106:20
**helped** 100:3
100:25
**hendrick**
118:25 119:2,6
**herring** 9:23
12:18,18,22
**hh428338**
127:17
**higher** 60:20
**highly** 44:2
80:13
**hiring** 33:22
**historical** 71:15
**hk** 42:5,13 45:8
47:13 56:18
57:15,23

**hold** 93:19
**holdings** 1:13
**holds** 70:6
**holland** 6:22
18:10 20:5,8
27:22 33:12,14
33:22 36:21
37:5,7 39:9
44:7,19 45:8
45:22 46:2,11
46:12 49:12
50:4 51:15,17
51:19 56:4
57:3,16,18
58:1,8 60:12
60:18 61:22
65:2 71:3
76:15 77:25
80:7,25 83:7
93:10 96:17
99:25 100:18
100:23 101:2
103:10,13,24
103:25 104:6
104:11,20,20
105:3,4,4
107:15,20,21
108:4 110:5,9
110:11,22
112:2,4 116:4
116:14 117:1
117:15,18,25
118:25 119:17
122:4,22

123:18 124:3 124:16 125:1
**homeowner** 19:23 116:9
**honduras** 12:7
**honest** 15:23
**hopefully** 88:1
**horizon** 35:24
**horse** 26:22
**hour** 29:1 41:1 41:7 73:18 94:1 124:11
**hours** 13:24 47:2 73:25 109:5 114:13
**houston** 1:8 129:4 130:1
**hs** 57:19
**huh** 82:16

**i**

**identification** 10:13 17:12 41:18 42:8 61:1,3 98:4 101:11 108:24 115:10 118:15 127:19,19
**identified** 17:25 101:14 102:20
**identifies** 98:22
**identify** 17:20

**ignores** 65:14
**imagine** 117:8 117:12
**imperial** 9:21
**impor** 34:18
**importance** 67:21
**important** 13:5 13:10 34:6,19 35:8 37:5 54:8 66:23
**impossible** 32:21,22 34:10 34:11
**impression** 52:5,6
**inappropriately** 111:14
**incident** 34:25
**including** 21:2 23:14 88:11 125:15
**inclusive** 128:7
**individual** 1:4 111:8,10,17,18 112:4,6,12 113:4,4 123:19 123:20
**individuals** 7:21 11:25 21:2 60:20 69:18 75:23 111:13 113:3,9

**inform** 73:5
**information** 17:6 24:11 49:11 77:16 79:10 96:22 97:4
**informed** 67:22 68:23 70:4 88:12
**initial** 18:6 19:4 20:4 23:2 23:3 25:21 49:23 58:25 101:20 116:16
**initially** 19:1 21:1,21,22 23:1 47:23 59:24 105:15
**initiated** 14:5
**innocuous** 14:6
**inquiry** 94:25
**inside** 101:1
**instruct** 8:3,24 11:15,16 14:18 15:25 16:9 25:8 36:2 40:9 111:21 112:15 123:9
**instructing** 10:5 13:6,17 16:5,15,20 17:1 26:17,24 27:1 28:21 33:18,24 72:20

72:25 73:14 86:25 94:20 95:2,9 117:21 120:18
**instruction** 13:11 40:19 73:10 97:14 113:17 118:4 118:13 120:24 123:15,22,23
**instructions** 26:14
**insurance** 1:7,8 1:10 2:17 5:23 7:11,12,22 29:8 36:18 87:13 93:11,17 94:7,10,14,18 94:24 95:6 112:22 113:5 113:11 121:4,9 121:10,19,24 122:2,5,11,23 123:3 124:4 129:4,5 130:1 130:2
**insured** 8:1
**insurers** 7:8,10
**intent** 62:18 101:7
**interaction** 59:18 83:2
**interest** 113:13

**[interfere - jim]** Page 147

**interfere** 5:10
**interference** 5:8
**internally** 38:15 54:4
**interrupt** 14:11 25:15 89:2
**interview** 49:18
**introduce** 54:5
**invalid** 55:4,6
**invest** 107:16
**investigated** 11:10 102:20
**investigating** 83:11,12
**investigation** 59:4 95:8 100:20 101:1,8 103:1,12,15 104:1,12,22 105:6,9,19 106:3,19,23 108:2,9,16,19 110:7,13,24 111:4,11,19 116:9,15,16 117:3,25 119:18,25 120:8,16,23 121:11 125:16
**investigations** 45:25 46:1 72:1,19 73:4 96:18 97:5

107:22 112:2 118:8 121:19 125:4
**investigative** 4:14,15 99:23 115:9,14,18 118:14,22
**investigator** 58:23,24
**investor** 12:22
**invoice** 47:3
**invoices** 46:12 46:13,15,17,21 46:25 47:8
**involve** 11:20 48:11,13 51:17 51:20 100:23 118:10
**involved** 14:4 21:2,9 22:3 23:2 37:11 38:9,22 43:22 43:24 45:10,25 48:18 49:16,24 50:4,16 51:25 52:1,3 55:9 57:19 58:9,13 58:19 59:1,21 60:6,7 67:2 76:1,19 77:2,5 80:25 81:20,22 82:23,24 84:13 88:10 89:18 90:7 99:25

108:2 119:21 119:24 124:17 125:2
**involvement** 21:1 52:7 83:1 83:15 89:17
**involves** 99:3 122:12
**involving** 12:21 12:23 15:17 37:11 65:9 72:1 75:25 76:25 89:7,14 89:22 94:8 110:13 118:8
**irrelevant** 65:16 112:25
**issuance** 43:25 102:12
**issue** 22:18,18 31:17,20 53:15 53:15 54:10 55:11,13 58:20 66:4 73:9 82:5 95:17,18 96:12 106:25 113:7 122:11,12 124:5
**issued** 32:25 46:5 98:19,23 115:21,23
**issues** 8:10,11 21:17 27:25 28:1,10,11,15

28:18 30:16,18 31:22 36:10,18 54:11,24 70:20 76:13,17 78:9 87:12 95:14 111:23 125:14
**issuing** 65:3 102:15
**item** 42:18
**items** 87:2 95:24,24 122:16

**j**

**j** 6:20 45:10,16
**jadon** 2:21 5:4
**james** 2:14
**james.kaplan** 2:16
**jazz** 100:25
**jersey** 59:8,9 109:14,17,18 110:2,6,12 111:3,10
**jesus** 1:17 2:11 3:3 5:14 6:3,11 6:20 127:8 128:5 129:5 130:2,25
**jim** 5:22 45:5 45:19 76:7,8 76:10,12,16 78:6,9,13,15 79:14 80:14

**[jim - laptop]**

89:14,18,22
90:7,8 91:8,11
**jim's** 89:17
91:1
**john** 41:23
**jonathan** 18:19
18:22,24 19:7
19:13 21:6
22:1,2,3,7,9,10
26:1,5,6,7
39:15 51:24,25
52:10 68:3,7
76:3,21 77:9
78:18 79:11
83:19 84:16
90:10 91:4
92:16 105:16
105:17 120:12
**jonathan's** 22:7
**july** 1:18 5:15
119:16 127:9
127:11 128:5
128:18 129:3,6
130:3
**june** 8:8
**jurisdictions**
12:6

**k**

**kaplan** 2:14,14
5:22,22 13:19
13:22 14:3,8,9
14:11,16 15:3
29:19 30:1,3

40:20 41:2,4
73:21 87:14,20
87:25 88:3,7
101:14,16,18
113:18,23
114:4,7,8
115:1 124:9,11
124:20,23
**kaplanzeena....**
2:16
**keep** 29:19,20
52:1 64:25
**keeping** 52:14
**kind** 8:13 20:16
53:17 112:25
**kingdom** 12:5
**knew** 18:22
43:22 83:18,19
84:6 103:13
108:10 112:3
113:9 117:5
**knight** 6:22
18:10 20:8
33:12,15,22
36:21 37:5
44:7,20 45:8
46:2,11 50:4
51:17,20 56:4
57:3,16,18
58:2,8 60:12
60:18 61:22
65:2 71:3
76:15 77:25
80:7,25 93:10

96:17 99:25
100:18,23
103:11,13,25
103:25 104:6
104:11,20,20
105:3,4,5
107:16,21
108:4 110:5,9
110:11,22
112:3,4 116:4
116:14 117:1
117:16,18
118:1,25
119:17 122:4
122:22 123:18
124:3,16 125:1
**knight's** 20:5
27:23 37:7
39:9 45:22
46:13 49:12
51:15 83:7
101:2 107:20
**know** 8:2,7,16
11:1 13:22,22
18:8,9 19:5
20:12,14 21:18
23:9,19 24:8
25:23 27:9
28:7 31:4,10
31:11,23 33:7
35:18 38:12,15
40:20 42:16
43:5 48:20
51:14 52:4,17

55:5 63:2
66:11 68:5,5
68:21 69:2
73:16 76:4
79:7 83:4 88:3
90:11 91:13
96:7 100:17
103:6 106:13
109:4 111:6,20
112:14 113:18
115:25 116:22
120:21
**knowing** 49:10
**knowingly**
24:17 36:16
**knowledge**
46:18,22,24
92:14 123:18
124:2
**known** 11:25
15:15
**knows** 38:5
92:16,17
**kurt** 77:6
**kyle** 2:2,5 4:17
5:19 40:20
41:5 48:23
114:5,6

**l**

**l** 4:20
**laptop** 52:25
53:1

**[large - local]**                                                      Page 149

| | | | |
|---|---|---|---|
| **large** 17:17 127:7,16 | 69:24 70:24,24 71:24 72:23 | 120:10,15,22 123:14 | 79:23 80:3 82:2 83:9,11 |
| **law** 2:3 6:1,25 7:3 24:16 25:10 36:14 62:9,21 65:17 66:2 70:6 82:14 87:9 100:15,16 106:18 116:19 116:20,25 125:3 | 75:3,8 86:22 86:23 96:24 101:2 129:19 **legally** 65:16 **leon** 2:9 **letter** 4:4,8 17:12,21,25 18:4,6,10,12 28:7 30:6 38:5 38:10,17,21 | **limit** 11:15 33:12 **limitation** 27:22 **limitations** 28:2 **limited** 1:4 13:21 14:15,17 26:23 36:10,17 87:12 122:14 **line** 39:17 40:5 | 83:17,18,20 84:7,11,12,14 84:18,19 85:2 85:6,7,8,14,15 86:13 89:8 90:23 91:16,22 92:3,6,11,13,16 92:17 93:15 94:10 96:1 105:21 111:6 111:12 112:9 |
| **lawful** 25:10,11 25:11 | 39:21 61:3,22 61:22,25 63:1 | 53:18 72:13 73:8 97:11 | 113:7 |
| **lawn** 109:14 | 63:2,5,24 64:6 | 130:5,8,11,14 | **litigations** 39:1 |
| **laws** 62:22 | 64:20 65:19,21 | 130:17,20 | **litigious** 84:17 |
| **lawsuit** 37:21 92:21,23,25 107:17 122:12 124:5 | 69:21,21 70:11 71:19 72:11 **letter's** 64:8 **letterhead** | **lis** 37:18,21 38:6 39:6 **list** 9:18 11:6,8 12:2 122:16 | **little** 20:20 42:21 62:4 63:11 75:18 81:16 85:13 |
| **lawsuits** 37:18 39:6 124:19,21 | 61:23 **letters** 83:6 | **listen** 25:7 72:6 | **live** 5:13 **lived** 12:19,19 |
| **lawyers** 37:4 | **letting** 87:21 | **lists** 87:2 | **lives** 12:19 |
| **lead** 12:1 74:11 78:2,4,4,23 83:8 116:19 | **lewis** 82:15,19 **liability** 1:4 72:18 | **literally** 32:24 **litigate** 85:11 **litigating** 92:18 | **llc** 1:4,13,14 17:23 18:1 62:10 98:10 |
| **leading** 122:24 | **license** 127:19 | **litigation** 7:7,7 | 102:11 109:17 |
| **learn** 38:8 | **licensing** 61:17 | 15:17 19:9 | 109:18 115:20 |
| **led** 121:11 | **lieu** 40:21 | 21:16 35:24 | 118:24 129:4 |
| **leeway** 8:17 112:18 | **likelihood** 73:6 **likely** 44:2 75:1 | 37:6,11,14 38:9,14,23,25 | 130:1 **llp** 2:14 |
| **left** 114:5,7 | 75:1 80:13 | 39:2,4 74:11 | **local** 56:21 |
| **legal** 33:23 66:6 67:14,15 | 117:2,16,18 118:2,11 | 75:16 76:22 78:2,4,23 | 58:3 60:13,19 110:8,10,23,24 |

**[lodged - matters]**

**lodged** 67:1
**long** 6:25 15:15
  15:19 25:2
**longer** 10:3
  29:12
**look** 17:15
  22:20,21,21
  23:25 29:21
  30:16 39:23,24
  40:7 42:15
  56:8 65:8 66:9
  66:11 77:18
  86:7,8 88:17
  88:21 89:16
  90:2 120:3
**looked** 24:4
  69:5
**looking** 27:9
  60:11 89:12
  98:18 115:17
**lose** 85:13
**lot** 21:24 35:10
  35:14 37:11
  84:11,12
  112:17,18
**lyons** 99:6
  103:8

**m**

**made** 24:16
  36:15 43:16
  55:8 87:9
  93:17 96:19
  100:22

**magistrate**
  113:25
**mail** 4:5,7 34:8
  34:22 41:18,22
  43:1 57:6 61:1
  61:9 115:19
  129:12
**mails** 35:18
  80:21 81:3
  83:6 88:18
  89:9
**majority** 33:3
**make** 8:5 10:21
  16:9 24:13
  30:11 46:17,21
  62:4 65:2
  68:22 69:1
  70:3 84:9
  109:9 112:7
  122:10 124:4
**makes** 99:18
**making** 52:13
  100:22 122:4
**malpractice**
  95:21
**manchester**
  1:14
**march** 102:14
**mark** 118:17
**marked** 10:13
  10:16 17:12,14
  41:18,21 42:8
  56:14 61:1,3,5
  61:7,20 64:12

98:3 101:11
  108:23 115:9
  118:15
**markel** 1:7,10
  2:17 5:23 97:4
  122:13 129:4
  130:1
**markel's** 97:5
**market** 19:3
**marking** 42:10
  98:5 101:13
  102:3 109:3
  115:13
**martin** 103:22
**massachusetts**
  50:14 55:23
  62:10,23 65:17
  66:3,7 70:12
  71:19 75:25
  76:18,19,25
  77:2,14 78:16
  78:19,20,22
  79:8,19 80:18
  81:8,19 86:8
  88:10,13 89:8
  91:4 92:24
  93:1,4,6
  115:19,24
  116:3,19,25
  117:4,20 118:9
**materials** 45:11
**matt** 2:21 6:2
**matter** 5:21
  7:19 8:1 11:13

11:20 12:12,21
  14:22 19:4
  39:10 47:2,9
  62:14 72:11
  76:25 77:14
  78:20,23 79:19
  79:19 81:8,9
  81:10 88:11
  89:8,19 122:24
  123:2 125:7
**matter's** 92:3
**matters** 7:17
  11:7,19 12:5
  12:13,17 16:11
  18:14 19:2
  20:8,17 21:16
  23:14 27:6,7
  27:10,23 28:3
  28:8,14 31:13
  35:8 36:24
  37:6 39:2
  42:19,20 44:4
  44:8,20,25
  45:23 49:24
  50:11 51:5,7
  52:2 53:14
  54:8 59:20,22
  60:6,17,23
  67:5,17 70:1
  72:1,9 73:6
  77:10 78:7,8
  79:16,20 81:1
  81:20,22,25
  83:8,16 89:17

**[matters - mv]**

89:23 91:5 92:5 94:7 104:5 105:9,18 106:18,22 121:23 122:2 125:13,14,14 125:20

**maurstad** 78:11

**mean** 8:4 14:11 14:12 23:2 26:1,20 29:4 32:2 35:13,14 40:6 44:22,23 47:4 55:5 60:2 67:10 68:5 70:7 79:22 81:14,15 89:1 91:12 93:22 112:17,17 117:10

**meaningful** 62:20

**means** 44:25 48:7 114:2

**meant** 88:3 97:19

**meet** 78:13 91:11

**meeting** 90:15 91:2 92:2

**meetings** 45:8 45:11 47:14,15 58:9,13 75:13

75:22,24,25 77:21 80:5,8,9 85:14,16 88:9 88:19 89:22 90:7,13,18 91:7,8

**member** 48:7 52:1

**members** 11:9 47:25 49:8

**memo** 39:12

**memorandum** 4:6 34:8 42:8 42:12 43:12

**memory** 92:23

**mention** 9:19

**mentioned** 4:17 27:12 30:9 31:5 38:23 59:22 100:4 103:2,5,18 117:6,13

**mentioning** 19:25 20:18,25 22:20

**merely** 36:9,17 87:11

**messrs** 47:19

**met** 15:16 35:20 90:21

**metlife** 7:13,15 7:18,20

**miami** 1:21 2:16 127:4

**microphone** 5:9

**microphones** 5:6

**miller** 2:14

**mind** 9:24,25 11:19 22:13 55:22 81:15 92:12 114:8,10

**minimum** 38:4

**minute** 17:15 110:10

**minutes** 14:3 73:20 114:7,9 124:11

**miscellaneous** 42:20

**misreading** 87:14

**misrepresent...** 24:17 36:15 87:10

**misrepresented** 49:11

**missed** 38:18

**misunderstood** 36:20 37:1

**mitchell** 1:14 9:11,16,17 10:3 11:13,16 11:20 12:12,14 12:18 13:1,4,9 13:14 15:15,16 15:17,20,21,23

16:3,19 17:23 22:11 35:9 41:23 84:5 88:12 102:22 103:24 108:7 108:10,14

**mitchell's** 12:15

**modifications** 21:5

**moment** 42:15 124:7

**monday** 1:18

**money** 37:24

**morning** 5:3,19 5:22,25 6:4,17 6:18

**motion** 29:21

**motions** 24:1

**move** 25:24 107:5

**mullins** 82:24 83:2,3

**multiple** 77:11 77:13,15

**mv** 1:4,13,13 9:21 16:24 17:5,7,23 18:1 18:6,10,13,17 19:22 20:5,8 20:12 21:13,14 32:9,16 33:4 33:13,15,21 34:4,5,7,9,19

35:8,23 36:21
37:5,11,12,13
37:16 38:13,14
38:24 39:1,3
39:10 42:5
44:8,20 45:22
45:25 46:3,12
47:9 49:5,7
51:12,16,16,20
53:11,21 54:5
54:21,24 55:2
55:14,21 56:11
56:12,20,25
57:1,19 60:5,9
60:12,17 61:10
61:12 62:10
65:3 67:2,3
70:19 71:4,25
72:16 73:3
74:10,11 75:14
75:22,23 77:16
78:1 79:21
80:24 81:1
82:8,20 83:7
83:15,16 85:19
85:19 86:3,16
88:11 89:23
90:6,21 91:15
91:22 92:9,13
92:19 93:11
94:13,17,19,23
95:1,5,14
96:25 98:10
100:10,19,20

101:3 102:10
102:11,23,25
103:10,13,25
104:10,11,12
104:14,19,21
104:24 105:4,5
105:15,18
106:1,2,18,20
106:22,22,22
107:2,15,22
108:7,8,15
109:16,18
110:5,7,11,12
111:2,9,17
112:5 113:3
115:19 116:4,9
116:14 117:2
117:16,18
118:1,2,10,11
118:24 119:5
119:17 120:2,7
120:14,21
121:3,8,18,23
122:4,10,22
123:4,7,13,19
124:3,18 125:3
129:4 130:1
**mv's** 62:21
99:25

**n**

**n** 2:1 3:1 4:20
5:1

**n.w.** 2:3
**name** 5:3,25
6:19 19:15,20
21:7,18,19
22:7,8 23:10
23:10 51:8,23
79:7,8 93:4
**named** 21:5
82:15
**narrow** 14:14
**nature** 68:15
**necessarily**
80:11
**necessary**
40:17 60:12
**need** 30:11,11
34:12 45:12
48:20 70:2,3
75:9 94:5
114:11
**needed** 17:6
68:22 69:9
105:11 106:20
**nelson** 82:24
83:1,3
**neuman** 18:19
21:6 22:9,9,10
23:20 25:20
26:18 27:3
40:2 41:23
84:6 88:11
120:12
**never** 18:22
53:21 83:10

90:14 92:10
104:13 105:15
**nevertheless**
62:18
**new** 28:10 59:8
59:9 109:14,16
109:18 110:2,6
110:12 111:3
111:10
**nicaragua** 12:7
12:20,21
**nicest** 88:4
**non** 29:7 94:25
**nonparty** 6:3
29:7
**notary** 127:6
127:16,17
**note** 4:17
129:10
**notes** 128:8
**notify** 122:23
123:2,3
**notifying** 121:9
121:18
**notwithstandi...**
104:7 108:6
**november**
17:22 18:5
30:16 85:18
**number** 4:3,3,4
4:5,6,7,9,11,12
4:14,15 9:22
10:12 12:2
17:11 28:14

**[number - opinions]**

30:20,22 31:15
31:16 36:23
41:17 42:7,18
60:25 61:2
87:4 98:2
101:10 108:22
115:8 118:14
121:22
**numbered**
128:7
**numerous**
11:24

**o**

**o** 4:20 5:1
**oath** 3:5 127:1
**obas** 1:23 127:6
127:15 128:3
128:23
**object** 8:3 15:9
67:6 81:13
83:25 111:21
122:7,19
124:20
**objection** 8:6
10:5 13:6,11
13:17 15:25
16:5,15,20
17:1,9 28:21
33:17,24 36:2
40:18 67:9
72:20 84:24
85:21 87:22,24
94:20 95:2,9

97:13 113:17
118:4,13
120:17,17,24
121:13 122:14
123:9,15,22
**objections** 14:5
29:11 40:22
95:12
**objective** 66:13
**observation**
91:23
**observe** 91:15
**observing**
111:2
**obtain** 36:8
49:21 59:5
**obtained** 58:17
58:19
**obtaining**
122:11 124:4
**obvious** 30:25
**obviously**
22:24 27:11
33:9 80:14
92:6 111:14
116:23
**occasions** 49:20
55:11
**occupational**
61:17
**occupy** 60:20
**occur** 39:22
**occurred** 79:21
88:14 89:9,25

**office** 4:13 45:4
45:18,19,20
48:12 51:4
58:18 77:4,7
79:5,6,8 93:3,5
95:7 98:10
102:16 103:2
103:15 105:19
108:1,3,18,23
109:13 115:23
116:3 117:19
118:12 119:1,4
119:7,8,9,23
**officer** 45:3
111:9 112:5
**officers** 11:9
121:4
**offices** 45:24
52:17 125:15
125:21
**official** 79:8
127:11
**oh** 40:1 50:21
64:25 82:14
109:22
**okay** 6:4 15:6
20:1 24:6,22
26:16 43:8
44:6,19 49:1
50:22 63:7,14
63:22 65:10,12
67:12 68:12
71:12,18 75:12
75:18 78:5

79:18 83:24
84:4 89:13
93:9 97:15
102:6,9 106:21
107:4,6 109:7
109:15,16,25
111:15 114:3,8
114:19 115:12
119:16,17
124:13 125:11
125:23 126:3,5
**once** 38:13,23
58:19 65:8
91:10
**ones** 10:1 31:22
31:25 56:1
58:6 59:23
80:1 82:6
83:12 103:16
**ongoing** 18:21
19:14 31:6,7
31:10
**open** 35:2
**operational**
38:22
**opinion** 25:9
36:8 37:2
71:10,15 72:24
72:25 75:8
86:23 96:24
112:18
**opinions** 24:15
36:13 70:24
75:3 87:8,15

**[opportunity - people]**

**opportunity** 62:21 65:14,23 66:17 67:22 70:2 107:7

**opposed** 7:10

**opti** 19:11,19 19:21 23:9

**order** 8:8,18,22 8:23 9:4 13:21 13:21,21 14:2 14:14,17 15:5 16:16 17:3,6 17:10 24:9,13 25:14 26:22,23 29:4,5,18,22 33:18,25 36:3 36:5,20 40:8 70:23 71:2,8 73:15 74:17 75:2,6 85:22 85:22 87:2,14 93:25 95:20,25 112:16,21,24 113:2,8 114:13 117:22 120:19 122:9

**ordering** 129:13

**organized** 52:15

**orseck** 2:9 6:1

**outcome** 59:20 60:5

**outline** 113:20

**outside** 35:11 90:21 97:5 101:2

**overall** 56:12

**own** 91:23

**owners** 18:25

**p**

**p** 2:1,1 4:20 5:1

**p.a.** 2:9

**p.m.** 1:19 126:8

**pa** 50:10

**page** 3:2 4:2,3 10:12,24 62:25 65:11 87:3 95:25,25 96:16 98:18,21 99:5 99:10,12,16 102:12,19 109:10 116:8 130:5,8,11,14 130:17,20

**pages** 128:7

**paragraph** 11:22 36:6 56:18 60:11 65:11 71:8 116:8,12

**paragraphs** 12:9 63:2,25

**part** 18:19 20:4 22:5 36:4 38:18,22 46:19

50:18 76:20 85:14,16 100:15 120:2

**participate** 47:17,18 75:21 95:17

**participated** 45:6 47:21 77:9 78:15

**participating** 91:18

**particular** 10:11 13:9 20:19 28:9 30:14,17,19 31:3,14 35:4 38:11 51:10 62:14 66:15 69:3,3 81:10 92:3 94:3 100:1 104:5 106:24 116:18

**particularly** 23:20 25:20

**parties** 4:22 5:12 12:14 13:1 18:25 23:17 24:14 36:12 87:7 128:14,15 129:13

**partner** 6:2,24

**partners** 18:24 45:17 51:10

**party** 29:6,6 36:8 66:20 69:19

**pashman** 110:25 111:2

**passed** 7:2

**pbc** 1:4,13 17:23 18:1,13 98:10 102:11 118:24 119:5 129:4 130:1

**pdf** 10:18 47:11

**peachtree** 9:13 9:21 15:18

**penalties** 130:22

**pendens** 37:18 37:21 38:6 39:6

**pending** 27:18 106:15

**penetrated** 64:3

**pennsylvania** 50:13 78:10,12 79:19 81:9,22 86:10 89:14,18 89:23 90:7,13 90:22,23 91:11 91:16 118:9

**people** 21:14 30:22 31:9 125:13

**perfect** 37:9
**performed** 32:9
  32:12 42:5
  47:2
**period** 24:4
  25:1,5 97:6
  122:6,24
**perjury** 130:22
**permit** 9:4
  13:25 14:12
  24:14 29:18
  36:7,12 70:25
  74:23,25 75:3
  75:3 87:7 94:2
**permits** 36:20
**permitted**
  10:10 36:11
  93:24,25 95:14
  96:15 112:19
**persist** 14:19
**person** 15:24
  59:11
**personal** 13:13
  15:19
**personally**
  32:16 47:14,17
  49:16 82:7
  100:9 108:14
**perspective**
  67:4
**peter** 2:8 5:25
  13:19 29:20
  114:4 129:1

**phase** 20:6 23:2
  23:3
**phases** 20:16
**philadelphia**
  50:13 51:4
  52:6 55:24
  78:13
**phone** 34:8
  52:23 103:6,8
  103:19 106:25
  108:4
**phones** 5:9
**phrase** 97:1
**pick** 5:7
**picked** 103:19
  106:25
**picking** 103:6,7
**picks** 108:3
**place** 1:21 5:9
  5:12 10:17
  19:11 20:12,13
  33:8 64:3
  80:21
**plaintiff** 2:5
**plaintiffs** 1:5
  1:11 4:3,3,4,5,6
  4:7,9,11,12,14
  4:15 5:20,24
  10:12 17:11
  24:16 36:14
  41:17 42:7
  60:25 61:2
  87:9 96:18,21
  97:3 98:2

  101:10 108:22
  115:8 118:14
**plans** 36:7
**play** 39:17
  100:18
**please** 5:6,8,17
  6:5,19 9:10,18
  17:20 18:16
  23:19 41:9
  42:4,22 62:5
  63:11,20 67:9
  68:8,15 74:18
  98:7 109:9
  119:12
**pllc** 2:3
**podhurst** 2:9
  6:1
**podhurst.com**
  2:11 129:2
**point** 20:19
  21:11 22:19
  28:9 29:24
  30:14,17,19
  31:3,14 35:5
  38:11 52:14
  63:8 66:5,15
  77:25 92:19
  100:14 103:3
  106:24 113:19
  116:18 123:4,6
  123:12,17
**pointing** 65:19
**points** 87:16,18

**policies** 93:14
  95:17 96:12
  122:5,11,12
  124:5
**policy** 95:18
  97:6 121:4
**ponce** 2:9
**posed** 74:24
**position** 14:24
  66:6 113:15
  114:4
**possibility**
  79:23 80:2
  84:7 92:11
  111:7,12
  112:10 117:5
**possible** 39:19
  39:19 47:20,20
  48:17 82:4,4
  88:4 90:9
  100:4 125:19
**possibly** 117:17
  120:13
**potential** 19:8
  40:12,16,17
  76:22 82:1
  83:10 85:7,15
  89:8 90:23
  91:22 92:13,16
  92:17 95:21
**potentially**
  92:1
**powerpoint**
  77:22 80:19

**[powerpoints - produce]** Page 156

**powerpoints** 83:6 89:10

**powers** 99:23

**pprieto** 2:11 129:2

**practice** 7:6,9 16:9,14 33:2 34:9,16 50:18 50:19 51:11 65:2

**practices** 16:12 33:23 34:4,21 99:4,4,22 118:23

**practicing** 6:25 7:3

**precipitated** 78:21,23

**precise** 106:7

**preliminaries** 8:6 34:3

**premise** 67:14 67:15 84:1

**preparation** 43:23

**prepared** 77:22 80:19 128:10

**preparing** 45:11

**presence** 90:22

**present** 2:19 45:2 75:13 76:6 80:4,7,9 80:10,12,14

90:12,15 92:2

**presentation** 80:20

**presentations** 77:22 81:3 88:18

**press** 40:14

**prestigious** 11:24

**pretty** 22:3 35:2,20 45:19 82:24 87:5 100:24

**previously** 14:7

**prieto** 2:8 5:25 6:1 8:2,19 9:1 10:5,8 11:14 13:6,11,17,20 14:8,10 15:2,4 15:7,10,25 16:5,15,20 17:1,9 24:6,23 25:7,14,16,24 26:9,16,20 27:18 28:21,24 28:25 29:9,16 29:25 33:17,24 36:2,5,6,19 37:1 40:7,10 40:18,25 41:3 41:6 42:21,24 43:2,3 44:16 46:2,6,6 48:23 48:25 50:21,23

63:4,7 67:6,10 70:21 71:6 72:3,20,22,23 73:3,12,23 74:15,23 81:13 84:24 85:21 86:19,20,22 87:3,4,19,24 88:1,6,23 90:3 93:19,21 94:20 95:2,9,11,13,23 96:6,16 97:1 97:13,17,19 101:4,17,21,25 109:4 111:20 112:14 113:13 113:16,19 114:6,11,15,17 114:20,25 117:21 118:4 118:13 119:12 120:17,24 121:13,15 122:7,17,20 123:9,15,22 125:25 126:2 129:1

**principally** 68:14

**principle** 69:25 72:17

**prior** 36:23 43:25 46:2,4 64:19 65:3,15

66:17 71:5 86:17 96:19 103:7 108:6,19 112:3,7 118:1 121:11,17 123:6,12,17,21 124:19 125:4

**private** 5:7 11:25

**privilege** 14:19

**pro** 22:14

**proactive** 44:9 44:21,23 45:2

**probably** 9:14 35:16 43:13 50:7 58:23 71:9 125:19

**problem** 8:11 67:11

**procedure** 38:1 129:21,21

**proceeding** 1:21 5:14 40:13

**proceedings** 41:13 74:5 115:5

**process** 26:10 47:24 51:17 54:13 57:11

**proclaimed** 65:16

**produce** 59:5 109:19,22

**[produced - read]** Page 157

**produced**
  127:19,19
**professional**
  9:10
**program**  19:14
  21:25 22:1,5
  22:11,15 45:4
**prohibition**
  70:23
**protection**  4:9
  98:3,9,14 99:9
  102:10 123:8
  123:14,20
**proven**  70:3
**provide**  102:23
  120:7 123:25
  124:3
**provided**  17:6
  120:10
**providing**
  33:15 66:5
  75:2
**provision**  22:24
  25:11
**public**  11:25
  48:1,7 49:8
  127:6,16
**puerto**  12:2
**pulling**  123:1
**purpose**  64:5
**purposes**  8:20
  10:10 40:15,16
  42:25

**pursuant**  8:8
  9:3 29:17
  33:25 102:20
**pursuing**  84:14
**push**  39:16
  40:4,5
**pushes**  26:7
**pushing**  26:2
**put**  63:10

**q**

**qualified**  71:7
  97:2
**ques**  107:10
**question**  14:6,7
  15:1,2,13,13
  22:17 23:18,23
  24:3,4,8,13,20
  24:21,24,25
  26:10,11 27:1
  27:18 28:13,15
  31:12,24 32:1
  32:20,22 34:10
  34:11,14,18
  35:18 36:20,25
  39:3 43:9,21
  44:16,17 46:9
  47:6 50:23
  51:24 54:16,16
  54:18 55:19
  56:5,6 64:15
  64:19 66:13
  68:11,17 71:18
  72:5,7 73:9

74:19,21,24
75:1,4,9 76:2
77:24 79:3
81:6 82:18
83:23 84:2
85:4,25 86:12
86:13 88:24,25
89:2,13,21
90:3,16 91:12
92:10 93:21,23
93:23,25 94:3
94:16 100:2
104:8,10,16,17
104:18 105:22
105:24 106:12
106:15 107:5
107:10 108:12
109:20 110:15
110:19,21
111:16,24
116:11 121:21
122:8,15,18
123:12 125:10
**questioning**
  36:21 73:8
  97:11 101:7
**questions**  8:19
  8:21,25 9:2
  10:9 14:1,13
  15:7,8 19:13
  26:18 27:2
  29:1,3,10,17
  34:3 44:4
  62:20 71:3

93:9,12,13
96:7,13,14,15
112:19,23
113:9,22,23
124:10 125:24
125:25
**quick**  74:2
**quicker**  114:2
**quite**  17:24
**quote**  105:17
  122:9
**quoted**  70:16
  71:19
**quotes**  70:11

**r**

**r**  2:1 5:1 130:4
  130:4
**raise**  6:5 96:4
**raised**  113:12
**rank**  60:20
**reach**  49:17
**reaching**  59:3
**read**  10:22 12:9
  17:17 48:2
  63:1,25 64:7
  69:12,14,20
  70:3,5,15
  71:22 74:21
  75:9 80:23
  88:21 90:16
  97:1,12 129:9
  130:23

**[reading - recording]**

**reading** 4:23 92:4,7
**reads** 11:23 42:3 45:7 47:23 56:18 70:14 71:22
**ready** 42:17 43:6 63:3
**real** 21:18 31:19 56:21,21 60:14 70:22 74:2
**really** 22:18 50:12 70:9 112:24 114:12 123:1
**realty** 1:4,13,13 9:21 16:24 17:5,7,23 18:1 18:7,10,13,17 19:22 20:5,8 32:10,16 33:13 33:16,22 34:4 34:7 35:8,23 37:5 45:22 46:3,12 47:9 49:7 53:22 54:21 55:2 67:2 73:3 78:1 79:21 80:25 91:15 92:9,20 94:13,17,19,23 95:1,5,14 96:25 98:10

101:3 102:10 102:11,24,25 103:10,13 104:10,11,12 104:19,21 105:4 106:1,2 107:15,17,22 108:8,8,15 109:16,18 110:5,7 111:2 111:9,18 112:5 113:3 116:4,14 117:2,16 118:1 118:11,24 119:5,17 120:15,22 121:3,8,18 122:4,22 123:5 123:7,13,19 124:3,18 125:3 129:4 130:1
**realty's** 56:12 92:13 116:9
**reamon** 2:21 5:4
**reason** 47:7 66:11,11 129:10 130:7 130:10,13,16 130:19,22
**reasonable** 29:2 129:14
**rebecca** 41:22 43:15,22,22

50:7 54:12 56:2 58:25 80:12,13
**rebut** 96:20
**rebutting** 113:10
**recall** 7:19 12:17 16:18,23 19:5 21:1,19 38:24,25 39:25 40:3 49:6,9 50:12,13,13 51:4,11 55:2 58:15,16,19,22 58:22 59:2,7,9 59:10,10 81:24 82:25 86:15,16 88:14 89:21,25 90:3 94:12 100:8,21,23 103:24 105:2 108:17,21 111:1,5,8,17 112:8,11 124:6
**recalls** 86:21
**receipt** 62:1 129:14
**receive** 49:5 54:2 56:25
**received** 21:12 49:7 59:2 64:17 74:11
**receiving** 56:19 57:4,8

**recess** 41:12 74:4 115:4
**recollect** 106:6
**recollection** 20:10,17,19 22:15 33:10 48:5 51:6 54:9 60:8 64:13 68:13 77:20 79:2 80:2,16 80:23 82:7,12 82:22 88:21 90:8 116:6
**reconsider** 8:24 73:10 96:5 113:15
**reconsidered** 73:13 113:16
**record** 5:5,12 5:18 6:19 41:9 41:10,14 53:3 53:5,7,8 54:20 68:25 69:9 74:2,3,6 98:8 106:10 107:19 107:23 114:2 114:23 115:2,6 122:3 126:1,4 126:6 128:8
**record's** 89:20
**recorded** 69:15 74:22
**recording** 5:11 5:13

**[records - remembering]** Page 159

records 56:9
81:3 107:21
109:19,23
refer 79:18
reference 55:9
69:1 99:18
112:7 116:7,11
referenced
12:12 99:21
110:23 113:8
129:8
referred 23:5
referring 22:12
23:6 25:23
80:17 81:7
85:5 93:1
122:17
refers 116:22
reflect 47:8
83:7 107:21,24
107:24,25
reflected 32:16
35:25 37:7
39:8 81:2,12
120:16,23
refresh 33:10
64:13 77:20
79:2 80:23
82:12 88:20
regard 76:18
129:15
regarding 19:2
20:18 21:25
23:14 27:10,11

36:22 39:6
42:13 45:23
71:4 78:7,16
78:18 89:17
91:6 98:17
100:10,12
102:24,25
104:4 105:9,18
106:19 120:8
122:2,23 123:2
125:14
regards 26:13
28:7 58:6
60:16,23 66:14
76:13 91:14
103:14 106:23
121:23
regular 65:2
regulation
24:16 36:15
87:9
regulator 65:4
65:20 66:6,14
74:12 78:3
86:4 88:13
89:24 90:15
regulators 30:7
30:24 67:2
75:17 84:13
85:9,11,20
86:18 90:22,24
91:17 92:20
regulatory
18:14 20:7

27:6,7,23 28:3
28:8 31:13
36:22 42:19
44:4,8,20
47:25 48:6
56:19 57:4
58:10,14 59:20
66:24 67:5,17
70:1,20 71:4
71:25 72:1,8
72:11,18 73:5
73:7 74:10
77:1,3 78:2,8
81:1,20 82:10
82:10 89:23
94:25 117:25
118:3 122:23
reidentify
19:15
reiner 1:14
related 25:21
27:5 36:24
37:6 42:5
61:17 77:13
88:10 93:13
94:10 95:23
125:16
relates 39:9
40:13 56:11
73:4 110:22
122:15
relating 45:1
58:24,24
125:20

relationship
9:10 35:5
relative 128:13
128:15
relevant 57:20
57:23 66:16
67:4 96:1,20
97:11 113:10
rely 37:25
remember 7:15
7:24 10:1
18:11 19:6,20
21:7,11,13,17
21:20 23:8,24
23:24 24:2
25:1,2 29:5
31:23,25 32:13
37:10,10 39:12
39:19 47:10,22
49:17,21,24
51:9,14 53:20
56:13 59:24,25
72:4 76:3,5,5
77:3,21,24
78:12,15 79:25
86:5 90:11
91:4,10,18
92:1,4 100:14
110:15,19
116:21 121:6
121:21,22,25
122:1 123:1
remembering
44:1,24

**[remote - reyes]**

| | | | |
|---|---|---|---|
| **remote** 1:21 5:13 | 105:18,20 106:21,22 107:16,21 110:5 116:4,14 119:17 | **requested** 42:3 69:14 128:6 | 119:10 |
| **renewing** 18:20 | | **requirements** 23:16 | **responses** 58:2 58:3 |
| **repeat** 43:19 46:9 74:18 75:19 89:1,3,3 94:5 110:18 | **representation** 16:11 17:7 20:5,7 27:23 33:13 45:22 93:18 100:19 101:3 119:21 119:22 125:2 | **research** 21:4 24:5 25:5 26:12 66:3 | **responsible** 70:7 |
| | | **reserved** 4:24 | **responsive** 70:7 |
| | | **resolutions** 55:16 | **rest** 14:9 52:2,4 113:21 |
| **repeatedly** 68:24 | | | **restrictions** 51:25 |
| **rephrase** 67:8 67:12 71:2 81:6 93:20 94:16 109:20 111:24 121:14 122:18 124:22 | | **resolve** 54:10 55:10 83:16 | **result** 20:25 23:16 81:1 108:19 |
| | **representative** 11:6 102:15 | **resolved** 58:20 60:2,8 | **retained** 4:17 104:3 |
| | **represented** 7:8 7:12,17,22,25 8:14 9:16 10:3 10:3 11:9,24 12:25 93:17 94:6 100:11 | **resolving** 59:24 | **return** 56:14 |
| **rephrasing** 81:16 | | **respect** 8:10 10:8 18:13 30:2 60:10 62:13 63:24 66:24 67:1 72:18 78:20 81:9 82:8 90:18 112:2 117:24 | **returned** 129:14 |
| **report** 128:4 | | | **review** 33:9 46:3,13,15,16 46:21 64:19 65:7,14,24 66:17 67:23 77:19 98:17 128:6 129:8 |
| **reported** 1:23 | | | |
| **reporter** 6:4,14 52:20,21 53:4 69:13,15 73:22 74:18,20,22 93:5,7 | **representing** 12:14 28:17 34:4 38:13 39:1 83:15 103:4,11,14,25 104:24 105:5 106:2,18 107:2 121:23 124:18 | | |
| | | **respective** 4:22 | **reviewed** 19:10 45:12 46:17 47:13 |
| | | **respond** 88:4 106:15 | |
| **reporter's** 3:6 4:17 128:1 | | **responding** 64:21 | **reviewing** 43:25 53:24 56:19 57:4,9 |
| **represent** 5:23 7:25 12:15 18:13 28:14 38:24 39:3 46:25 101:7 102:25 103:21 104:10,12,13 104:15,21 | **represents** 60:12 62:10 | **response** 37:22 61:16 64:16 65:6 66:10 99:25 107:1,13 116:5,17 | |
| | **republic** 12:7 | | **reviews** 57:18 |
| | **request** 29:14 96:5 | | **reyes** 9:24 |

**[rica - screen]**

**rica** 12:8
**richard** 100:17
   101:9 103:17
   103:22 104:3,5
   104:9,14,25
   105:10 107:3
**richard's** 108:3
**rico** 12:2
**right** 6:5 7:15
   9:22 10:1
   20:11 22:14,19
   22:21,25 23:1
   23:10,12,13,24
   24:3 26:1,4,11
   27:12,15 28:2
   28:4,4,7,16
   29:17 30:14,18
   30:19,21,22,24
   31:6,8,12,13
   32:5,5,19
   34:13,25,25
   37:10,10,12,12
   37:13,17,25
   38:7,8,24
   39:12,12,13,15
   39:16 44:24
   49:15 50:1,9
   51:13,18,19,20
   51:21 52:19
   53:14,17,18
   54:1,3,9,9,13
   54:14,25 55:9
   55:12,12,20,21
   56:25,25 59:23

60:4 64:9,16
64:19 65:21,23
65:25 66:2,9
66:10,11,13,20
66:21,22 67:19
67:23 68:20,21
68:23,24 69:2
69:5,8,22,23
70:4,4,6 71:6
72:6,13 73:16
76:16,17,17,18
77:3,4 78:6,9
78:15,16 79:1
79:3,8,14,15
80:10,11,20,21
80:23 81:5,10
81:19 82:17,21
83:12,14,16,17
85:10 86:6,8
86:12,16 91:2
91:3,5,7,9,20
92:5,10,15
97:7,17 100:5
100:17 101:15
103:16,17,18
105:10 106:5
106:14,17,24
106:25 108:2
109:2 111:12
114:20,23
116:25 117:12
117:13,24
125:6,12 126:3

**risk** 14:20
   35:24
**roca** 82:15,20
**role** 47:15
   49:12 51:6
   100:18
**roles** 45:21
**rpr** 1:23 127:6
   127:15 128:3
   128:23
**rule** 129:21,21
**rules** 37:25
   40:24 129:15
**ruling** 14:21
   40:23
**run** 75:5
**running** 14:20
   23:4,12
**runs** 75:2

**s**

**s** 2:1,5,6,15 4:1
   4:20,20 5:1
   6:20,20 41:23
   45:10,16 130:4
**save** 113:24
**saw** 67:20
**saying** 29:16
   44:7 46:7 57:3
   58:1 68:12
   70:12 72:8
   87:5,6 91:1
**says** 11:9 12:4
   24:14 29:5,5

36:6 44:11,19
57:10 61:25
64:20 65:13,24
71:20 97:2
100:5 122:9
**schiff** 19:1,8
   20:23
**schultz** 45:5,10
   45:16,20 47:1
   47:19 76:11,12
   76:16 80:6
   81:22 89:14,22
   90:7,21 118:8
   124:16 125:1
**schwartz** 77:6
**scope** 8:17,22
   8:23 13:20
   14:1,14,17
   24:9 27:8 29:3
   33:13,17 40:8
   85:22 87:23
   95:20 96:14
   101:2 111:22
   112:16,21,24
   113:2
**scopes** 33:14
**scott** 1:14
   41:23 52:12,12
   64:6
**screen** 10:19
   97:24 101:19
   102:5 109:8
   115:15 118:19

**[screens - speaking]**

screens  10:17
scroll  42:17
  63:4,20
seal  127:11
second  11:22
  65:10
section  44:3
  116:10,22
see  10:18,20
  11:8 12:9
  18:12 20:4
  22:1,4,11 38:7
  41:22 42:3,12
  45:7 47:3
  51:24 56:4,16
  61:9,16,19,21
  61:25 62:8,11
  62:16,17 63:5
  63:18,19 65:13
  70:11,16,17
  87:25 88:1
  89:16 96:9,13
  97:23 98:8,18
  98:21 99:5,17
  102:4,12 109:7
  109:11 115:14
  116:7,11
  118:19 119:11
  119:12,15
seeing  111:1
seek  14:21 36:8
seeking  40:23
seen  96:9

selected  51:21
self  65:16
send  35:18 38:4
  46:11 65:2
sending  46:2
  64:5
sends  56:25
sensitive  5:6
sent  57:6,6,7
  65:7
sentence  45:7
  47:13,23
separate  78:14
  79:13 99:18
separately
  106:16
september  9:15
series  93:12
serve  37:22,23
  38:1,3,8
served  98:16
  115:18
serving  37:18
  39:7
session  29:15
setting  59:18
  81:19,21
settle  92:5
share  66:14
  72:17
sheet  3:6 32:25
  129:10,11
sheets  20:11,13
  30:21 32:5

33:9,11
shepherd
  100:14 103:20
  104:24 107:1,2
shift  9:8 73:18
short  30:3
shorter  29:25
shot  29:23
show  10:15
  61:5,7,20
  97:17 109:2
  115:12 118:17
  119:11 125:15
showed  102:7
showing  11:6
  11:22 17:14
  101:13 102:3
sic  68:11
sign  129:11
signature  99:5
  127:15 128:22
signed  17:21
  30:7 48:10
  129:17
significance
  69:24
significant
  35:24
signing  4:23
  65:15 66:18
signs  70:13
  71:20
silence  5:8

similar  51:6
  123:12
simple  111:15
simply  71:9
  74:24 106:8
single  22:24
sir  111:21
  114:25 126:2
sitting  86:15
slash  102:11
slides  102:17
solemnly  6:6
solutions
  129:19
somewhat
  82:23
soon  15:21
sorry  25:15
  38:18 41:3
  43:10,17 46:8
  46:19 52:20,21
  57:12 59:15
  68:10 74:13
  93:5 101:17,25
  110:17
sort  114:14
sorts  20:16
sound  72:24
southern  1:1
spanish  12:6
speak  35:15
  54:6 58:21
speaking  8:5
  12:6 41:2,4,5

**[speaking - stop]**

49:6 58:22
77:5,7
**speaks**  65:21
**spec**  34:13
**specialists**
50:17
**speciality**  129:4
130:1
**specialty**  1:8
**specific**  16:13
30:16,18 33:10
34:13,14,24,24
36:4 40:3 47:4
48:10 49:9,15
50:8 51:23
52:9 53:19
54:23 60:16
65:8,9 68:19
68:20 69:2
73:8 75:23
76:17 78:7
79:16 86:13
89:21 93:16,25
106:6 107:10
120:3 125:14
125:14
**specifically**
7:19 19:5,6,19
21:13 27:10
34:5 37:20
39:15 43:20
44:1,24 49:21
50:1,12 52:17
52:18 64:7

75:13,22 78:8
78:10 79:17,23
84:22 91:4,12
96:17 104:2
107:9 108:18
110:21 113:8
116:23 121:5,6
**specifics**  79:2
80:16
**speculation**
34:17
**spell**  6:19
**spend**  13:24
37:24
**spending**  13:23
**spent**  47:2,9
**spoke**  87:17
**squarely**  87:1
**ss**  127:4
**sscott**  61:10
**stand**  10:16
40:18 87:21,24
97:13 113:16
**start**  22:21
23:8,11,13
24:3 38:7
76:24 93:12
94:14
**started**  7:1 9:12
15:16,22 18:18
19:6 20:23
21:23 38:16,19
38:21 101:8

**starting**  22:19
**starts**  19:12,13
19:24 20:17,24
44:7 84:1,1
101:18
**state**  5:17
27:13 45:3
50:9,10,11
59:3,8,19
60:18 69:23,23
98:11 100:13
108:8,11
110:12 111:3
111:10 118:23
119:9,9 120:6
125:12,12
127:3,7,16
**stated**  69:10
100:22 130:23
**statement**
25:22 44:10,12
44:19 45:14
48:4 56:23
58:5,11,17
59:15 60:15,22
71:18 84:9
114:22
**states**  1:1 12:3
47:24 52:8
58:4 78:10
125:22
**status**  120:8
**statute**  98:22
98:25 99:3,21

116:24,24
123:8,14,21
129:15
**statutes**  99:13
99:13,19
**stein**  110:25
111:2
**stenographic**
128:8
**stenographic...**
1:23 128:4
**step**  92:6
**stephen**  45:5,18
79:14 82:25
88:10 89:7
91:2
**stepped**  116:19
**steps**  45:2
**steve**  52:12,12
68:3,7 76:1,1
76:12,16,18
77:5,5,7,8 78:7
78:17,18 80:14
83:3 117:7,9
117:14 120:13
**steve's**  52:13
79:4,9
**steven**  1:14
**stick**  39:5
114:14
**sticking**  78:21
**stipulated**  4:21
**stop**  37:17

street  2:3
stretching
  29:23
strike  22:6 49:5
  66:25 89:5
  94:15 98:1
  104:7 123:5,25
structure  20:16
subject  103:3
submit  94:10
  94:13,18
submitted
  94:19 113:4
submitting
  94:24 95:6
subpoena  4:10
  4:11,13 59:2
  95:8 98:3,9,14
  98:16,19,22
  99:11 100:1,10
  100:12 101:11
  101:20,23
  102:9,10,13,21
  102:24 103:7,7
  108:23 109:12
  110:14
subpoenaed
  95:1
subsequent
  29:15 101:22
subsequently
  105:19
substance
  14:24

substantial
  125:6,7
substantially
  124:17 125:2
successfully
  49:25 54:10
  82:5
sue  108:20
sued  81:1 82:9
  85:19 86:4,18
  86:24 88:12
  89:24 92:9,20
  108:8,11,15
  110:12,16,20
  111:3,9,14,18
  112:5,9,12
  113:3 117:2,5
  117:16,17,19
  118:2,11
  120:15,22
  123:7,14,19
sufficient  73:21
suggested
  129:14
suing  38:5,7
  84:14
suit  73:7
suite  2:4,10,15
summary  42:4
  42:13
supervision
  128:11
supporting
  83:1

sure  7:16 9:20
  9:25 24:23
  30:11 38:16
  45:19 46:17,22
  68:4,22 69:5,8
  69:13 74:20
  75:20 81:17
  82:24 88:4
  100:11,24
  110:19 120:9
suspect  25:3
suspending
  40:22
swear  6:6
sworn  5:18
  6:13 49:21
  55:13,13 58:17
  127:9

### t

t  4:1,20,20
  130:4,4
table  122:13
take  5:11 17:15
  20:6 42:10
  48:19 53:22
  54:22 64:11
  73:20,22 87:22
  93:22 99:10
  114:8 121:2
taken  8:5,7
  29:12,13 41:12
  74:4 115:4
  129:6 130:3

talk  49:19
  53:25
talked  81:21
  118:7
talking  16:12
  23:1,1 28:6
  34:24 50:1
  54:11,12 55:18
  68:19,20 82:1
  82:6 96:3
  122:6
tallahassee
  21:8,10 27:13
targeted  47:24
tecum  4:10,13
  98:3,9,15
  102:10 108:23
  109:12
tell  20:9,9
  26:14 27:14
  34:25 39:20
  43:14,20 49:6
  52:16 54:17,25
  55:6,8 59:13
  68:2 69:2 72:9
  75:24 85:18
  86:2 88:7
  91:13,22 94:23
  95:5 96:25
  99:11 102:19
  103:10 104:19
  107:11,15
  108:7,14
  109:10 110:11

113:19 115:17
118:1 120:14
**telling**  34:23,23
39:11 52:1,2
64:18 66:8
79:22 86:16
87:20 91:15
92:2,15 103:24
104:23 108:20
111:2,8,17
112:8,11
**ten**  73:22
**tend**  68:5
**term**  22:14
23:22,23 106:5
**terminate**
14:20
**terms**  26:8,10
30:23 31:12
56:7 65:15
66:17 69:20
70:13 71:21
79:2 83:16
85:5 86:5 91:4
94:1
**testified**  6:13
40:2 84:5 88:9
117:8
**testifying**  55:15
90:21
**testimony**  3:3
6:6 36:8 40:6
40:13 48:15
53:2,21 69:14

71:9,10 88:17
88:20 89:5
90:19 108:6
129:9,14
**text**  35:17
**thank**  6:14 18:2
41:16 43:3
46:23 49:1
53:4 63:9 93:7
97:21 101:16
121:15
**thanks**  124:23
**thereto**  62:3
**thing**  37:15
43:14 53:13
**things**  22:6,10
22:13 26:2
30:10 37:16,23
52:14 54:14
66:19 99:14
113:14
**think**  8:6 15:11
19:11,17,18,20
20:20,21 21:6
21:6 23:18
25:16 26:13,25
27:19 29:20
32:19 36:19
38:11,14,15,16
38:19,21 43:15
45:18 49:14
54:16 55:6
56:8 59:25
63:16 73:17

75:1 77:4
82:15 83:25
88:23,25 89:18
91:25 92:21,21
92:23,24 93:3
93:23 95:16
96:6,7 97:19
100:21 114:1
114:15 124:12
124:20
**third**  23:16
29:6 56:18
60:11 96:10
**thought**  74:10
85:19 86:3,17
**threatened**
95:22
**three**  35:19
68:13 69:4,18
95:12 109:5
**tim**  9:24
**time**  1:19 5:15
5:15 13:23
16:18,23 20:11
20:13,19 21:11
24:4 25:1,5
28:9,18,20
29:11,12,13,14
30:6,14,15,18
30:19,21 31:4
31:14 32:4,9
32:11,13,17,19
32:25 33:4,8
33:11 35:5

38:1,11 39:2
40:24 43:18
45:17 47:8
57:1 59:5
73:17,24 88:2
88:2 89:11
96:3 100:14
101:4 103:3
106:24 107:5,8
107:9,11,13
112:20 113:20
113:21 114:5
116:18 119:8
121:20 122:6
122:24 124:21
**timeline**  57:20
86:7
**times**  48:8,11
48:13 51:24
114:16
**title**  6:23 99:20
**titled**  19:20
42:18 44:4
**today**  113:14
**together**  9:12
9:23 15:22
110:8
**told**  26:9 37:16
37:20,24 38:3
58:17 65:22
68:25 69:8
89:24 96:17
103:16,20
104:2,6,9,10,13

**[told - vagueness]**

104:14 105:4
105:14 106:1
106:17 107:19
**toni** 22:1
**tony** 9:11,12,22
18:19,21,24
19:7,13 22:2,2
22:11 35:9,12
35:15,15,17,20
39:15 45:5
52:9 59:3 68:2
68:7 76:3,21
77:9 78:12,18
79:11 83:17
84:17 90:9
91:3,8,9,10
92:16 100:6
103:20 105:14
105:16 108:17
120:12 122:1,1
**took** 7:2 64:2
116:19
**top** 95:25
**topic** 9:2,9
13:23 23:22
53:16,16 71:7
76:7 84:22
96:9
**topics** 22:18
23:21 25:21,23
26:18 73:19
87:6 96:8,8,10
**total** 73:24,24

**totally** 51:18
**trailing** 43:17
**transaction**
31:19
**transcript** 4:24
128:6,10 129:8
129:16
**transcripts**
129:12
**trapped** 28:1
**trial** 113:24
**tried** 48:21
**true** 44:12,13
45:14 120:6
128:8 130:23
**truth** 6:7,7,8
**try** 83:15 106:5
**trying** 29:9
39:16 40:4,5
55:7 64:23
65:1 74:15
83:22 85:3,4
113:14
**turning** 109:10
**two** 24:15
30:22 31:16
36:9,13,16
39:1 45:17
47:9 49:17,20
55:11,17 63:1
73:24 81:11,25
86:10 87:7,11
95:24 99:18,18
122:12,16

125:17
**type** 7:17 8:1
47:1 127:19
**typical** 50:18
**typically** 34:7
34:20

**u**

**u** 4:20 6:20,20
**uh** 82:16
**uk** 12:12,13
**unaware** 51:19
**uncommon**
86:14
**under** 37:25
52:5 65:17
98:22 122:5
123:7,14,20
128:10 129:15
130:22
**underlying**
119:18
**understand**
15:10 30:12
46:20 54:2,4
64:2,15 66:2
68:17 71:6,16
71:17 96:2
104:8 109:21
114:7
**understanding**
18:22 28:20
33:21 40:15
43:18 52:23

65:5,6 67:11
72:5 73:5
90:19,20,25
92:8
**understands**
70:14 71:22
**understood**
25:12 69:20
122:20
**unfair** 99:3,4
**united** 1:1 12:5
**unlawful** 25:11
99:22
**unquote** 105:17
**unsupported**
55:4,5
**upcoming** 37:6
**updates** 120:7
120:11
**use** 23:10 25:25
38:10 85:12
**used** 85:3
129:17
**useful** 40:20
**using** 29:23
38:12,16,21
52:23 106:7,8
122:1

**v**

**v** 129:4 130:1
**vaguely** 91:10
**vagueness**
67:11

**[valid - worked]**

Page 167

**valid**  25:10,10
**vanessa**  1:23
  127:6,15 128:3
  128:23
**variances**  35:6
**vast**  33:3
**verify**  32:25
  129:9
**veritext**  129:12
  129:19
**veritext.com**
  129:12
**version**  11:3
**versus**  9:5
**video**  5:4,11,14
**videoconfere...**
  127:9
**videographer**
  2:21 5:3,4
  41:10,14 53:5
  53:8 74:1,6
  115:2,6 126:5
**videotaped**
  1:17 126:7
**view**  52:14
**violated**  24:16
  36:14 87:9
  116:10
**vocal**  22:2
  23:20,21 25:20
  25:25 26:18
  27:3
**volume**  56:3,7
  56:11

**volunteered**
  24:10
**vs**  1:6,12

**w**

**wait**  50:21
  86:19 116:1,1
**want**  8:5 9:15
  14:22 20:11,15
  20:15 24:10,13
  25:22 26:21,21
  33:7 34:2,13
  37:23,24 42:10
  42:16 44:3
  49:3 85:11
  89:2 93:12
  106:5,14 114:1
  120:3 125:25
**wanted**  22:1,4
  22:11 24:2
  25:2 103:22
**warburg**  9:23
**warranted**
  84:19
**washington**  2:4
**wasting**  96:3
**way**  10:9 48:9
  53:24,25 54:14
  57:2 81:2,12
  84:3 88:4
  106:4 111:5
  122:14
**ways**  35:7
  119:24 120:3

**we've**  29:12
  38:20 40:25
  41:6,7 73:18
  92:17
**website**  10:25
**weigh**  53:14
**weinshall**  2:21
  6:2
**went**  94:1
**whatever's**
  33:10
**whispering**  5:7
**willfully**  24:18
  36:16 87:11
**willingly**  87:10
**wish**  13:25
  40:25 41:6
**witness**  3:5
  5:18 6:3,9,12
  8:3 10:6 11:18
  13:7,18 14:10
  14:13,15,18,25
  16:1,6,16,21
  17:2 24:7,12
  24:22,24 25:12
  25:25 26:24
  27:2,20 28:22
  29:7,18,22
  33:18,25 36:3
  40:9 50:25
  52:23,25 63:10
  72:6,21,25
  73:14 85:2
  87:15,17 90:4

  93:6 94:21
  95:3,10 101:6
  111:21 112:15
  117:21 120:18
  122:19 123:9
  127:1,7,11
  128:5,9 129:5
  129:9,10,11,16
**witnesses**  36:10
  36:17 87:12
**woefully**  122:8
**wonderful**
  23:11
**word**  19:16
  25:25 56:24
  85:2,12,13
  86:13,14 125:5
**words**  10:22
  33:14 40:3
  72:24 106:7
**wordy**  81:16
**work**  6:21 8:14
  18:17 19:2
  20:12 21:22
  22:22 24:5
  25:22 32:9,12
  32:15 33:3
  42:4,13 46:13
  47:1,12 51:15
  51:22 54:7
  55:10 62:19
  99:8 104:4
**worked**  20:3
  28:4 30:23

**[worked - zoom]**

Page 168

32:14 45:23
51:5 56:1,2
57:7,11 58:7
60:24 66:20
120:5 125:13
125:17,20
**working**   7:1
9:12 15:17,22
18:18 19:18
20:23 21:14
23:15,25 30:10
44:25 50:19
51:11 56:7
60:6,7 78:7,9
90:8 119:23
**works**   58:3
60:19
**wrap**   124:10
**write**   62:16
**writes**   62:18
**writing**   39:18
67:19 69:8
81:12 100:12
**written**   54:13
70:13 71:21
**wrong**   84:1
**wry**   122:8

**x**

**x**   3:1 4:1 38:1

**y**

**yeah**   22:15,25
23:18 28:2
30:9 67:10

77:18 91:1
102:11 106:13
**year**   8:9 22:14
23:21,23 24:25
59:12
**years**   11:23
15:18 22:14
24:2 92:18,18
**yield**   113:21

**z**

**z**   6:20
**zachman**   1:4
1:13 61:14
62:2,10 64:6
102:22 129:4
130:1
**zeena**   2:14
**zoom**   2:6,12,18
127:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.