# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:25-CV-80826-DMM

AMANDA ZACHMAN, an individual, and MV REALTY PBC, LLC, a Florida limited liability company,

Plaintiffs,

v.

MARKEL AMERICAN INSURANCE COMPANY, a foreign corporation, and HOUSTON SPECIALTY INSURANCE COMPANY, a foreign corporation,

Defendants.

______________________________________________x

MARKEL AMERICAN INSURANCE COMPANY, et al.,

Defendants/Counter-Plaintiffs,

v.

AMANDA ZACHMAN, MV REALTY PBC, LLC, MV REALTY HOLDINGS, LLC, ANTONY MITCHELL, DAVID MANCHESTER, DAVID REINER, STEVEN SCOTT, and DARRYL COOK,

Counter-Defendants.

______________________________________________x

LOCATION: BY ZOOM VIDEO CONFERENCE
Veritext Legal Solutions
2 South Biscayne Boulevard
Suite 2030
Miami, FL 33131
Monday, June 22, 2026
9:33 a.m. - 2:43 p.m.

DEPOSITION OF STEVEN SCOTT

Taken before TRACIE S. PERRY, Court Reporter and Notary Public for the State of Florida at Large, Pursuant to Notice of Taking Deposition filed in the above cause.

APPEARANCES

JAMES KAPLAN, ESQ.
KAPLAN ZEENA LLP
2 South Biscayne Boulevard
Suite 3050
Miami, FL 33131
james.kaplan@kaplanzeena.com

MICHAL MEILER, ESQ.
MEILER LAW, P.A.
3000 Biscayne Boulevard
Suite 100
Miami, FL 33137
mmelier@meilerlaw.com

KYLE C. HANKEY, ESQ.
ANNA G. KAMINSKA, ESQ.
JONATHAN SHI - Paralegal
AXS LAW GROUP, LLP
1050 20th Street NW
Washington, DC 20007
khankey@axslawgroup.com
akaminska@axslawgroup.com

ILIRIANA FTEJA, ESQ.
KENNEDYS CMK LLP
1111 Brickell Avenue
Suite 1300
Miami, FL 33131
iliriana.fteja@kennedyslaw.com

ALSO PRESENT:
ANTONY MITCHELL

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEVEN SCOTT | 4 | 108 | | |

E X H I B I T S


| Defendant's | For Ident. |
|---|---|
| Exhibit 20(3/5/21 e-mail) | 50 |
| Exhibit 21(1/28/22 e-mail) | 50 |
| Exhibit 22(spreadsheet) | 55 |
| Exhibit 23(e-mail string) | 65 |
| Exhibit 24(e-mail string) | 77 |
| Exhibit 25(e-mail string) | 83 |
| Exhibit 26(e-mail string) | 89 |
| Exhibit 27(e-mail string) | 91 |
| Exhibit 28(warranty letter) | 92 |
| Exhibit 29(8/16 e-mail) | 95 |
| Exhibit 30(8/25/22 e-mail) | 97 |
| **Plaintiff's** | **For Ident.** |
| (Retained by Ilriana Fteja, Esq.) | |
| Exhibit 1(Skyward Renewal Application) | 99 |

Thereupon--

STEVEN SCOTT

was called as a witness by the Defendants and, having been first duly sworn and responding "I do", testified as follows:

DIRECT EXAMINATION

BY MR. KAPLAN:

Q Good morning, sir. My name is Jim Kaplan. I don't think we've met before. I'm here to take your deposition in this case, MV Realty and others against Markel American Insurance Company. Is there any reason why you're not going to be able to offer accurate and truthful testimony today?

A No, sir.

Q Okay. So tell me a little bit about yourself. Where do you work?

A I'm currently employed by MV Realty, though I do not collect a salary.

Q How long have you been employed by MV Realty?

A I believe I started in an official capacity January 1, 2020.

Q And prior to that, did you have some other form of association with the company?

A I did. I began a consulting role for approximately mid-January 2018 through kind of 1/1/2020.

Q What's your position at MV Realty?
A My official title is Senior Vice President of Business Operations I believe.
Q So what responsibilities do you have with the company?
A Sir, just to clarify, today or what time period are you referring to?
Q So as I understand it from Mr. Mitchell's testimony, the company is not currently operating; correct?
MS. MEILER: Form.
BY MR. KAPLAN:
Q You can answer.
A That's correct as far as I know as well.
Q Okay, so let me ask you to go back in time to when the company was operating. What were your duties and responsibilities?
A Sure. So my duties and responsibilities were not unlike a lot of start-up companies where a lot of different roles found themselves administratively to one person. My main focus was to assist the CEO, in this case, Mr. Mitchell, in capital raising efforts, liaisoning with our various creditholders, shareholders, and working directly with Holland & Knight and our 30 plus, I think at one point in time we had 35 plus

individual firms that were working with us on moving into various states, our operational states.

Q So when you say 30-something firms, do you mean law firms?

A That's right. Sorry, I'll be more specific. My apologies.

Q Sure. So what was it in your background, prior experience, that qualified you for that position?

A We have to go back in time for that a little bit. My role really formed in kind of late college with Charles Schwab himself. I acted as his intern in San Francisco and he was very good at pointing out the flaws in the business world as he saw it and he said to me, something that changed my life, which was he thought a legal education was going to be the future for business relationships and I took that seriously, listened to him. I did a good enough job to get an internship with a Schwab office my senior year in college and then I went off to law school and I worked for a couple different firms, local firms. I spent time at the battered women's shelter. I finally spent time at the California Supreme Court between my 2L and 3L year and after I graduated law school, I started to work for a small publicly traded company in Calabasas, California and really the point for me there was to get experience

in how publicly traded companies work.

I worked in financial reporting, tax, finance and that role propelled itself into the next role, which was in MV Energy, which was a, you know, a main board listed energy company. That company, I worked specifically in financial reporting and really got my feet wet into kind of the nuts and bolts of how companies work and really what whet my appetite for something a bit larger. That said, I was presented with the opportunity, and I believe it was October of 2009, to join a startup company and the startup was a small geothermal company called Ram Power Corp. I believe now it's called Polaris Energy Nicaragua, S.A., and the company was extremely exciting. It had 185 million in subscription receipts that it had just acquired. I had two very promising projects; one in Nicaragua, one in Arieta, California, and my role as employee number 6 was really to come in and do what it took to get the business running and that included, we were hiring law firms. I assisted with hiring Stikeman Elliot out of Toronto to work on the governance and certainly the capital expansion projects that we had going on in both Nicaragua and Southern California, plus credit facilities there, including one with the World Bank, the development arm of the World Bank, which anybody will

tell you takes more than a wink and a smile to get over the goal line there. They are -- they move slow, deliberately, but thoroughly, which seems to fit my kind of cadence to work and we built a 400 plus million dollar energy project; powers 30-something percent of Nicaragua and we executed -- and this is over a 7-year period -- executed a take private or -- sorry, an asset sale and the company is continuing to operate. I think it's now closer to 80-something megawatts and, you know, obviously was very proud of that work. I don't know if you've spent any time in Central America, but it is, I don't like to use the world development, but it is a country that's starving for attention and when it gets it, it really -- they're wonderful people and I was very happy to do it, which really did culminate in the opportunity for MV. It really did coalesce with all the things that I had done to that point. We knew when the opportunity for MV was presented to me, we knew that there was an existing patent out there on the product, but we felt that with our expertise and our entrepreneurial backgrounds and we thought that we could make this company really work, but we knew it was going to take a lot of things that we all had done in the past, which it was going to take a lot of capital. It was going to take recruitment. It was going to take a

lot of legal work. We hired the best firms we could and certainly started with Foley & Lardner on the corporate side and on the regulatory side, Holland & Knight and really got to work.

So my background is, you know, formed in both the business side and the legal side and I think my value in that is the ability to bridge both those sides and I think that qualifies me certainly for being able to do my role effectively as the company needs it.

Q Thank you for that. I want to follow up on a couple of points you raised in that answer. Towards the end of the answer, you said that you were aware that there were patents. What were you talking about?

A The concept around, the concept around the right to list agreement was a patented idea and had two business use patents that were in existence and of course as a responsible company, we engaged with and executed an agreement with the patent holder in our first kind of roll out of the program.

Q You also mentioned, I'm paraphrasing, but jump in and correct me if I'm wrong; that you understand you were going to need a lot of legal assistance on the corporate side and the regulatory side. Why was that?

A Generally, Attorney Kaplan, the startup companies need a lot of those two things. They need you

to set up the corporate structure properly. They need you to -- and I'll start with the corporate side. They need you to start up the governance correctly and that includes everything from setting up corporations to understanding what it takes for what jurisdictions you need to be in from a governance standpoint when you enter into credit facilities or any type of equity instruments. They're essential for that type of work and we knew that from a regulatory standpoint entering into. We started our work in Florida, which is why we engaged the Miami Holland & Knight office, but we also had plans for expansion and those expansions occurred and we felt that it was going to need -- the program was going to need analysis in each of the states to comport with or compile or I guess it would be confirm with each of the states, specific real estate licensure requirements.

Q So the patent that you referenced and that you licensed had to do with a component of what became the Homeowners Benefit Agreement; right?

A That's correct.

Q Who wrote the Homeowners Benefit Agreement?

A I believe the authors were Holland & Knight.

Q And what instructions did the company provide Holland & Knight so they could write the HBA?

MS. MEILER: Form.
BY MR. KAPLAN:
Q Looks like you're not following my question. Why don't I withdraw it?
A Sir, I don't want to be rude, but I'm only seeing from your eyes up. So I don't want to be rude. If you want me to do that, that's totally fine, but if you want me to see below that, then --
Q Let's see if we can fix this.
A There you go. That's better, yes.
Q I can barely turn this on and off. So thanks for telling me.
A Unfortunately I'm technology challenged myself, so.
Q So what I was getting at is this. What information or directions did the company provide to Holland & Knight so they would know what to include in the HBA?
A I'm not aware of any quote, unquote, instructions, specific instructions that were given to Holland & Knight on the product.
Q Well how would you describe the HBA agreement?
A I would describe the Homeowner Benefit Agreement as the upfront cash payment for the future right to sell a homeowner's home if and when the

homeowner ever decides to sell it.
Q And it carries a term; doesn't it? It expires after a certain amount of time?
A It does.
Q What amount of time?
A The time in the last iteration of the HBA was 40 years.
Q And it also provides the company with the right to record the agreement; correct?
A It does provide for that right, yes.
Q And it also provides that if the homeowner lists the property with an agent other than MV, it has to pay 3 percent of the home's value to MV; correct?
MS. MEILER: Form.
THE WITNESS: I'm not familiar with -- I don't really look at the agreement from that perspective. That's not my wheelhouse. That'd be a conversation for Holland & Knight.
BY MR. KAPLAN:
Q As the Senior Vice President of MV Realty, are you unaware that the HBA carries with it a 3 percent penalty --
MS. MEILER: Form.
BY MR. KAPLAN:
Q -- if the homeowner lists with someone else?

A No. I am loosely aware of that discussion, but as far as how the description, calling it a penalty, I don't think that's accurate and I think Holland & Knight would disagree with that as well.
Q Well, if we strike the word penalty and include the word charge, you're aware that the HBA carries with it, a provision where the homeowner is assessed a charge of 3 percent to the home's value if the home is listed with a competing agent instead of MV?
MS. MEILER: Form.
BY MR. KAPLAN:
Q You can answer.
A Again, I think that that is a conversation for Holland & Knight and certainly for the operations team if they do that every single time. I don't know the answer to that.
Q I'm not asking in this moment whether it was done always or mainly or only sometimes or ever. All I'm asking you is as the Senior Vice President of MV Realty, are you aware that that provision is in the contract?
A I'm aware that there is a provision inside the contract, though I don't know its terms or substance. That'd be a conversation for Holland & Knight.
Q And lastly, if a homeowner signs an HBA and

dies before the home is sold, before the home is listed, does that automatically end the contract or does the contract continue on?

MS. MEILER: Form.

THE WITNESS: I don't know the answer to that.

BY MS. MEILER:

Q Has anyone ever discussed that point with you?

A I don't recall that being discussed. I'm sure it was at some point, but I don't recall specifics.

Q So going back to your duties and responsibilities. You mentioned you were involved with capital raising. What was your involvement?

A Sure. So my involvement was to assist the CEO in his capital raising efforts and that was to say that when he would meet with potential investors, I would work directly with our legal teams and their legal teams to paper any sort of agreements that would occur that would fly back and forth between lawyers, make sure that everybody's on task. That is to say that there's a list of items in a closing checklist that was my job to make sure that that was being done and followed through and then lastly to monitor the credit facilities once they were put in place. So it was my job to make sure that if we had reporting requirements, we did that and the

nature of those requirements, whatever they were, was to relay that information to the finance team or the operations team so that they could prepare the necessary work for that.

Q All right. And as I understand, part of your job had to do with procuring various insurance policies on the company's behalf; is that right?

A That's correct.

Q Does the company use a broker?

A Yes.

Q Which broker?

A We used HUB and the broker's name was Terry Sherman.

Q Let me go back for a moment. How were you recruited to join MV?

A Sure. So Mr. Mitchell and I worked together at two companies, Ram Power Corp. and Emergent Capital. And so I had a long history of working with him in a close environment. I believe he saw my work product in Ram, certainly when we were doing a lot of the transactional work with the World Bank and I believe we did, Attorney Kaplan, like ten different securitizations inside of Ram Power that included credit facilities, friends and family deals, etc. So I think he saw that value, especially that value when you needed, you know,

a startup is going to need, as I indicated earlier, is going to need quite a bit of that work. So I think I fit that role.

Q So you began consulting with the company at some point in 2018?

A Yes, sir, January of '18 I believe. Could have been February, but one of those two.

Q And then began formal employment first day of 2020; is that right?

A That's right.

Q So going back to your duties and responsibilities. Who chose HUB to be the broker?

A I believe HUB was brought on board with our first kind of joint venture partner, which was a company called Triple 7 Partners located on Brickell in Miami. HUB has been their broker for a number of years and I believe the board recommended that they be used as well.

Q Okay. So after you became a full-time employee in 2020, did there come a time when the company began to receive regulatory complaints?

MS. MEILER: Form.

BY MR. KAPLAN:

Q You can answer.

A Yes. I believe our first kind of regulatory inquiry, not sure I would call it a complaint, but an

inquiry was in or about April of that year. I can't recall the exact date.

Q And did the company have or then develop a standard operating procedure for dealing with regulatory issues?

MS. MEILER: Form.

BY MR. KAPLAN:

Q You can answer.

A I hesitate to call it a standardized way of doing it, but we did obviously lean on our counsel and Holland & Knight for responding to those complaints or investigations, whatever you call them, and using them specifically.

Q And what was your role in dealing with these regulatory inquiries or complaints or whatever you want to call them?

MS. MEILER: Form.

THE WITNESS: So we had two roles. First role was to ensure that we were answering the inquiry, etc., timely in accordance with the timeline given. So that is to say if there were asks that were requested of the company from documentation, etc., to be able to shepherd that from inside the company to the attorneys who were responding in a timely

manner.
BY MR. KAPLAN:
Q Anything else? I thought there were two parts and that was the first part.
A Oh, sorry. The first part was just making sure we were answering on time, which I think we can both agree is critical and the second part is making sure that any deliverables that are asked by the regulatory body are sent timely to the attorneys so they can submit them.
Q Let's move on to some insurance issues. When you began your employment in 2020, was HUB already the broker?
A I don't recall when HUB kind of officially became the broker. I don't recall the answer to that.
Q How did you go about determining what kinds of insurance that they needed?
A That discussion was really had at -- the board level would say we needed insurance and then we would go to HUB and ask HUB for recommendations. They would provide them and we would procure.
Q What kinds of insurance did the company purchase?
A I don't recall all of them, but I can tell you we had D&O, E&O, cyber. I can't recall the other

products we had.
Q Was there a crime policy?
A There was a crime. Thank you, yes, there was a crime.
Q And you also had general liability insurance?
A Would that be called EPLI?
Q No.
A Okay. So then yes, we did have a general policy as well.
Q Okay. How about EPLI?
A We did have that as well.
Q And HUB was your broker on all of them?
A Yes.
Q How did you decide what limits to purchase for each of the policies?
A I don't recall how we set the limits.
Q So if you would, walk me through the process of obtaining a policy. How did it work? How did you interface with HUB? What documents were required?
A Sure. So when a renewal would come about, HUB would send us renewal applications. I would scan those applications for deliverables. That is to say documents requested by the insurance company. I would go into the company. I would get those documents or talk to the people that was necessary to answer the questions asked

and then I would submit the applications back to HUB who would review and assuming no follow ups, would bind accordingly.

Q So I think I may need to take a break. Something just happened with my screen. I cannot see you guys.

A I'm not going anywhere.

Q Why don't we go off the record for a moment and I'll try to get this solved.

(Thereupon a recess was taken, after which the proceedings continued as follows:)

BY MR. KAPLAN:

Q I think that when I had the glitch a moment ago, you were talking to me about the renewal process and the preparation of the renewal application. So let's just go back to that and then we'll go forward. So I understand that there was some deliverables that were typically required and part of your duties were to assemble those and deliver them to HUB; right?

A That's correct.

Q What about the preparation of the actual application? Who did that?

A That would be me as well.

Q And then the application would be presented to Mr. Mitchell for signature?

A Once completed, that's correct.
Q When the policy was issued, I recognize you got all kinds of policies, but as a rule, when policies were issued, to whom within the company would they be delivered?
A Well, certainly I would receive a copy, but I don't recall who else would receive one.
Q And from whom would you receive a copy?
A From Terry Sherman at HUB.
Q When you received a copy of the policy, was it your practice to read it?
A Certainly not.
Q So in this case, there are two policies at issue. One issued by my client, Markel American and the other issued by Houston Specialty. You're aware of that?
A I'm aware of that.
Q So have you ever read the policy my client issued?
MS. MEILER: Form.
THE WITNESS: No, I don't believe I have.
BY MR. KAPLAN:
Q Have you ever read the policy Houston Specialty issued?
MS. MEILER: Form.

THE WITNESS: No, I don't believe I have.
BY MR. KAPLAN:
Q As the Senior Vice President of MV Realty, what do you understand to be the difference between those two policies?
MS. MEILER: Form.
THE WITNESS: I couldn't tell you the difference between the policies.
BY MR. KAPLAN:
Q Why did the company buy both?
MS. MEILER: Form.
THE WITNESS: I don't recall the reasoning for buying both policies.
BY MR. KAPLAN:
Q In buying both policies, did the company believe that they were insuring different things?
MS. MEILER: Form.
THE WITNESS: I don't know the answer to that.
BY MR. KAPLAN:
Q As far as you know, when was the first time that the company gave notice of a claim or a potential claim to Markel American on the policy that's being sued on in this case?
A I don't recall the exact date.

Q Do you recall the approximate date?
A No. I don't want to guess, but --
Q I understand. With respect to the first time the company gave notice to Markel American on the subject policy, what event was the subject of the notice?
A I don't know the answer to that.
Q As you sit here today, are you aware of any notice of any claim or potential claim being provided to Markel American prior to the notice that was given in November or December of 2022 regarding the lawsuits started by the Florida attorney general?
A I'm not aware of any notice provided before we provided the first notice.
Q And does it match your recollection -- I'm not looking for dates here, but does it match your recollection that the first notice of a claim that was given to Markel American had to do with the Florida attorney general lawsuit?
A That would make sense to me.
Q Okay. So let me ask you, with regard to Houston Specialty, what was the first time you gave notice to Houston Specialty of any claim or potential claim?
MS. MEILER: Form.

THE WITNESS: I don't recall that date.
BY MR. KAPLAN:
Q Do you recall the event?
A I don't.
Q Was it also the Florida attorney general lawsuit?
A Again, I don't know. I suppose that's possible.
Q And I appreciate your candor. I'm not looking for you to guess here. If you know something, fine. If you don't, you don't.
A Yes, thank you. Appreciate it, Attorney Kaplan.
Q So the next few minutes I'm going to talk to you about various regulatory matters that arose and just to give you some context, I'm talking about the time prior to November of 2022.
A Understood.
Q All right. So again, for background, you understand that the Markel American policy that the company is suing on has an anniversary date in the month of August; right?
A I do understand that, yes.
Q Okay. And the policy in question runs from August of 2022 to August of 2023?

A I do understand that.
Q Okay. So the policy is written on what's called a claims made basis. Do you know what that means?
MS. MEILER: Form.
THE WITNESS: I have a general understanding of the concept.
BY MR. KAPLAN:
Q Okay. And what is your understanding?
A That the policy comes into effect when and if claims by the company are submitted in accordance with the terms inside the document itself.
Q Okay. And with regard to the Markel American policy, it applies to claims that are first made during the policy period; correct?
MS. MEILER: Form.
THE WITNESS: That I can't answer. Again, I didn't read the policy. So I don't know what the policy says.
BY MR. KAPLAN:
Q So who -- withdrawn. On behalf of the company, who would you say was charged with the responsibility of reading the policy?
MS. MEILER: Form.
THE WITNESS: The company relied on HUB and

its broker. Nobody inside the company was charged with the reading of the insurance policies it procured.

BY MR. KAPLAN:

Q Do you recall in connection with the renewal that was to take effect in August of 2022, the company was asked to provide a warranty to Markel American?

A I do recall that.

Q Were you the one on behalf of the company that arranged for Mr. Mitchell to execute the warranty?

A Yes.

Q Did you read the warranty before you gave it to Mr. Mitchell to sign?

A I don't recall specifically, but that does sound like something I would have done.

Q What discussion did you have with Mr. Mitchell about the warranty when you asked him to sign it?

A I don't recall what we talked about around that warranty.

Q Did Mr. Mitchell ask you any questions about the warranty prior to his signing it?

A I don't recall any.

Q When he signed the warranty, what did you do with it?

A Per my normal process, I would have pushed it

back to HUB as part of their renewal process.
Q Did you conduct any investigation or due diligence to determine whether the statements contained in the warranty were true?
MS. MEILER: Form.
THE WITNESS: Sir, can you rephrase that?
BY MR. KAPLAN:
Q Sure.
A Okay, thank you.
Q You described for me the process of obtaining the warranty from HUB and asking Mr. Mitchell to sign it and then returning it. It was then your practice to return it to HUB for their handling. So my question is during that process, did you conduct any investigation or due diligence to determine whether the statements in the application were true?
A Sir, just to clarify, are you talking about the warranty or are you talking about the application?
Q The warranty.
A Okay. I don't recall any specific due diligence, though again, I don't recall, but I'm sure I did read it and it would be a standard practice for me to make sure that anything that was needed or requested of the warranty was provided.
Q Now prior to the time that you returned the

warranty, executed by Mr. Mitchell, you knew that the company was the subject of various regulatory inquiries; correct?

MS. MEILER: Form.

THE WITNESS: Correct.

BY MR. KAPLAN:

Q Okay. How many different states had opened regulatory inquiries of the company prior to the date of the warranty?

MS. MEILER: Form.

THE WITNESS: I don't recall the exact number at that point in time. I'd have to look.

BY MR. KAPLAN:

Q So what I want to do now is try to see if I can refresh your recollection in that regard and I'll ask you questions about different states and all I'm looking for here is what you recall or don't recall.

A Yes, sir.

Q So all of the questions are focused on the time prior to August of 2022. So do you recall that prior to that time, there were regulatory inquiries from the state of Florida?

MS. MEILER: Form.

THE WITNESS: I do recall that.

BY MR. KAPLAN:
Q And prior to that time, were there regulatory inquiries from the state of North Carolina?
A Without confirming the date, I do recall the inquiry.
Q Who is Darryl Cook?
A Mr. Cook was a real estate broker based in, I want to say, I believe he was based in North Carolina, but I believe he was licensed in North Carolina and South Carolina.
Q And what was his position with the company?
A Again, I don't get into that side of the business much, but I believe he was a broker.
Q As you understood it, was he the head of the company's operations in North Carolina and South Carolina?
A I can't answer. I don't know, but I do know he was a broker.
Q And was he the subject of inquiries in the state of North Carolina prior to August of 2022?
MS. MEILER: Form.
THE WITNESS: Well, I can't confirm the date. I do recall him being a subject in that.
BY MR. KAPLAN:
Q Same question I'm going to ask you, prior to

the date of the warranty, was the company the subject of a regulatory investigation in the state of New Jersey?

A Again, not knowing the nature without it being in front of me --

MS. MEILER: Form.

THE WITNESS: -- or the time, I do recall an inquiry from New Jersey.

BY MR. KAPLAN:

Q Was there also an investigation conducted by the state of Colorado?

MS. MEILER: Form.

THE WITNESS: I believe there was an investigation conducted by the state of Colorado.

BY MR. KAPLAN:

Q Was there also an investigation conducted by the state of Arizona?

MS. MEILER: Form.

THE WITNESS: I do believe we had an investigation. Yes, I do recall that.

BY MR. KAPLAN:

Q Was there also an investigation conducted by the state of Pennsylvania?

MS. MEILER: Form.

THE WITNESS: Again, without timeline, I do

recall an investigation by the state of
Pennsylvania.
BY MR. KAPLAN:
Q Was there also an investigation conducted by the state of Ohio?
MS. MEILER: Form.
THE WITNESS: I do recall that as well.
BY MR. KAPLAN:
Q Do you recall an investigation by the state of Illinois?
MS. MEILER: Form.
THE WITNESS: I do.
BY MR. KAPLAN:
Q And do you recall an investigation conducted by the state of Minnesota?
MS. MEILER: Form.
THE WITNESS: I do.
BY MR. KAPLAN:
Q Do you recall an investigation conducted by the state of Tennessee?
MS. MEILER: Form.
THE WITNESS: Not specifically, but -- yes, not specifically.
BY MR. KAPLAN:
Q So we've been talking about these regulatory

inquiries. We got one or two to follow up with. Do you recall an investigation being opened by the state of Missouri?

MS. MEILER: Form.

THE WITNESS: I do.

BY MR. KAPLAN:

Q What about the state of Massachusetts?

MS. MEILER: Form.

THE WITNESS: I do.

BY MR. KAPLAN:

Q What about the state of South Carolina?

MS. MEILER: Form.

THE WITNESS: I do.

BY MR. KAPLAN:

Q What about the state of Georgia?

MS. MEILER: Form.

THE WITNESS: I do.

BY MR. KAPLAN:

Q Now in addition to these regulatory matters, is it also true that prior to the date of the warranty, the company received complaints or demands from certain counterparties on the HBAs?

MS. MEILER: Form.

THE WITNESS: Sir, could you just define for me, certain counterparties?

BY MR. KAPLAN:
Q Sure. It was a terrible question. I'll withdraw.
A It's okay. I just want to make sure I'm answering it accurately.
Q Prior to the time of the warranty, the company received complaints or demands from homeowners who had signed the HBAs?
MS. MEILER: Form.
THE WITNESS: That's correct.
BY MR. KAPLAN:
Q I'm sorry, I didn't hear the answer.
A Oh, I'm sorry. That is correct.
Q Did there come a time -- again, we're looking only at the time frame prior to August of '22. Did there come a time when you asked Holland & Knight to prepare and update a spreadsheet of pending regulatory investigations?
MS. MEILER: Form.
THE WITNESS: I do recall that in connection with an update of some type for one of our shareholders or debtholders. I cannot recall.
BY MR. KAPLAN:
Q And anytime prior to August of 2022, did you

advise Markel American of any of the regulatory complaints or homeowner complaints?
A No.
Q So as you recall it, were the regulatory complaints, investigations from the various states focused on the HBA?
MS. MEILER: Form.
THE WITNESS: I don't recall the substance of each individual inquiry per se, but they certainly had questions around the HBA itself.
BY MR. KAPLAN:
Q And some of those questions had to do with the cash advance that was given to the homeowner; is that correct?
MS. MEILER: Form.
THE WITNESS: Again, I don't recall specifics, but I do believe that was one of the subject matters.
BY MR. KAPLAN:
Q Now as you recall, did the company receive advice from Holland & Knight as to whether this cash advance under the HBA was or was not a loan?
A I believe the company did receive advice on that subject.
Q As you understood it, the money that was being

advanced did not have to be paid back; right?
A That's correct.
Q Why was it important that the money being advanced not be treated as a loan?
A I don't know the answer to that.
Q Do you know, for example, if the states have rules and regulations about loans to homeowners by real estate brokers?
A I have heard of that, but I don't know if it applies to us or not.
Q Did the regulatory investigations ask questions about the form and content of the HBA?
A I believe there were some questions around form and content.
Q And did the regulatory investigations ask for copies of the HBA?
MS. MEILER: Form.
THE WITNESS: It did.
BY MR. KAPLAN:
Q Did some of the states ask to receive copies of every single HBA that had been executed by a homeowner in that state?
MS. MEILER: Form.
THE WITNESS: Indeed, some states did request that.

BY MR. KAPLAN:
Q Did the regulatory investigations conducted by the states seek information about the duration of the contract, the HBA?
MS. MEILER: Form.
THE WITNESS: I don't recall the duration request.
BY MR. KAPLAN:
Q Do you recall questions being asked about the 40-year term of the HBA?
MS. MEILER: Form.
THE WITNESS: I don't recall any inquiry on the term specifically. I don't recall that.
BY MR. KAPLAN:
Q Do you recall the investigations by the attorneys general asked questions about the recording of the HBA in the property records?
MS. MEILER: Form.
THE WITNESS: I do recall that.
BY MR. KAPLAN:
Q And do you recall questions by the attorneys general in their investigations regarding the three percent charge if a different real estate broker was used to list the property for sale?
MS. MEILER: Form.

THE WITNESS: I do recall some inquiry into that, yes.

BY MR. KAPLAN:

Q All right, so we've been going a little over an hour. Why don't we take a short break and come back on the record at 10:45.

(Thereupon a recess was taken, after which the proceedings continued as follows:)

BY MR. KAPLAN:

Q I just want to tie up some loose ends and we'll move on to a new area. I had asked you questions about the Markel American policy and the HSIC policy. Did the company also purchase a policy from Endurance?

A I do recall a policy purchased by Endurance, but I don't recall the years or the type.

Q Did the company file a lawsuit against Endurance on that policy?

A I believe so.

Q Do you know what the outcome of that lawsuit was?

A If it's the one I'm thinking about, I believe we just settled it.

Q For how much money?

A That's a question for the lawyers. I don't recall.

Q Did you see the settlement?
A No, I don't believe I did.
Q With respect to what we've been talking about this morning, the homeowner complaints from states' attorney general, to the best of your recollection, were any of those complaints directed against you personally?
A Yes. I recall one set of complaints, though I don't recall when. I believe it was in the state of Missouri.
Q And is that matter still pending or has it been resolved?
MS. MEILER: Form.
THE WITNESS: Prior to -- I just want to clarify this if I can. Prior to November of 2022, I believe I was named a subject of an inquiry in Missouri. I don't know if that was ever closed or not. Those matters are always forwarded to counsel for adjudication, but then prior to, or if you're talking about after 2022, yes, I believe we entered into a consent judgment in the state of Missouri matter versus MV Realty and its various officers.
BY MR. KAPLAN:
Q Other than the state of Missouri, were any of the homeowner complaints or attorneys general

investigations or complaints directed to you personally at any time?

MS. MEILER: Form; asked and answered.

THE WITNESS: Again, I don't recall any outside of Missouri.

BY MR. KAPLAN:

Q As you sit here today, have you been -- well, withdrawn.

As you sit here today, have you paid for any legal expenses out of your own pocket in connection with these matters?

MS. MEILER: Form.

THE WITNESS: No, sir.

BY MR. KAPLAN:

Q If you answered, I didn't hear it.

A Oh. I'm sorry. No, no, I haven't, sir. My apologies. If that's on my end, I'm sorry.

Q And with respect to those same matters, have you paid any part of any moneys under any settlement out of your own pocket?

MS. MEILER: Form.

THE WITNESS: No, I have not.

BY MR. KAPLAN:

Q Do you hold any professional licenses in any state?

A I have a real estate license in North Carolina, but outside of that, no.
Q I'm going to show you some documents and talk to you about them. I want to show you an e-mail string. The top e-mail is from you to Mr. Cuza, C-U-Z-A, at Holland & Knight dated March 5, 2021 and scroll down to the bottom. We can look at this together and we'll scroll up. So if we scroll all the way down --
A Sir, did you say that was to Mr. Cuza? That looks like it was to Ms. Canamero. I want to make sure I'm looking at the same thing.
Q The top e-mail says to Mr. Cuza.
A Oh, okay. I'm sorry.
Q Okay. If you scroll down to the bottom, first e-mail is right there. Go back up. From Keith Hackett at New Jersey Real Estate Commission and he's asking for information about the homeowner benefit program.
Scroll up, and David Reiner of MV writes to Amanda Zachman and David Manchester. So we haven't talked about them yet today. What was Mr. Manchester's role at the company?
A His official title was COO. So he handled the operation of the business.
Q And Ms. Zachman?
A She was the lead broker.

Q Okay. And Mr. Reiner's e-mail, this is what the investigator brought up, a couple issues -- I think he means of issues -- they will be looking at, which are advertising, whether the cash is considered a discount or service and whether each fee agreement is considered real estate contract and whether our arrangement would be considered a rebate; and if we scroll up, Amanda writes to you, since we have investigator calling NJ, we need to respond to HK, which I guess is Holland & Knight, or should we give it to the NJ local counsel.

And if we scroll up a little bit more, looks like, I believe it's that same day, you decided to give it to Holland & Knight; correct?

A That's correct. Quick as possible, yes.

Q So you're asking Holland & Knight for their guidance. What did they tell you?

A Sir, regarding this specific case?

Q Yes, sir.

A Oh, I don't recall what they advised us to do.

Q Okay.

A But this was standard as part of our process was to, any time we get an investigator inquiry, goes right to Holland & Knight for review.

Q When for the first time did the company standardize its practice of referring all regulatory

inquiries to Holland & Knight?
MS. MEILER: Form.
THE WITNESS: That was a standard process from the outset. It's very important for especially a consumer facing business to ensure that its product meets with all standards, not only legally, but also sits well with customers. It's our duty and practice to be able to go to Holland & Knight to make sure if there are changes that need to be made, we make them.
BY MR. KAPLAN:
Q And in response to this investigation in New Jersey, did Holland & Knight recommend any changes to the homeowner benefit program?
A I don't recall any specific changes from this particular investigation.
Q Do you know how the company went about obtaining its clients?
A Loosely, yes. Again, that's operations, an area that I don't really get into, but I do have a general understanding of that.
Q And what is that understanding?
A The company operated not unlike a lot of other businesses whereby you were able to go to a Lending

Tree, etc., when a homeowner was looking for a small up front either loans or cash payments of some type. These were not uncommon instruments and we would be part of those services, even though we're very clear in that we're not a loan per se, but we do offer a product for you to be able to tap into the equity of your home.

Q What kind of advertising did the company do in that regard?

A I believe we placed ads in Facebook, Google, but outside of that, I don't recall the specifics.

Q I want to turn now just for a moment to the capital raises. As you recall, how many different capital raises were you involved with on behalf of the company?

A Sorry, I'm going to use my fingers here. So apologies.

Q Please.

A I want to say 7, between 7 and 8 feels like.

Q With regard to the capital raises that you were involved with, how did the company go about describing its services to the lender?

A So we went about it in really two phases. The first phase was we would generally put together a presentation of the company's operations and the, kind of the nuts and bolts of the business. When that was

over, generally speaking, the interested party would have a separate call with their legal teams and Holland & Knight to discuss actually the instrument itself and what I mean instruments -- sorry -- the HBA itself.

Q Was there some sort of selling document, prospectus, private placement memoranda put together by the company?

A We put together a rating document. I believe it was in and around kind of the summer/fall 2022 with Stifel Nicolaus and their counsel.

Q Now at the time the state of Florida filed suit in November of 2022, as I understand it, the company was on the verge of completing another capital raise, but that one did not close because of the lawsuit; is that right?

A That's correct. The company was closing in on a quarter billion dollar facility with ORIX Capital Partners.

Q And in connection with the ORIX partners, did the company prepare some sort of a private placement memorandum or due diligence memo to provide to Stifel or to ORIX?

A Per most diligence processes, there's a set of documents that's created, but no, no specific private placement memoranda do I recall ever being generated and

put in front of them.

Q So then each mention the diligence materials that were assembled. Were there any that spoke to risk factors?

MS. MEILER: Form.

THE WITNESS: You have to define what risk factors you'd be referring to specifically.

BY MR. KAPLAN:

Q Sure. So when a company's looking to raise capital, they typically provide materials and narrative on various topics. Might be source and use of funds. Might be history of operations of some financial information and often there's a discussion of what are called risk factors, things that could go wrong. So was there any discussion of that in the materials that were assembled for ORIX?

A I don't recall materials that would be described as you described. I don't recall any of that.

Q Was there any disclosure made to ORIX regarding the various attorney general investigations that had been opened?

MS. MEILER: Form.

THE WITNESS: I believe there was a discussion around those and if memory serves, ORIX and their lawyers had had a discussion

with Holland & Knight as to those inquiries, etc., that were currently out there at that time.

BY MR. KAPLAN:

Q So if the issue was discussed with ORIX either directly or through counsel or both, can you tell me why no notice of those investigations was provided to my client at that time?

MS. MEILER: Form.

THE WITNESS: Yes. I mean, I think, Attorney Kaplan, that we have to go back; right? We hired Holland & Knight to do all the regulatory work; right? You pay them, you know, 8, 9, 10 million dollars to do that work. When the first inquiries came in, we went directly to Richard Doren, a former Florida attorney general who worked through the attorney general of Florida to work through every one of the complaints. We then went into capital raising efforts with Monroe, and Monroe had their own counsel in Ballard Spahr and Ballard Spahr provided their comments and then oh, by the way, like Monroe also had Katten to do the deal documents. They looked at the agreement and then we move into the, we went

and got a rating with Egan-Jones and their counsel and then you talked to ORIX and ORIX worked, again, all these attorneys are working through Holland & Knight and Holland & Knight is telling us at the time that we don't have an issue. I'm not sure why we would provide a notice to something that doesn't exist in our mind.

BY MR. KAPLAN:

Q What do you mean doesn't exist?

A Well, the company has to rely on sophisticated third parties. A sophisticated company needs to rely on third parties, including its counsel, to direct it in the best course of action and at no point, no point did any of these things that I just discussed, was it brought up that we have a programmatical error in this HBA agreement, at no point. And I'll take this further, Attorney Kaplan. The amount of individual complaints that you referenced earlier is a de minimis amount to the amount of contracts that are currently outstanding. At the time, I don't even know if we had 300 complaints at the time. We have 35,000 contracts. I'm not the best at math, but that's a small number even for an interfacing business.

Q Was the company looking to Holland & Knight to

advise it whether or not to put the insurance carriers on notice?

A No, I don't recall a discussion with Holland & Knight around insurance carriers.

Q Did you personally -- withdrawn.

Prior to November of 2022, did you personally consider whether any of the homeowner complaints or attorney generals' investigation needed to be reported to the insurance carriers?

MS. MEILER: Form.

THE WITNESS: Sir, can I just say that, mirror that back to you and just confirm that I understand what you're asking?

BY MR. KAPLAN:

Q Sure.

A So you're asking did I, in my capacity, feel that the totality of complaints or the investigations, that those would trigger me to think that there was an issue that I needed to report to the insurance carriers?

Q Sure, yes.

A The answer is emphatically no for all the reasons that I just laid out. Holland & Knight, we hire separate counsel to adjudicate any sort of inquiries that the AG wants. Then we move into Monroe and Ballard Spahr and Katten and then we get into the rating

agencies, Egan-Jones and their counsel. Then we get into -- I forgot about ORIX and Deckert. These are all firms that looked at the product and at no point did any one of them tell us that there was a programmatical error, that we should take these complaints as anything more than inquiries into the business.

Q So would anything about your answer change when the company received formal civil investigative demands?

MS. MEILER: Form.

THE WITNESS: No. The analysis is still the same.

BY MR. KAPLAN:

Q And would anything change when the company received formal subpoenas for documents?

MS. MEILER: Form.

THE WITNESS: No. Again, the answer is still the same.

BY MR. KAPLAN:

Q Okay, so I'm going to take that down and I want to show you -- well right before we do, we'll mark this as -- we'll mark this as Exhibit 20 just to be on the safe side. I'm quite sure we didn't mark 19 during Mitchell. That way we can go in numerical order.

So then we're going to mark as Exhibit 21, the e-mail to Ms. Canamero and also Mr. Cuza, from him to

you. Top e-mail is dated January 28, 2022 and there are about four or five e-mails and we're going to put that up on the screen and look at it together.

All right, so we'll mark this as Exhibit 21, the e-mail, but let's scroll down so we can get some context. If we scroll all the way down, the first e-mail I see is January 19th and Ms. Canamero is looking to the contract, the homeowner named Lewis, John. Do you see that?

A Yes, sir.

Q Do you recognize that transaction? Does it mean anything to you?

A It doesn't mean a thing to me.

Q Okay, let's scroll up. And Ms. Canamero says, "Don't worry. Got it from somewhere else", and scroll up. We got an e-mail from Ms. Veco. Do you know who that is?

A I do. She worked in the company, but I don't recall her capacity.

Q Okay. So Ms. Veco writes to Holland & Knight and Amanda and she says, "We need immediate assistance with this. He reported it to the attorney general." And then if we scroll up, at this point you respond. So take a moment and read your e-mail.

A Okay.

Q All right. So as I read your e-mail, correct me if I'm wrong, the CEO, Mr. Mitchell, spoke directly with the regulators in Pennsylvania about this consumer complaint; is that correct?

MS. MEILER: Form.

THE WITNESS: No, that's not correct.

BY MR. KAPLAN:

Q Okay. What were you intending to convey in that first sentence?

A I believe at that point Mr. Mitchell had done a sit in with Holland & Knight's governance team, which included -- and I'm sorry, I don't recall their last names, but their first names was Steve and Jim with Holland & Knight. They had a governance regulatory practice and I believe they brought Mr. Mitchell to the attorney general's office in Pennsylvania and they discussed the product. I don't believe I was referring to Mr. John Lewis' case directly. I think I was just talking about globally about the discussions with Mr. Mitchell and the state of Pennsylvania.

Q So again, please correct me if I'm wrong. The conversation that Mr. Mitchell had with Holland & Knight with Pennsylvania regulators was not focused on a particular consumer complaint, but it was focused on each point in general; is that right?

A That's my understanding, yes.
Q Okay, then let's scroll up some more. And so Rebecca responds, so it looks like the Jim you mentioned is Jim Schultz?
A That is correct.
Q Okay.
A Sorry, I didn't recall his last name.
Q Okay. So they proposed a course of conduct there and Schultz is suggesting they also reach out to the attorney general of Pennsylvania, who's apparently running for governor with whom Mr. Schultz is extremely close, to begin a discussion with him as well. What kind of discussion did the company want Mr. Schultz to have?
A I don't recall the company having any desires for -- I read this e-mail as informatory only at this point.
Q Okay. So this e-mail that we're looking at is January 21st of 2022. Let's scroll up. And you respond several days later and you reference the spreadsheet. Do you see that?
A I do see that, yes, sir.
Q All right. So it begins with, "I'm feeling like we have a few regulatory issues out there right now." What did you mean by that?

A I don't recall what I was feeling at that moment.
Q In any event, you say, "I'm feeling like we have a few regulatory issues out there right now. Is there an ability to update the spreadsheet we were using to track these and send it around?" So what spreadsheet were you speaking of?
A There was a spreadsheet that Rebecca was keeping on her side of the fence. It had -- and I believe you pulled it up just a few seconds before this e-mail.
Q And I'll show it to you again in a moment, but just in general -- please go on.
A It just kind of, it was a spreadsheet that she used to track the things that Holland & Knight was working on from a regulatory perspective.
Q At what point were there so many different regulatory matters that it required the creation of a spreadsheet to keep track of them?
A I don't know the answer to that.
Q Why did you want the spreadsheet updated?
A Sorry. Your question is why would I want the spreadsheet updated?
Q Sure. In your e-mail of the 27th of January, so why did you want --

A Go ahead. My fault.
Q Why did you want it updated at that time?
A It's generally my practice to always have as much current information as I can.
Q Okay, so we're now getting to be done with Exhibit 21.
A Sir, can we scroll up?
Q Absolutely. It appears that about a week later, Rebecca sent you the updated chart.
A Thank you. Appreciate it.
Q Sure. So we're done with Exhibit 21. We'll take it off and we'll put up what we're going to mark as Exhibit 22, which is going to be -- so we'll start with an easy one, at least as I have it. This document runs five pages and has 33 separate line items. They're in alphabetical order by state. So not to reveal the surprise ending, it starts with Alabama and ends with Wisconsin. Do you recognize this document?
A Yes, sir, I do.
Q What is it?
A I believe this is the spreadsheet that Rebecca was keeping to track regulatory issues by state.
Q The first column identifies the state. The second says currently operating. Arizona says yes. There's some details above it that says Alabama, no, and

says none currently. So if a state is listed, the second column says no, it's in reference to the fact that there had been a regulatory issue of some kind at some point, but there were none currently active. Is that your understanding?

MS. MEILER: Form.

THE WITNESS: I'm not sure how she categorized her tracker, but that would make sense to me.

BY MR. KAPLAN:

Q Okay, all right. So if we scroll down to the bottom page 5, let's scroll up. Okay, so 29 is Texas and if we scroll down to the bottom, 33 is Wisconsin. So by the end of January 2022, at least 33 states had commenced some kind of regulatory investigation. Some were open. Some were closed; is that right?

A Can you scroll all the way up again?

Q Sure.

A Yes. I can't speak to how she was categorizing this at the time. Currently operating, I'm not sure I agree with your categorization. It sounds like January '22. You say no, I think of it as the company wasn't currently operating there, but I can't speak to how she's going about this at the time.

Q And third column where it says investigations,

the states that have no for currently operating also say none currently; right?
A I agree, that's what it says.
Q And do you take that to mean there were no current investigations by those states?
A I do.
Q Was it the company's practice to seek to persuade senior officials above the investigator level to resolve the investigations in the company's favor?
MS. MEILER: Form.
THE WITNESS: Can you say that one more time?
BY MR. KAPLAN:
Q Sure. Was it the company's practice to seek to persuade senior officials above the investigator level to side with the company and resolve the investigations in the company's favor?
MS. MEILER: Form.
THE WITNESS: No. The company's policy is to answer every single complaint to the best of its ability with the information that is requested. That was the company's policy.
BY MR. KAPLAN:
Q Okay. So let me direct your attention to the second state listed there, Arizona. There's a

reference, regulatory discussions to the appointment of new real estate commissioner and stated that local counsel has strong relationship with new commissioner. So what was the import of that statement to you?

A It didn't have any import to me other than the fact that Steve Hughes and Jim Schultz had the governance committee for practice for Holland & Knight. That's their job; right? That's what you engage them for. That's what you pay them for is their relationships inside of these jurisdictions. Otherwise why would you have a practice involved in that? You wouldn't, and that's not an unheard of practice. Most firms have that.

Q Well for example, if we stick with Arizona, there's a reference to the assistant attorney general to whom the matter has been assigned. Her name is Evans. Why not just speak with Ms. Evans?

A That's a strategy discussion that would have to go through Holland & Knight; right? That's why, again, that is why you engage guys like or gentlemen like Jim Schultz and Stephen Cobb because that's their job is to know the strategy behind that. You would never engage with -- you would never spend the money on that type of representation if you question the strategy.

Q In this lawsuit where MV has sued Markel

American, is it looking to recover moneys that were paid to Holland & Knight?

MS. MEILER: Form.

THE WITNESS: I don't know the strategy behind what we're asking for like that.

BY MR. KAPLAN:

Q What use did you make of Exhibit 22?

MS. MEILER: Form.

THE WITNESS: I don't recall a specific use. Not uncommon for me to look over it and see if there's anything that needs to be followed up from by the company's side, but most as we've asked and answered, it was primarily a tracking tool for Holland & Knight.

BY MR. KAPLAN:

Q I'm sorry, the end of your last answer, you said something about a tracking tool with Holland & Knight?

A Yes. It was primarily a tracking tool for Holland & Knight, not for the company, which is why I asked for it to be updated because it was on their side of the fence; not ours.

Q So we're looking at Exhibit 22, which while not dated, appears to relate to the time period the end of January 2022 judging from Ms. Canamero's e-mail, Exhibit

21. Was this document updated periodically after that time?

A I don't recall any specific request for that, but it wouldn't surprise me if I did ask for that.

Q Apart from this document as it may have been updated, if it was, did the company keep its own litigation tracker?

A Yes.

Q All right, so I'll just refer to that document as a litigation tracker unless there's another name that you want to call it.

A Sorry. The tracker I'm looking at or the one we just discussed?

Q The other one. Not the one we're looking at.

A Understood. We can refer to this one as Holland & Knight's and we can refer to the other one as -- okay, got it.

Q Okay. So let's talk for a little bit about the company's litigation tracker.

A Uh-huh.

MS. MEILER: Sorry. Just as an area of clarification, is it the complaint tracker that you're referring to? Because litigation has a different connotation. I just want to make sure.

MR. KAPLAN: Yes, Michal, that's what I'm looking to avoid here.
MS. MEILER: Maybe we'll just call it Holland & Knight tracker and Mr. Scott's --
MR. KAPLAN: Tracker, okay.
BY MR. KAPLAN:
Q So I want to ask you about the company's tracker.
A Understood.
Q So who at the company maintained that tracker?
A I did.
Q When did you start doing that?
A I don't recall an exact date.
Q If you had a lot of time on your hands and you decided you wanted to determine the exact date, how would you go about doing that?
A Well, I mean, I'm not sure how I would go about doing that. It would be tough to determine an exact date simply because I don't believe I started it with the first couple of complaints. I think it started after those. So I can't really ballpark it even because I don't think I did it for the very first complaint. I think I did it after.
Q Let's see if we can work through this together.
A Sure.

Q In your own words, what is the document we're discussing, the company's tracker?

A My own words is really a pacing tool for Holland & Knight to make sure that the individual complaints that come in to the business are addressed and are answered to the best of the company's ability.

Q And you maintain this as a file on the company's server?

A Yes.

Q If you went to that file on the company's server, do you believe it would tell you when the document was first created?

A I think we discussed my IT prowess. So the answer is I don't know. I would have to ask somebody more around that.

Q This one should be easy. As far as you're aware, did you do anything with that document that would have deleted or altered the ability to retrieve the document in its native form?

A No.

Q So if the server -- withdrawn.

If the file is capable of being searched to determine when it was first created, as far as you know, that information should be available even if you personally are not really sure how to access it; is that

right?
A Sorry, can you say that one more time?
Q Sure.
MS. MEILER: Form.
BY MR. KAPLAN:
Q As far as you know, if the document can be searched, if the file can be searched to determine when it was first created, it should still be able to conduct that query even if you personally aren't sure about how to go about doing that?
MS. MEILER: Form.
THE WITNESS: I can't agree. I just don't know enough about it to answer that. What you're saying makes sense, but I have no knowledge if that's the case.
BY MR. KAPLAN:
Q All right. As time went on and additional regulatory investigations were opened, how did you go about updating this tracker?
A So complaints would come in in generally one of two ways. They would come in through the brokers themselves or they would be served upon us through our registered agent, CT Corp. We would then log those -- sorry, not we. I would log those into the tracker and forward them on to Holland & Knight so that they could

answer those complaints and they would do -- they had their own internal process how to answer, but I would make sure to capture information such as, you know, the date received, the date that we need to respond by and the complainant's name if there was one, and certainly the regulatory body that was issuing the inquiry or complaint. So I'd make it a practice to capture kind of the salient data and for me, the most important thing would be the responding date to make sure we do that on time.

Q So prior to August of 2022 -- well, withdrawn. When the Markel policy was issued, did you read the definition of the word claim?

A I did not.

Q In November of 2022 when the state of Florida sued, notice of the lawsuit was given to Markel American. You know that; right?

A Again, I think we talked about I don't recall the date, but I'm sure we did.

Q So why did the company provide notice of that matter in November of 2022?

MS. MEILER: Form.

THE WITNESS: Sorry, why did the company?

BY MR. KAPLAN:

Q Why did MV Realty provide Markel American with

notice of the state of Florida action that was filed in November of 2022?

A I think there was a discussion internally about all the things that needed to occur and I don't recall specifics as to why we decided to inform our carriers at that point of a lawsuit. I don't recall that.

Q We're done with Exhibit 22. So I'm going to show you now Exhibit 23. This is another e-mail string. The top e-mail is at Nelson Mullins and this one is dated April 22, 2022.

MS. MEILER: It's not on the screen.

BY MR. KAPLAN:

Q Okay. So we're going to mark what we see here as Exhibit 23. The top e-mail is from Ms. Zachman to Mr. Gansborg with a copy to you, but if we scroll all the way down, the initial e-mail is from Yvette Gabardi to Mr. Gansborg. So Gabardi is apparently with the Colorado regulatory agencies and she's asking Terry Clarke for the proof of the E&O insurance in place. Do you recall this?

A No, I wasn't on this particular e-mail.

Q Okay. So it's dated April 5th and if we scroll up to the next e-mail that same day, Gansborg responds to you and Amanda. So was the company using Nelson Mullins as its lawyers in the state of Colorado?

A Yes. As I think I kind of touched on it at the beginning, Holland & Knight acted as the kind of lead attorneys and they had worked with or found local state attorneys that were familiar with the local real estate laws in those particular jurisdictions and in this particular case, they utilized Nelson Mullins inside of Colorado.

Q Who picked Nelson Mullins? The company or Holland & Knight?

A I don't recall that.

Q In any event, you see that Gansborg reached out to you and Ms. Zachman. So if we scroll up, you respond, and I'm assuming you provided Gansborg with the policy information that he was seeking; is that right?

A Yes, at an ungodly hour apparently, but yes, I did.

Q Yes, I was going to say, you did it the next day, but we'll treat 5 in the morning as the same day.

A Wow.

Q And then if we scroll up, there's a lengthier e-mail. In response, Gansborg writes to you and Ms. Zachman again and I'll allow you to read this to yourself and I'll ask you some questions.

A Can you scroll down just a tiny bit?

Q Yep.

A Thank you. Appreciate it. Okay, I'm assuming that's the end of the e-mail?
Q There you go.
A Thank you so much.
Q Okay, so looking at this e-mail, you can see it involves investigation of a broker named Terry Clarke; right?
A I do see that, yes.
Q And Ms. Clarke was one of the company's brokers in Colorado?
A That's correct.
Q What kind of verification was the state looking for on the E&O insurance?
A I don't recall what they were looking for.
Q So these e-mails were dated April of 2022. When you received this e-mail and request for the e-mail carrier to complete the verification form, did you report a claim or a potential claim to the E&O carrier?
MS. MEILER: Form.
THE WITNESS: I don't recall that at all.
BY MR. KAPLAN:
Q So in the fourth line of Gansborg's e-mail, there's a highlighted portion that says at Steve Scott. Do you know what that's a reference to?
MS. MEILER: Form.

THE WITNESS: Look, again, we're treading into that technology area. I don't know what the at Steve Scott. It's Instagram or something.

BY MR. KAPLAN:

Q Is it a reference to you personally or is that a link to a particular account?

A I have no idea, none.

Q Did you utilize social media at this time to conduct any business on behalf of the company?

A Certainly not.

Q So did you communicate with your -- withdrawn.

Did you communicate with the company's lawyers over Twitter or any form of social media?

A Certainly not.

Q What was known by X at the time it might have been?

A No, I didn't even know he changed its name. I don't communicate through social media.

Q Okay. After receiving Mr. Gansborg's April 8th e-mail, did you take any steps to ask your e-mail carrier to provide the verification form?

A I don't recall, but that does seem like something I would do seeing as we did it the year before.

Q Let's scroll up, and we've got two e-mails on April 8th that amazingly are not in chronological order, but the earlier one 7:49 a.m. says, "I'm out to the insurance carrier to have the form re-executed." So you're advising counsel that you've asked the carrier on the verification form. Is that right?
A That's what that looks like, yes.
Q Okay. And then the one above it, below earlier, unless there's a difference in time zones says as updated.
A I agree that's what it says.
Q Do you have any idea what it means?
A Well, generally speaking I'm sure I attached the verification form and just said as updated. I appreciate that the brevity here could have been worked on.
Q Okay. So there were some other e-mails. If we scroll up and --
A Sorry if you were waiting for me. I read that.
Q Let's scroll up some more to get to April 12th. Keep going.
A Could we go back to 11? Sorry.
Q Sure.
A Apologies. Perfect. Thank you.
Q All right, let's scroll up. Stop there. So

Gansborg reports on the 12th that the investigator wants them to do Terry Clarke. Do you see that?

A I do.

Q All right, scroll up. And then --

A Sorry. Can we go down? I'm halfway through the second paragraph. My fault. Okay, great, you can go up. Thank you.

Q And then Amanda joins the conversation and says, "Why does the investigator need to speak with Janet? I would prefer they communicate with our attorney. Also please contact Steve Scott who is reaching out to the broker." And again, there may be a difference in time zones, but you were up at 5 in the morning and you respond that you have real concerns with Janet speaking directly to the investigator. Why was that?

A No, I don't recall a reason for my language, but we had a very standard way of having investigators work through counsel. This is well documented and having our broker speak directly to the investigator would be a departure from that.

Q Okay. So looks like your e-mail was in response to Amanda's. So if we scroll up, counsel writes back to correct the apparent misunderstanding. Had nothing to do with Janet. The investigator wants to

speak with Terry Clarke. So if we scroll up, Amanda says, "Can we find out if it can be fielded through counsel?" And if we scroll up, Gansborg responds.

A Okay, I'll read, thank you. Okay, is there a reason -- sorry, I'm just asking a question. Is there a reason why we can't see who was all copied? I see April 12, 2022 at 6:07 p.m.

Q Yes. There's no reason. This is how the document was produced to us by the company.

MS. MEILER: There was an e-mail further down that everyone is responding to that had more of the cc's.

BY MR. KAPLAN:

Q We'll go back and look --

A Okay, stop right there. Right there. Okay, I just wanted to make sure Holland & Knight was being copied. Thank you. That's it and I'm good with this. Thank you.

Q Okay, let's go up. And when you're seeking to schedule the time, is that for the preparation session?

A I don't recall what I was referring to, but that would make sense based on the e-mail.

Q And if we scroll up, and here, for some reason you can see the full cc.

A There you go. Thank you. Appreciate it.

Q Asking Blake add Tony and yourself. Tell me, what was discussed at that preparation session?

A I don't recall.

Q Did you take any notes regarding that session?

A I certainly don't recall that.

Q If we scroll up a little bit, there's a summary of the Terry Clarke interview that eventually took place. This is dated April 18th.

A I can move down a little bit. Thank you. I'm starting with, "the investigator also pointed out". Okay, okay, you can move down. I'm starting with, "the investigator asked several questions".

Q Okay, let's scroll down to the end of that e-mail.

A Thanks. I'm here. I appreciate it. Okay, thank you so much.

Q Now you respond to this e-mail -- scroll back up to the top. Let's see the response. Again, I think we need to get to the higher up regulators inside of CRE as well as the SGG at this point. CRE is in reference to Colorado Division of Real Estate?

A I'm not sure what I wrote there, but that does make sense.

Q And ATG is reference to the attorney general's office in Colorado?

A I would agree that that's what I was referring to.

Q So as of this date, there was not even a report from the investigator. So why was it important to you to get this to the higher up regulators inside of the real estate department and the attorney general's office?

A Well, it's important certainly for the company because again, hiring the governance team from Stephen Cobb and Jim Schultz, right, the point is to understand our product. If there's a problem with the product, we want to know about it and this isn't an effort to -- this isn't an effort to fully understand any sort of modifications or changes that we need to make to the agreement. As Mr. Gansborg pointed out, there was an issue with signing capacity and my guess is we probably made that change. The standard practice for us when we have a consumer facing document is to be able to get to the people who ultimately look and review these documents and make sure that we're in compliance.

Q So by this time, did you understand that there was a systemic issue with the product?

MS. MEILER: Form.

THE WITNESS: Attorney Kaplan, you start a business, you hire a topnotch firm in Holland &

Knight. You hire subsequently 30 additional firms in each of the states that work through Holland & Knight. You have other firms that we went over that look at the product for investment, rating, securitization, and the concept that at this point in time, all of us would continue working in a business that was systemically flawed from this point forward is, each of us had to go through four years of being told we are scam artists or swindlers or we have some type of I think elder abuse. The concept, if we knew that we had a systemic problem with our backgrounds of multiple products and multiple areas of investment, hundreds of millions of dollars of capital that was put to work, thousands of jobs, that we would risk our careers and make no mistake, my career is over as we know it. To think that we would do that at this point, I'm not even sure how to fully answer that for you.

BY MR. KAPLAN:

Q Well, considering what you've just said, did there come a time in 2022 when you called Holland & Knight and said if what you're telling me is correct, why do we keep getting investigated by so many different

states?

MS. MEILER: Form.

THE WITNESS: Again, I do recall several conversations with Holland & Knight. I recall several conversation of discussing the pace of the regulatory inquiries and we were assured there was not a systemic problem with the product, assured of that. And sir, I have to say, who would go through this? Who would sign up for this? You've seen it. You've read the files. What professional -- and by the way, I'm risking the ability also to never be able to sit for the Bar ever if I wanted to. Why would I do that if I thought that there was a systemic problem in the business?

BY MR. KAPLAN:

Q Let's go back to Exhibit 23. We'll scroll up. Now we're a day later on the 19th. Gansborg writes that the investigator wants another interview. And scroll up. Zachman writes, you add John Newman to the discussion. Who's Mr. Newman?

A He was an executive inside the business.

Q He was an executive where?

A Inside the business. He had a role in the early days of the company and then became a shareholder

of the business.

Q So we're three days later now and counsel writes, again, now the investigator wants additional information relating to the company's other transactions in Colorado going beyond the transaction at issue in the complaint against Terry Clarke. Specifically the investigator has asked for a spreadsheet of every MV Realty transaction, closed or otherwise, since October of 2020 with specific information regarding the client buyer with the seller and if the seller, past or present, party to the HBA and then it goes on and they want it within a week.

A One second. Can I finish reading?

Q Sure.

A Thank you. Okay, thank you so much.

Q So if we scroll up, the final e-mail which came from Amanda where it begins with the word Steve and since you're the only Steve on this e-mail, I assume it's to you. What's the conversation we had here with relations to the AG? What's that in reference to?

A I don't know what Amanda's referring to, but as we said earlier, we were going to engage the governance group, including copied here, Stephen Cobb, right, and the discussions higher up, either the CRE or the AG's office.

Q So why did that have to be done as soon as possible?

MS. MEILER: Form.

THE WITNESS: Well, generally speaking, if you have a problem or as you pointed out, a systemic problem in the product, you want to know that as soon as possible. That's not a wait and see thing. That's not hey, do we wait a week or two weeks or a month or two months? Proper business people, if they have a problem in the business, they want to deal with it now, especially in a consumer facing business.

BY MR. KAPLAN:

Q Okay, we'll take this down. This is Exhibit 24 I'm going to put up next. Somewhat shorter e-mail string. The top one is from you to Tony Mitchell, February 28, 2025.

A Sir, did you say 2025?

Q Yes.

A Okay.

Q Let's scroll down to the bottom. So this one starts with an e-mail from you on the 28th of February of 2025 to someone at HUB. Do you see that?

A I do. I think her name is, I think it's called AY-Zhuh(Axia phonetically) Velasco.

Q Right. And HUB is to Mr. Sherman. You're aware that Mr. Sherman is the lead broker; right?
A Yes, and Mr. Norman is the specialist at, I can't recall.
Q RT Specialty?
A Yes, but he's like the specialist for Mr. Sherman.
Q Okay. And then Mr. Mitchell is copied, but not at an MV e-mail address. What is that e-mail address?
A Amitchell@pinechase.com.
Q Yep, what is Pine Chase?
A I believe that's his e-mail.
Q Is it another company?
A Not that I'm aware of.
Q You think it's just a domain that Mr. Mitchell uses sometimes?
MS. MEILER: Form.
THE WITNESS: It's generally the way I've always communicated with him.
BY MR. KAPLAN:
Q Okay. And what about the e-mail after that, outsidepine, what is that?
A I believe that is Mr. Newman's e-mail.
Q So the e-mail string begins on February 28, 2025 and you write to Ms. Velasco, and you ask for a

list of notices, including actual notices themselves from HUB to the carriers prior to August 2022 and the last portion is in bold. Do you see that?

A I do.

Q Okay. So you would agree that you're asking your broker to provide you with a list and actual copies of the notices from the broker to your various carriers prior to August of 2022; right?

A I would agree that's what I was asking.

Q And the notices you were speaking of were notices of claim or notices of loss; right?

A I can't speak to the notices part, but I was asking for a list of the claims made because again, this is on HUB's side of the fence. I don't know how they make notices to the carrier.

Q Okay. So recognizing that you don't know how they prepare the notices, you were looking for a list and copies of the notices of claims to the carriers; right?

A I was.

Q What's the significance of the August 2022 date?

MS. MEILER: Form.

THE WITNESS: I don't know.

BY MR. KAPLAN:

Q Were you looking to establish that notices had been provided or that notices had not been provided?
MS. MEILER: Form.
THE WITNESS: I think the e-mail says I'd like a list of the notices that were provided.
BY MR. KAPLAN:
Q So you believed that there were notices that were provided; right?
MS. MEILER: Form.
THE WITNESS: I don't recall what I believed at that point.
BY MR. KAPLAN:
Q Did you expect that notices had been provided?
MS. MEILER: Form.
THE WITNESS: I don't think I had any expectations. I think I wanted a list of the notices and that was that.
BY MR. KAPLAN:
Q Why?
A I believe I was asked for that.
Q Let's scroll up. And later that same morning, Ms. Velasco responds. I'll give you a moment to read it.
A Okay, thank you.
Q So in this e-mail, your broker confirms to you

that it provided no notice of claims to carriers prior to December 1 of 2022; is that correct?
A That's what it says.
Q Okay, and if we scroll up, Mr. Mitchell responds. Have you had a chance to look at his response? And then if we scroll up --
A Sorry. Yes, thank you.
Q You respond to him. Looks like, "I though the same", should have been, I thought the same. You agree?
A I agree that that's what it should have said.
Q Okay. So why were you and Mr. Mitchell interested in whether a notice of any kind was provided to the D&O carrier prior to December 1 of 2022?
MS. MEILER: Mr. Scott, I just caution you, if this was something that you discussed with your attorneys in 2025, then I would just caution you not to reveal any privileged information.
THE WITNESS: That's what I was going to go along with is I'm sure that was a discussion with counsel.
BY MR. KAPLAN:
Q Which counsel?
A We engaged Covington & Burling. Sorry, that wasn't a full answer. We engaged Covington & Burling to

work on our insurance matters.

Q So I don't want to put words in your mouth. So please correct me if I'm wrong. Are you saying that the inquiry to determine whether any notices were provided to the D&O carrier prior to August of 2022 was done following conversations you had with Covington & Burling?

A No. I'm saying that I'm sure that the -- I was asked to provide the notices as you can see. The answer came back and I'm sure that the discussion was with counsel as to the reasoning behind it.

Q I'm sorry, I didn't hear the last part of your answer.

A I'm sure the discussion was with counsel as to any reasoning.

Q As to what?

A Any reasoning as to why they would ask for it. I don't know.

Q In any event, Mr. Mitchell says I never thought we filed any D&O notices until after the FL suit. Then you respond, "Agreed." So at least at that time you did not believe that there were any notices provided to the D&O carrier prior to the Florida attorney general suit; is that right?

A That's correct. That would have been a

surprise to me.

Q We're done with Exhibit 24. Let's look at Exhibit 25, another e-mail string. The top e-mail is from Axia Velasco to Tony Mitchell and it's dated May 14th of 2025. That's the one. We'll mark this as Exhibit 25 and can we scroll down to the bottom. So you'll see that this e-mail string starts on February 6th. Ms. Velasco writes to you and Mr. Mitchell regarding the MV Realty claims reporting process. Do you see that?

A I do see that, yes.

Q And she's providing you with a spreadsheet or table of some kind with certain statistical information and says in bold print, anything that is not on that list needs to be notified to the carriers. Meaning any CID, civil investigative demand, complaint, lawsuit and potential claim needs to be reported and then it goes off. So do you recall this e-mail?

A I do.

Q Okay. And if we scroll up, it looks like you respond a few weeks later on the 21st, and I'll let you read it to yourself.

A Okay, thank you.

Q So looking at the e-mail that you sent on February 21st, we note certain discrepancies and you

reference states of Indiana, California, Georgia, Missouri and also the CFPB.

A Yes.

Q What's the reference to the CFPB?

A That's the Consumer Protection Financial Bureau; Consumer Financial Protection Bureau.

Q Federal agency?

A Yes, sir.

Q So the discrepancy we're pointing out is on the dates indicated, you had provided notice to HUB that you didn't see that notices were sent on to the carriers?

A It appears that I sent the notices and they either weren't reported or weren't reflected in their spreadsheet.

Q Okay. If we scroll up to, the next e-mail was May 12th and it's an e-mail from Mr. Mitchell. Let you read it to yourself.

A Okay, thank you so much.

Q And in response, Ms. Velasco responds later that same day. Scroll up and have a look at the next e-mail. Did you ever determine whether or not Houston Specialty received notices from California and Georgia?

A Unless I'm reading into this, it feels like the next e-mail maybe addresses that.

Q Scroll up.

A I'm assuming Houston is the E&O carrier? My apologies. Did you hear me?
Q Yes. So you're correct, Houston Specialty is the E&O carrier.
A So it looks like Tony's asking --
Q -- the same question?
A The same question.
Q If we scroll up.
A Okay.
Q What's your understanding of the significance of the claims being, quote, interrelated with one another?
MS. MEILER: Form; asks for a legal opinion.
MR. KAPLAN: Nope, just asking for his understanding.
BY MR. KAPLAN:
Q You can answer.
A I don't have an understanding of that.
Q Did you write back to Ms. Velasco, if you recall asking her to explain what she meant?
A No, I did not. I think it's important to also remember at that point in time, I'm also, I don't believe, I think I was not collecting a salary at this point in time. I think that was the end of April. So

my work phone was slightly different.
Q So when did you cease drawing a salary?
A I believe officially it was April of '25. Sorry, that's a terrible answer. 2025.
Q And why did you cease --
A Sorry, I missed you.
Q Sure. Why did you cease to earn a salary at that time?
A Mr. Mitchell said the company could no longer afford my services.
Q So since that time, what have you done to make a living?
A Well, I'm lucky we're in a two income household. So I've been relying on my wife and since my career is essentially over from doing the things that I have built to that point, I found myself busy with doing the things that any father would; dropping off kids, picking them up, tutoring, athletics, etc.
Q Why don't we take a lunch break at this point and see if we can resume at 1:30 sharp and I'll use the time to see if I can streamline the rest of the day.
MS. MEILER: Just a matter of housekeeping. I'm going to be switching out from defending the deposition just due to the hour. So I think Kyle is going to take over for me.

MR. HANKEY: That's correct.
MS. FTEJA: And also to add, Houston Specialty cross-noticed for today. We'll also have some questions after.
(Thereupon a recess was taken, after which the proceedings continued as follows:)
BY MR. KAPLAN:
Q So Mr. Scott, I've got a few more questions for you and a few more documents, but I'm not going to consume the whole rest of your afternoon. And so let's see if we can push through this.
Once the state of Florida filed suit, what was your involvement or participation in that lawsuit on behalf of the company, if any?
A No participation. It goes directly to the lawyers and it works from there.
Q Were you asked to be a witness in that case?
A I don't believe so.
Q Did you sit for deposition in that case?
A No, sir.
Q Did you participate in the company's assembly of documents for use and production in that case?
A I did assist the company in its document production.
Q And what did that consist of?

MR. HANKEY: Objection, form.
THE WITNESS: Generally requests would come in from Holland & Knight. They were, generally speaking, just general documentation requests. We would provide those documents that they requested and they would assemble accordingly.
BY MR. KAPLAN:
Q Did there come a time that you recall when the company filed for protection under Chapter 11 of the bankruptcy laws?
A Yes, yes.
Q And as I recall from Mr. Mitchell's testimony last week, eventually the bankruptcy was dismissed; is that correct?
A That's my understanding as well.
Q Now going back to the lawsuit for the state of Florida, ultimately a consent judgment was executed by the company in that case; is that right?
A I don't actually know what the form of the agreement was.
Q Have you personally -- have you ever read the opinion of Judge Farfante in that case on the cross motions for summary judgment? That would have been issued maybe in September of 2024.
A I did not.

Q Going back to the policy and the policy issuance. The policy year that was beginning in August of 2022, the company sought to raise the limits of the D&O policies; right?
A I recall that, but I don't recall the amount.
Q Do you recall that the warranty letter that Mr. Mitchell signed was acquired because higher limits were being requested?
A I don't recall the reasoning for the letter.
Q As you understood the various investigatory documents from the states' attorneys general, were they challenging the real estate services provided by MV Realty?
MS. MEILER: Objection; form.
THE WITNESS: I'd have to ask counsel as to the nature of those. I don't recall.
BY MR. KAPLAN:
Q I'm going to show you an e-mail string. The top e-mail is from you to Terry Sherman dated August 13th of '21.
A Did you say of 2021?
Q Yes.
A Okay, thank you.
Q Now I think this is going to be Exhibit 26. That's what we'll mark it. If you scroll down, the

first e-mail is from Terry Sherman to you on August 12th.

A Yep. Sorry, can we just scroll down?

Q Certainly.

A Thank you so much. Appreciate it. Thank you so much.

Q You'll see that there are five separate policies identified in Sherman's e-mail. One is called Real Estate Professional Liability, Management Liability, D&O hyphen Difference in Conditions, Excess D&O and Cyber Liability.

So the first one, Real Estate Professional Liability, you understand to be a reference to the E&O policy; right?

A I do understand that, yes.

Q Okay. And then Management Liability is what we've been referring to as the D&O policy?

A I don't know what he's referring to there because I do see D&O Difference in Conditions below and Excess D&O.

Q So as you sit here, what do you understand -- withdrawn.

As you sit here, do you understand what the difference is between Management Liability and the Difference in Conditions policy?

A No.

Q Scroll up to the top e-mail. You responded, inquiring as to the cost of some additional limits on the D&O; correct?

A I did.

Q So is that a reference to the Management Liability or to the Difference in Conditions?

A I'm not sure what I was referring to at that point.

Q Marking Exhibit 27. The top e-mail is from you to Dawn Knight at HUB. It's dated January 18th. Okay, if we scroll down, it starts on December 27 of '21. Actually December 26th where Terry Sherman is asking you questions and then if we scroll up, you'll see that you provide her with the answer and then later on the 27th, Mr. Sherman writes to you. Looking at this e-mail, do you see that the reference to D&O is a reference to the Markel American policy with an excess policy written by Scottsdale and that the reference to the Difference in Conditions is a reference to the endurance policy?

A I do see that.

Q Okay. So then if we scroll up right after, you go ahead and provide binding instructions for an additional two million dollars in coverage. Do you see that?

A I do.
Q Why did the company want two million dollars more in coverage?
A It's my experience that's not uncommon; right? The company is growing. It went from a valuation in the early days of kind of circa 6 million and about this time in January of '22, we were doing equity raises in the 150 million dollar range. It's not uncommon to increase its insurance coverage. That's commensurate with the value of the business.
Q Then if we scroll up, HUB responds that they need a warranty letter. Do you see that?
A I do.
Q And then if we scroll up, looks like on January 18th, you write, "Please see the attached." So we'll go to Exhibit 28, which is the warranty letter.
A You said you're going to where?
Q Exhibit 28. So first thing is we'll scroll down and let you look at the whole letter. So you can see that this letter, there's a date of January 18, 2021. In view of what I just showed you on Exhibit 27, the e-mail exchange, does it seem to you that this should be dated January 18, 2022?
A I mean, I can't answer that. I don't know. Maybe.

Q Let's look at the subject matter of the letter. Respecting limits of liability in excess of 3 million dollars, which is the increased limits that the company was seeking in January of 2022; right?
A That's correct.
Q Okay. You prepared this document for Mr. Mitchell's signature?
A Did I prepare it? No. I believe that e-mail chain says that HUB prepared it and sent it over; correct?
Q And did you then take the template provided by HUB, put it on MV Realty letterhead, and present it to Mr. Mitchell for signature?
A Yes.
Q So the statement was made that the undersigned warrants that he does not have knowledge of any wrongful act, fact, circumstance or situation which might reasonably be expected to give rise to a claim under the above captioned coverage. Was that a true statement?
A Yes.
Q What's the basis of your statement that this was a true statement at that time?
A As we went over earlier, we have no indication from Holland & Knight that there are any wrongful acts, facts or circumstances that might give rise to a claim

at any level, including discussions with capital raising efforts, one that was generated from this e-mail as you saw below. We did a transaction in January. Nothing from rating agency, nothing from securitization agents, nothing from potential capital partners that would give rise to the company to reasonably expect that a claim was coming, none.

Q If, as you testified to me this morning, you never read the policy and you never read the definition of a claim, how would you know whether or not that statement was true?

A Because we would have most likely heard that from discussions, multiple discussions over many years with our counsel.

Q So, and I just want to be clear that we're talking about apples and apples here. To begin, when you say discussions with our counsel, you're talking about Holland & Knight; correct?

A Correct, but we also have counsel that's engaged in every one of our operating states.

Q Okay.

A And they all work through Holland & Knight, but their engagement is also with the company.

Q And as I understand it from your testimony this morning, the sum and substance of those conversations

with counsel was that after investigation and consideration, there was no systemic problem with the homeowner benefit program. That's what you're relaying to me; right?

A That's correct. Nothing was relayed to the management team that there was a systemic problem with the business.

Q And in those conversations with counsel, the ones that we're talking about now, was the company told that there was no need to report a claim or a potential claim to its insurance carriers?

A I don't recall any discussion around insurance like that.

Q Let's go to the next document. We'll mark this as Exhibit 29. This is going to be an e-mail dated August 16th. This is another e-mail string. So we'll scroll all the way down so you can see the context.

A Sorry. I want to make sure. Are you seeing the same blacked out areas that I'm seeing?

Q Yes.

A I just want to make sure it's not just on my end.

Q Nope.

A Thank you.

Q I don't think it will limit your ability to see

the text, but if it does, we'll deal with it.
A Thank you. I appreciate it.
Q Scroll down. Starts on July 15th. You're providing Terry Sherman with some financial information and if we scroll up, the next e-mail responds, Terry responds to you and says D&O underwriting has requested some information and then within just a couple of hours -- scroll up -- you respond by providing that information and then the next day -- scroll up -- on the 28th, Terry writes to you and says, just one question from the underwriters, and if we look at this one, you can see that your answers are typed in in red.
A Sir, can you go down to the previous e-mail?
Q Sure.
A Thank you so much. Okay, I'm good. Thank you. Okay, I appreciate it.
Q If you scroll up, your response on the 29th is answers were red and then Terry writes back.
A Could we go back so I can just review my answers in red? That would be appreciated.
Q Sure.
A Thank you so much. If you could scroll down just slightly, please? Thank you. Okay, great, I'm done with that e-mail. Thank you.
Q We'll scroll up.

A Okay, thank you.
Q Scroll up to August 16th. You'll see that question number 5 is for a copy of the HBA and if we scroll up, within a couple of hours you provide the HBA.
A Yes. Sorry, I do see that. Thank you.
Q So did you ever receive any information as to what the interest was in seeing a copy of the HBA?
A I don't believe so, no.
Q So I'm going to go to an e-mail dated August 25, 2022. So this is I think going to be marked Exhibit 30. Scroll up. All right, so let's scroll down. On August 25th, Sherman writes to you.
A Attorney Kaplan, we're just seeing the same black; right?
Q Yep.
A Okay, great. I think it is blocking out the right hand side of --
Q Yep.
A Okay.
Q But we'll deal with that. If we scroll down, we should be able to reveal it.
A There you go. Thank you so much. And if you could scroll down slightly? Thank you so much. Up a little bit? Thank you. Appreciate it. Okay, I'm done with that e-mail. Thank you so much.

Q So in the middle paragraph, HUB is recommending 6 million dollars of D&O coverage and then additional 4 million dollars excess Difference in Conditions to increase your D&O tower from 6 million to 10 million and if we scroll to the top, in response you ask him to get started on the financing. What financing were you talking about?

A Apologies. I believe I was referring to the finance agreements that one would do to pay your coverage or premiums over time.

Q Premium financing?

A Yes, sir.

Q Okay. And then the last reference to TM, that's Tony Mitchell?

A Yes, sir.

Q All right, subject to cross-examination, I'll pass the witness.

A Okay, sir. I appreciate it.

MR. HANKEY: Iliriana, I can reserve my cross until you're finished or would you like to go ahead or like me to go ahead?

MS. FTEJA: I can go ahead. I was going to ask for maybe five minutes just to gather my notes and we can get back on around 2:12. 2:15 to make it even.

(Thereupon a recess was taken, after which the proceedings continued as follows:)

BY MS. FTEJA:

Q Mr. Scott, we've just formally introduced ourselves. So I'm just going to ask you a few questions on behalf of Houston Specialty. I may refer to it as HSIC, Houston Specialty Insurance Company, but that's neither here nor there.

Some of these questions might be repetitive. I'm going to try to avoid any repetition and hopefully this should go quite quickly. So I'm going to start off with sharing my screen. Might be a bit difficult. Can you guys see my screen? So this'll be Exhibit 1. And Mr. Scott, have you seen this document before?

A I have.

Q Can you tell me what this document is?

A It appears, on its face, to be the Skyward Renewal Application.

Q And just for clarity and for the record, Skyward Specialty Insurance is Houston Specialty Insurance Company. Houston Speciality is a subsidiary of Skyward. Would that be your understanding, the E&O carrier?

A It's not my understanding, but thank you for the education on that.

Q And is this your e-mail, Mr. Scott?
A Yes, ma'am.
Q Okay, great. But at the bottom of the page, is this your signature?
A No, ma'am.
Q No. And do you know whose signature this is?
A It's Antony Mitchell.
Q And you would be familiar with that because you presented this to him for signing?
A That's correct. It's also titled CEO.
Q Right. Okay, great. So you presented this to him and then you submitted to it HUB, right, for renewal of the HSIC policy?
A That would be our standard practice, yes, ma'am.
Q Perfect. And is this for the renewal of the August 14, 2022 policy period?
A That I can't determine off the face of the document.
Q Would that be your understanding, you would have submitted this based off the 4th of August 2022 policy period?
A That would be reasonable, yes.
Q Okay. And the information on this application, did you fill this out?

A No, I would not have filled that out.
Q Who would have filled out this application?
A Well, this part of the application, I'm assuming you're talking about Section 3 and Section 4?
Q Well, all who would have answered these questions 1 through 5, 6 and 7.
A So as we discussed earlier, parts of the application, I go into the company for. So I'm happy to go number by number if that's helpful for you.
Q Yes, why not? So questions 1--
A I would answer more than likely 1 and 2.
Q Okay.
A 3 and 4 would be answered by our financial team.
Q All right.
A 5 -- sorry, going into the next page. 6 and 7 would also be answered by me.
Q So you did answer question 7?
A That's correct.
Q Can you read question 7 out loud for the record?
A Could you do me one favor and zoom in?
Q Sure.
A Thank you so much. I appreciate it. Is the applicant aware of any fact, circumstance, situation,

error or omission that can reasonably be expected to result in a claim against the applicant? If yes, please explain.

Q Okay, and which one did you select of the options?

A No.

Q And you filled this out and presented this to Mr. Mitchell; correct?

A That's correct.

Q And Mr. Mitchell, did he have any questions about this application?

A I don't recall any.

Q Okay. And earlier you said in your testimony that you were aware of regulatory complaints and investigations. I believe you had mentioned when those came in. Do you recall what date you said? I think you said April, but I didn't catch the year.

A So I was aware of a handful of regulatory complaints that came in. Are you asking the date of the first one that I recall?

Q Yes. Earlier in your testimony, you said you recall.

A Yes. So I believe the first inquiry, I want to say it was either early second or late second quarter of 2021. I can't be exact on that.

Q And as part of these regulatory complaints and investigations, were those regarding the HBAs, the homeowner benefit agreements? I apologize. I'm referring to them as HBAs.
A No, not all of them were.
Q Were some of them or part of the subject matters of those complaints and inquiries the HBA, Homeowner Benefit Agreements?
MR. HANKEY: Object to the form. Iliriana, can you just define what you mean by complaints and regulatory complaints?
BY MS. FTEJA:
Q My apologies. I'm just using the regulatory complaints either from any regulatory bodies, state investigatory agencies, Department of Business and Professional Regulations, any of those governing bodies.
A And can you just repeat your question one more time?
Q Were any of those regulatory complaints or investigations into MV Realty, did any of them pertain to HBAs?
A I believe some did.
Q And when those were received, how were those handled internally?
MR. HANKEY: Object to the form as to the

meaning of the word complaint.
THE WITNESS: Well, any inquiry that comes into the business is adjudicated through the company's regulatory counsel. So if any complaint is pushed, as we've established, pushed to Holland & Knight and they take the lead on answering the inquiry.
BY MS. FTEJA:
Q And did you review any of those inquiries?
A I would imagine I would have reviewed on occasion.
Q And then earlier you had also testified that MV Realty had received homeowner complaints regarding HBAs. Do you remember how early those came in?
A No. I think as we discussed it, I couldn't pin it to an exact date as to when they started coming in.
Q Okay, but compared to -- sorry, not compared. Excuse me. With respect to the regulatory inquiries and investigations, those came in, you said, around early or second quarter of 2021. Would that be before this application?
A Yes, I believe it was before this application.
Q Okay, I'm going to stop sharing my screen. So at any time prior to August 14, 2022, did you advise Houston Specialty of the regulatory complaints or

investigations or regulatory inquiries? Excuse me.
MR. HANKEY: Object to the form as to complaint.
THE WITNESS: No, we did not.
BY MS. FTEJA:
Q Would you be in charge of providing notice to the broker of those regulatory inquiries or any other claims?
MR. HANKEY: Objection to form as to claim; vague.
THE WITNESS: Can you maybe state that differently?
BY MS. FTEJA:
Q Yes. Just generally as part of your duties as Senior Vice President, if a claim came in of any kind, would it be your duty to report it to the broker?
A If a claim did come in, yes, through concert within our discussions with counsel, our discussions with management. It would most likely fall to me to make the notice to HUB being that I had the relationship.
Q Okay. And what was the first event that prompted you to provide notice to Houston Specialty with respect to any regulatory inquiries or claims or complaints by consumers to Houston Specialty or to the

broker?
MR. HANKEY: Object to the form.
THE WITNESS: I believe the first instance was the suit, the Florida AG suit in late November of 2022.
BY MS. FTEJA:
Q And was notice provided under the 2022 Houston Specialty policy?
A That I don't know. We provided notice to our broker and our broker provided notice from there.
Q And notice was provided, you just said, in November of 2022 with respect to the Florida lawsuit?
A It may have been December. I don't recall an exact date.
Q December of 2022; correct?
A Yes, somewhere around there, yes, ma'am.
Q And earlier you described the homeowner benefit agreement as a product. Is that what you would refer to it as? Can you explain what you mean by product?
A Well, perhaps that's a little tongue in cheek, but any time you produce an instrument or a product and you sell it to consumers, I'm not sure what else we could call it. We could call it an HBA if you'd like to.
Q Is that because it was not a professional

service?

MR. HANKEY: Objection to form. Calls for a legal conclusion.

BY MS. FTEJA:

Q Withdrawn. Let me rephrase. Is that because it was not a real estate service?

A Again, that's certainly a conversation for Holland & Knight.

Q Is it your understanding that with respect to the HBAs, the homeowner may never sell their home?

A Sorry, I'm not following. With respect to the HBAs, the homeowner may never sell their home?

Q Correct. So earlier you described it as an upfront cash payment for the future right to sell the homeowner's home.

A If and when they decide to sell.

Q If and when --

(Reporter interrupts proceeding due to technical issues, after which, the proceedings continued as follows.)

BY MS. FTEJA:

Q Mr. Scott, I'm sorry if you already went through this earlier, but do you have any professional licenses or certifications?

A Just a real estate license in North Carolina.

Q And is that real estate license still active?
A It's still active.
Q No further questions from Houston Specialty. Thank you, Mr. Scott.
A Yes, ma'am. Thank you.
MR. HANKEY: I just need two minutes. I'll be back.

CROSS EXAMINATION

BY MR. HANKEY:
Q Mr. Scott, do you remember being asked questions about regulatory complaints?
A I do.
Q Are you familiar with the use of the term complaint in describing like a lawsuit that's been filed by an agency or another party?
A Yes.
Q Okay. Also I believe we talked earlier about complaints that would be submitted by homeowners through a system or through some other way. Are you familiar with those types of complaints?
A Yes.
Q Can you describe the difference between those different types of complaints?
MR. KAPLAN: Objection to form. You can answer.

THE WITNESS: Sure. In your hypothetical, complaints are filed in suit form, right. So they would -- state of Florida is a good example. Complaint filed in late November would also have customer, we call them complaints that would come in through the regulatory agencies. Either the REG(phonetic) or on occasion, the attorney general office that were tracked with the company's tracker.

BY MR. HANKEY:

Q Okay. And earlier, if I recall the testimony or the question correctly, there was reference made to regulatory complaints and the suggestion that they were raised prior to November or August of 2022. Do you recall questioning along those lines?

A Vaguely.

Q Okay. Do you recall any regulator filing a lawsuit type complaint prior to let's say August of 2022?

A Not that I can recall.

Q Okay. Were there consumer complaints launched prior to August of 2022?

A Yes.

Q Okay. So to the extent that you were referring to complaints raised prior to August of 2022, which

types of complaints would you have been referring to?

A I'll be referring to consumer complaints that would come in through a regulatory body.

Q And can you explain what that means for consumer complaints to come in through a regulatory body?

A So complaints are form-driven generally speaking. So most states, not all, most have an online form that a consumer would be able to fill out either through the real estate commission or through the attorney general's office and that form either generates and is pushed to the company on regulatory letterhead, right. Some states you have to do a more formal approach, but most states just do it that way.

Q Is that the same or different from the regulator actually filing a lawsuit initiated by the complaint?

A That's quite a bit different.

Q Okay.

MR. HANKEY: Mr. Kaplan, could we put Exhibit 25 back up, please?

MR. KAPLAN: Absolutely, yes.

MR. HANKEY: Thank you.

BY MR. HANKEY:

Q While we're pulling that up, I can start asking

you some questions about it. Mr. Scott, when notice was provided of a matter that the company wanted provided to its insurance carriers, to whom did you or others within the company submit that notice to? With whom was that notice directed?

A Would you say that one more time?

Q Let me say it again. So when insurance notices were made by MV Realty, what was MV Realty's practice? Was it to provide it directly to the carrier or was it to provide it through a different channel?

A It was to provide it through a different channel, specifically HUB.

Q And HUB was the broker?

A That's right.

Q When you submitted notices through HUB, did you, Mr. Scott, decide which carrier would then receive the notice after that?

A No. Once we submit the claim, it goes to HUB. I'm not sure how it gets submitted outside that.

MR. HANKEY: Mr. Kaplan, could we pull up Exhibit 26?

MR. KAPLAN: So you don't need Exhibit 25?

MR. HANKEY: We're done with Exhibit 25. Thank you.

MR. KAPLAN: Okay.

BY MR. HANKEY:
Q I can go ahead and ask some questions, Mr. Scott. If need be, we can refer back to the document once it's up. Mr. Scott, do you remember seeing an exhibit where Ms. Zachman referred to contacting higher ups in connection with an investigation?
A I do recall that.
Q Okay. At that time it was addressed in that exhibit, were you thinking that there was a systemic problem with MV Realty's business?
A No.
Q Why not?
A Well again, counsel is copied. We've already worked, you know, we've got Richard Doren working through the complaints with the AG directly. There's Monroe counsel at that point in time is taking a look at the instrument. I don't recall the exact day. I think it was early 2021. We've got regulatory -- not only regulatory counsel, but then you have the office with governmental affairs with Stephen Cobb and Jim Schultz, whose specialty is this business. Nobody has told us that we have a systemic problem in the business?
Q Remember being asked questions about the company's tracker, MV Realty's tracker?

A I do.
Q That I believe also is better referred to as a litigation tracker?
A I do.
Q And you recall a complaint tracker separate and apart from the litigation tracker?
A Right.
Q What was the purpose of those trackers?
A Again, the complaint tracker, the purpose of the complaint tracker was twofold. The first was to of course keep our legal team on pace with answering every single complaint that comes in the business, right. We had a policy of doing that. We wanted to make sure every complaint was answered thoroughly. We wanted to make sure counsel reviewed all the complaints. So if we needed to make our product better, then we could do that, but the second thing is that also to really ensure that we had a grasp; that I had a grasp, specifically me, on the due dates for things that have come in the business. Where I'm not in the habit of, just my nature, of letting deadlines pass. When people ask for things, I try to get them to them as quickly as possible and the purpose was to make sure that we had an understanding of the time associated with each one of those inquiries, complaints, etc. that had come in the

business.

Q Thank you. I don't have any further questions.

MR. KAPLAN: Neither do I. So we'll close the record at this time. Mr. Scott, you have the right to read and sign your transcript or you can give up that right. You're not required to. So you may want to discuss that with your lawyer and decide what you want to do, but Tracie, I'll order the transcript.

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, TRACIE PERRY, Shorthand Reporter and Notary Public, State of Florida, certify that STEVEN SCOTT appeared before me via videoconference on the 22nd of June 2026 and was duly sworn.

Witness my hand and official seal this 30th day of June, 2026.

TRACIE S. PERRY
Notary Public - State of Florida
My Commission #HH355595
Expires: February 23, 2027

Personally known _______
OR Produced Identification YES

Type of Identification Produced FL DRIVERS LICENSE

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, TRACIE S. PERRY, Court Reporter, certify that I was authorized to and did stenographically report the deposition of STEVEN SCOTT; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in the action.

DATED this 30th day of June 2026.

TRACIE S. PERRY

(Thereupon, the taking of the deposition was concluded at 2:43 p.m.)

EXCEPT FOR ANY CORRECTIONS MADE ON THE ERRATA SHEET BY ME, I CERTIFY THIS IS A TRUE AND ACCURATE TRANSCRIPT. FURTHER DEPONENT SAYETH NOT.

__________________________________

WITNESS' NAME

STATE OF FLORIDA )
) SS:
COUNTY OF MIAMI-DADE)

Sworn and subscribed to before me this 30th day of June 2026.

PERSONALLY KNOWN_______ OR I.D. DRIVER LICENSE

________________________________________________________

Notary Public in and for the State of Florida at Large.

My commission expires: February 23, 2027

Amanda Zachman vs Markel American

June 30, 2026/Steven Scott/Job# 8231612

E R R A T A  S H E E T

PAGE_____LINE_____CHANGE______________________________________

______________________________________________________________

REASON________________________________________________________

PAGE_____LINE_____CHANGE______________________________________

______________________________________________________________

REASON________________________________________________________

PAGE_____LINE_____CHANGE______________________________________

______________________________________________________________

REASON________________________________________________________

PAGE_____LINE_____CHANGE______________________________________

______________________________________________________________

REASON________________________________________________________

PAGE_____LINE_____CHANGE______________________________________

______________________________________________________________

REASON________________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_______________________________________ ___________________

(Steven Scott) (Date)

Michal Meiler, Esq.
mmeiler@meilerlaw.com

June 30, 2026

RE: Amanda Zachman vs Markel American Insurance
June 22, 2026/Steven Scott/Job #8231612

The above-referenced transcript is available for review.

STEVEN SCOTT should read the testimony to verify its accuracy. If there are any changes, STEVEN SCOTT should note those with the reason on the attached Errata Sheet.

STEVEN SCOTT should, please, date and sign the Errata Sheet and e-mail to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

## &

**&** 6:24 10:2,3 11:11,23,25 12:17,21 13:18 14:3,14,24 18:11 34:16 35:21 41:6 42:9 42:13,15,23 43:1,9,14 45:3 47:1,12 48:4,4 48:25 49:3,22 51:20 52:11,14 52:22 54:15 58:7,19 59:2,14 59:17,20 60:16 61:4 62:4 63:25 66:2,9 71:16 73:25 74:3,23 75:4 81:24,25 82:6 88:3 93:24 94:18,22 104:6 107:8

## 1

**1** 4:20 5:21 81:2 81:13 99:13 101:6,10,11
**1.310** 119:25
**1/1/2020** 5:25
**1/28/22** 4:8
**10** 47:14 98:4
**100** 3:7
**1050** 3:11
**108** 4:3
**10:45** 38:6
**11** 69:22 88:9
**1111** 3:14
**12** 71:7
**12th** 69:20 70:1 84:16 90:2
**1300** 3:15
**13th** 89:20
**14** 100:17 104:24
**14th** 83:5
**150** 92:8
**15th** 96:3
**16th** 95:16 97:2
**18** 17:6 92:20,23
**185** 8:14
**18th** 72:8 91:11 92:15
**19** 50:22
**19th** 51:7 75:18
**1:30** 86:20

## 2

**2** 1:20 3:3 101:11
**20** 4:7 50:21
**20007** 3:11
**2009** 8:10
**2018** 5:25 17:5
**2020** 5:21 17:9 17:19 19:12 76:9
**2021** 41:6 89:21 92:21 102:25 104:20 112:19
**2022** 24:11 25:17,25 27:6 29:21 30:20 34:25 39:15,20 45:9,12 49:6 51:1 53:19 56:14 59:25 64:11,15,21 65:2,10 67:15 71:7 74:23 79:2 79:8,21 81:2,13 82:5 89:3 92:23 93:4 97:10 100:17,21 104:24 106:5,7 106:12,15 109:14,19,22,25
**2023** 25:25
**2024** 88:24
**2025** 77:17,18 77:23 78:25 81:16 83:5 86:4
**2026** 1:21 115:8 115:11 116:16 117:18 118:2 119:3,4
**2027** 115:15 117:23
**2030** 1:20
**20th** 3:11
**21** 4:8 50:24 51:4 55:6,11 60:1 89:20 91:12
**21st** 53:19 83:21 83:25
**22** 1:21 4:9 34:15 55:13 56:22 59:7,23 65:7,10 92:7 119:4
**22nd** 115:8
**23** 4:10 65:8,14 75:17 115:15 117:23
**24** 4:11 77:14 83:2
**25** 4:12 83:3,6 86:3 97:10 110:21 111:22 111:23
**2552** 115:13 116:19
**25th** 97:12
**26** 4:13 89:24 111:21
**26th** 91:13
**27** 4:14 91:10,12 92:21
**27th** 54:24 91:15
**28** 4:15 51:1 77:17 78:24 92:16,18

**28th** 77:22 96:10
**29** 4:16 56:12 95:15
**29th** 96:17
**2:12** 98:24
**2:43** 1:22 117:2
**2l** 7:22

**3**

**3** 13:13,21 14:8 93:2 101:4,13
**3/5/21** 4:7
**30** 4:17 6:24 7:3 9:5 74:1 97:11 118:2 119:3,17 119:24
**300** 48:21
**3000** 3:6
**3050** 3:3
**30th** 115:10 116:16 117:17
**33** 55:15 56:13 56:14
**33131** 1:21 3:4 3:15
**33137** 3:7
**35** 6:25
**35,000** 48:22
**3l** 7:22

**4**

**4** 4:3 98:2 101:4 101:13
**40** 13:7 37:10
**400** 9:4
**4th** 100:21

**5**

**5** 41:6 56:12 66:18 70:13 97:3 101:6,16
**50** 4:7,8
**55** 4:9
**5th** 65:22

**6**

**6** 8:17 92:6 98:2 98:4 101:6,16
**65** 4:10
**6:07** 71:7
**6th** 83:8

**7**

**7** 9:6 17:15 44:18,18 101:6 101:16,18,20
**77** 4:11
**7:49** 69:3

**8**

**8** 44:18 47:14
**8/16** 4:16
**8/25/22** 4:17
**80** 9:9
**80826** 1:2
**8231612** 118:2 119:4
**83** 4:12
**89** 4:13
**8th** 68:20 69:2

**9**

**9** 47:14
**91** 4:14
**92** 4:15
**95** 4:16
**97** 4:17
**99** 4:20
**9:25** 1:2
**9:33** 1:22

**a**

**a.m.** 1:22 69:3
**ability** 10:7 54:5 57:21 62:6,18 75:12 95:25
**able** 5:12 10:8 18:23 43:9,25 44:6 63:8 73:18 75:12 97:21 110:9
**above** 2:4 55:25 57:8,15 69:8 93:19 119:6
**absolutely** 55:8 110:22
**abuse** 74:11
**access** 62:25
**accordance** 18:20 26:11
**account** 68:7
**accuracy** 119:9
**accurate** 5:12 14:3 117:6
**accurately** 34:5
**acquired** 8:15 89:7
**act** 93:17
**acted** 7:11 66:2
**action** 48:14 65:1 116:13,14
**active** 56:4 108:1,2
**acts** 93:24
**actual** 21:21 79:1,6
**actually** 45:3 88:19 91:13 110:16
**add** 72:1 75:20 87:2
**addition** 33:19
**additional** 63:17 74:1 76:3 91:3,24 98:2
**address** 78:9,9
**addressed** 62:5 112:9
**addresses** 84:24
**adjudicate** 49:23
**adjudicated** 104:3
**adjudication** 39:18

**administratively** 6:20
**ads** 44:9
**advance** 35:13 35:22
**advanced** 36:1,4
**advertising** 42:4 44:7
**advice** 35:21,23
**advise** 35:1 49:1 104:24
**advised** 42:19
**advising** 69:5
**affairs** 112:21
**afford** 86:10
**afternoon** 87:10
**ag** 49:24 76:20 106:4 112:16
**ag's** 76:24
**agencies** 50:1 65:18 103:15 109:7
**agency** 84:7 94:4 108:15
**agent** 13:12 14:9 63:23
**agents** 94:4
**ago** 21:14
**agree** 19:7 56:21 57:3 63:12 69:11 73:1 79:5,9 81:9 81:10
**agreed** 82:21
**agreement** 10:15,18 11:20 11:22 12:22,24 13:9,16 42:5 47:25 48:17 73:15 88:20 106:18
**agreements** 15:18 98:9 103:3,8
**ahead** 55:1 91:23 98:21,21 98:22 112:2
**akaminska** 3:12
**al** 1:11
**alabama** 55:17 55:25
**allow** 66:22
**alphabetical** 55:16
**altered** 62:18
**amanda** 1:3,14 41:19 42:7 51:21 65:24 70:8 71:1 76:17 118:1 119:4
**amanda's** 70:23 76:21
**amazingly** 69:2
**america** 9:11
**american** 1:7,11 5:11 22:14 23:23 24:4,10 24:18 25:20 26:13 27:7 35:1 38:12 59:1 64:17,25 91:18 118:1 119:4
**amitchell** 78:10
**amount** 13:3,5 48:18,19,20 89:5
**analysis** 11:14 50:10
**anna** 3:9
**anniversary** 25:21
**answer** 6:13 10:11,12 14:12 14:16 15:5 17:23 18:8 19:15 20:25 23:18 24:7 26:17 30:17 34:12 36:5 49:21 50:7,16 54:20 57:20 59:16 62:14 63:13 64:1,2 74:20 81:25 82:9,13 85:18 86:4 91:15 92:24 101:11,18 108:25
**answered** 40:3 40:15 59:13 62:6 101:5,13 101:17 113:14
**answering** 18:19 19:6 34:5 104:7 113:11
**answers** 96:12 96:18,20
**antony** 1:15 3:17 100:7
**anybody** 8:25
**anytime** 34:25
**apart** 60:5 113:6
**apologies** 7:6 40:17 44:16 69:24 85:2 98:8 103:13
**apologize** 103:3
**apparent** 70:24
**apparently** 53:10 65:17 66:15
**appearances** 3:1
**appeared** 115:7
**appears** 55:8 59:24 84:12 99:17
**appetite** 8:8
**apples** 94:16,16
**applicant** 101:25 102:2
**application** 4:20 21:15,22,24 28:16,18 99:18 100:24 101:2,3

101:8 102:11 104:21,22
**applications** 20:21,22 21:1
**applies** 26:14 36:10
**appointment** 58:1
**appreciate** 25:9 25:12 55:10 67:1 69:15 71:25 72:15 90:5 96:2,16 97:24 98:18 101:24
**appreciated** 96:20
**approach** 110:14
**approximate** 24:1
**approximately** 5:25
**april** 18:1 65:10 65:22 67:15 68:20 69:2,20 71:6 72:8 85:25 86:3 102:17
**area** 38:11 43:21 60:21 68:2
**areas** 74:14 95:19
**arieta** 8:17
**arizona** 31:17 55:24 57:25 58:14
**arm** 8:25
**arose** 25:15
**arranged** 27:10
**arrangement** 42:6
**artists** 74:10
**asked** 19:8 20:25 27:7,17 34:16 37:9,16 38:11 40:3 59:13,21 69:5 72:12 76:7 80:20 82:9 87:17 108:10 112:24
**asking** 14:17,19 28:11 41:16 42:15 49:13,16 59:5 65:18 71:5 72:1 79:5,9,13 85:5,15,21 91:13 102:19 110:25
**asks** 18:22 85:13
**assemble** 21:19 88:6
**assembled** 46:3 46:16
**assembly** 87:21
**assessed** 14:7
**asset** 9:7
**assigned** 58:16
**assist** 6:21 15:14 87:23
**assistance** 10:22 51:21
**assistant** 58:15
**assisted** 8:20
**associated** 113:24
**association** 5:23
**assume** 76:18
**assuming** 21:2 66:13 67:1 85:1 101:4
**assured** 75:6,8
**atg** 72:24
**athletics** 86:18
**attached** 69:13 92:15 119:10
**attention** 9:13 57:24
**attorney** 10:24 16:22 24:12,19 25:5,12 39:5 46:20 47:11,17 47:18 48:18 49:8 51:22 52:16 53:10 58:15 70:11 72:24 73:6,24 82:23 97:13
109:8 110:11 116:12,13 119:13
**attorneys** 18:25 19:9 37:16,21 39:25 48:3 66:3 66:4 81:16 89:11
**august** 25:22,25 25:25 27:6 29:21 30:20 34:15,25 64:11 79:2,8,21 82:5 89:2,19 90:1 95:16 97:2,9,12 100:17,21 104:24 109:14 109:18,22,25
**authorized** 116:6
**authors** 11:23
**automatically** 15:2
**available** 62:24 119:6
**avenue** 3:14
**avoid** 61:2 99:10
**aware** 10:12 12:19 14:1,6,20 14:22 22:15,17 24:8,13 62:17 78:2,14 101:25 102:14,18

**axia** 77:25 83:4
**axs** 3:10
**axslawgroup....** 3:12,12
**ay** 77:25

**b**

**b** 4:5
**back** 6:15 7:9 15:11,19 16:14 17:11 21:1,16 28:1 36:1 38:5 41:15 47:11 49:12 69:22 70:24 71:14 72:17 75:17 82:10 85:20 88:16 89:1 96:18,19 98:24 108:7 110:21 112:3
**background** 7:7 10:5 25:19
**backgrounds** 9:21 74:13
**ballard** 47:21 47:22 49:24
**ballpark** 61:21
**bank** 8:24,25 16:21
**bankruptcy** 88:10,13
**bar** 75:13
**barely** 12:11
**based** 30:7,8 71:22 100:21
**basis** 26:3 93:21
**battered** 7:21
**began** 5:24 17:4 17:8,19 19:12
**beginning** 66:2 89:2
**begins** 53:23 76:17 78:24
**behalf** 16:7 26:21 27:9 44:13 68:10 87:14 99:6
**believe** 5:20 6:3 8:10,12 11:23 16:19,21 17:6 17:13,17,24 22:21 23:1,16 30:8,9,13 31:12 31:19 35:17,23 36:13 38:18,21 39:2,8,15,20 42:12 44:9 45:8 46:23 52:10,15 52:17 54:10 55:21 61:19 62:11 78:12,23 80:20 82:22 85:24 86:3 87:18 93:8 97:8 98:8 102:15,23 103:22 104:22 106:3 108:17 113:2
**believed** 80:7,11
**benefit** 11:20,22 12:23 41:17 43:15 95:3 103:3,8 106:17
**best** 10:1 39:5 48:14,23 57:20 62:6
**better** 12:10 113:2,16
**beyond** 76:5
**billion** 45:17
**bind** 21:2
**binding** 91:23
**biscayne** 1:20 3:3,6
**bit** 5:15 7:10 8:9 17:2 42:11 60:18 66:24 72:6,9 97:24 99:12 110:18
**black** 97:14
**blacked** 95:19
**blake** 72:1
**blocking** 97:16
**board** 8:4 17:13 17:17 19:18
**bodies** 103:14 103:16
**body** 19:9 64:6 110:3,6
**bold** 79:3 83:14
**bolts** 8:7 44:25
**bottom** 41:7,14 56:12,13 77:21 83:6 100:3
**boulevard** 1:20 3:3,6
**break** 21:4 38:5 86:19
**brevity** 69:15
**brickell** 3:14 17:15
**bridge** 10:7
**broker** 16:9,11 17:12,16 19:13 19:15 20:12 27:1 30:7,13,18 37:23 41:25 67:6 70:12,20 78:2 79:6,7 80:25 105:7,16 106:1,10,10 111:13
**broker's** 16:12
**brokers** 36:8 63:21 67:9
**brought** 17:13 42:2 48:16 52:15
**built** 9:4 86:16
**bureau** 84:6,6
**burling** 81:24 81:25 82:7

**business** 6:3 7:13,15 8:19 10:6,16 30:13 41:23 43:5 44:25 48:24 50:6 62:5 68:10 73:25 74:7 75:15,22,24 76:1 77:10,11 77:12 92:10 95:7 103:15 104:3 112:11,22 112:23 113:12 113:20 114:1
**businesses** 43:25
**busy** 86:16
**buy** 23:10
**buyer** 76:10
**buying** 23:13,15

**c**

**c** 3:9 41:5
**cadence** 9:4
**calabasas** 7:24
**california** 7:22 7:24 8:17,23 84:1,22
**call** 17:25 18:9 18:12,16 45:2 60:11 61:3 106:23,23 109:5
**called** 5:3 8:12 8:13 17:15 20:6 26:3 46:14 74:23 77:24 90:8
**calling** 14:2 42:8
**calls** 107:2
**canamero** 41:10 50:25 51:7,14
**canamero's** 59:25
**candor** 25:9
**capable** 62:22
**capacity** 5:20 49:16 51:19 73:16
**capital** 6:22 8:22 9:24 15:13 15:15 16:17 44:12,13,19 45:13,17 46:10 47:20 74:15 94:1,5
**captioned** 93:19
**capture** 64:3,7
**career** 74:18 86:15
**careers** 74:17
**carolina** 30:3,8 30:9,10,15,16 30:20 33:11 41:1 107:25
**carrier** 67:17,18 68:22 69:4,5 79:15 81:13 82:5,23 85:1,4 99:23 111:9,16
**carriers** 49:1,4 49:9,19 65:5 79:2,7,18 81:1 83:15 84:11 95:11 111:3
**carries** 13:2,21 14:6
**case** 1:2 5:10 6:22 22:13 23:24 42:17 52:18 63:15 66:6 87:17,19 87:22 88:18,22
**cash** 12:24 35:13,21 42:4 44:2 107:14
**catch** 102:17
**categorization** 56:21
**categorized** 56:8
**categorizing** 56:19
**cause** 2:4
**caution** 81:14 81:17
**cc** 71:24
**cc's** 71:12
**cease** 86:2,5,7
**central** 9:11
**ceo** 6:21 15:14 52:2 100:10
**certain** 13:3 33:21,25 83:13 83:25
**certainly** 8:21 10:2,8 14:14 16:20 22:6,12 35:10 64:5 68:11,15 72:5 73:8 90:4 107:7
**certificate** 115:1 116:1
**certifications** 107:24
**certify** 115:6 116:5,11 117:5
**cfpb** 84:2,4
**chain** 93:9
**challenged** 12:13
**challenging** 89:12
**chance** 81:5
**change** 50:7,13 73:17 118:4,7 118:10,13,16
**changed** 7:14 68:18
**changes** 43:10 43:14,16 73:14 119:9
**channel** 111:10 111:12
**chapter** 88:9

**charge** 14:6,7 37:23 105:6
**charged** 26:22 27:2
**charles** 7:11
**chart** 55:9
**chase** 78:11
**checklist** 15:21
**cheek** 106:20
**chose** 17:12
**chronological** 69:2
**cid** 83:16
**circa** 92:6
**circumstance** 93:17 101:25
**circumstances** 93:25
**civil** 50:8 83:16 119:24,24
**claim** 23:22,23 24:9,9,17,23,24 64:13 67:18,18 79:11 83:17 93:18,25 94:6 94:10 95:10,11 102:2 105:9,15 105:17 111:18
**claims** 26:3,11 26:14 79:13,18 81:1 83:9 85:11 105:8,24
**clarification** 60:22
**clarify** 6:6 28:17 39:14
**clarity** 99:19
**clarke** 65:19 67:6,9 70:2 71:1 72:7 76:6
**clear** 44:4 94:15
**client** 22:14,18 47:8 76:9
**clients** 43:19
**close** 16:19 45:14 53:12 114:3
**closed** 39:17 56:16 76:8
**closer** 9:9
**closing** 15:21 45:16
**cmk** 3:14
**coalesce** 9:16
**cobb** 58:21 73:10 76:23 112:21
**collect** 5:18
**collecting** 85:24
**college** 7:10,18
**colorado** 31:10 31:14 65:18,25 66:7 67:10 72:21,25 76:5
**column** 55:23 56:2,25
**come** 8:18 17:19 20:20 34:14,16 38:5 62:5 63:20 63:21 74:23 88:2,8 105:17 109:6 110:3,5 113:19,25
**comes** 26:10 104:2 113:12
**coming** 94:7 104:16
**commenced** 56:15
**commensurate** 92:9
**comments** 47:22
**commission** 41:16 110:10 115:15 117:23
**commissioner** 58:2,3
**committee** 58:7
**communicate** 68:12,13,19 70:10
**communicated** 78:19
**companies** 6:19 8:1,8 10:25 16:17
**company** 1:4,7 1:8,11 5:11,23 6:5,9,16 7:24 8:5,5,11,12,14 9:8,22 10:9,17 11:24 12:16 13:8 16:9 17:4 17:14,19 18:3 18:22,24 19:22 20:23,24 22:4 23:10,15,22 24:4 25:21 26:11,21,25 27:1,6,9 29:2,8 30:11 31:1 33:21 34:6 35:20,23 38:13 38:16 41:21 42:24 43:18,24 44:7,14,20 45:7 45:12,16,20 48:11,12,25 50:8,13 51:18 53:13,15 56:22 57:16 59:20 60:6 61:10 64:20,23 65:24 66:8 68:10 71:9 73:8 75:25 78:13 86:9 87:14,23 88:9 88:18 89:3 92:2 92:5 93:3 94:6 94:23 95:9 99:7 99:21 101:8 110:12 111:2,4
**company's** 16:7 30:15 44:24 46:9 57:7,9,14 57:17,19,22

59:12 60:19 61:7 62:2,6,8,10 67:9 68:13 76:4 87:21 104:4 109:9 112:25
**compared** 104:17,17
**competing** 14:9
**compile** 11:15
**complainant's** 64:5
**complaint** 17:25 52:4,24 57:20 60:22 61:22 64:7 76:6 83:16 104:1,5 105:3 108:14 109:4,18 110:17 113:5,9 113:10,12,14
**complaints** 17:20 18:11,15 33:21 34:7 35:2 35:2,5 39:4,6,7 39:25 40:1 47:19 48:18,21 49:7,17 50:5 61:20 62:5 63:20 64:1 102:14,19 103:1 103:7,10,11,14 103:19 104:13 104:25 105:25 108:11,18,20,23 109:2,6,13,21 109:25 110:1,2 110:5,7 112:16 113:15,25
**complete** 67:17 116:9
**completed** 22:1 119:16
**completing** 45:13
**compliance** 73:20
**component** 11:19
**comport** 11:14
**concept** 10:14 10:14 26:7 74:6 74:12
**concerns** 70:14
**concert** 105:17
**concluded** 117:2
**conclusion** 107:3
**conditions** 90:10,19,25 91:7,20 98:3
**conduct** 28:2,14 53:8 63:8 68:10
**conducted** 31:9 31:13,16,22 32:4,14,19 37:2
**conference** 1:19
**confirm** 11:15 30:22 49:12
**confirming** 30:4
**confirms** 80:25
**connected** 116:13
**connection** 27:5 34:21 40:10 45:19 112:6
**connotation** 60:24
**consent** 39:20 88:17
**consider** 49:7
**consideration** 95:2
**considered** 42:4 42:5,7 119:18
**considering** 74:22
**consist** 87:25
**consulting** 5:24 17:4
**consume** 87:10
**consumer** 43:5 52:3,24 73:18 77:12 84:5,6 109:21 110:2,5 110:9
**consumers** 105:25 106:22
**contact** 70:11
**contacting** 112:6
**contained** 28:3
**content** 36:12 36:14
**context** 25:16 51:6 95:17
**continue** 15:3 74:7
**continued** 21:11 38:8 87:6 99:2 107:20
**continuing** 9:8
**contract** 14:21 14:23 15:2,3 37:4 42:6 51:8
**contracts** 48:20 48:22
**conversation** 13:18 14:13,24 52:22 70:8 75:5 76:19 107:7
**conversations** 75:4 82:6 94:25 95:8
**convey** 52:8
**coo** 41:22
**cook** 1:16 30:6,7
**copied** 71:6,17 76:23 78:8 112:14
**copies** 36:16,20 79:6,18 119:15
**copy** 22:6,8,10 65:15 97:3,7
**corp** 8:12 16:17 63:23

Case 9:25-cv-80826-DMM Document 151-6 Entered on FLSD Docket 07/16/2026 Page 129 of 159



**corporate** 10:2 10:23 11:1,2
**corporation** 1:8 1:9
**corporations** 11:4
**correct** 6:10,14 10:21 11:21 13:9,13 16:8 21:20 22:1 26:15 29:3,5 34:10,13 35:14 36:2 42:13,14 45:16 52:1,4,6 52:21 53:5 67:11 70:24 74:24 81:2 82:3 82:25 85:3 87:1 88:14 91:4 93:5 93:10 94:18,19 95:5 100:10 101:19 102:8,9 106:15 107:13
**corrections** 117:3
**correctly** 11:3 109:12
**cost** 91:3
**counsel** 18:10 39:18 42:10 45:10 47:6,21 48:2,13 49:23 50:1 58:3 69:5 70:19,23 71:3 76:2 81:21,23 82:11,14 89:15 94:14,17,19 95:1,8 104:4 105:18 112:14 112:17,20 113:15 116:12 116:13
**counter** 1:12,17
**counterparties** 33:22,25
**country** 9:13
**county** 115:3 116:3 117:15
**couple** 7:19 10:11 42:2 61:20 96:7 97:4
**course** 10:17 48:14 53:8 113:11
**court** 1:1 2:1 7:22 116:5
**coverage** 91:24 92:3,9 93:19 98:2,10
**covington** 81:24 81:25 82:6
**cre** 72:19,20 76:24
**created** 45:24 62:12,23 63:8
**creation** 54:18
**credit** 8:23 11:7 15:23 16:23
**creditholders** 6:23
**crime** 20:2,3,4
**critical** 19:7
**cross** 4:2 87:3 88:22 98:16,20 108:8
**ct** 63:23
**culminate** 9:15
**current** 55:4 57:5
**currently** 5:17 6:9 47:2 48:20 55:24 56:1,4,20 56:23 57:1,2
**customer** 109:5
**customers** 43:8
**cuza** 41:5,9,12 50:25
**cv** 1:2
**cyber** 19:25 90:11

**d**

**d** 4:1
**d&o** 19:25 81:13 82:5,20 82:23 89:4 90:10,11,17,19 90:20 91:4,17 96:6 98:2,4
**dade** 115:3 116:3 117:15
**darryl** 1:16 30:6
**data** 64:8
**date** 18:2 23:25 24:1 25:1,21 29:8 30:4,23 31:1 33:20 61:13,15,19 64:4,4,9,19 73:3 79:22 92:20 102:16,19 104:16 106:14 118:23 119:12
**dated** 41:6 51:1 59:24 65:10,22 67:15 72:8 83:4 89:19 91:11 92:23 95:15 97:9 116:16
**dates** 24:16 84:10 113:19
**david** 1:15,15 41:18,19
**dawn** 91:11
**day** 17:8 42:12 65:23 66:18,18 75:18 84:20 86:21 96:9 112:18 115:11 116:16 117:17
**days** 53:20 75:25 76:2 92:6 119:17
**dc** 3:11

**de** 48:19
**deadlines** 113:21
**deal** 47:24 77:11 96:1 97:20
**dealing** 18:4,14
**deals** 16:24
**debtholders** 34:22
**december** 24:11 81:2,13 91:12 91:13 106:13,15
**decide** 20:14 107:16 111:16 114:8
**decided** 42:12 61:15 65:5
**decides** 13:1
**deckert** 50:2
**declare** 118:20
**defendant's** 4:6
**defendants** 1:10 1:12,17 5:3
**defending** 86:23
**define** 33:24 46:6 103:10
**definition** 64:13 94:9
**deleted** 62:18
**deliberately** 9:3
**deliver** 21:19
**deliverables** 19:8 20:22 21:17
**delivered** 22:5
**demand** 83:16
**demands** 33:21 34:7 50:8
**department** 73:6 103:15
**departure** 70:21
**deponent** 117:7
**deposing** 119:13
**deposition** 1:24 2:3 5:10 86:24 87:19 116:1,7 117:1
**describe** 12:22 12:23 108:22
**described** 28:10 46:18,18 106:17 107:13
**describing** 44:20 108:14
**description** 14:2
**desires** 53:15
**details** 55:25
**determine** 28:3 28:15 61:15,18 62:23 63:7 82:4 84:21 100:18
**determining** 19:16
**develop** 18:3
**development** 8:25 9:12
**dies** 15:1
**difference** 23:4 23:8 69:9 70:13 90:10,19,24,25 91:7,19 98:3 108:22
**different** 6:20 7:20 16:22 23:16 29:7,17 37:23 44:12 54:17 60:24 74:25 86:1 108:23 110:15 110:18 111:10 111:11
**differently** 105:12
**difficult** 99:12
**diligence** 28:3 28:15,21 45:21 45:23 46:2
**direct** 4:2 5:6 48:13 57:24
**directed** 39:6 40:1 111:5
**directions** 12:16
**directly** 6:24 15:17 47:6,16 52:2,18 70:15 70:20 87:15 111:9 112:16
**disagree** 14:4
**disclosure** 46:19
**discount** 42:4
**discrepancies** 83:25
**discrepancy** 84:9
**discuss** 45:3 114:7
**discussed** 15:8,9 47:5 48:15 52:17 60:13 62:13 72:2 81:15 101:7 104:15
**discussing** 62:2 75:5
**discussion** 14:1 19:18 27:16 46:13,15,24,25 49:3 53:12,13 58:18 65:3 75:21 81:20 82:10,14 95:12
**discussions** 52:19 58:1 76:24 94:1,13 94:13,17 105:18 105:18
**dismissed** 88:13
**district** 1:1,1
**division** 72:21
**dmm** 1:2
**document** 26:12 45:5,8 55:14,18 60:1,5,9 62:1,12 62:17,19 63:6

71:9 73:18 87:23 93:6 95:14 99:14,16 100:19 112:4 118:20
**documentation** 18:23 88:4
**documented** 70:19
**documents** 20:19,22,24 41:3 45:24 47:24 50:14 73:20 87:9,22 88:5 89:11
**doing** 16:20 18:10 61:12,16 61:18 63:10 86:15,16 92:7 113:13
**dollar** 9:5 45:17 92:8
**dollars** 47:14 74:15 91:24 92:2 93:3 98:2,3
**domain** 78:15
**doren** 47:16 112:15
**drawing** 86:2
**driven** 110:7
**driver** 117:19
**drivers** 115:21
**dropping** 86:17
**due** 28:2,15,20 45:21 86:24 107:18 113:19
**duly** 5:4 115:8
**duration** 37:3,6
**duties** 6:16,18 15:11 17:11 21:18 105:14
**duty** 43:8 105:16

**e**

**e** 4:1,5,7,8,10,11 4:12,13,14,16 4:17 41:4,5,12 41:15 42:1 50:25 51:1,2,5,7 51:16,24 52:1 53:16,18 54:11 54:24 59:25 65:8,9,14,16,21 65:23 66:21 67:2,5,15,16,16 67:22 68:21,21 69:1,17 70:22 71:10,22 72:14 72:17 76:16,18 77:15,22 78:9,9 78:12,21,23,24 80:4,25 83:3,3,7 83:18,24 84:15 84:16,21,24 89:18,19 90:1,8 91:2,10,16 92:22 93:8 94:2 95:15,16 96:5 96:13,24 97:9 97:25 100:1 118:3,3,3 119:13,24,25
**e&o** 19:25 65:19 67:13,18 85:1,4 90:13 99:22
**earlier** 17:1 48:19 69:3,9 76:22 93:23 101:7 102:13,21 104:12 106:17 107:13,23 108:17 109:11
**early** 75:25 92:6 102:24 104:14 104:19 112:19
**earn** 86:7
**easy** 55:14 62:16
**education** 7:15 99:25
**effect** 26:10 27:6
**effectively** 10:9
**effort** 73:12,13
**efforts** 6:22 15:15 47:20 94:2
**egan** 48:1 50:1
**either** 44:2 47:5 76:24 84:13 102:24 103:14 109:7 110:9,11
**elder** 74:11
**elliot** 8:20
**emailed** 119:15
**emergent** 16:17
**emphatically** 49:21
**employed** 5:17 5:19
**employee** 8:17 17:18 116:12
**employment** 17:8 19:12
**ends** 38:10 55:17
**endurance** 38:13,14,17 91:20
**energy** 8:4,5,13 9:5
**engage** 58:8,20 58:22 76:22
**engaged** 10:17 11:11 81:24,25 94:20
**engagement** 94:23
**ensure** 18:19 43:5 113:17
**enter** 11:7
**entered** 39:20
**entering** 11:9

**entrepreneurial** 9:21
**environment** 16:19
**epli** 20:6,10
**equity** 11:7 44:6 92:7
**errata** 117:4 119:10,13,16
**error** 48:16 50:5 102:1
**especially** 16:25 43:5 77:12
**esq** 3:2,5,9,9,13 4:19 119:1
**essential** 11:8
**essentially** 86:15
**establish** 80:1
**established** 104:5
**estate** 11:16 30:7 36:8 37:23 41:1,16 42:6 58:2 66:4 72:21 73:6 89:12 90:9 90:12 107:6,25 108:1 110:10
**et** 1:11
**evans** 58:16,17
**event** 24:5 25:3 54:3 66:11 82:19 105:22
**eventually** 72:7 88:13
**everybody's** 15:20
**exact** 18:2 23:25 29:11 61:13,15 61:18 102:25 104:16 106:14 112:18
**examination** 5:6 98:16 108:8
**example** 36:6 58:14 109:4
**except** 117:3
**excess** 90:10,20 91:18 93:2 98:3
**exchange** 92:22
**exciting** 8:14
**excuse** 104:18 105:1
**execute** 27:10
**executed** 9:6,7 10:18 29:1 36:21 69:4 88:17
**executive** 75:22 75:23
**exhibit** 4:7,8,9 4:10,11,12,13 4:14,15,16,17 4:20 50:21,24 51:4 55:6,11,13 59:7,23,25 65:7 65:8,14 75:17 77:14 83:2,3,6 89:24 91:10 92:16,18,21 95:15 97:10 99:13 110:21 111:21,22,23 112:5,10
**exist** 48:7,10
**existence** 10:16
**existing** 9:19
**expansion** 8:22 11:12
**expansions** 11:12
**expect** 80:13 94:6
**expectations** 80:16
**expected** 93:18 102:1
**expenses** 40:10
**experience** 7:8 7:25 92:4
**expertise** 9:20
**expires** 13:2 115:15 117:23
**explain** 85:21 102:3 106:19 110:4
**extent** 109:24
**extremely** 8:14 53:11
**eyes** 12:6

**f**

**face** 99:17 100:18
**facebook** 44:9
**facilities** 8:24 11:7 15:23 16:23
**facility** 45:17
**facing** 43:5 73:18 77:12
**fact** 56:2 58:6 93:17 101:25
**factors** 46:4,7 46:14
**facts** 93:25 118:20
**fails** 119:20
**fall** 45:9 105:19
**familiar** 13:15 66:4 100:8 108:13,19
**family** 16:24
**far** 6:14 14:2 23:21 62:16,23 63:6
**farfante** 88:22
**father** 86:17
**fault** 55:1 70:6
**favor** 57:9,17 101:22
**february** 17:7 77:17,22 78:24 83:7,25 115:15

117:23
**federal** 84:7 119:18,24
**fee** 42:5
**feel** 49:16
**feeling** 53:23 54:1,3
**feels** 44:18 84:23
**feet** 8:7
**felt** 9:20 11:13
**fence** 54:9 59:22 79:14
**fielded** 71:2
**file** 38:16 62:7 62:10,22 63:7
**filed** 2:3 45:11 65:1 82:20 87:12 88:9 108:14 109:2,4
**files** 75:11
**filing** 109:17 110:16
**fill** 100:25 110:9
**filled** 101:1,2 102:7
**final** 76:16
**finally** 7:21
**finance** 8:2 16:2 98:9
**financial** 8:2,6 46:12 84:5,6 96:4 101:13
**financially** 116:14
**financing** 98:6,6 98:11
**find** 71:2
**fine** 12:7 25:10
**fingers** 44:15
**finish** 76:13
**finished** 98:20
**firm** 73:25
**firms** 7:1,3,4,20 7:20 8:20 10:1 50:3 58:13 74:2 74:3
**first** 5:4 10:19 17:8,14,24 18:18 19:4,5 23:21 24:3,14 24:17,22 26:14 41:14 42:24 44:23 47:15 51:6 52:9,13 55:23 61:20,22 62:12,23 63:8 90:1,12 92:18 102:20,23 105:22 106:3 113:10
**fit** 9:3 17:3
**five** 51:2 55:15 90:7 98:23
**fix** 12:9
**fl** 1:21 3:4,7,15 82:20 115:21
119:14
**flawed** 74:8
**flaws** 7:12
**florida** 1:1,4 2:2 11:10 24:12,18 25:5 29:23 45:11 47:16,18 64:15 65:1 82:23 87:12 88:17 106:4,12 109:3 115:3,6 115:14 116:3 117:13,22 119:19,24
**fly** 15:19
**focus** 6:21
**focused** 29:20 35:6 52:23,24
**foley** 10:2
**follow** 10:10 21:2 33:1
**followed** 15:22 59:12
**following** 12:3 82:6 107:11
**follows** 5:5 21:11 38:8 87:6 99:2 107:20
**foregoing** 118:20
**foreign** 1:8,9
**forgot** 50:2
**form** 5:22 6:11 12:1 13:14,23
14:10 15:4 17:21 18:6,17 22:20,25 23:6 23:11,17 24:25 26:5,16,24 28:5 29:4,10,24 30:21 31:5,11 31:18,24 32:6 32:11,16,21 33:4,8,12,16,23 34:9,19 35:7,15 36:12,13,17,23 37:5,11,18,25 39:12 40:3,12 40:21 43:2 46:5 46:22 47:9 49:10 50:9,15 52:5 56:6 57:10 57:18 59:3,8 62:19 63:4,11 64:22 67:17,19 67:25 68:14,22 69:4,6,14 73:23 75:2 77:3 78:17 79:23 80:3,9,14 85:13 88:1,19 89:14 103:9,25 105:2,9 106:2 107:2 108:24 109:2 110:7,9 110:11
**formal** 17:8 50:8,14 110:13

**formally** 99:4
**formed** 7:10 10:5
**former** 47:16
**forth** 15:19
**forward** 21:16 63:25 74:8
**forwarded** 39:18
**found** 6:20 66:3 86:16
**four** 51:2 74:9
**fourth** 67:22
**frame** 34:15
**francisco** 7:12
**friends** 16:24
**front** 31:4 44:2 46:1
**fteja** 3:13 4:19 87:2 98:22 99:3 103:12 104:8 105:5,13 106:6 107:4,21
**full** 17:18 71:24 81:25
**fully** 73:13 74:20
**funds** 46:11
**further** 48:17 71:10 108:3 114:2 116:11 117:7
**future** 7:15 12:24 107:14

**g**

**g** 3:9
**gabardi** 65:16 65:17
**gansborg** 65:15 65:17,23 66:11 66:13,21 70:1 71:3 73:15 75:18
**gansborg's** 67:22 68:20
**gather** 98:23
**general** 20:5,8 24:12,19 25:5 26:6 37:16,22 39:5,25 43:22 46:20 47:17,18 51:22 52:25 53:10 54:13 58:15 82:23 88:4 89:11 109:8
**general's** 52:16 72:24 73:6 110:11
**generally** 10:24 44:23 45:1 55:3 63:20 69:13 77:4 78:18 88:2 88:3 105:14 110:7
**generals** 49:8
**generated** 45:25 94:2
**generates** 110:11
**gentlemen** 58:20
**georgia** 33:15 84:1,22
**geothermal** 8:12
**getting** 12:15 55:5 74:25
**give** 25:16 42:10 42:12 80:22 93:18,25 94:5 114:6
**given** 12:20 18:21 24:10,18 35:13 64:16
**glitch** 21:13
**globally** 52:19
**go** 6:15 7:9 12:10 16:14 19:16,19 20:23 21:8,16,16 41:15 43:9,25 44:20 46:14 47:11 50:23 54:13 55:1 58:19 61:16,17 63:10,18 67:3 69:22 70:5,7 71:14,19,25 74:9 75:9,17 81:19 91:23 92:15 95:14 96:13,19 97:9 97:22 98:21,21 98:22 99:11 101:8,9 112:2
**goal** 9:2
**goes** 42:22 76:11 83:17 87:15 111:18
**going** 5:12 7:15 8:22 9:22,24,25 9:25 10:22 11:13,14 15:11 17:1,2,11 21:7 25:14 30:25 38:4 41:3 44:15 50:19,24 51:2 55:12,13 56:24 65:7,13 66:17 69:21 76:5,22 77:15 81:19 86:23,25 87:9 88:16 89:1,18 89:24 92:17 95:15 97:9,10 98:22 99:5,10 99:11 101:16 104:23
**good** 5:8 7:12 7:17 71:17 96:15 109:3
**google** 44:9
**governance** 8:21 11:3,6

52:11,14 58:7 73:9 76:22
**governing** 103:16
**governmental** 112:21
**governor** 53:11
**graduated** 7:23
**grasp** 113:18,18
**great** 70:6 96:23 97:16 100:3,11
**group** 3:10 76:23
**growing** 92:5
**guess** 11:15 24:2 25:10 42:9 73:16
**guidance** 42:16
**guys** 21:6 58:20 99:13

**h**

**h** 4:5 118:3
**habit** 113:20
**hackett** 41:15
**halfway** 70:5
**hand** 97:17 115:10
**handful** 102:18
**handled** 41:22 103:24
**handling** 28:13
**hands** 61:14
**hankey** 3:9 87:1 88:1 98:19 103:9,25 105:2 105:9 106:2 107:2 108:6,9 109:10 110:20 110:23,24 111:20,23 112:1
**happened** 21:5
**happy** 9:15 101:8
**hba** 11:25 12:18 12:22 13:6,21 14:6,25 35:6,10 35:22 36:12,16 36:21 37:4,10 37:17 45:4 48:17 76:11 97:3,4,7 103:7 106:23
**hbas** 33:22 34:8 103:2,4,21 104:13 107:10 107:12
**head** 30:14
**hear** 34:12 40:15 82:12 85:2
**heard** 36:9 94:12
**helpful** 101:9
**hesitate** 18:9
**hey** 77:8
**hh355595** 115:15
**higher** 72:19 73:5 76:24 89:7 112:6
**highlighted** 67:23
**hire** 49:22 73:25 74:1
**hired** 10:1 47:12
**hiring** 8:19,20 73:9
**history** 16:18 46:12
**hk** 42:9
**hold** 40:24
**holder** 10:18
**holdings** 1:15
**holland** 6:24 10:3 11:11,23 11:25 12:17,21 13:18 14:3,14 14:24 18:11 34:16 35:21 41:6 42:9,13,15 42:23 43:1,9,14 45:2 47:1,12 48:4,4,25 49:3 49:22 51:20 52:11,14,22 54:15 58:7,19 59:2,14,17,20 60:16 61:4 62:4 63:25 66:2,9
71:16 73:25 74:3,23 75:4 88:3 93:24 94:18,22 104:6 107:8
**home** 12:25 14:8 15:1,1 44:6 107:10,12,15
**home's** 13:13 14:8
**homeowner** 12:23 13:1,11 13:25 14:7,25 35:2,13 36:21 39:4,25 41:17 43:15 44:1 49:7 51:8 95:3 103:3 103:8 104:13 106:17 107:10 107:12
**homeowner's** 12:25 107:15
**homeowners** 11:20,22 34:7 36:7 108:18
**hopefully** 99:10
**hour** 38:5 66:15 86:24
**hours** 96:8 97:4
**household** 86:14
**housekeeping** 86:22

**houston** 1:8 22:15,23 24:22 24:23 84:21 85:1,3 87:2 99:6 99:7,20,21 104:25 105:23 105:25 106:7 108:3
**hsic** 38:12 99:7 100:13
**hub** 16:12 17:12 17:13,16 19:12 19:14,20,20 20:12,19,20 21:1,19 22:9 26:25 28:1,11 28:13 77:23 78:1 79:2 84:10 91:11 92:11 93:9,12 98:1 100:12 105:20 111:12,13,15,18
**hub's** 79:14
**hughes** 58:6
**huh** 60:20
**hundreds** 74:15
**hyphen** 90:10
**hypothetical** 109:1

**i**

**i.d.** 117:19
**idea** 10:15 68:8 69:12
**ident** 4:6,18
**identification** 115:20,21
**identified** 90:8
**identifies** 55:23
**iliriana** 3:13 98:19 103:9
**iliriana.fteja** 3:16
**illinois** 32:10
**ilriana** 4:19
**imagine** 104:10
**immediate** 51:21
**import** 58:4,5
**important** 36:3 43:4 64:8 73:4,8 85:22
**include** 12:17 14:5
**included** 8:19 16:23 52:12
**includes** 11:4
**including** 8:24 48:13 76:23 79:1 94:1
**income** 86:13
**increase** 92:9 98:4
**increased** 93:3
**indiana** 84:1
**indicated** 17:1 84:10
**indication** 93:23
**individual** 1:3 7:1 35:9 48:18 62:4
**inform** 65:5
**information** 12:16 16:2 37:3 41:17 46:13 55:4 57:21 62:24 64:3 66:14 76:4,9 81:18 83:13 96:4,7,9 97:6 100:24
**informatory** 53:16
**initial** 65:16
**initiated** 110:16
**inquiries** 18:15 29:2,8,22 30:3 30:19 33:1 43:1 47:1,15 49:23 50:6 75:6 103:7 104:9,18 105:1 105:7,24 113:25
**inquiring** 91:3
**inquiry** 17:25 18:1,20 30:5 31:7 35:9 37:12 38:1 39:16 42:22 64:6 82:4 102:23 104:2,7
**inside** 14:22 16:23 18:24 26:12 27:1 58:10 66:6 72:19 73:5 75:22,24
**instagram** 68:3
**instance** 106:3
**instructions** 11:24 12:20,20 91:23
**instrument** 45:3 106:21 112:18
**instruments** 11:8 44:3 45:4
**insurance** 1:7,8 1:11 5:11 16:6 19:11,17,19,22 20:5,23 27:2 49:1,4,9,19 65:19 67:13 69:4 82:1 92:9 95:11,12 99:7 99:20,21 111:3 111:7 119:4
**insuring** 23:16
**intending** 52:8
**interest** 97:7
**interested** 45:1 81:12 116:14
**interface** 20:19
**interfacing** 48:24
**intern** 7:11
**internal** 64:2

**internally** 65:3 103:24
**internship** 7:17
**interrelated** 85:11
**interrupts** 107:18
**interview** 72:7 75:19
**introduced** 99:4
**investigated** 74:25
**investigation** 28:2,14 31:2,9 31:13,16,20,22 32:1,4,9,14,19 33:2 43:13,17 49:8 56:15 67:6 95:1 112:7
**investigations** 18:12 34:18 35:5 36:11,15 37:2,15,22 40:1 46:20 47:7 49:17 56:25 57:5,9,16 63:18 102:15 103:2,20 104:19 105:1
**investigative** 50:8 83:16
**investigator** 42:2,8,22 57:8 57:15 70:1,9,15 70:20,25 72:10 72:12 73:4 75:19 76:3,7
**investigators** 70:18
**investigatory** 89:10 103:15
**investment** 74:5 74:14
**investors** 15:16
**involved** 15:12 44:13,20 58:11
**involvement** 15:13,14 87:13
**involves** 67:6
**issuance** 89:2
**issue** 22:14 47:5 48:6 49:19 56:3 73:16,22 76:5
**issued** 22:2,4,14 22:15,19,24 64:12 88:24
**issues** 18:5 19:11 42:2,3 53:24 54:4 55:22 107:19
**issuing** 64:6
**items** 15:21 55:15
**iteration** 13:6

**j**

**james** 3:2
**james.kaplan** 3:4
**janet** 70:10,15 70:25
**january** 5:21,25 17:6 51:1,7 53:19 54:24 56:14,21 59:25 91:11 92:7,14 92:20,23 93:4 94:3
**jersey** 31:2,7 41:16 43:14
**jim** 5:8 52:13 53:3,4 58:6,20 73:10 112:21
**job** 7:17 15:21 15:24 16:6 58:8 58:21 118:2 119:4
**jobs** 74:16
**john** 51:8 52:18 75:20
**join** 8:11 16:15
**joins** 70:8
**joint** 17:14
**jonathan** 3:10
**jones** 48:1 50:1
**judge** 88:22
**judging** 59:25
**judgment** 39:21 88:17,23
**july** 96:3
**jump** 10:20
**june** 1:21 115:8 115:11 116:16 117:18 118:2 119:3,4
**jurisdictions** 11:5 58:10 66:5

**k**

**kaminska** 3:9
**kaplan** 3:2,2 5:7 5:8 6:12 10:24 12:2 13:19,24 14:11 16:22 17:22 18:7 19:2 21:12 22:22 23:2,9,14,20 25:2,13 26:8,20 27:4 28:7 29:6 29:14 30:1,24 31:8,15,21 32:3 32:8,13,18,24 33:6,10,14,18 34:1,11,24 35:11,19 36:19 37:1,8,14,20 38:3,9 39:23 40:6,14,23 43:12 46:8 47:4 47:11 48:9,18 49:14 50:12,18 52:7 56:10 57:13,23 59:6 59:15 61:1,5,6 63:5,16 64:24 65:12 67:21 68:5 71:13

73:24 74:21 75:16 77:13 78:20 79:25 80:6,12,18 81:22 85:15,17 87:7 88:7 89:17 97:13 108:24 110:20,22 111:20,22,25 114:3
**kaplanzeena.c...** 3:4
**katten** 47:23 49:25
**keep** 54:19 60:6 69:21 74:25 113:11
**keeping** 54:9 55:22
**keith** 41:15
**kennedys** 3:14
**kennedyslaw....** 3:16
**khankey** 3:12
**kids** 86:17
**kind** 5:25 7:10 8:7 9:3 10:19 17:14,24 19:14 44:7,24 45:9 53:13 54:14 56:3,15 64:7 66:1,2 67:12 81:12 83:13 92:6 105:15
**kinds** 19:16,22 22:3
**knew** 9:17,18,22 11:9 29:1 74:12
**knight** 6:24 10:3 11:11,23,25 12:17,21 13:18 14:3,14,24 18:11 34:16 35:21 41:6 42:10,13,15,23 43:1,9,14 45:3 47:1,12 48:4,4 48:25 49:4,22 51:20 52:14,22 54:15 58:7,19 59:2,14,18,20 61:4 62:4 63:25 66:2,9 71:16 74:1,3,24 75:4 88:3 91:11 93:24 94:18,22 104:6 107:8
**knight's** 52:11 60:16
**know** 6:14 8:4 9:9,10 10:5 12:17 14:15,23 15:5 16:25 23:18,21 24:7 25:7,10 26:3,18 30:17,17 36:5,6 36:9 38:19 39:16 43:18 47:14 48:21 51:16 54:20 58:22 59:4 62:14,23 63:6 63:13 64:3,17 67:24 68:2,18 73:12 74:18 76:21 77:7 79:14,16,24 82:18 88:19 90:18 92:24 94:10 100:6 106:9 112:15
**knowing** 31:3
**knowledge** 63:15 93:16
**known** 68:16 115:20 117:19
**kyle** 3:9 86:25

**l**

**laid** 49:22
**language** 70:17
**lardner** 10:2
**large** 2:2 117:22
**larger** 8:9
**lastly** 14:25 15:23
**late** 7:10 102:24 106:4 109:4
**launched** 109:21
**law** 3:6,10 7:4 7:19,23 8:19
**laws** 66:5 88:10
**lawsuit** 24:19 25:6 38:16,19 45:14 58:25 64:16 65:6 83:16 87:13 88:16 106:12 108:14 109:18 110:16
**lawsuits** 24:11
**lawyer** 114:8
**lawyers** 15:19 38:24 46:25 65:25 68:13 87:16
**lead** 41:25 66:2 78:2 104:7
**lean** 18:10
**legal** 1:19 7:15 10:1,6,22 15:17 15:17 40:10 45:2 85:13 107:3 113:11 119:23
**legally** 43:7
**lender** 44:21
**lending** 43:25
**lengthier** 66:20
**letter** 4:15 89:6 89:9 92:12,16 92:19,20 93:1
**letterhead** 93:12 110:12

**letting** 113:21
**level** 19:19 57:8 57:15 94:1
**lewis** 51:8 52:18
**liability** 1:4 20:5 90:9,10,11,13 90:16,24 91:7 93:2
**liaisoning** 6:23
**license** 41:1 107:25 108:1 115:21 117:19
**licensed** 11:19 30:9
**licenses** 40:24 107:24
**licensure** 11:16
**life** 7:14
**likely** 94:12 101:11 105:19
**limit** 95:25
**limited** 1:4
**limits** 20:14,16 89:3,7 91:3 93:2 93:3
**line** 9:2 55:15 67:22 118:4,7 118:10,13,16
**lines** 109:15
**link** 68:7
**list** 10:15 15:20 37:24 79:1,6,13 79:17 80:5,16 83:15
**listed** 8:5 14:8 15:1 56:1 57:25
**listened** 7:16
**lists** 13:12,25
**litigation** 60:7 60:10,19,23 113:3,6
**little** 5:15 7:9 38:4 42:11 60:18 72:6,9 97:24 106:20
**living** 86:12
**llc** 1:4,14,15
**llp** 3:2,10,14
**loan** 35:22 36:4 44:5
**loans** 36:7 44:2
**local** 7:20 42:10 58:2 66:3,4
**located** 17:15
**location** 1:19
**log** 63:23,24
**long** 5:19 16:18
**longer** 86:9
**look** 13:16 29:13 41:7 51:3 59:10 68:1 71:14 73:19 74:4 81:5 83:2 84:20 92:19 93:1 96:11 112:17
**looked** 47:24 50:3
**looking** 24:16 25:9 29:17 34:14 41:11 42:3 44:1 46:9 48:25 51:7 53:18 59:1,23 60:12,14 61:2 67:5,12,14 79:17 80:1 83:24 91:16
**looks** 12:3 41:10 42:11 53:3 69:7 70:22 81:8 83:20 85:5 92:14
**loose** 38:10
**loosely** 14:1 43:20
**loss** 79:11
**lot** 6:19,19 9:23 9:24 10:1,22,25 16:20 43:24 61:14
**loud** 101:20
**lucky** 86:13
**lunch** 86:19

**m**

**ma'am** 100:2,5 100:15 106:16 108:5
**made** 26:3,14 43:10 46:19 73:17 79:13 93:15 109:12 111:8 117:4
**mail** 4:7,8,10,11 4:12,13,14,16 4:17 41:4,5,12 41:15 42:1 50:25 51:1,5,7 51:16,24 52:1 53:16,18 54:11 54:24 59:25 65:8,9,14,16,21 65:23 66:21 67:2,5,16,16,22 68:21,21 70:22 71:10,22 72:14 72:17 76:16,18 77:15,22 78:9,9 78:12,21,23,24 80:4,25 83:3,3,7 83:18,24 84:15 84:16,21,24 89:18,19 90:1,8 91:2,10,16 92:22 93:8 94:2 95:15,16 96:5 96:13,24 97:9 97:25 100:1 119:13
**mails** 51:2 67:15 69:1,17
**main** 6:21 8:4
**maintain** 62:7
**maintained** 61:10

**make** 9:22 15:19,21,24 24:20 28:23 34:4 41:10 43:9 43:10 56:8 59:7 60:24 62:4 64:3 64:7,9 71:16,22 72:23 73:14,20 74:17 79:15 86:11 95:18,21 98:25 105:20 113:13,15,16,23 38:12 58:25 64:12,16,25 91:18 118:1 119:4
**makes** 63:14
**making** 19:5,7
**management** 90:9,16,24 91:6 95:6 105:19
**manchester** 1:15 41:19
**manchester's** 41:20
**manner** 19:1
**march** 41:6
**mark** 50:20,21 50:22,24 51:4 55:12 65:13 83:5 89:25 95:14
**marked** 97:10
**markel** 1:7,11 5:11 22:14 23:23 24:4,10 24:18 25:20 26:13 27:7 35:1 38:12 58:25 64:12,16,25 91:18 118:1 119:4
**marking** 91:10
**massachusetts** 33:7
**match** 24:15,16
**materials** 46:2 46:10,15,17
**math** 48:23
**matter** 39:10,21 58:16 64:21 86:22 93:1 111:2
**matters** 25:15 33:19 35:18 39:17 40:11,18 54:18 82:1 103:7
**mean** 7:3 45:4 47:10 48:10 51:12,13 53:25 57:4 61:17 92:24 103:10 106:19
**meaning** 83:15 104:1
**means** 26:4 42:3 69:12 110:4
**meant** 85:21
**media** 68:9,14 68:19
**meet** 15:16
**meets** 43:6
**megawatts** 9:9
**meiler** 3:5,6 6:11 12:1 13:14 13:23 14:10 15:4,7 17:21 18:6,17 22:20 22:25 23:6,11 23:17 24:25 26:5,16,24 28:5 29:4,10,24 30:21 31:5,11 31:18,24 32:6 32:11,16,21 33:4,8,12,16,23 34:9,19 35:7,15 36:17,23 37:5 37:11,18,25 39:12 40:3,12 40:21 43:2 46:5 46:22 47:9 49:10 50:9,15 52:5 56:6 57:10 57:18 59:3,8 60:21 61:3 63:4 63:11 64:22 65:11 67:19,25 71:10 73:23 75:2 77:3 78:17 79:23 80:3,9,14 81:14 85:13 86:22 89:14 119:1
**meilerlaw.com** 3:8 119:1
**memo** 45:21
**memoranda** 45:6,25
**memorandum** 45:21
**memory** 46:24
**mention** 46:2
**mentioned** 10:20 15:12 53:3 102:15
**met** 5:9
**miami** 1:21 3:4 3:7,15 11:11 17:15 115:3 116:3 117:15
**michal** 3:5 61:1 119:1
**mid** 5:25
**middle** 98:1
**million** 8:14 9:4 47:14 91:24 92:2,6,8 93:2 98:2,3,4,4
**millions** 74:15
**mind** 48:8
**minimis** 48:19
**minnesota** 32:15
**minutes** 25:14 98:23 108:6
**mirror** 49:12

**missed** 86:6
**missouri** 33:3 39:9,16,21,24 40:5 84:2
**mistake** 74:17
**misunderstan...** 70:24
**mitchell** 1:15 3:17 6:22 16:16 21:25 27:10,13 27:16,20 28:11 29:1 50:23 52:2 52:10,15,20,22 77:16 78:8,15 81:4,11 82:19 83:4,8 84:16 86:9 89:7 93:13 98:14 100:7 102:8,10
**mitchell's** 6:8 88:12 93:7
**mmeiler** 119:1
**mmelier** 3:8
**modifications** 73:14
**moment** 14:17 16:14 21:8,13 44:11 51:24 54:2,12 80:22
**monday** 1:21
**money** 35:25 36:3 38:23 58:23
**moneys** 40:19 59:1
**monitor** 15:23
**monroe** 47:20 47:20,23 49:24 112:17
**month** 25:21 77:9
**months** 77:9
**morning** 5:8 39:4 66:18 70:14 80:21 94:8,25
**motions** 88:23
**mouth** 82:2
**move** 9:2 19:11 38:11 47:25 49:24 72:9,11
**moving** 7:1
**mullins** 65:9,25 66:6,8
**multiple** 74:13 74:14 94:13
**mv** 1:4,14,15 5:10,17,19 6:1 8:4 9:16,18 13:12,13,20 14:9,19 16:15 23:3 39:22 41:18 58:25 64:25 76:7 78:9 83:9 89:12 93:12 103:20 104:12 111:8,8 112:11,25

**n**

**n** 4:1
**name** 5:8 16:12 53:7 58:16 60:10 64:5 68:18 77:24 117:11
**named** 39:15 51:8 67:6
**names** 52:13,13
**narrative** 46:10
**native** 62:19
**nature** 16:1 31:3 89:16 113:21
**necessary** 16:3 20:25
**need** 10:22,25 10:25 11:1,3,6 11:13,14 17:1,2 21:4 42:9 43:10 51:21 64:4 70:9 72:19 73:14 92:12 95:10 108:6 111:22 112:3
**needed** 16:25 19:17,19 28:23 49:8,19 65:4 113:16
**needs** 10:9 48:12 59:11
83:15,17
**neither** 99:8 114:3
**nelson** 65:9,24 66:6,8
**never** 58:22,23 75:12 82:19 94:9,9 107:10 107:12
**new** 31:2,7 38:11 41:16 43:13 58:2,3
**newman** 75:20 75:21
**newman's** 78:23
**nicaragua** 8:13 8:16,23 9:6
**nicolaus** 45:10
**nj** 42:8,10
**nope** 85:15 95:23
**normal** 27:25
**norman** 78:3
**north** 30:3,8,9 30:15,20 41:1 107:25
**notary** 2:2 115:6,14 117:21
**note** 83:25 119:10
**notes** 72:4 98:24 116:9
**notice** 2:3 23:22 24:4,6,9,10,13

24:14,17,23 47:7 48:7 49:2 64:16,20 65:1 81:1,12 84:10 105:6,20,23 106:7,9,10,11 111:1,4,5,17
**noticed** 87:3
**notices** 79:1,1,7 79:10,11,11,12 79:15,17,18 80:1,2,5,7,13,17 82:4,9,20,22 84:11,12,22 111:7,15
**notified** 83:15
**november** 24:11 25:17 39:14 45:12 49:6 64:15,21 65:2 106:5,12 109:4 109:14
**number** 8:17 17:16 29:12 48:23 97:3 101:9,9
**numerical** 50:23
**nuts** 8:7 44:25
**nw** 3:11

**o**

**oath** 115:1
**object** 103:9,25 105:2 106:2
**objection** 88:1 89:14 105:9 107:2 108:24
**obtaining** 20:18 28:10 43:19
**obviously** 9:10 18:10
**occasion** 104:11 109:8
**occur** 15:18 65:4
**occurred** 11:12
**october** 8:10 76:8
**offer** 5:12 44:5
**office** 7:18 11:11 52:16 72:25 73:7 76:25 109:8 110:11 112:20
**officers** 39:22
**official** 5:20 6:2 41:22 115:10
**officially** 19:14 86:3
**officials** 57:8,15
**oh** 19:5 34:13 40:16 41:13 42:19 47:23
**ohio** 32:5
**okay** 5:15 6:15 17:18 20:8,10 24:21 25:24 26:2,9,13 28:9 28:20 29:7 34:4 41:13,14 42:1 42:20 50:19 51:14,20,25 52:8 53:2,6,8,18 55:5 56:11,12 57:24 60:17,18 61:5 65:13,22 67:1,5 68:20 69:8,17 70:6,22 71:4,4,15,15,19 72:11,11,13,15 76:15 77:14,20 78:8,21 79:5,16 80:24 81:4,11 83:20,23 84:15 84:18 85:9 89:23 90:16 91:11,22 93:6 94:21 96:15,16 96:23 97:1,16 97:19,24 98:13 98:18 100:3,11 100:24 101:12 102:4,13 104:17 104:23 105:22 108:17 109:11 109:17,21,24 110:19 111:25 112:9
**omission** 102:1
**once** 15:23 22:1 87:12 111:18 112:4
**ones** 95:9
**online** 110:8
**open** 56:16
**opened** 29:7 33:2 46:21 63:18
**operate** 9:8
**operated** 43:24
**operating** 6:9 6:16 18:4 55:24 56:20,23 57:1 94:20
**operation** 41:23
**operational** 7:2
**operations** 6:3 14:14 16:3 30:15 43:20 44:24 46:12
**opinion** 85:14 88:22
**opportunity** 8:10 9:16,18
**options** 102:5
**order** 50:23 55:16 69:2 114:9
**ordering** 119:15
**orix** 45:17,19,22 46:16,19,25 47:5 48:2,2 50:2
**outcome** 38:19
**outset** 43:4
**outside** 40:5 41:2 44:10

111:19
**outsidepine** 78:22
**outstanding** 48:20
**own** 40:10,20 47:21 60:6 62:1 62:3 64:2

**p**

**p.a.** 3:6
**p.m.** 1:22 71:7 117:2
**pace** 75:5 113:11
**pacing** 62:3
**page** 56:12 100:3 101:16 118:4,7,10,13 118:16
**pages** 55:15
**paid** 36:1 40:9 40:19 59:1
**paper** 15:18
**paragraph** 70:6 98:1
**paralegal** 3:10
**paraphrasing** 10:20
**part** 16:5 19:4,5 19:7 21:18 28:1 40:19 42:21 44:3 79:12 82:12 101:3
103:1,6 105:14
**participate** 87:21
**participation** 87:13,15
**particular** 43:17 52:24 65:21 66:5,6 68:7
**parties** 48:12,13 116:12,13 119:15
**partner** 17:14
**partners** 17:15 45:18,19 94:5
**parts** 19:3 101:7
**party** 45:1 76:11 108:15
**pass** 98:17 113:21
**past** 9:24 76:10
**patent** 9:19 10:18 11:18
**patented** 10:15
**patents** 10:13 10:16
**pay** 13:13 47:13 58:9 98:9
**payment** 12:24 107:14
**payments** 44:2
**pbc** 1:4,14
**penalties** 118:20
**penalty** 13:22 14:2,5
**pending** 34:17 39:10
**pennsylvania** 31:23 32:2 52:3 52:16,20,23 53:10
**people** 9:14 20:25 73:19 77:10 113:21
**percent** 9:5 13:13,21 14:8 37:23
**perfect** 69:24 100:16
**period** 6:6 9:7 26:15 59:24 100:17,22
**periodically** 60:1
**perjury** 118:20
**perry** 2:1 115:5 115:14 116:5,20
**person** 6:21
**personally** 39:6 40:1 49:5,6 62:25 63:9 68:6 88:21 115:20 117:19
**perspective** 13:17 54:16
**persuade** 57:8 57:15
**pertain** 103:20
**phase** 44:23
**phases** 44:22
**phone** 86:1
**phonetic** 109:7
**phonetically** 77:25
**picked** 66:8
**picking** 86:18
**pin** 104:15
**pine** 78:11
**pinechase.com.** 78:10
**place** 15:24 65:19 72:8
**placed** 44:9
**placement** 45:6 45:20,25
**plaintiff's** 4:18
**plaintiffs** 1:5,12
**plans** 11:12
**please** 44:17 52:21 54:13 70:11 82:3 92:15 96:23 102:2 110:21 119:12
**plus** 6:25,25 8:23 9:4
**pocket** 40:10,20
**point** 6:25 7:25 9:17 15:8,10 17:5 29:12 48:14,14,17

50:3 51:23 52:10,25 53:17 54:17 56:4 65:6 72:20 73:10 74:6,8,19 80:11 85:23,25 86:16 86:19 91:9 112:17
**pointed** 72:10 73:15 77:5
**pointing** 7:12 84:9
**points** 10:11
**polaris** 8:13
**policies** 16:6 20:15 22:3,3,13 23:5,8,13,15 27:3 89:4 90:8
**policy** 20:2,9,18 22:2,10,18,23 23:23 24:5 25:20,24 26:2 26:10,14,15,18 26:19,23 38:12 38:12,13,14,17 57:19,22 64:12 66:14 89:1,1,2 90:14,17,25 91:18,18,20 94:9 100:13,17 100:22 106:8 113:13
**portion** 67:23 79:3
**position** 6:1 7:8 30:11
**possible** 25:8 42:14 77:2,7 113:22
**potential** 15:16 23:22 24:9,23 67:18 83:17 94:5 95:10
**power** 8:12 16:17,23
**powers** 9:5
**practice** 22:11 28:12,22 42:25 43:8 52:15 55:3 57:7,14 58:7,11 58:12 64:7 73:17 100:14 111:8
**prefer** 70:10
**premium** 98:11
**premiums** 98:10
**preparation** 21:15,21 71:20 72:2
**prepare** 16:3 34:17 45:20 79:17 93:8
**prepared** 93:6,9
**present** 3:17 76:11 93:12
**presentation** 44:24
**presented** 8:9 9:18 21:24 100:9,11 102:7
**president** 6:2 13:20 14:19 23:3 105:15
**previous** 96:13
**primarily** 59:14 59:19
**print** 83:14
**prior** 5:22 7:7 24:10 25:17 27:21 28:25 29:8,21,21 30:2 30:20,25 33:20 34:6,15,25 39:13,14,19 49:6 64:11 79:2 79:8 81:1,13 82:5,23 104:24 109:14,18,22,25
**private** 9:7 45:6 45:20,24
**privileged** 81:17
**probably** 73:16
**problem** 73:11 74:13 75:7,15 77:5,6,10 95:2,6 112:11,23
**procedure** 18:4 119:24,25
**proceeding** 107:18
**proceedings** 21:11 38:8 87:6 99:2 107:19
**process** 20:17 21:14 27:25 28:1,10,14 42:21 43:3 64:2 83:9
**processes** 45:23
**procure** 19:21
**procured** 27:3
**procuring** 16:6
**produce** 106:21
**produced** 71:9 115:20,21
**product** 9:19 12:21 16:19 43:6 44:5 50:3 52:17 73:11,11 73:22 74:4 75:8 77:6 106:18,19 106:21 113:16
**production** 87:22,24
**products** 20:1 74:14
**professional** 40:24 75:11 90:9,12 103:16 106:25 107:23
**program** 10:19 11:13 41:17 43:15 95:3

**programmatical** 48:16 50:4
**project** 9:5
**projects** 8:16,22
**promising** 8:16
**prompted** 105:23
**proof** 65:19
**propelled** 8:3
**proper** 77:10
**properly** 11:1
**property** 13:12 37:17,24
**proposed** 53:8
**prospectus** 45:6
**protection** 84:5 84:6 88:9
**proud** 9:10
**provide** 11:24 12:16 13:10 19:21 27:7 45:21 46:10 48:6 64:20,25 68:22 79:6 82:9 88:5 91:15,23 97:4 105:23 111:9,10,11
**provided** 24:9 24:13,14 28:24 47:7,22 66:13 80:2,2,5,8,13 81:1,12 82:4,22 84:10 89:12 93:11 106:7,9 106:10,11 111:2 111:2
**provides** 13:8 13:11
**providing** 83:12 96:4,8 105:6
**provision** 14:7 14:20,22
**prowess** 62:13
**public** 2:2 115:6 115:14 117:21
**publicly** 7:24 8:1
**pull** 111:20
**pulled** 54:10
**pulling** 110:25
**purchase** 19:23 20:14 38:13
**purchased** 38:14
**purpose** 113:8,9 113:23
**pursuant** 2:3
**push** 87:11
**pushed** 27:25 104:5,6 110:12
**put** 15:24 44:23 45:6,8 46:1 49:1 51:2 55:12 74:16 77:15 82:2 93:12 110:20

**q**

**qualified** 7:8
**qualifies** 10:8
**quarter** 45:17 102:24 104:20
**query** 63:9
**question** 12:3 25:24 28:13 30:25 34:2 38:24 54:22 58:24 71:5 85:6 85:7 96:10 97:3 101:18,20 103:17 109:12
**questioning** 109:15
**questions** 20:25 27:20 29:17,20 35:10,12 36:11 36:13 37:9,16 37:21 38:11 66:23 72:12 87:4,8 91:14 99:5,9 101:6,10 102:10 108:3,11 111:1 112:2,24 114:2
**quick** 42:14
**quickly** 99:11 113:22
**quite** 17:2 50:22 99:11 110:18
**quote** 12:19 85:11

**r**

**r** 118:3,3
**raise** 45:13 46:9 89:3
**raised** 10:11 109:14,25
**raises** 44:12,13 44:19 92:7
**raising** 6:22 15:13,15 47:20 94:1
**ram** 8:12 16:17 16:20,23
**range** 92:8
**rating** 45:8 48:1 49:25 74:5 94:4
**reach** 53:9
**reached** 66:11
**reaching** 70:12
**read** 22:11,18 22:23 26:18 27:12 28:22 51:24 52:1 53:16 64:12 66:22 69:19 71:4 75:10 80:22 83:22 84:17 88:21 94:9,9 101:20 114:5 118:20 119:8

**reading** 26:23 27:2 76:13 84:23
**real** 11:16 30:7 36:7 37:23 41:1 41:16 42:6 58:2 66:4 70:14 72:21 73:6 89:12 90:9,12 107:6,25 108:1 110:10
**really** 7:10,25 8:6,8,18 9:14,15 9:16,22 10:4 13:16 19:18 43:21 44:22 61:21 62:3,25 113:17
**realty** 1:4,14,15 5:10,17,19 6:1 13:20 14:20 23:3 39:22 64:25 76:8 83:9 89:13 93:12 103:20 104:13 111:8
**realty's** 111:8 112:11,25
**reason** 5:11 70:17 71:5,6,8 71:23 118:6,9 118:12,15,18 119:10
**reasonable** 100:23 119:18
**reasonably** 93:18 94:6 102:1
**reasoning** 23:12 82:11,15,17 89:9
**reasons** 49:22
**rebate** 42:7
**rebecca** 53:3 54:8 55:9,21
**recall** 15:9,10 18:2 19:14,15 19:24,25 20:16 22:7 23:12,25 24:1 25:1,3 27:5 27:8,14,18,22 28:20,21 29:11 29:18,18,21,25 30:4,23 31:6,20 32:1,7,9,14,19 33:2 34:20,23 35:4,8,16,20 37:6,9,12,13,15 37:19,21 38:1 38:14,15,25 39:7,8 40:4 42:19 43:16 44:10,12 45:25 46:17,18 49:3 51:19 52:12 53:7,15 54:1 59:9 60:3 61:13 64:18 65:4,6,20 66:10 67:14,20 68:23 70:17 71:21 72:3,5 75:3,4 78:4 80:10 83:18 85:21 88:8,12 89:5,5,6,9,16 95:12 102:12,16 102:20,22 106:13 109:11 109:15,17,20 112:8,18 113:5
**receipt** 119:17
**receipts** 8:15
**receive** 17:20 22:6,7,8 35:20 35:23 36:20 97:6 111:16
**received** 22:10 33:21 34:7 50:8 50:14 64:4 67:16 84:22 103:23 104:13
**receiving** 68:20
**recess** 21:10 38:7 87:5 99:1
**recognize** 22:2 51:11 55:18
**recognizing** 79:16
**recollection** 24:15,17 29:16 39:5
**recommend** 43:14
**recommendati...** 19:20
**recommended** 17:17
**recommending** 98:1
**record** 13:9 21:8 38:6 99:19 101:21 114:4 116:9
**recording** 37:16
**records** 37:17
**recover** 59:1
**recross** 4:2
**recruited** 16:15
**recruitment** 9:25
**red** 96:12,18,20
**redirect** 4:2
**refer** 60:9,15,16 99:6 106:18 112:3
**reference** 53:20 56:2 58:1,15 67:24 68:6 72:20,24 76:20 84:1,4 90:13 91:6,17,17,19 91:20 98:13 109:12
**referenced** 11:18 48:19

119:6
**referred** 112:5 113:2
**referring** 6:7 42:25 46:7 52:17 60:23 71:21 73:1 76:21 90:17,18 91:8 98:8 103:4 109:24 110:1,2
**reflected** 84:13
**refresh** 29:16
**reg** 109:7
**regard** 24:21 26:13 29:16 44:8,19 119:19
**regarding** 24:11 37:22 42:17 46:19 72:4 76:9 83:9 103:2 104:13
**registered** 63:23
**regulations** 36:7 103:16
**regulator** 109:17 110:16
**regulators** 52:3 52:23 72:19 73:5
**regulatory** 10:3 10:23 11:9 17:20,24 18:4 18:15 19:8 25:15 29:2,8,22 30:2 31:2 32:25 33:19 34:17 35:1,4 36:11,15 37:2 42:25 47:13 52:14 53:24 54:4,16 54:18 55:22 56:3,15 58:1 63:18 64:6 65:18 75:6 102:14,18 103:1 103:11,13,14,19 104:4,18,25 105:1,7,24 108:11 109:7,13 110:3,5,12 112:19,20
**reiner** 1:16 41:18
**reiner's** 42:1
**relate** 59:24
**relating** 76:4
**relations** 76:20
**relationship** 58:3 105:21
**relationships** 7:16 58:10
**relative** 116:11
**relay** 16:2
**relayed** 95:5
**relaying** 95:3
**relied** 26:25
**rely** 48:11,12
**relying** 86:14
**remember** 85:23 104:14 108:10 112:4,24
**renewal** 4:20 20:20,21 21:14 21:15 27:5 28:1 99:18 100:12,16
**repeat** 103:17
**repetition** 99:10
**repetitive** 99:9
**rephrase** 28:6 107:5
**report** 49:19 67:18 73:3 95:10 105:16 116:6
**reported** 49:8 51:22 83:17 84:13
**reporter** 2:1 107:18 115:5 116:5
**reporter's** 116:1
**reporting** 8:2,6 15:25 83:9
**reports** 70:1
**representation** 58:24
**request** 36:25 37:7 60:3 67:16
**requested** 18:22 20:23 28:23 57:22 88:6 89:8 96:6 116:8
**requests** 88:2,4
**required** 20:19 21:18 54:18 114:7
**requirements** 11:17 15:25 16:1
**reserve** 98:19
**resolve** 57:9,16
**resolved** 39:11
**respect** 24:3 39:3 40:18 104:18 105:24 106:12 107:9,11
**respecting** 93:2
**respond** 42:9 51:23 53:19 64:4 66:13 70:14 72:17 81:8 82:21 83:21 96:8
**responded** 91:2
**responding** 5:4 18:11,25 64:9 71:11
**responds** 53:3 65:23 71:3 80:22 81:5 84:19 92:11 96:5,6
**response** 43:13 66:21 70:23 72:18 81:6

84:19 96:17 98:5
**responsibilities** 6:4,17,18 15:12 17:12
**responsibility** 26:22
**responsible** 10:17
**rest** 86:21 87:10
**result** 102:2
**resume** 86:20
**retained** 4:19
**retrieve** 62:18
**return** 28:13
**returned** 28:25 119:17
**returning** 28:12
**reveal** 55:16 81:17 97:21
**review** 21:2 42:23 73:19 96:19 104:9 116:7 119:7
**reviewed** 104:10 113:15
**richard** 47:16 112:15
**right** 7:5 10:15 11:20 12:25 13:8,10 16:5,7 17:9,10 21:19 25:19,22 36:1 38:4 41:15 42:23 45:15 47:12,13 50:20 51:4 52:1,25 53:23,24 54:4 56:11,16 57:2 58:8,19 60:9 63:1,17 64:17 66:14 67:7 69:6 69:25 70:4 71:15,15 73:10 76:23 78:1,2 79:8,11,19 80:8 82:24 88:18 89:4 90:14 91:22 92:4 93:4 95:4 97:11,14 97:17 98:16 100:11,12 101:15 107:14 109:2 110:13 111:14 113:7,12 114:5,6
**rise** 93:18,25 94:6
**risk** 46:3,6,14 74:17
**risking** 75:12
**role** 5:24 7:10 8:3,3,17 10:9 17:3 18:14,19 41:21 75:24
**roles** 6:20 18:18
**roll** 10:19
**rt** 78:5
**rude** 12:5,6
**rule** 22:3 119:24 119:25
**rules** 36:7 119:18
**running** 8:19 53:11
**runs** 25:24 55:14

**s**

**s** 2:1 4:5 115:14 116:5,20 118:3
**s.a.** 8:13
**safe** 50:22
**salary** 5:18 85:24 86:2,7
**sale** 9:8 37:24
**salient** 64:8
**san** 7:11
**saw** 7:13 16:19 16:24 94:3
**sayeth** 117:7
**saying** 63:14 82:3,8
**says** 26:19 41:12 51:14,21 55:24 55:24,25 56:1,2 56:25 57:3 67:23 69:3,9,11 70:9 71:2 80:4 81:3 82:19 83:14 93:9 96:6 96:10
**scam** 74:10
**scan** 20:21
**schedule** 71:20
**school** 7:19,23
**schultz** 53:4,9 53:11,13 58:6 58:21 73:10 112:21
**schwab** 7:11,18
**scott** 1:16,24 4:3 5:2 67:23 68:3 70:11 81:14 87:8 99:4,14 100:1 107:22 108:4,10 111:1 111:16 112:3,4 114:4 115:7 116:7 118:2,23 119:4,8,9,12
**scott's** 61:4
**scottsdale** 91:19
**screen** 21:5 51:3 65:11 99:12,13 104:23
**scroll** 41:6,8,8 41:14,18 42:7 42:11 51:5,6,14 51:15,23 53:2 53:19 55:7 56:11,12,13,17 65:15,22 66:12 66:20,24 69:1 69:18,20,25

70:4,23 71:1,3 71:23 72:6,13 72:17 75:17,19 76:16 77:21 80:21 81:4,6 83:6,20 84:15 84:20,25 85:8 89:25 90:3 91:2 91:12,14,22 92:11,14,18 95:17 96:3,5,8,9 96:17,22,25 97:2,4,11,11,20 97:23 98:5
**se** 35:9 44:5
**seal** 115:10
**searched** 62:22 63:7,7
**second** 19:7 55:24 56:2 57:25 70:6 76:13 102:24,24 104:20 113:17
**seconds** 54:10
**section** 101:4,4
**securitization** 74:5 94:4
**securitizations** 16:22
**see** 12:8,9 21:5 29:15 39:1 51:7 51:9 53:21,22 59:11 61:24 65:13 66:11 67:5,8 70:2 71:6 71:6,24 72:18 77:8,23 79:3 82:9 83:7,10,11 84:11 86:20,21 87:11 90:7,19 91:14,17,21,24 92:12,15,20 95:17,25 96:12 97:2,5 99:13
**seeing** 12:6 68:24 95:18,19 97:7,13 112:5
**seek** 37:3 57:7 57:14
**seeking** 66:14 71:19 93:4
**seem** 68:23 92:22
**seems** 9:3
**seen** 75:10 99:14
**select** 102:4
**sell** 12:25 13:1 106:22 107:10 107:12,14,16
**seller** 76:10,10
**selling** 45:5
**send** 20:21 54:6
**senior** 6:2 7:18 13:20 14:19 23:3 57:8,15 105:15
**sense** 24:20 56:9 63:14 71:22 72:23
**sent** 19:9 55:9 83:24 84:11,12 93:9
**sentence** 52:9
**separate** 45:2 49:23 55:15 90:7 113:5
**september** 88:24
**seriously** 7:16
**served** 63:22
**server** 62:8,11 62:21
**serves** 46:24
**service** 42:5 107:1,6
**services** 44:4,21 86:10 89:12
**session** 71:20 72:2,4
**set** 11:1 20:16 39:7 45:23
**setting** 11:4
**settled** 38:22
**settlement** 39:1 40:19
**several** 53:20 72:12 75:3,5
**sgg** 72:20
**shareholder** 75:25
**shareholders** 6:23 34:22
**sharing** 99:12 104:23
**sharp** 86:20
**sheet** 117:4 119:11,13
**shelter** 7:21
**shepherd** 18:24
**sherman** 16:13 22:9 78:1,2,7 89:19 90:1 91:13,16 96:4 97:12
**sherman's** 90:8
**shi** 3:10
**short** 38:5
**shorter** 77:15
**shorthand** 115:5
**show** 41:3,4 50:20 54:12 65:8 89:18
**showed** 92:21
**side** 10:3,3,6,6 10:23,23 11:2 30:12 50:22 54:9 57:16 59:12,21 79:14 97:17
**sides** 10:7
**sign** 27:13,17 28:11 75:9 114:5 119:12

**signature** 21:25 93:7,13 100:4,6 115:13 116:19
**signed** 27:23 34:8 89:7 119:21
**significance** 79:21 85:10
**signing** 27:21 73:16 100:9
**signs** 14:25
**simply** 61:19
**single** 14:15 36:21 57:20 113:12
**sir** 5:8,14 6:6 12:5 17:6 28:6 28:17 29:19 33:24 40:13,16 41:9 42:17,18 49:11 51:10 53:22 55:7,19 75:8 77:18 84:8 87:20 96:13 98:12,15,18
**sit** 24:8 40:7,9 52:11 75:13 87:19 90:21,23
**sits** 43:7
**situation** 93:17 101:25
**skyward** 4:20 99:17,20,22
**slightly** 86:1 96:23 97:23
**slow** 9:2
**small** 7:24 8:11 44:1 48:23
**smile** 9:1
**social** 68:9,14 68:19
**sold** 15:1
**solutions** 1:19 119:23
**solved** 21:9
**somebody** 62:14
**somewhat** 77:15
**soon** 77:1,7
**sophisticated** 48:11,12
**sorry** 7:5 9:7 19:5 34:12,13 40:16,17 41:13 44:15 45:4 52:12 53:7 54:22 59:16 60:12,21 63:2 63:24 64:23 69:19,22 70:5 71:5 81:7,24 82:12 86:4,6 90:3 95:18 97:5 101:16 104:17 107:11,22
**sort** 15:18 45:5 45:20 49:23 73:13
**sought** 89:3
**sound** 27:15
**sounds** 56:21
**source** 46:11
**south** 1:20 3:3 30:10,15 33:11
**southern** 1:1 8:23
**spahr** 47:21,22 49:25
**speak** 56:19,23 58:17 70:9,20 71:1 79:12
**speaking** 45:1 54:7 69:13 70:15 77:4 79:10 88:4 110:8
**specialist** 78:3,6
**speciality** 99:21
**specialty** 1:8 22:15,23 24:22 24:23 78:5 84:22 85:3 87:3 99:6,7,20,20 104:25 105:23 105:25 106:8 108:3 112:22
**specific** 7:5 11:16 12:20 28:20 42:17 43:16 45:24 59:9 60:3 76:9
**specifically** 8:6 18:13 27:14 32:22,23 37:13 46:7 76:6 111:12 113:18
**specifics** 15:10 35:17 44:10 65:5
**spend** 58:23
**spent** 7:20,21 9:11
**spoke** 46:3 52:2
**spreadsheet** 4:9 34:17 53:20 54:5,6,8,14,19 54:21,23 55:21 76:7 83:12 84:14
**ss** 117:14
**standard** 18:4 28:22 42:21 43:3 70:18 73:17 100:14
**standardize** 42:25
**standardized** 18:9
**standards** 43:6
**standpoint** 11:6 11:9
**start** 6:19 11:2,3 55:13 61:12 73:24 99:11 110:25

**started** 5:20 7:23 10:2 11:10 24:12 61:19,20 98:6 104:16
**starting** 72:10 72:11
**starts** 55:17 77:22 83:7 91:12 96:3
**startup** 8:11,11 10:24 17:1
**starving** 9:13
**state** 2:2 29:23 30:3,20 31:2,10 31:13,17,23 32:1,5,9,15,20 33:2,7,11,15 36:22 39:8,21 39:24 40:25 45:11 52:20 55:16,22,23 56:1 57:25 64:15 65:1,25 66:3 67:12 87:12 88:16 103:14 105:11 109:3 115:3,6 115:14 116:3 117:13,22
**stated** 58:2 118:20
**statement** 58:4 93:15,19,21,22 94:11
**statements** 28:3 28:15
**states** 1:1 7:2,2 11:14,16 29:7 29:17 35:5 36:6 36:20,24 37:3 39:4 56:14 57:1 57:5 74:2 75:1 84:1 89:11 94:20 110:8,13 110:14
**statistical** 83:13
**statute** 119:19
**stenographic** 116:9
**stenographica...** 116:6
**stephen** 58:21 73:9 76:23 112:21
**steps** 68:21
**steve** 52:13 58:6 67:23 68:3 70:11 76:17,18
**steven** 1:16,24 4:3 5:2 115:7 116:7 118:2,23 119:4,8,9,12
**stick** 58:14
**stifel** 45:10,21
**stikeman** 8:20
**stop** 69:25 71:15 104:23
**strategy** 58:18 58:22,24 59:4
**streamline** 86:21
**street** 3:11
**strike** 14:5
**string** 4:10,11 4:12,13,14 41:4 65:8 77:16 78:24 83:3,7 89:18 95:16
**strong** 58:3
**structure** 11:1
**subject** 24:5,5 29:2 30:19,23 31:1 35:18,24 39:15 93:1 98:16 103:6
**submit** 19:9 21:1 111:4,18
**submitted** 26:11 100:12,21 108:18 111:15 111:19
**subpoenas** 50:14
**subscribed** 117:17
**subscription** 8:15
**subsequently** 74:1
**subsidiary** 99:21
**substance** 14:23 35:8 94:25
**sued** 23:23 58:25 64:16
**suggested** 119:16
**suggesting** 53:9
**suggestion** 109:13
**suing** 25:21
**suit** 45:11 82:20 82:23 87:12 106:4,4 109:2
**suite** 1:20 3:3,7 3:15
**sum** 94:25
**summary** 72:6 88:23
**summer** 45:9
**suppose** 25:7
**supreme** 7:22
**sure** 6:18 7:7 15:9,14,19,22 15:24 16:16 17:25 19:5,7 20:20 28:8,21 28:23 34:2,4 41:10 43:9 46:9 48:6 49:15,20 50:22 54:24 55:11 56:7,18 56:20 57:14 60:25 61:17,25 62:4,25 63:3,9

64:3,9,19 69:13 69:23 71:16 72:22 73:20 74:19 76:14 81:20 82:8,10 82:14 86:7 91:8 95:18,21 96:14 96:21 101:23 106:22 109:1 111:19 113:13 113:15,23
**surprise** 55:17 60:4 83:1
**swindlers** 74:10
**switching** 86:23
**sworn** 5:4 115:8 117:17
**system** 108:19
**systemic** 73:22 74:12 75:7,15 77:6 95:2,6 112:10,23
**systemically** 74:8

**t**

**t** 4:5 118:3,3
**table** 83:13
**take** 5:9 9:7,23 9:24,25,25 21:4 27:6 38:5 48:17 50:5,19 51:24 55:12 57:4 68:21 72:4 77:14 86:19,25 93:11 104:6
**taken** 2:1 21:10 38:7 87:5 99:1
**takes** 9:1 11:5
**talk** 20:24 25:14 41:3 60:18
**talked** 27:18 41:20 48:2 64:18 108:17
**talking** 10:13 21:14 25:16 28:17,18 32:25 39:3,19 52:19 94:16,17 95:9 98:7 101:4
**tap** 44:6
**task** 15:20
**tax** 8:2
**team** 14:14 16:2 16:3 52:11 73:9 95:6 101:14 113:11
**teams** 15:17,17 45:2
**technical** 107:19
**technology** 12:13 68:2
**tell** 5:15 9:1 19:24 23:7 42:16 47:6 50:4 62:11 72:1 99:16
**telling** 12:12 48:5 74:24
**template** 93:11
**ten** 16:22
**tennessee** 32:20
**term** 13:2 37:10 37:13 108:13
**terms** 14:23 26:12
**terrible** 34:2 86:4
**terry** 16:12 22:9 65:18 67:6 70:2 71:1 72:7 76:6 89:19 90:1 91:13 96:4,5,10 96:18
**testified** 5:4 94:8 104:12
**testimony** 5:13 6:9 88:12 94:24 102:13,21 109:11 119:8,17
**texas** 56:12
**text** 96:1
**thank** 10:10 20:3 25:12 28:9 55:10 67:1,4 69:24 70:7 71:4 71:17,18,25 72:9,16 76:15 76:15 80:24 81:7 83:23 84:18 89:23 90:5,5 95:24 96:2,15,15,22 96:23,24 97:1,5 97:22,23,24,25 99:24 101:24 108:4,5 110:23 111:24 114:2
**thanks** 12:11 72:15
**that'd** 13:17 14:24
**thing** 41:11 51:13 64:8 77:8 92:18 113:17
**things** 9:17,23 10:25 23:16 46:14 48:15 54:15 65:4 86:15,17 113:19 113:22
**think** 5:9 6:25 9:8 10:6,8 14:3 14:3,13 16:24 17:2 19:6 21:4 21:13 42:2 47:10 49:18 52:18 56:22 61:20,22,23 62:13 64:18 65:3 66:1 72:18 74:11,18 77:24 77:24 78:15 80:4,15,16 85:22,24,25

86:25 89:24 95:25 97:10,16 102:16 104:15 112:18
**thinking** 38:21 112:10
**third** 48:12,13 56:25
**this'll** 99:13
**thoroughly** 9:3 113:14
**thought** 7:14 9:21 19:3 75:14 81:9 82:19
**thousands** 74:16
**three** 37:22 76:2
**tie** 38:10
**time** 6:6,15,25 7:9,20,21 9:11 13:3,5,6 14:15 17:18,19 19:6 23:21 24:3,22 25:16 28:25 29:12,20,22 30:2 31:6 34:6 34:14,15,16 40:2 42:22,24 45:11 47:3,8 48:5,21,22 55:2 56:20,24 57:12 59:24 60:2 61:14 63:2,17 64:10 68:9,16 69:9 70:13 71:20 73:21 74:6,23 82:21 85:23,25 86:8 86:11,21 88:8 92:7 93:22 98:10 103:18 104:24 106:21 111:6 112:9,17 113:24 114:4
**timeline** 18:21 31:25
**timely** 18:20,25 19:9
**tiny** 66:24
**title** 6:2 41:22
**titled** 100:10
**tm** 98:13
**today** 5:13 6:6 24:8 40:7,9 41:20 87:3
**together** 16:16 41:7 44:23 45:6 45:8 51:3 61:24
**told** 74:10 95:9 112:22
**tongue** 106:20
**tony** 72:1 77:16 83:4 98:14
**tony's** 85:5
**took** 7:16 8:18 72:7
**tool** 59:14,17,19 62:3
**top** 41:5,12 51:1 65:9,14 72:18 77:16 83:3 89:19 91:2,10 98:5
**topics** 46:11
**topnotch** 73:25
**toronto** 8:21
**totality** 49:17
**totally** 12:7
**touched** 66:1
**tough** 61:18
**towards** 10:11
**tower** 98:4
**tracie** 2:1 114:9 115:5,14 116:5 116:20
**track** 54:6,15,19 55:22
**tracked** 109:9
**tracker** 56:8 60:7,10,12,19 60:22 61:4,5,8 61:10 62:2 63:19,24 109:9 112:25,25 113:3 113:5,6,9,10
**trackers** 113:8
**tracking** 59:14 59:17,19
**traded** 7:24 8:1
**transaction** 51:11 76:5,8 94:3
**transactional** 16:21
**transactions** 76:4
**transcript** 114:5 114:9 116:8,8 117:6 119:6,20
**transcripts** 119:14
**treading** 68:1
**treat** 66:18
**treated** 36:4
**tree** 44:1
**trigger** 49:18
**triple** 17:15
**true** 28:4,16 33:20 93:19,22 94:11 116:9 117:5 118:21
**truthful** 5:13
**try** 21:9 29:15 99:10 113:22
**turn** 12:11 44:11
**tutoring** 86:18
**twitter** 68:14
**two** 8:16 10:15 10:25 16:17 17:7 18:18 19:3 22:13 23:4 33:1 44:22 63:21 69:1 77:9,9 86:13 91:24 92:2 108:6

**twofold** 113:10
**type** 11:7,8 34:21 38:15 44:2 58:23 74:11 109:18 115:21
**typed** 96:12
**types** 108:20,23 110:1
**typically** 21:18 46:10

**u**

**u** 41:5
**uh** 60:20
**ultimately** 73:19 88:17
**unaware** 13:21
**uncommon** 44:3 59:10 92:4,8
**under** 35:22 40:19 88:9 93:18 106:7 118:20 119:18
**undersigned** 93:15
**understand** 6:8 10:21 16:5 21:17 23:4 24:3 25:20,23 26:1 45:12 49:13 73:10,13,21 90:13,15,21,23 94:24
**understanding** 11:5 26:7,9 43:22,23 53:1 56:5 85:10,16 85:19 88:15 99:22,24 100:20 107:9 113:24
**understood** 25:18 30:14 35:25 60:15 61:9 89:10
**underwriters** 96:11
**underwriting** 96:6
**unfortunately** 12:13
**ungodly** 66:15
**unheard** 58:12
**united** 1:1
**unquote** 12:19
**update** 34:17,21 54:5
**updated** 54:21 54:23 55:2,9 59:21 60:1,6 69:10,14
**updating** 63:19
**upfront** 12:24 107:14
**ups** 21:2 112:6
**use** 9:12 10:16 16:9 44:15 46:11 59:7,10 86:20 87:22 108:13
**used** 16:12 17:17 37:24 54:15 119:21
**uses** 78:16
**using** 18:12 54:5 65:24 103:13
**utilize** 68:9
**utilized** 66:6

**v**

**v** 1:6,13
**vague** 105:10
**vaguely** 109:16
**valuation** 92:5
**value** 10:7 13:13 14:8 16:25,25 92:10
**various** 6:23 7:2 16:6 25:15 29:2 35:5 39:22 46:11,20 79:7 89:10
**veco** 51:16,20
**velasco** 77:25 78:25 80:22 83:4,8 84:19 85:20
**venture** 17:14
**verge** 45:13
**verification** 67:12,17 68:22 69:6,14
**verify** 119:8
**veritext** 1:19 119:14,23
**veritext.com** 119:14
**versus** 39:21
**vice** 6:2 13:20 14:19 23:3 105:15
**video** 1:19
**videoconferen...** 115:7
**view** 92:21
**vs** 118:1 119:4

**w**

**wait** 77:8,8
**waiting** 69:19
**walk** 20:17
**want** 10:10 12:5 12:6,7,8 18:15 24:2 29:15 30:8 34:4 38:10 39:13 41:4,10 44:11,18 50:19 53:13 54:21,22 54:25 55:2 60:11,24 61:7 73:12 76:12 77:6,11 82:2 92:2 94:15 95:18,21 102:23 114:7,8

**wanted** 61:15 71:16 75:13 80:16 111:2 113:13,14
**wants** 49:24 70:1,25 75:19 76:3
**warrants** 93:16
**warranty** 4:15 27:7,10,12,17 27:19,21,23 28:4,11,18,19 28:24 29:1,9 31:1 33:20 34:6 89:6 92:12,16
**washington** 3:11
**way** 18:9 41:8 47:23 50:23 51:6 56:17 65:16 70:18 75:11 78:18 95:17 108:19 110:14
**ways** 63:21
**we've** 5:9 32:25 38:4 39:3 59:13 69:1 90:17 99:4 104:5 112:14,15 112:19
**week** 55:8 76:12 77:9 88:13
**weeks** 77:9 83:21
**went** 7:19 43:18 44:22 47:15,19 47:25 62:10 63:17 74:4 92:5 93:23 107:22
**wet** 8:7
**wheelhouse** 13:17
**whet** 8:8
**wife** 86:14
**wink** 9:1
**wisconsin** 55:18 56:13
**withdraw** 12:4 34:3
**withdrawn** 26:21 40:8 49:5 62:21 64:11 68:12 90:22 107:5
**witness** 4:2 5:3 13:15 15:5 18:18 22:21 23:1,7,12,18 25:1 26:6,17,25 28:6 29:5,11,25 30:22 31:6,12 31:19,25 32:7 32:12,17,22 33:5,9,13,17,24 34:10,20 35:8 35:16 36:18,24 37:6,12,19 38:1 39:13 40:4,13 40:22 43:3 46:6 46:23 47:10 49:11 50:10,16 52:6 56:7 57:11 57:19 59:4,9 63:12 64:23 67:20 68:1 73:24 75:3 77:4 78:18 79:24 80:4,10,15 81:19 87:17 88:2 89:15 98:17 104:2 105:4,11 106:3 109:1 115:10 117:11 119:20
**women's** 7:21
**wonderful** 9:14
**word** 14:5,6 64:13 76:17 104:1
**words** 62:1,3 82:2
**work** 5:16 7:23 8:1,8,21 9:4,10 9:22 10:1,4 11:8 11:10 15:17 16:4,19,21 17:2 20:18 47:13,14 47:18 61:24 70:19 74:2,16 82:1 86:1 94:22
**worked** 7:19 8:2 8:5 16:16 47:17 48:3 51:18 66:3 69:15 112:15
**working** 6:24 7:1 16:18 48:3 54:16 74:7 112:15
**works** 87:16
**world** 7:13 8:24 8:25 9:12 16:21
**worry** 51:15
**wow** 66:19
**write** 11:25 78:25 85:20 92:15
**writes** 41:18 42:8 51:20 66:21 70:24 75:18,20 76:3 83:8 91:16 96:10,18 97:12
**written** 26:2 91:18
**wrong** 10:21 46:14 52:2,21 82:3
**wrongful** 93:16 93:24
**wrote** 11:22 72:22

**x**

**x** 1:10,18 4:1,5 68:16

**y**

**year** 7:18,22 9:6 18:1 37:10 68:24 89:2 102:17
**years** 13:7 17:16 38:15 74:9 94:13
**yep** 66:25 78:11 90:3 97:15,18
**yvette** 65:16

**z**

**z** 41:5
**zachman** 1:3,14 41:19,24 65:14 66:12,22 75:20 112:5 118:1 119:4
**zeena** 3:2
**zhuh** 77:25
**zones** 69:9 70:13
**zoom** 1:19 101:22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.