**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 9:25-CV-80826-DMM

AMANDA ZACHMAN, an individual,
and MV REALTY PBC, LLC, a Florida
limited liability company,

         Plaintiffs,

v.

MARKEL AMERICAN INSURANCE
COMPANY, a foreign corporation, and
HOUSTON SPECIALTY INSURANCE
COMPANY, a foreign corporation,

         Defendants.

---

MARKEL AMERICAN INSURANCE
COMPANY, et al.,

         Defendants/Counter-Plaintiffs,

v.

AMANDA ZACHMAN, MV REALTY PBC,
LLC, MV REALTY HOLDINGS, LLC,
ANTONY MITCHELL, DAVID MANCHESTER,
DAVID REINER, STEVEN SCOTT, and
DARRYL COOK,

         Counter-Defendants.

---

**DEFENDANT MARKEL AMERICAN INSURANCE COMPANY'S MOTION FOR**
**SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant/Counter-Plaintiff, MARKEL AMERICAN INSURANCE COMPANY ("MAIC"), by and through its undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 56.1, moves for summary judgment in its favor and against Counter-Defendants, AMANDA ZACHMAN ("Zachman"), MV REALTY PBC, LLC ("MV PBC"), MV REALTY HOLDINGS, LLC ("MV Holdings"), ANTONY MITCHELL ("Mitchell"), DAVID MANCHESTER ("Manchester"), DAVID REINER ("Reiner"), STEVEN SCOTT ("Scott"), and DARRYL COOK ("Cook") (collectively, "MV Realty") and, in support thereof, states:

## I.      INTRODUCTION

This insurance coverage action arises out of various consumer complaints, civil actions initiated by the attorneys general of numerous states and regulatory proceedings brought against MV Realty and its officers based upon an extensive consumer fraud that was perpetrated by MV Realty and various subsidiaries throughout the United States.

In the civil lawsuits, the attorneys general of various states alleged that MV Realty operated a deceptive scheme that offered unsuspecting homeowners seeking payday and short-term loans with $300 to $5,000 in cash. In exchange, these homeowners were required to execute a (now adjudicated) unconscionable contract called a Homeowner Benefit Agreement ("HBA") that required the homeowner to utilize MV Realty as their exclusive real estate listing broker if the homeowner decided to sell their home. The exclusivity period was forty (40) years! If the homeowner failed to use MV Realty to list their home, or to the extent title was transferred through other means (foreclosure, death, *etc*.), MV Realty would be entitled to an exorbitant "penalty" totaling 3% of the home's value. Following execution of the HBA, MV Realty recorded liens against the home preventing the homeowner from transferring title without using the services of MV Realty or paying the stated penalty. MV Realty also aggressively enforced the terms of the

HBAs through litigation.

MAIC issued a For Profit Management Liability Policy to MV Holdings, bearing policy number MKLM2MML000716 for the policy period of August 28, 2022 to August 28, 2023 (the "Policy"). The Policy is a "claims-made" policy, which means that it provides coverage if, and only if, a claim is <u>first</u> made against an insured during the policy period. Notably, the Policy provides, *inter alia*, that all Claims that arise out of the same Wrongful Act or Interrelated Wrongful Acts are considered a Single Claim, deemed to have been first made on the earliest date such Single Claim was made. A "Claim", as defined by the Policy, is not limited to a lawsuit. For example, a Claim can be, *inter alia*, a written demand against an Insured for monetary damages or non-monetary relief; or an administrative or regulatory proceeding (or investigation) commenced by receipt of a notice of charges or similar document.

MV Realty first submitted a Notice of Claim to MAIC on or about December 1, 2022, in which it reported a Complaint for Injunctive Relief filed in Hillsborough County, Florida on November 29, 2022 by the Florida Office of the Attorney General ("AG") (the "Florida Action"). In the Florida Action, the Florida AG alleged, *inter alia*, that MV Realty and individual defendants, Zachman, Mitchell, Manchester (collectively, the "Florida Defendants") "engage[d] in a complex and deceptive scheme that attempts to skirt existing Florida law with the goal of swindling consumers out of their home equity." D.E. 50-1, ¶1. The Florida Action arises out of, and relates to, the Homeowner Benefit Program ("HBP") and HBA. *See id*. at ¶¶ 2-4, 11, 34-78.

There is no coverage for the Florida Action under the Policy because it is related to a series of claims made prior to the inception of the Policy. That is, MV Realty did not disclose to MAIC (and in fact concealed) that at the time MV Realty applied for the Policy (and long before MV Realty submitted the Notice of Claim regarding the Florida Action), there were Claims (as defined

in the Policy) that were made prior to inception of the Policy, which arose out of the same Interrelated Wrongful Acts (i.e. Claims that arose out of, and had a common nexus with, the same improprieties involving the HBP and HBA). Moreover, MV Realty warranted in its insurance application documents that it was not aware of any prior claims, or even facts which could result in claims. However, MAIC has established through discovery that there were, in fact, multiple Claims (as defined in the Policy) that were first made against MV Realty prior to inception of the Policy involving the HBP and HBA transactions. For example, there were two formal investigatory subpoenas issued by the Florida AG prior to filing the Florida Action; multiple complaints by the Florida Department of Business and Professional Regulation (Florida DBPR) and the Better Business Bureau ("BBB"); administrative and regulatory complaints in states other than Florida; and demand letters from counsel on behalf of consumers.

The foregoing previously undisclosed Claims were primarily made between 2019 and 2022, well before the inception of the Policy. Discovery has established that not only did MV Realty receive these Claims, but it routinely retained the services of multiple law firms throughout the country to respond to the Claims. Yet not one of these Claims was reported to MAIC. Each of the foregoing pre-policy Claims arose out of the same Wrongful Act or Interrelated Wrongful Acts and are deemed to be a "Single Claim" under the Policy and further deemed to have been first made on the date of the earliest of said Claims. Since the date of the earliest one of these Claims was long before the inception of the Policy, there is no coverage available under the Policy for this reason alone. Additionally, even if the Single Claim, as defined by the Policy, was first made during the policy period (it was not), summary judgment would still be warranted because there is no "Loss" as that term is defined in the Policy, and as discussed below, several separate and independent exclusions apply to preclude coverage.

## II.    BACKGROUND

The material facts supporting this Motion are stated in MAIC's Statement of Material Facts, which is being filed and served contemporaneously with this Motion, and summarized below. Citations to MAIC's Statement of Material Facts is cited in the form (S. __).

### A.    The MAIC Policy.

The Policy was issued for the policy period of August 28, 2022 to August 28, 2023. D.E. 50-5, p. 9 of 73. Subject to its terms, conditions, exclusions, and endorsements, the Policy's Coverage Part A. contains liability limits of $3,000,000 Each Claim and in the Aggregate. *Id*. at p. 10. The Policy is a "claims-made" policy, which means that it provides coverage if, and only if, a claim is first made against an insured during the policy period. The Declarations Page of the Policy specifically provides as follows:

> **Claims Made Coverage:** The coverage afforded by this policy only applies to **Claims** that are first made against the **Insured** during the **Policy Period** or the **Extended Reporting Period**, if purchased.

*Id*. at p. 9.

The Insuring Agreements for the Directors and Officers and Company Liability Coverage Part (the "D&O and Company Liability Coverage Part") state, in part, as follows:

**DIRECTORS AND OFFICERS AND COMPANY LIABILITY
COVERAGE PART**

**SECTION I – INSURING AGREEMENTS**

**A.    INSURED PERSON LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

**B.    COMPANY REIMBURSEMENT COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** for which the

**Company** grants indemnification to the **Insured Persons**, as permitted or required by law, and which the **Insured Persons** have become legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

**C.    COMPANY LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** which the **Company** becomes legally obligated to pay on account of any **Claim** first made against the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

….

*Id*. at p. 32.

For purposes of the D&O and Company Liability Coverage Part, "**Insured**, whether in the singular or plural, means the **Insured Persons** and, solely with respect to INSURING AGREEMENTS B, INSURING AGREEMENTS C, and INSURING AGREEMENTS D, the **Company**." *Id*. at p. 35. "Claim" is defined by this Coverage Part to mean:

1. A written demand against an Insured for monetary damages or non-monetary relief, including a written demand that an Insured toll or waive a statute of limitations, commenced by such Insured's receipt of such written demand;

2. A civil proceeding against an Insured commenced by the service of a complaint or similar pleading upon such Insured;

3. A criminal proceeding against an Insured commenced by such Insured's receipt of an indictment, information or similar document;

4. An administrative or regulatory proceeding against an Insured commenced by such Insured's receipt of a notice of charges or similar document;

5. A civil, criminal, administrative or regulatory investigation of an Insured Person commenced by the service upon or other receipt by such Insured Person of a target letter or other written notice from the investigating authority identifying by name such Insured Person as an individual against whom a proceeding may be commenced;

….

*Id.* at p. 34. Moreover, if more than one Claim is made against an Insured arising out of the same Wrongful Act or Interrelated Wrongful Acts, the Policy states that all such claims will be deemed

to be a "Single Claim" as follows:

> **D.   SINGLE CLAIM**
> All Claims which arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of the **Insured** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any Insured, regardless of whether such date is before or during the **Policy Period** or any **Extended Reporting Period**.

*Id*. at p. 22. The Policy defines "Interrelated Wrongful Acts" to mean "all **Wrongful Acts**, including all **Wrongful Employment Practices**, that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." *Id*. at p. 17.

### B.   The Underlying Claims.

### 1. *The Florida Attorney General Action.*

On November 29, 2022, the Florida AG filed the Florida Action against MV PBC, Zachman, Mitchell, and Manchester in the Circuit Court of Hillsborough County, Florida, Case No. 2022-CA-009958. D.E. 50-1. MV Realty reported the Florida Action via a Notice of Claim dated December 1, 2022. (S.13; Ex. A). The Notice of Claim reported the Complaint for Injunctive Relief filed in the Florida Action. (Ex. A, p. 3).

In the Florida Action, the Florida AG alleged that "[d]efendants engage in a complex and deceptive scheme that attempts to skirt existing Florida law with the goal of swindling consumers out of their home equity." D.E. 50-1, ¶1. The Florida AG summarized the scheme as follows:

> Defendants offer consumers $300-$5,000 cash as a "loan alternative" but without requiring consumers to take out a loan. In exchange, consumers enter into a misleading and confusing Homeowner Benefit Program ("HBP") which includes signing a contract, the "Homeowner Benefit Agreement" ("HBA"), that requires consumers to use MV Realty as their exclusive real estate listing broker for a period of 40 years. During the course of the 40-year term of the HBP, if the consumer lists the property for sale but does not use MV Realty as its listing broker, or if the home is foreclosed upon, heirs try to sell the home, or consumers simply wish to cancel

the deal, Defendants will seek to be paid 3% of the property's value, a value that, pursuant to the terms of the HBA, is determined by Defendants.

*Id.* at ¶2. The relief sought in the Florida Action consisted of temporary and permanent injunctive relief; restitution to consumers and disgorgement of ill-gotten gains; and civil penalties. *Id.* at pp. 41-42.

On September 24, 2024, the Florida Court entered partial summary judgment against MV Realty as to liability and injunctive relief. D.E. 50-3, p. 10 of 11; *see also* S.28; Ex. B. The Court held, *inter alia*, that "the HBAs and associated Memoranda are both procedurally and substantively unconscionable and thereby unenforceable." D.E. 50-3, p. 6 at ¶14. The Court also found that the individual defendants (Zachman, Mitchell, and Manchester) "directly participated in the wrongful acts or practices" and, therefore, they were individually liable for violating FDUTPA (*id.* at ¶19).

On December 17, 2025, the Court entered separate Consent Final Judgments against MV PBC [S.30; Ex. C] and the individual defendants (Zachman, Mitchell, and Manchester) [S.30; Ex. D]. Each Consent Final Judgment stated, *inter alia*, that "[t]his Consent Judgment does not affect, change or amend the terms of this Court's prior Orders, including but not limited to, this Court's Order on Cross-Motions for Summary Judgment dated September 24, 2024, and this Court's Partial Summary Judgment on Injunctive Relief Order dated February 12, 2025." [S.31, Ex. C and D, p. 2 at ¶1.3]. The relief awarded in the Consent Final Judgments consisted of injunctive relief against all defendants; disgorgement against MV PBC; civil penalties against all defendants (with payment suspended as to the individual defendants); and attorney's fees and costs against MV PBC. [S.32; Ex. C and D at ¶¶ 3.1-4.6]

### 2. *Additional State Attorney General Actions.*

Based upon the exact same contract (i.e. the HBA) and the same course of conduct and business practices (i.e. the HBP), attorneys general in numerous other states filed actions against

MV Realty including New Jersey, Missouri, North Carolina, Minnesota, Georgia, Pennsylvania, Massachusetts, Illinois, California, and Ohio. D.E. 50, ¶48. The Florida Action and other state attorney general actions filed against MV Realty, including those described above, shall collectively be referred to as the "Various State Actions."

### 3. *Related Claims First Made Prior to Inception of the MAIC Policy.*

At the time MV Realty submitted its Notice of Claim regarding the Florida Action, it did not disclose the existence of any Claims (as defined by the Policy) which were made prior to inception of the Policy arising out of the same Interrelated Wrongful Acts (i.e. Claims that arose out of, and had a common nexus with, the same improprieties involving the HPB and HBA).

To the contrary, MV Realty represented that it was not aware of any prior claims, or facts which could give rise to a Claim. That is, a "Claim Free Warranty Statement" dated August 26, 2022 and signed by Mitchell as CEO (which forms a part of the Policy (D.E. 50-5, p. 73) stated:

> Re:  MV Realty PBC, LLC
> MV Realty Holdings, LLC
>
> Dear Insurer:
>
> With respect to the coverage part limit of liability stated below:
>
> Directors and Officers Liability limits excess of $5,000,000
> Employment Practices Liability limits excess of $1,000,000
>
> No person or entity proposed for coverage is aware of any fact, circumstance or situation which he or she has reason to suppose might give rise to a future claim that would fall within the scope of any of the proposed coverage part limit of liability stated above, except: None or
> Am_____
> _____
> _____
>
> Without prejudice to any other rights and remedies of the Insurer, the Applicant understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed above, any claim or action arising from any such fact,

circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Insurer.

D.E. 50-5, p. 73. Despite this misrepresentation, by this time there were multiple Claims (as defined in the Policy) which were previously made against MV Realty, arising out of the same Interrelated Wrongful Acts (i.e. arising out of the HBP and HBA scheme) (the "Pre-Policy Claims"). The Policy provides that the earliest of these Claims will be deemed the date that the Claim was first made for coverage purposes. Accordingly, the existence of any one of the Pre-Policy Claims would preclude coverage.

For example, on May 11, 2021 (approximately fifteen months prior to inception of the Policy), the Florida AG issued a Consumer Protection Subpoena Duces Tecum titled "In The Investigation of" MV PBC (the "2021 Florida Subpoena") (S.38; Ex. G). The 2021 Florida Subpoena states, *inter alia*, that it "is issued pursuant to the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, in the course and authority of an official investigation." (S.39; Ex. G, p. 1). The subpoena identifies two senior citizen "complainants" and commands production of extensive documents from MV PBC (and its affiliates, officers, directors, etc.), including documents relating to the HBA. (S.39; Ex. G, p. 4). Hence, the 2021 Florida Subpoena itself was a Claim as defined by the Policy since, *inter alia*, it was both "[a]n administrative or regulatory proceeding against an Insured commenced by such Insured's receipt of a notice of charges or similar document" and "[an] … administrative or regulatory investigation of an Insured Person commenced by the service upon or other receipt by such Insured Person of a target letter or other written notice from the investigating authority…." *See* D.E. 50-5, p. 34.

Likewise, on March 22, 2022, the Florida AG issued a separate Consumer Protection Subpoena Duces Tecum. (S.40; Ex. H). The 2022 Florida Subpoena stated that it "is issued … in the course and authority of an official investigation." (S.41; Ex. H, p. 1). The 2022 Florida

- 9 -

subpoena identifies sixteen (16) additional consumer complainants and also commands production of extensive documents from MV PBC. (S.41; Ex. H, p. 13). Like the 2021 Florida Subpoena, the 2022 Florida Subpoena is also a Claim as defined by the Policy. Documents produced in discovery reflect that the law firm of Ausley McMullen responded to both of the Florida AG Subpoenas on behalf of MV Realty before the inception of the Policy. (Ex. E, No. 7.5 and 20.2-20.4).

In fact, there were approximately forty (40) Claims that were first made prior to inception of the Policy, including the Florida AG investigation subpoenas described above; multiple complaints by the Florida DBPR and BBB; administrative and regulatory complaints in states other than Florida; and demand letters from attorneys on behalf of consumers. A Summary of Pre-Policy Claims is attached to the Statement of Material Facts as **Exhibit "E."** (S.42). These unreported Claims were made between 2019 and 2022—each prior to the inception of the Policy. *See* Ex. E.

Discovery has also revealed that at least ten (10) law firms represented MV Realty in responding to approximately thirty-five (35) of the Pre-Policy Claims, including Holland & Knight LLP ("H&K"); Nelson Mullins; Ausley McMullen; Lewis Roca; Dykema Gossett; Pashman Stein Walder Hayden P.C.; Frascona, Joiner, Goodman and Greenstein; and Hinshaw & Culbertson. (S.43).

As shown by the Summary of Pre-Policy Claims (Ex. E), the earliest Claim made arising out of the HBP and HBA was Florida DBPR Complaint No. 2019063900 (the "2019 DBPR Complaint"), which was dated December 23, 2019. (S.44). H&K responded to the 2019 DBPR Complaint by letter dated March 11, 2020. (S.45). Shortly thereafter, by letter dated April 1, 2020, H&K also responded to DBPR Complaint No. 2020013043 (the "2020 DBPR Complaint"). (S.48). Zachman received official notice of the 2020 DBPR Complaint by letter dated March 12, 2020, which stated in part, "[t]his letter is to serve as official notice to you in accordance with Section

455.225(1), Florida Statutes, that a complaint has been filed against you and that an investigation has been initiated regarding the allegations made in the attached complaint." (S.46; S.47; Ex. E at No. 3.1). The statutory authority for the investigation is set forth in Fla. Stat. § 455.225(1). (Ex. E at No. 3.1, p. 1).

Accordingly, the date that the "Single Claim" (as defined by the Policy) was first made was in late 2019 and no later than March 11, 2020—the date of the first H&K letter—which acknowledged receipt of the 2019 DBPR Complaint on behalf of MV Realty. (S. 45). Accordingly, there is no coverage under the Policy since the Claim was first made more than twenty-nine (29) months prior to inception of the Policy and the Insuring Agreement is not triggered. However, again, it bears repeating that even assuming, *arguendo*, that the 2019 DBPR Complaint was not deemed a Claim under the Policy (which it is), any one of the other approximately forty (40) Pre-Policy Claims in the Summary of Pre-Policy Claims would require the same finding of no coverage since each and every one was first made prior to inception of the Policy and arose out of the same "Wrongful Act" or "Interrelated Wrongful Acts."

## III.    LEGAL STANDARDS

### A.    Summary Judgment.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)). After the moving party has met its burden,

the burden shifts to the nonmoving party to establish that there is a "genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). The non-moving party must "go beyond the pleadings" and by affidavits, or "depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324. If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,]" Rule 56(c) mandates the entry of summary judgment. *Id.* at 322.

## B.      Principles of Insurance Policy Construction.

"Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997). That is, "[a] person seeking to recover on an insurance policy has the burden of proving a loss from causes within the terms of the policy[,] and if such proof of loss is made within the contract of insurance, the burden is on the insurer to establish that the loss arose from a cause that is excepted from the policy." *U.S. Liab. Ins. Co. v. Bove*, 347 So. 2d 678, 680 (Fla. 3d DCA 1977) (citations omitted). Under Florida law, "[c]overage provisions define the scope of insurance coverage." *Universal Prop. & Cas. Ins. Co. v. Jean*, 426 So. 3d 504, 505 (Fla. 4th DCA 2025). Likewise, a "[l]ack of coverage may exist where 'the insuring clause does not by its express terms apply to the kind of claim being made, or it *may exist simply because the policy elsewhere expressly excludes the coverage*.'" *Id.* (citations omitted, emphasis in original).

Interpretation of insurance contracts is a question of law for Florida's courts. *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015). In construing an insurance policy, Florida courts "start with the plain language of the policy, as bargained for by the parties." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Auto-Owners Ins.*

- 12 -

*Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). "'Florida courts have said again and again that insurance contracts must be construed in accordance with the plain language of the policy,'… and '[a] court should read an insurance policy as a whole, and endeavor to give each provision its full meaning and operative effect'…." *Mt. Hawley Ins. Co. v. Miami River Port Terminal, LLC*, 228 F.Supp.3d 1313, 1327 (S.D.Fla. 2017), *aff'd*, 713 F. App'x 951 (11th Cir. 2017) (internal citations omitted). In Florida, a clear and unambiguous policy provision "should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 965 (11th Cir. 2014) (citing *Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)).

    **C.**    **The Duty to Defend and Indemnify (the Eight-Corners Rule and its Exceptions).**

"In Florida, 'the general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses.' … If the alleged facts and legal theories do not fall within a policy's coverage, no duty to defend arises." *Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F.App'x 861, 865 (11th Cir. 2014) (internal citations omitted). However, there are well recognized exceptions to the general rule that a court is limited to considering only the allegations of the underlying complaint and the insurance policy (i.e. the "eight corners rule"). These exceptions are described as follows:

> The Florida Supreme Court has recognized there are exceptions to the general rule that the duty to defend is determined solely from the allegations of the complaint: "[T]here are some natural exceptions to this standard where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint." *Higgins v. State Farm Fire and Cas. Co.*, 894 So.2d 5, 10 n. 2 (Fla.2005). Similarly, Florida District Courts of Appeal have concluded that, under certain circumstances, facts outside the underlying complaint can be considered when assessing the duty to defend. In *Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So.3d 565 (Fla. 1st DCA 2010), the policy under which the insured

claimed defense and liability coverage contained a prior litigation exclusion. *Id*. at 567-68. In determining whether the prior litigation exclusion applied, the court concluded it was proper to consider the complaint from a previously-filed action, which complaint was outside the allegations of the underlying complaint. *Id*. at 574-75; *see also Nationwide Mut. Fire Ins. Co. v. Keen*, 658 So.2d 1101, 1103 (Fla. 4th DCA 1995) (permitting consideration of uncontroverted fact not contained in underlying complaint; "if uncontroverted evidence places the claim outside of coverage, and the claimant makes no attempt to plead the fact creating coverage or suggest the existence of evidence establishing coverage, we think the carrier is relieved of defending.").

*Id.* at 865. *See also Mt. Hawley Ins. Co. v. H&M Builders, LLCs*, 711 F.Supp.3d 1373, 1379 (S.D.Fla. 2024) ("The first exception permits a court to 'consider extrinsic facts if those facts are undisputed, and, had they been pled in the complaint, they clearly would have placed the claims outside the scope of coverage.' … The second exception permits for the consideration of extrinsic evidence 'where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint.'").

Here, it is respectfully submitted that the exceptions to the general rule clearly apply to the issue of whether the Claim (or "Single Claim"), as defined in the Policy, was first made during the policy period as required to trigger the Insuring Agreement. For example, it is proper for this Court to consider extrinsic facts outside of the complaint's allegations in the Florida Action relating to whether a Claim arising out of the same Interrelated Wrongful Acts was first made prior to inception of the Policy. First, the facts and documents related to the pre-policy Claims (described above), including the Florida AG investigation subpoenas; the DBPR and BBB Complaints; and demand letters cannot in good faith be disputed. Likewise, the dates these Claims were first made can be ascertained from the documents themselves. Second, there would be no logical reason or need for the Florida AG to allege facts involving all the pre-policy Claims in its November 29, 2022 Complaint. Third, the undisputed facts regarding the pre-policy Claims (which are deemed first made as of the earliest date of said Claims) clearly place all Claims arising out of the same

- 14 -

Interrelated Wrongful Acts outside of the scope of coverage.

## IV.    MEMORANDUM OF LAW

### A.    The Court Should Grant Summary Judgment to MAIC Because the "Single Claim" was First Made Prior to the Policy's Inception.

The Policy only provides coverage to an Insured Person and/or the Company (including its subsidiaries) if, and only if, a Claim is "first made" against an Insured Person or the Company "during the Policy Period or any applicable Extended Reporting Period, if purchased, for a Wrongful Act taking place before or during the Policy Period." This is consistent with Florida law in which it is well-settled that "a [claims-made policy] provides coverage only if a claim is first made against an insured during the policy period." *Certain Underwriters at Lloyds, London v. Anchor Ins. Holdings, Inc.*, No. 23-10364, 2024 WL 4836693, at *3 (11th Cir. Nov. 20, 2024).

In *Anchor*, an insurance coverage dispute arose between several investors and the holding company in which they bought stock (Anchor). Lloyds issued a policy to Anchor on November 30, 2018. 2024 WL 4836693 at *3. In December 2018, the investors added Anchor as a defendant in a lawsuit that was already pending against other entities. *Id*. The Court found, *inter alia*, that certain rescission demands made by the investors constituted claims first made prior to the policy, including a March 14, 2018 email explaining that the investors wanted rescission and several demand letters in April and May 2018. *Id*. The Court concluded that a claim was first made prior to the policy's inception, holding, in part, as follows:

> …this case presents several formal rescission demands amounting to "a specific demand for [the Insured] to rectify the legally cognizable damage created by its [Wrongful Acts]." *Ditech Fin. LLC*, 2021 WL 4263330, at *8. Because these demands came long before the beginning of the policy period, Lloyd Underwriters are not obliged to provide coverage for the investors' claims.
> ….
> We find that the investors' claims were first made before the policy's inception. Accordingly, Lloyd Underwriters are not contractually required to provide coverage for those claims.

- 15 -

*Id*. at *4.

While in *Anchor* there were "several formal rescission demands" made prior to inception of the policy period, in the instant case there were approximately forty (40) Claims (as defined in the Policy) that were first made prior to the Policy's inception. (S.42; Ex. E). Each of these Pre-Policy Claims satisfies the definition of "Claim" under the Policy. Specifically, for purposes of the D&O and Company Liability Coverage Part of the Policy, the definition of "Claim" is not limited to a lawsuit, and includes the following:

> **Claim** means:
>
> 1. A written demand against an Insured for monetary damages or non-monetary relief, including a written demand that an Insured toll or waive a statute of limitations, commenced by such Insured's receipt of such written demand;
>
> 2. A civil proceeding against an Insured commenced by the service of a complaint or similar pleading upon such Insured;
>
> 3. A criminal proceeding against an Insured commenced by such Insured's receipt of an indictment, information or similar document;
>
> 4. An administrative or regulatory proceeding against an Insured commenced by such Insured's receipt of a notice of charges or similar document;
>
> 5. A civil, criminal, administrative or regulatory investigation of an Insured Person commenced by the service upon or other receipt by such Insured Person of a target letter or other written notice from the investigating authority identifying by name such Insured Person as an individual against whom a proceeding may be commenced;
>
> ….

D.E. 50-5, p. 34.

Further, all Claims arising out of the same Wrongful Act or Interrelated Wrongful Acts, will be deemed to be a "Single Claim" as follows:

> **D.    SINGLE CLAIM**
>
> All Claims which arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of the **Insured** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any Insured, regardless of whether such date is before or

during the **Policy Period** or any **Extended Reporting Period**.

*Id*. at p. 22. "Interrelated Wrongful Acts" is defined to mean "all **Wrongful Acts**, including all **Wrongful Employment Practices**, that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." *Id*. at p. 17. Accordingly, if there are multiple Claims against the Insured that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes, such Claims will be considered to be a "Single Claim", and be deemed to have been first made on the date that the earliest of such Claims was first made, even if that date is before the policy period. That is exactly what occurred here, and the date that the earliest Claim was first made was well before the inception of the Policy.

The Pre- and Post-Policy Claims here arise out of the same "Wrongful Act" or "Interrelated Wrongful Acts" (i.e. the HBP and HBA) and, therefore, collectively constitute a "Single Claim" under the Policy, which was first made long before the inception of the policy period. Accordingly, as the *Anchor* Court held, the subject Claims are not covered under the Policy.

**B.    The Pre- and Post-Policy Claims Arise from the Same Interrelated Wrongful Acts.**

Related claims provisions, such as those in the Policy, are routinely enforced in Florida. *See, e.g.*, *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1263 (11th Cir. 2000) (finding related acts language in policy unambiguous); *PNI Litig. Tr. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 21-21416-CIV, 2023 WL 2528942 (S.D.Fla. Feb. 14, 2023), *rep. & rec. adopted* 2023 WL 2524727 (S.D.Fla. Mar. 15, 2023), *aff'd*, No. 23-11260, 2024 WL 3027682 (11th Cir. June 17, 2024) (claims made in 2019 lawsuit related to claims first made before 2017 policy period and were therefore excluded from coverage).

In the oft-cited case of *Wendt*, the defendant/insured (Hall) "promoted the sale of

- 17 -

[promissory] notes by K.D. Trinh [Investments] and also provided legal services regarding various aspects of the transactions." 205 F.3d at 1259. K.D. Trinh did business in the state of Florida selling promissory notes to investors through agents, one of which was Wendt. *Id*. at 1260. Lawsuits were filed during two policy periods (1996 and 1997). The 1996 case was filed by investors against Hall and Wendt. The 1997 case was a third-party complaint by Wendt against Hall alleging, *inter alia*, that Wendt had sold over $1 million worth of promissory notes to over 44 investors, and that K.D. Trinh was a "fraudulent enterprise which sustained itself through its selling agents, including Wendt." *Id*. at 1260. The issue became whether the 1997 claim arose out the same or related wrongful acts as the 1996 claim, precluding coverage under the 1997 policy. The Court concluded that it did:

> The Court can see no ambiguity when applying the language of the policy to the facts of this case. The record reveals, and the Defendant does not dispute, that Hall engaged in a series of actions all of which were intended to encourage investment in K.D. Trinh. The language of the insurance policy clearly focuses on the wrongful act or acts, and not on the number of duties breached or injuries sustained. The policy states that "[a]ny claim or claims arising out of the same or related wrongful acts, shall be considered first made during the policy term in which the earliest claim arising out of such wrongful acts was made." .... Furthermore, the policy defines a "claim" as "the receipt of a demand for money or services, naming you and alleging a wrongful act." *See id.*
> ….
> It is clear that Hall's course of conduct encouraged investment in the K.D. Trinh's notes. Though clearly this course of conduct involved different types of acts, these acts were tied together because all were aimed at a single particular goal. The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action against Hall does not render the "wrongful acts" themselves to be "unrelated" for the purposes of the insurance contract. Rather, they comprised a single course of conduct designed to promote investment in K.D. Trinh. It is this same course of conduct which serves as the basis for both the Cowan and Wendt litigation. The conduct at issue in both cases was arguably the "same" and at the very least "related" in any common sense understanding of the word.

*Id*. at 1263-64.

Here, as in *Wendt*, MV Realty "engaged in a series of actions," all of which were "aimed

at a single particular goal" (i.e. to induce homeowners to enter into HBA transactions, that have since been adjudicated to be both procedurally and substantively unconscionable). Each Claim, whether before or during the policy period, is based upon the same alleged misconduct concerning the HBP and HBA. The same "course of conduct" by MV Realty therefore serves as the basis for each Claim; and each Claim is "related" under the terms of the Policy. Since the Claims presented by MV Realty during the policy period clearly arise out of the same "Interrelated Wrongful Acts" as the numerous Pre-Policy Claims discovered during this action, they are collectively deemed to be a "Single Claim", which was first made prior to the inception of the MAIC policy period, and therefore, there is no coverage under the Policy.

Similarly, in *PNI Litig. Tr.*, *supra*, certain directors sought coverage for a 2019 lawsuit brought by the plaintiff PNI Litigation Trust. 2023 WL 2528942 at *1. The insurers (National Union and RSUI) denied coverage because the 2019 claim was related to a claim made in 2016. Relying, in part, on *Wendt*, the Court considered various relatedness factors, including whether the two claims were based upon the "same predicate acts" (*id*. at *9); whether the underlying complaints described a "continuing pattern or practice or behavior" (*id*. at *10); whether the allegations of the later claim "merely constitute variation of the same course of conduct – or pattern of behavior" as the earlier claim (*id*.); and whether the later claim involves the same "pattern of corporate misconduct" as the earlier claim (*id*.). After analyzing these various factors, the Court granted summary judgment in favor of the insurers, concluding that "the Trust's claims against the Coblentz directors related back to the claims first made by Wasik in 2016 and are excluded from coverage by the plain text of the 2017 Policies." *Id*. at *11. Specifically, the Court held:

> [T]he Trust's claims clearly "comprise a single course of conduct designed to promote a [specific goal]," *Cont'l Cas. Co.*, 205 F.3d at 1264, that is marked by a "continuing pattern or practice of behavior." *Health First, Inc.*, 747 F. App'x at 751. In other words, the Trust's alleged breaches are but mere variations,

- 19 -

repetitions, and, in some instances, direct continuations of the same underlying course of conduct denounced in Wasik's initial complaint. ... Therefore, the Trust's claims against the Coblentz directors related back to the claims first made by Wasik in 2016 and are excluded from coverage by the plain text of the 2017 Policies.

*Id*. Here, each of the Claims against MV Realty clearly arise from the same "Interrelated Wrongful Acts". Applying the factors from *PNI* and *Wendt*, each of the Claims "comprise a single course of conduct designed to promote a [specific goal]" and involve a "continuing pattern or practice of behavior." The unconscionability and impropriety of the HBP and HBA was also the "very crux" of each Claim. Hence, pursuant to the Policy's terms, no coverage exists for the "Single Claim" since it was first made long before the Policy's inception. *See also Gidney v. Axis Surplus Ins. Co.*, 140 So.3d 609, 615 (Fla. 3d DCA 2014) (finding relatedness where "the … claim and the [subsequent] class claim [were] based on the same course of conduct by [the company], particularly its alleged failure to conduct due diligence, maintain proper accounting, and detect and report prior encumbrances on the properties which provided collateral for the loans."); *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018); *Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 849 (11th Cir. 2013); *Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 666 F.Supp.2d 1332, 1339 (S.D. Fla. 2009)).

## C.    A Claim First Made Prior to the Inception of the Policy is Not Covered.

It is well settled that if a claim is not "first made" during the policy period of a claims-made policy, there simply is no coverage. It is not considered a "coverage defense" that requires prior written reservation of rights under Section 627.426, Fla. Stat. (Florida's Claims Administration Statute). For example, in *Country Manor Ass'n, Inc. v. Master Antenna Sys., Inc.*, 534 So.2d 1187, 1194 (Fla. 4th DCA 1989), the court explained:

A claims-made policy is one where coverage depends on the claim being discovered and reported to the insurer during the policy period. *Gulf Insurance Company v. Dolan, Fertig & Curtis,* 433 So.2d 512, 514 (Fla.1983). International argues that

the policy does not cover the Association's liability because the claim against the Association was not first made during that policy's effective period. The insured counters that International cannot assert this "coverage defense" because the insurer failed to comply with section 627.426(2), Florida Statutes. However, the term "coverage defense" does not include a complete lack of coverage such as in this case, where the policy term was not yet in effect when the claim was first made against the association. *See United States Fidelity & Guaranty Co. v. American Fire and Indemnity Co.,* 511 So.2d 624 (Fla. 5th DCA 1987). An insurer does not assert a "coverage defense" where there was no coverage in the first place. *Id.* ….

**D.      No Coverage Exists Because the Claimed Damages Do Not Constitute a "Loss" Under the Policy.**

The Policy's definition of "Loss" states, in pertinent part, that Loss does not include "[m]atters uninsurable under the law pursuant to which this policy is construed." D.E. 50-5, pp. 35, 52. Moreover, Florida law is clear that damages involving disgorgement or restitution do not constitute "loss" or "damages" within the ambit of a liability insurance policy. *See Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc*., 786 F. App'x 167, 171 (11th Cir. 2019). In *Sabal*, the Eleventh Circuit held that "'loss' under an insurance contract does not include the restitution of ill-gotten gains and that '[t]he return of money received through a violation of law, even if the actions of the recipient were innocent, constitutes a restitutionary payment, not a 'loss'.' *Id*. (citing *CNL Hotels & Resorts, Inc. v. Twin City Fire Ins. Co*., 291 F. App'x. 220, 223 (11th Cir. 2008)). The Court went on to state that "[p]ublic policy considerations, therefore, reinforce the axiom that 'one should not be able to insure against one's own intentional misconduct,' and together compel our conclusion that insurance contracts are not, as a matter of Florida law, permitted to insure the restitution of ill-gotten gains. *Id*. at 172 (internal citations omitted).

In *James River Ins. Co. v. Sheehe & Assoc., P.A.*, 716 F.Supp.3d 1285 (M.D.Fla. 2024), the court considered fraudulent billing practices by a law firm. A client sued the law firm for violation of the Florida Deceptive and Unfair Trade Practices Act. *Id*. at 1289. The law firm sought coverage from its insurer, James River. The policy provided that "damages" does not include "any

matter, sum, or award that is uninsurable under the law." *Id*. at 1292. Relying on *Sabal*, the Court

in *Sheehe & Assoc.* held, in pertinent part:

> The Policy provides coverage for 'Damages,' defined as 'any compensatory amount which [insureds] become legally obligated to pay as a result of a covered 'Claim,' including judgments, awards, and settlements." … However, 'Damages' does not include 'any matter, sum or award that is uninsurable under the law.' …
>
> "It is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct." *Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*, 786 F. App'x 167, 171-72 (11th Cir. 2019) (quoting *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So. 2d 1005, 1007 (Fla. 1989)); *see also CNL Hotels & Resorts, Inc. v. Twin City Fire Ins.*, 291 F. App'x 220, 223 (11th Cir. 2008) ("The interpretive principle that a loss within the meaning of an insurance contract does not include the restoration of ill-gotten gains is clearly right." (alterations and quotation omitted)); *Twin City Fire Ins. Co. v. C.R. Tech., Inc.*, 90 F. Supp. 3d 1320, 1325 (S.D. Fla. 2015) ("As a matter of law, [l]oss does not include the restoration of ill-gotten gains." (quotation omitted)).
>
> As discussed above, the Underlying Action arises solely out of the allegedly 'ill-gotten gains' Defendants acquired through excessive fees and fraudulent billing practices. Indeed, the only damages Frontline seeks are associated with excessive fees and the costs of pursuing the Underlying Action. Under the terms of the Policy, the damages sought in the Underlying Action are not insurable.

*Id*.

Here, each of the underlying Claims arises out of, and is associated with, allegations of

MV Realty's willful, unlawful and unconscionable conduct involving the HBP and HBA. For

example, in the Florida Action, the Florida AG alleged, *inter alia*:

> 100. MV Realty willfully engaged in and is continuing to engage in deceptive and unfair acts and practices in that MV Realty knew or should have known that the methods, acts, or practices alleged herein were and are unfair, deceptive, unconscionable, and prohibited by law.
>
> 101. These above-described acts and practices of MV Realty have caused substantial injury to the public and will likely continue to cause injury and prejudice the public.

D.E. 50-1, pp. 32-33. In its Order on Cross-Motions for Summary Judgment (the "Florida Action

Summary Judgment"), the Circuit Court specifically held "…the HBA's and associated

Memoranda are both procedurally and substantively unconscionable and thereby unenforceable" (D.E. 50-3, p. 6 at ¶14), and that "… each of the named Individual Defendants directly participated in the wrongful acts or practices and each is liable under FDUPTA" (*id*. at ¶19). The Consent Final Judgments entered in the Florida Action incorporated by reference the Florida Action Summary Judgment. (S.31; Ex. C and D, p. 2 at ¶ 1.3). Therefore, all the monetary relief sought and awarded in the Florida Action, including disgorgement, penalties, attorney's fees, and costs, were awarded as a result of the wrongful acts and practices of MV Realty and the individual defendants relating to the HBP and HBA. (S.32; Ex. C and D at ¶¶ 3.1-4.6).

Therefore, the amounts sought by the Plaintiffs in this action do not constitute "Loss" as defined by the Policy and, therefore, are not covered by the Policy. First, the amounts sought by MV Realty are not on account of "covered Claims" since, as discussed above, the "Single Claim" (as defined by the Policy) was first made prior to the Policy's inception. The amounts sought were also incurred to comply with injunctive relief; involve disgorgement or restitution of ill-gotten gains or rescissionary damages; and arise from matters uninsurable under Florida law—none of which constitute "Loss" under the Policy or Florida law. *See* D.E. 50-5, p. 52.

**E.      The Court Should Grant Summary Judgment Because Coverage is Excluded by Several Endorsements and Exclusions.**

### 1. *<u>The Professional Services Endorsement Applies to Bar Coverage</u>*.

While the Insuring Agreement is not triggered in the first instance, coverage is separately barred by the Policy's endorsement titled "Exclusion – Broad Professional Liability", which provides, in part:

> The Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services.

….

D.E. 50-5, p. 59 (hereinafter, the "Professional Services Exclusion").

Florida law holds that "[w]hether an act arises from the performance of a professional service is determined by focusing on the particular act itself, as opposed to the character of the person performing the act." *Goldberg*, 143 F.Supp.3d at 1297 (citing *Estate of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So.3d 1232, 1237 (Fla. 4th DCA 2009)). "The 'majority of courts to address the issue have concluded that the term "professional service" unambiguously refers to services unique to a specific profession.'" *Id*. (quoting *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898-99 (11th Cir. 2009) ("Professional services generally refers to those serves involving specialized knowledge, labor or skill.")). The Court in *Goldberg* explained:

> ….professional services are those services performed by persons who belong to a learned profession or which require specialized skills, training, or experience. *See, e.g.*, *Auto–Owners Ins. Co. v. E.N.D. Servs., Inc.,* 506 Fed.Appx. 920, 925 (11th Cir.2013) (despite the fact that the policy did not define professional services, professional services exclusion was unambiguous and barred coverage); *Evanston Ins. Co. v. Budget Grp. Inc.,* 199 Fed.Appx. 867, 868 (11th Cir.2006) ("The term 'professional' refers to persons who belong to a learned profession or whose occupations require a high level of training and proficiency.").

> "When an insurance contract fails to explicitly define the term 'professional services,' Florida Courts have considered, among other things, whether the service involves specialized skill, requires specialized training, is regulated, requires a degree, and/or whether there is an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services." *Auto-Owners Ins. Co. v. E.N.D. Servs., Inc.,* No. 8:10-CV-2387-T-30EAJ, 2011 WL 6319189, at *4 (M.D.Fla. Dec. 15, 2011) *aff'd,* 506 Fed.Appx. 920 (11th Cir.2013).

*Id*.

Here, as in *Goldberg*, the conduct alleged in the Florida Action—and each of the other interrelated Claims—is clearly based upon, arises out of, and in some way involves the actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in

connection with the rendering or failure to render professional services. First, "'[a]rising out of' is a term of art regularly used in insurance policies. The Supreme Court of Florida has interpreted the phrase broadly and held that it is 'broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Horn v. Liberty Ins.*, 998 F.3d 1289, 1294 (11th Cir. 2021). *See also Houston Specialty Ins. Co. v. Fenstersheib*, 632 F.Supp.3d 1318, 1329 (S.D. Fla. 2022). Moreover, the word "involve" has been defined to mean, *inter alia*, "to relate to or affect." *Hart Mech. Contractors, Inc. v. Fed. Ins. Co.*, No. 22-21390-CIV, 2022 WL 18465613, at *6 (S.D. Fla. 2022).

Specifically, each of the underlying Claims arise out of the acts and practices of the HBP – including the marketing and implementing of the HBP and HBA – which requires that consumers use MV Realty as their exclusive listing real estate agent. D.E. 50-2, p. 10. The HBA itself states, *inter alia*, that "… Company or its designee shall act as Property Owner's listing agent should Property Owner decide to market the Property for sale during the term of this Agreement," (D.E. 50-2, p. 38 at ¶1.d.) and that the Company will act as a transaction broker (*id.* at ¶1.a). In the Florida Action, the Florida AG alleged that "MV Realty is a licensed real estate brokerage in the state of Florida" (D.E. 50-1, ¶19), and that Zachman "…was the manager and lead broker of MV Realty and directly participated in, managed, operated, controlled, and had the ability to control the operations of MV Realty and its subsidiaries" (*id.* at ¶22).

"The Florida Supreme Court recognizes real estate brokers as working in a 'professional service,' as classified by the Florida Legislature." *Southern-Owners Ins. Co. v. Herrera*, 116 F.Supp.3d 1310, 1315 (M.D.Fla. 2015) (quoting *Rotemi Realty, Inc. v. Act Realty Co.*, 911 So.2d 1181, 1187 (Fla. 2005)). Further, "[r]eal estate brokers are statutorily bound to complete training, licensing, and continuing education." *Id*. In fact, Section 475.01(1)(a), Fla. Stat. specifically states

that, "[a] broker renders a professional service and is a professional within the meaning of s.95.11(5)(b)." In a February 26, 2020 email from Zachman to a homeowner who was complaining about the HBA transaction, Zachman herself stated that "the listing of your home is MV Realty's business." (S.57; Ex. J, p. 5). With respect to the real estate agents employed by MV Realty, comprehensive training was provided in relation to the HBP. (S.60; Ex. N). Indeed, both Manchester and Mitchell testified as to the extensive real estate training that was required of the licensed real estate agents employed by MV Realty in relation to the HBP. (S.58; S.59; Ex. K at 24:22-26:16; Ex. K at 26:19-26:21; Ex. L at 38:6-10; Ex. L at 32:9-33:8).

Based upon the foregoing, it is clear that each underlying "Claim" is "based upon, arises out of, or involves an actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with" the rendering or failure to render professional real estate brokerage services relating to the HBP and HBA transaction. MAIC therefore has no liability under the terms of the Policy to pay for any Loss based upon, arising out of, or in any way involving any actual or alleged provision of professional services.

## 2. *The Consumer Protection Exclusion Applies to Bar Coverage.*

The Policy also contains an endorsement titled "Consumer Protection Exclusion", which provides, in part, as follows:

> The Insurer shall not be liable under any purchased Coverage Part to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:
>
> > Based upon, arising out of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts** that violate(s) or is(are) alleged to violate any federal or state consumer protection statute, law, rule, ordinance or regulation including, but not limited to ….

D.E. 50-5, p. 61. Here, each of the underlying Claims against MV Realty relates to alleged improprieties involving the HBP and the HBA, and their impact upon consumers. Accordingly,

- 26 -

the "Wrongful Acts" or "Interrelated Wrongful Acts" in each Claim violates, at a minimum, "consumer protection statute[s], law[s], rule[s], ordinance[s] or regulation[s]."

While apparently recognizing that the HBP has (at a minimum) violated state and consumer protection laws, MV Realty previously argued that this Exclusion should not apply because multiple states have also brought other causes of action against them based upon the HBP and HBA. For instance, Plaintiffs have alleged that "multiple jurisdictions assert independent and standalone claims separate and apart from any consumer protection related claim." D.E. 42 at ¶38. Plaintiffs assert that "[b]y way of example, multiple states assert allegations specific to: (i) unlawful lending related conduct, (ii) unlawful title recording, and (iii) unlawful prohibited contractual terms, all of which are not asserted under any consumer protection law." *Id.*

This same argument was raised by Zachman in her Second Verified Amended Expedited Motion for Preliminary Injunction. D.E. 18. In the Order Denying the Second Amended Motion for Preliminary Injunction, this Court rejected Zachman's argument regarding limitation as to the scope of the Consumer Protection Exclusion, holding, in pertinent part, as follows:

> Because there are some counts that allege conduct purportedly outside the scope of the Consumer Protection Exclusion, Plaintiff suggests that the insurance companies must be preliminarily enjoined to pay to defend her against not only those counts, but in fact the entire suit. (*Id*. at 11) (highlighting Eleventh Circuit precedent suggesting that the duty to defend applies to the entire action).
>
> I find that this argument misunderstands the definition of the term "Wrongful Act." The Markel Policy defined the term "Wrongful Act," in relevant part, as:
>
> > Any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by any **Insured Person** in their capacity as such.
>
> (DE 27 at 5). The "Act" may include an alleged misrepresentation that violates a range of laws, including non-consumer protection laws. But just because the Act also forms the basis of a separate claim, not itself sounding in consumer protection, does not mean that the Consumer Protection Exclusion cannot apply. In other words, if a non-consumer protection claim arises out of the action itself (e.g., a

- 27 -

misrepresentation), and that same action also violates or is alleged to violate a consumer protection law, then it, too, is presumably barred from coverage. Plaintiff's reading – which centers solely on the count and not the underlying action – would likely render the Exclusion meaningless where the same misrepresentation fits under a consumer protection law and a separate law. Plaintiff suggests that "UDAP 'arising out of' breadth does not swallow stand-alone allegation [*sic*]" and that a "meaningful causal nexus" is still required. Plaintiff offers no authorities to support this assertion. As a result, I find that Plaintiff is unable to demonstrate a substantial likelihood of success on the merits as it applies to the Markel Policy.

D.E. 41, pp.7-8. The same holding as to the scope of the Exclusion should apply in ruling on this Motion since the Wrongful Acts in the underlying Claims are alleged to violate a federal or state consumer protection statute, law, rule, ordinance or regulation, regardless of whether the claimants also asserted additional causes of action based upon the same conduct.

### 3.   *Coverage is Also Excluded by Exclusion I.*

The Policy's Exclusion I. provides that the Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured:**

Based upon, arising out of or in any way involving any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such a deliberately fraudulent act or omission or willful violation.

D.E. 50-5, p. 37. Here, the entire basis of the underlying Claims is that MV Realty engaged in unfair and deceptive business practices relating to the HBP and HBA. To be sure, the administrative proceedings and causes of action lodged against MV Realty allege various consumer protection statute violations. For example, the Florida Action alleges:

Defendants are harming consumers in Florida and at least 32 other states across the country. Pursuant to FDUTPA, the Attorney General seeks to enjoin enforcement of Defendants' contracts with consumers, enjoin future unfair and deceptive practices, return the money the Defendants have wrongfully taken from homeowners, and impose civil penalties for Defendants' willful violations of the law.

- 28 -

D.E. 50-1, p. 4 at ¶6. The Florida Action further alleges that MV Realty (and the individual defendants) violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq*. through the putative HBA program.

Significantly, in granting summary judgment, the Florida Court expressly determined that the individual defendants directly participated in the wrongful acts or practices and violated FDUTPA as matter of law:

> Based on the summary judgment record, it is undisputed that each of the named Individual Defendants directly participated in the wrongful acts or practices and each is liable under FDUTPA. Each was directly involved in the planning, engineering, implementation, execution and other key aspects of the Homeowner Benefit Program, HBA and Memoranda which the Court has separately found to be violative of FDUTPA as a matter of law. Further, all three Individual Defendants had the ability to control the respective conduct and practices that violate the Act within their spheres of responsibility

D.E. 50-3, p. 8 at ¶19. The willful violation of Florida law by MV Realty was reaffirmed in the Consent Final Judgments entered on December 19, 2025 against MV Realty and the individual defendants in the Florida Action, which were not appealed and thus constitute final adjudications. (S.30; S.31). For example, each Consent Final Judgment states, *inter alia*, that:

> This Consent Judgment does not affect, change or amend the terms of this Court's prior Orders, including but not limited to, this Court's Order on Cross-Motions for Summary Judgment dated September 24, 2024, and this Court's Partial Summary Judgment on Injunctive Relief Order dated February 12, 2025. All findings, decisions and injunctive relief entered by this Court expressly survive the conclusion of the litigation and are incorporated into this Consent Judgment as if fully restated herein.

(S.31; Ex. C and D, p. 2 at ¶1.3). Therefore, even if coverage under the Policy was otherwise triggered, Exclusion I. would nevertheless apply to exclude coverage.

### 4. *Coverage is Also Excluded by Exclusion J.*

Exclusion J., as modified by the "Policy Changes Endorsement Description", specifies that the Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend,

any **Claim** made against any **Insured:**

> Based upon, arising out of or in any way involving an **Insured Person** gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if:
>
> **1.** A final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such **Insured** gained any such profit, remuneration or advantage; or
>
> **2.** Such **Insured** agrees to repay to the **Company** such profit, remuneration or financial advantage;

D.E. 50-5, pp. 36, 52. As discussed above and in MAIC's Statement of Material Facts (S.14-S.29), each count of the complaint in the Florida Action (D.E. 50-1) is based upon MV Realty's alleged gaining of profit and remuneration through a fraudulent scheme and unconscionable business practice.

Indeed, the Order on Cross-Motions for Summary Judgment in the Florida Action includes the following description of FDUTPA:

> While the FDUTPA does not define the terms "unfair," "deceptive," and "unconscionable, the Florida Supreme Court notes that "[u]nconscionability is a common law doctrine that courts have used to prevent the enforcement of contractual provisions that are overreaches by one party to gain 'an unjust and undeserved advantage which it would be inequitable to permit him to enforce.'" *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1157 (Fla. 2014) ….

D.E. 50-3, pp. 2-3 at ¶4. Here, the entire HBP was designed to obtain an unconscionable profit, renumeration, and advantage to which MV Realty was not legally entitled, including real estate commissions or early termination penalties if a consumer chose not to use MV Realty as its broker in the event of a sale.

Moreover, as stated above, the Consent Final Judgments in the Florida Action are not appealable and state, *inter alia*, that "[a]ll findings, decisions and injunctive relief entered by this Court [in prior orders] expressly survive the conclusion of the litigation and are incorporated into

- 30 -

this Consent Judgment as if fully restated herein." (S.31). Accordingly, Exclusion J. applies to preclude coverage for the entirety of the Claim.

F.     The Deposition Testimony Confirms that there is No Coverage Under the Policy.

As described above, the documents conclusively establish that the "Single Claim" was first made before the inception of the Policy. The deposition testimony of MV Realty and its officers confirm that the "Claim" at issue was first made prior to inception of the Policy and, thus, does not trigger the Insuring Agreement. The gist of the deposition testimony (described in more detail below) is that the pre-policy Claims were nothing more than inquiries; that all Claims were given to legal counsel; that legal counsel reassured MV Realty that there was not a "systemic problem" with the HBP program; and that the amount of pre-policy complaints compared to the number of outstanding HBAs was "*de minimis*," amounting to less than 1% of the portfolio (i.e. HBAs).

Notably, Mr. Scott (Senior VP of Business Operations), whose job included procuring insurance policies for the company (Ex. F at 16:5-8), testified that he never even read the Policy or the definition of "Claim" (*id.* at 26:13-19, 94:8-14). This begs the question under what legal theory does MV Realty contend that the multiple pre-policy demands, proceedings, and investigations were (or were not) Claims under the Policy, if not from the express language of the Policy itself.

Mitchell, who has served as the CEO of MV Realty since October 2018, testified both individually and as the corporate representative of MV Realty. In his individual deposition, Mitchell testified that all business was stopped upon the filing of the Florida Action. Ex. M at 22:22-23:1. At that time, the amount of transactions (HBAs) was 3000-4000 per month and had peaked at 40,000 across 33 states. *Id.* at 23:3. Mitchell acknowledged that by the time of the Florida Action, there were about 300 complaints across 40,000 customers. *Id.* at 47:23-48:2. This included

complaints directly by homeowners and by regulators. *Id.* at 48:4-24. A year or two before the Florida Action, the Florida AG issued two CIDs with which MV Realty fully cooperated. *Id.* at 49:5-22.

On or about August 26, 2022, in connection with the insurance policy renewal process, Mitchell executed a "Claim Free Warranty Statement" as CEO of MV Realty. *Id.* at 64:19-65:8. When asked what he did to assure that the "claim free" warranty was accurate, Mitchell testified that "… to me, there may be more things, but suits or threatened suits, I was just – to my mind, they were – there was no real difference in my universe of suits or threatened suits that gave me pause to sign a claim free warranty. *Id.* at 66:10-23. In other words, the only type of claim that Mitchell believed he needed to disclose was a lawsuit or threatened lawsuit. But clearly there is a substantive difference between what was "in his mind" and what is expressly stated in the Policy, since a lawsuit is not the only type of proceeding that is defined to be a "Claim" under the Policy. Mitchell admits that prior to the date of the Claim Free Warranty Statement, the company had been contacted by attorneys general in several states, complaints had been received through the BBB, and various individuals had lodged complaints directly. *Id.* at 67:6-18. Mitchell said that these complaints went to H&K, and that "[t]he complaints we're talking about were less than one percent of the -- portfolio." *Id.* at 67:19-68:21. Importantly, however, the Policy does not limit the number of Claims that determine when the "Claim" was first made.

Mitchell's testimony as corporate representative of MV Realty was consistent with his individual testimony. The Florida AG sent a CID in May or June of 2021 relating to two senior citizens. Ex. L at 23:7-20. If a consumer logged a complaint on the Florida AG website, it would come to the company to deal with and "we were certainly dealing with a few consumer complaints," all of which were sent to H&K. *Id.* at 24:11-25:11. At the time of the first Florida

CID involving the two senior citizens, the total universe of complaints was 13. After dealing with the first CID, Florida issued a second CID in 2022 seeking documents about the business as a whole. *Id.* at 26:24-27:6. MV Realty did not provide notice to MAIC after receiving the first CID. *Id.* at 27:25-28:3. Between the time of the first Florida CID and the Florida Action, a number of other states issued CIDs. *Id.* at 29:1-9. In addition to the two Florida Subpoenas (referred to by Mitchell as CIDs), other examples include a New Jersey investigation subpoena served on April 22, 2022 (*id.* at 59:25-60:10); a Massachusetts CID issued May 20, 2022 (*id.* at 61:5-14); a Georgia investigative demand dated June 29, 2022 (*id.* at 61:25-62:15); and North Carolina Civil Investigative Demand sent on August 19, 2022 (*id.* at 64:16-24). Referring to the time period around the end of June 2022, Mitchell stated that H&K gave a presentation to certain lenders and "… at that point, we'd received eight CIDs out of 33 states and obviously you know, you take them seriously, comply with." *Id.* at 63:11-64:15. Despite this activity (regulatory subpoenas, investigations, etc.), Mitchell testified that he still believes the Claim Free Warranty Statement he signed on August 26, 2022 was accurate. *Id.* at 65:16-66:4. Specifically, Mitchell stated that "[l]evels of complaints were so *de minimis*, but the level of complaints I don't think translates to the issues at the end of the day." *Id*.

Steven Scott was the VP of Business Operations for MV Realty since January 2020. His duties included assisting the CEO and working with H&K and 30 other law firms in various states. Ex. F at 5:15-7:6. Scott was similarly involved in procuring insurance for the company and working with the insurance broker (HUB). *Id.* at 15:5-12. Scott testified that the company started receiving regulatory complaints (which he referred to as "inquiries") around April 2020. MV Realty would "lean on" counsel and H&K to respond. *Id.* at 17:18-18:8. Renewal applications would be prepared by Scott and presented to Mitchell for signature. *Id.* at 21:13-25. However,

Scott did not read the policies, including the Policy issued by MAIC. *Id.* at 22:10-21. Scott is not aware of any claim or potential claim being provided to MAIC prior to first notice of the Florida Action in December 2022. *Id.* at 24:8-20. With respect to the August 2022 Claim Free Warranty Statement, Scott would have discussed it with Mitchell but he does not remember any details or specific due diligence. *Id.* at 27:12-28:24. Significantly, prior to returning the warranty executed by Mitchell, Scott knew that the company was the subject of various regulatory inquiries. *Id.* at 28:25-29:5. Specifically, prior to August 2022, the regulatory inquiries included Florida, North Carolina, New Jersey, Colorado, Arizona, Pennsylvania, Ohio, Illinois, Minnesota, Tennessee, Missouri, Massachusetts, and Georgia. *Id.* at 29:20-33:17. Prior to August 2022, the company also received complaints from homeowners who had signed HBAs. *Id.* at 34:6-10. Yet, Scott confirmed that prior to August 2022, MV Realty did not advise MAIC of any of the regulatory of homeowner complaints. *Id.* at 34:25-35:3. When asked why no notice was given to MAIC of the numerous regulatory inquiries, Scott testified H&K told them at the time that they don't have an issue and "I'm not sure why we would provide a notice to something that doesn't exist in our mind." *Id.* at 47:5-48:8. Like Mitchell, Scott justified the lack of notice of the pre-policy regulatory inquiries by stating that the amount of complaints was "*de minimis*" compared to the amount of HBA contracts outstanding, which he estimated to be 300 complaints to 35,000 contracts. *Id.* at 48:10-24.

## V.   CONCLUSION

For all of the foregoing reasons, MAIC respectfully requests that this honorable Court grant MAIC's Motion for Summary Judgment and:

1. declare that MAIC has no duty to defend or indemnify under the Policy with respect to any Claim for which Plaintiffs/Counter-Defendants seek coverage in this action;

2. enter judgment in favor of MAIC and against the Plaintiffs/Counter-Defendants; and

3.      grant such other and further relief as the Court deems just and proper.

DATED this <u>16th</u> day of July 2026.

Respectfully submitted,

**KAPLAN ZEENA LLP**
*Attorneys for Plaintiff, Markel*
*American Insurance Company*
2 South Biscayne Blvd., Suite 3050
Miami, Florida 33131
Telephone: (305) 530-0800
Facsimile:  (305) 530-0801

By: */s/ James M. Kaplan*
JAMES M. KAPLAN
Florida Bar No.: 921040
james.kaplan@kaplanzeena.com
elizabeth.salom@kaplanzeena.com
service@kaplanzeena.com
KIMBERLY S. HEIFFERMAN
Florida Bar No.: 055996
kimberly.heifferman@kaplanzeena.com
maria.escobales@kaplanzeena.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this <u>16th</u> day of July 2026, a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel of record.

By: */s/ James M. Kaplan*
        James M. Kaplan
