**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-CV-80826-MIDDLEBROOKS

AMANDA ZACHMAN, an individual,
and MV REALTY PBC, LLC, a Florida
limited liability company,

Plaintiffs,

v.

MARKEL AMERICAN INSURANCE
COMPANY, et al.,

Defendants.
_________________________________/

MARKEL AMERICAN INSURANCE
COMPANY, et al.,

*Defendants/Counter-Plaintiffs*,

v.

AMANDA ZACHMAN, MV REALTY PBC, LLC,
ANTONY MITCHELL, DAVID MANCHESTER,
DAVID REINER, STEVEN SCOTT, and
DARRYL COOK,

*Plaintiffs/Counter-Defendants*.
_________________________________/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before me on the Parties' respective Motions for Summary Judgment. On July 16, 2026, Defendant/Counter-Plaintiff Markel American Insurance Company (MAIC) filed its Motion for Summary Judgment. (DE 152).[1] Likewise, Plaintiffs/Counter-Defendants filed

[1] This Motion is fully briefed. (DE 172, DE 179).

a Motion for Partial Summary Judgment on the same day. (DE 155).[2] For the following reasons, I will grant the Defendant's Motion.

## I. UNDISPUTED FACTS

### A. Background

Plaintiff MV Realty PBC, LLC (MV Realty) is a listing broker that operated across the country. At all relevant times, Plaintiff Amanda Zachman, and Counter-Defendants Antony Mitchell, David Manchester, and Steven Scott were employees and/or officers of MV Realty. (DE 156 at ¶ 7). A core aspect of their operations included paying homeowners an upfront amount in exchange for the right to act as their listing broker if they later decided to sell their homes. (*Id.* at ¶ 1). The subject of this lawsuit concerns what it called, the "Homeowner Benefit Agreement" (HBA) under MV Realty's Homeowner Benefit Program. (*Id.* at ¶ 2).

The HBA operated as follows: after entering into an HBA with a homeowner, MV Realty recorded a Memorandum of HBA in the property records, memorializing the agreement. (*Id.* at ¶ 3). MV Realty hired Holland & Knight LLP (Holland & Knight) to design the Program, the HBA, and the Memorandum of HBA. (*Id.* at ¶ 5). This description, however, is the tip of the controversial iceberg that surrounds the Program.

The Program came under scrutiny on November 29, 2022, when the Office of the Attorney General for the State of Florida filed a complaint against MV Realty and its individual officers (the "Florida Action"). (DE 156 at ¶ 25, DE 151 at ¶ 12). The Florida Action alleged that the "[d]efendants engage in a complex and deceptive scheme that attempts to skirt existing Florida law with the goal of swindling consumers out of their home equity." (DE 151 at ¶ 14). In describing the scheme, the Florida Action explained that

[2] This Motion is fully briefed. (DE 171, DE 181).

> Defendants offer consumers $300-$5,000 cash as a 'loan alternative' but without requiring consumers to take out a loan. In exchange, consumers enter into a misleading and confusing Homeowner Benefit Program, which includes signing a contract, the "Homeowner Benefit Agreement", that requires consumers to use MV Realty as their exclusive real estate listing broker for a period of 40 years. During the course of the 40-year term of the [Program], if the consumer lists the property for sale but does not use MV Realty as its listing broker, or if the home is foreclosed upon, heirs try to sell the home, or consumers simply wish to cancel the deal, Defendants will seek to be paid 3% of the property's value, a value that, pursuant to the terms of the HBA, is determined by Defendants.

(*Id.* at ¶ 15). The Florida allegations continue to explain that this Memorandum of HBA in the public record created a lien in the consumer's title and ultimately prevented consumers "from unlocking the equity in their homes through refinancing, reverse mortgages, home equity lines of credit, and other financial tools." (*Id.* at ¶¶ 16, 17). The Florida Attorney General also alleged that "[d]efendants use deceptive and abusive telemarketing and advertising practices to advertise the [Homeowners Benefit Program] and accompanying HBA as a loan alternative. Consumers are told that there is no obligation to return the cash, and they owe MV Realty nothing in return unless and until they sell their home…" (*Id.* at ¶ 18).

Indeed, several states followed Florida by filing lawsuits against MV Realty and its officers, including but not limited to New Jersey, Georgia, North Carolina, Missouri, Minnesota, Pennsylvania, Massachusetts, Ohio, Illinois, California, and South Carolina. (DE 156 at ¶ 26).

And on September 24, 2024, the Circuit Court in the Florida Action entered an Order on Cross-Motions for Summary Judgment, finding in favor of the Florida Attorney General. (DE 151 at ¶ 20). The Court held that the HBA was "substantively unconscionable" and therefore violated the Florida Deceptive and Unfair Trade Practices Act because (1) the term of the agreement was 40 years; (2) consumers have no choice but to arbitrate claims; and (3) consumers must agree the contract runs with the land and expressly binds subsequent owners." (*Id.* at ¶ 22). The Florida

Court continued by finding Zachman, Mitchell, and Manchester directly involved and individually liable. Zachman, for her part, "participated in designing and implementing the HBA, and her knowledge of the issues raised by complaining consumers, establishes Zachman's liability for MV Realty's FDUTPA violations." (*Id.* at ¶¶ 23, 24). Meanwhile, Mitchell "knew what information and features of the Homeowner Benefit Program were being conveyed to consumers, and which were not." (*Id.* at ¶ 25). Likewise, the Court found that Manchester "had deep knowledge of and participation in the key aspects of the marketing and implementation of the Homeowner Benefit Program, and further had the authority to control the how and what information was communicated to consumers in connection with their solicitation to enter into the HBA." (*Id.* at ¶ 26). On February 12, 2025, the Court entered a Partial Summary Judgment on injunctive relief. (*Id.* at ¶ 28).

The instant lawsuit, however, does not concern the veracity of these judgments, nor does it require me to adjudicate the deceptive nature of the Program, the HBA, or the Memorandum of HBA. Instead, this dispute boils down to Plaintiffs' request for insurance coverage in light of these various lawsuits.

**B. Architecture of the MAIC Insurance Policy**

MAIC issued a For Profit Management Liability Policy bearing policy number MKLM2MML00716 to MV Realty for the policy period of August 28, 2022 to August 28, 2023 (the "MAIC Policy"). Generally, coverage under the MAIC Policy included indemnification of losses sustained as a result of claims made against the Policy holder and a separate duty to defend any claim covered under the Policy.

The MAIC Policy consists of several different provisions that serve as the basis for the dispute in this case. Beginning with the "Coverage Schedule" in "Item 5" of the declarations of the Policy identifies Coverage Parts "(A) Directors and Officers and Company Liability" and "(B)

Employment Practices and Third-Party Discrimination Liability" as "Coverage Part[s] Purchased. (DE 50-5 at 10). Plaintiffs seek, and MAIC has denied, coverage under the "Directors and Officers and Company Liability Coverage Part" under the 2022/2023 MAIC Policy. (DE 156 at ¶ 13).

The Directors and Officers and Company Liability Coverage Part of the Policy provides coverage to both "the Company" and the "insured Persons" for "a Wrongful Act taking place before or during the Policy Period." (DE 156 at ¶ 14, DE 50-5 at 32 (emphasis omitted)). The Policy defines "Company" as "collectively, the Parent Company and its Subsidiaries," i.e., Plaintiff MV Realty, as a subsidiary of MV Realty Holdings, LLC. (DE 156 at ¶ 15). The Policy defines "Insured Person" as "[a]ny natural person who was, now is or shall during the Policy period become a duly elected or appointed director, trustee, governor, Manager, officer, advisory director, or member of a duly constituted committee or board of the Company or their functional equivalent" as well as any other "Employee of the Company," i.e., Plaintiff Amanda Zachman and Counter-Defendants Antony Mitchell and David Manchester, each of whom were employees and officers of MV Realty. (*Id.* at ¶ 16, DE 50-5 at 34).

As part of the coverage under the MAIC Policy, Section I, – Insuring Agreements – broadly lists four instances upon which the Insurer shall pay on behalf of the Insured. (DE 156 at ¶ 17, DE 50-5 at 32). Section I.A – Insured Person Liability Coverage – reads that "[t]he Insurer shall pay on behalf of the Insured Persons all Loss for which the Insured Persons are not indemnified by the Company and which the Insured Persons become legally obligated to pay on account of any Claim first made against Insured Persons, individually or otherwise, during the Policy Period." Section I.B – Company Reimbursement Coverage – reads that "[t]he Insurer shall pay on behalf of the Company all Loss for which the Company grants indemnification to the Insured Persons, as permitted or required by law, and which the Insured Persons have become

legally obligated to pay on account of any claim first made against Insured Persons, individually or otherwise, during the Policy Period or any applicable Extended Reporting Period, if purchased, for a Wrongful Act taking place before or during the Policy Period." Similar to Section I.A, Section I.C reads that "[t]he Insurer shall pay on behalf of the Company all Loss which the Company becomes legally obligated to pay on account of any Claim first made against the Company during the Policy Period or any applicable Extended Reporting Period, if purchased, for a Wrongful Act taking place before or during the Policy Period." (DE 156 at ¶¶ 17-18, DE 50-5 at 32).

With respect to these provisions in the Directors and Officers and Company Liability Coverage Part, certain terms are worth emphasizing and defining. "Claim" is defined as follows:

> 1. A written demand against an Insured for monetary damages or non-monetary relief, including a written demand that an Insured toll or waive a statute of limitations, commenced by such Insured's receipt of such written demand;
> 2. A civil proceeding against an Insured commenced by the service of a complaint or similar pleading upon such Insured;
> 3. A criminal proceeding against an Insured commenced by such Insured's receipt of an indictment, information or similar document;
> 4. An administrative or regulatory proceeding against an Insured commenced by such Insured's receipt of a notice of charges or similar document;
> 5. A civil, criminal, administrative or regulatory investigation of an Insured Person commenced by the service upon or other receipt by such Insured Person of a target letter or other written notice from the investigating authority identifying by name such Insured Person as an individual against whom a proceeding may be commenced;
>
> …

(DE 50-5 at 34, DE 151 at 3). A "Wrongful Act" is defined as "[a]ny actual or alleged error, misstatement, act, omission, neglect, or breach of duty by any Insured Person in their capacity as such or in an Outside Person, or with respect to Insuring Agreement C, by the Company; or [a]ny matter claimed against any Insured Person solely by reason of their serving in such capacity or in an outside person." (DE 50-5 at 36, DE 156 at ¶ 22). "Loss" is defined as "the total amount the Insured becomes legally obligated to pay on account of covered Claims made against them,

including, but not limited to, damages (including punitive, exemplary or multiple damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, Claim Expenses and civil money penalties assessed against an Insured: (i) pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2(g)(2)(B); or (ii) for a violation of any federal, state, local or foreign law if such violation is not knowing or willful." (DE 50-5 at 35, DE 156 at ¶ 19).

Turning to terms defined in the General Terms and Conditions of the Policy, "Claim Expenses" is defined as "reasonable and necessary fees, costs and expenses incurred by (1) The Insurer, if duty to defend coverage has been purchased for the applicable Coverage Part; (2) The Insureds, if duty to defend coverage has not been purchased for the applicable Coverage Part." (DE 50-5 at 18, DE 156 at ¶ 20). Notably, Defendant also points out language defining a "Single Claim" which explains that "[a]ll Claims which arise out of the same Wrongful Act or Interrelated Wrongful Acts of the Insured shall be deemed one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period or any Extended Reporting Period." (DE 50-5 at 22), DE 151 at ¶ 5). The final relevant term to this dispute is "Interrelated Wrongful Acts" and is defined as "Interrelated Wrongful Acts means all Wrongful Acts, including all Wrongful Employment Practices, that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." (DE 50-5 at 17, DE 151 at ¶ 6).

Returning to the Directors and Officers and Company Liability Coverage Part of the Policy, several relevant Exclusions to coverage may apply, wherein the Insurer would not "be liable under this Coverage Part to pay any Loss on account of, and shall not be obligated to defend, any Claim

made against any Insured." (DE 50-5 at 36). Of note, Exclusion I to the Policy provides that the Insurer shall not be liable to pay any Loss on account of, and shall not be obligated to defend, any Claim made against any Insured, "[b]ased upon, arising out of or in any way involving any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such Insured, if a final and non-appealable adjudication adverse to such Insured in any proceeding not brought by the Insurer establishes such a deliberately fraudulent act or omission or willful violation." (DE 50-5 at 37, DE 151 at ¶ 8). Exclusion J of the same Coverage Part excludes Claims "[b]ased upon, arising out of or in any way involving an Insured Person gaining any profit, remuneration or financial advantage to which such Insured was not legally entitled, if: (1) A final and non-appealable adjudication adverse to such Insured in any proceeding not brought by the Insurer establishes such Insured gained any such profit, remuneration or advantage; or (2) Such Insured agrees to repay to the Company such profit, remuneration or financial advantage[.]" (DE 50-5 at 37, DE 151 at ¶ 9).

Defendant MAIC also points the Court to a Policy Endorsement titled "Exclusion – Broad Professional Liability" which appears to amend the Policy Exclusions such that "[t]he Insurer shall not be liable to pay any Loss on account of, and shall not be obligated to defend, any Claim based upon, arising out of, or in any way involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services." (DE 50-5 at 59, DE 151 at ¶ 10). Plaintiffs, however, dispute whether this Broad Professional Liability Exclusion applies to their claims that are the subject of this lawsuit because they suggest that the "Broad Professional Liability Exclusion does not check a box endorsing that it modifies that particular coverage part." (DE 172 at ¶ 10).

Finally, Defendant points to the "Consumer Protection Exclusion" Policy Endorsement, which provides that the Insurer shall not be liable under any purchased Coverage Part to pay any Loss on account of, and shall not be obligated to defend, any Claim made against any Insured Based upon, arising out of, or in any way involving any Wrongful Act or Interrelated Wrongful Acts that violate(s) or is(are) alleged to violate any federal or state consumer protection statute, law, rule, ordinance or regulation including, but not limited to …" what appear to be laws and regulations governing unsolicited communications and disclosure of private communications. (DE 42-1 at 61).

**C. Pre-Policy Notices to MV Realty**

The Parties dispute whether notices issued to MV Realty and its officers constitute "Claims" as defined throughout the policy. Although the answer to that is a question of law, it is helpful at this stage to provide the undisputed facts surrounding these pre-Policy notices.

Defendant MAIC points to two formal investigations undertaken by the Florida Attorney General directed towards MV Realty. First, on May 11, 2021 (15 months prior to the inception of the Policy), the Florida Attorney General issued a Consumer Protection Subpoena Duces Tecum titled "In the Investigation of" MV Realty PBC, LLC (the "2021 Florida Subpoena"). Therein, the subpoena identifies two senior citizen "Complainants" and commands production of documents from MV PBC, LLC. (DE 151 at ¶ 39). Then, on March 22, 2026, (still 5 months prior to the Policy inception date), the Florida Attorney General issued a separate Consumer Protection Subpoena Duces Tecum to MV Realty PBC, LLC. (DE 151-8 at 2). Therein, it includes an Exhibit listing sixteen additional complainants and further commanding production of documents.

In addition to these two Attorney General investigations, Defendant points to complaints by the Florida Department of Business & Professional Regulation (DBPR), the Better Business

Bureau, and other administrative and regulatory complaints by states other than Florida, as well as demand letters from attorneys on behalf of consumers. (DE 151 at ¶ 42).

The earliest of the notices was Florida DBPR Complaint No. 2019063900 (the 2019 DBPR Complaint), which was dated December 23, 2019. (*Id.* at ¶ 44). And in response to several of these notices, MV Realty enlisted legal counsel to respond. The 2019 DBPR notice, for example, was responded to by the law firm Holland & Knight on March 11, 2020. (*Id.* at ¶ 45). And on March 12, 2020, the DBPR provided "official notice" to Zachman of DBPR Complaint Number 2020013043 (the "2020 DPBR Complaint)" that stated, in part, "[t]his letter is to serve as official notice to you in accordance with Section 455.255(1), Florida Statutes, that a complaint has been filed against you and that an investigation has been initiated regarding the allegations made in the attached complaint." (*Id.* at ¶ 46).

On or about October 19, 2021, an attorney letter was sent on behalf of two consumers, the Sukers, (the "Suker Demand") stating that the Sukers were in the process of filing a complaint against MV Realty PBC, LLC with the Fraud Against the Elderly Division of the Florida State Attrney's [sic] office…." (*Id.* at ¶ 49).

Then, several state attorneys general offices began to request documents from MV Realty parties. On April 22, 2022, the Acting Attorney General of New Jersey issued an Administrative Action Subpoena Duces Tecum directed to MV Realty of New Jersey, LLC.[3] On May 20, 2022, the Office of Massachusetts Attorney General issued a Civil Investigative Demand to MV of Massachusetts. On June 29, 2022, the Assistant Attorney General, at the Department of Law, Consumer Protection Unit for the State of Georgia, issued an Investigative Demand to MV PBC.

[3] Plaintiffs do dispute whether the subpoena was directed to anyone other than MV Realty PBC, LLC.

And on August 18, 2022, the Special Deputy Attorney General for the State of North Carolina issued a Civil Investigative Demand to MV Realty of North Carolina. (*Id.* at ¶¶ 51, 54, 55, 56). Defendant MAIC provides a full list of what it believes constitutes pre-Policy inception "Claims" under the Insurance Agreement, amounting to over 40 potential "Claims." (*See* DE 151-5 at 2—13).

MV Realty tendered a Notice of Claim regarding the Florida Action without disclosing any of these prior notices made prior to the inception of the Policy. (DE 151 at ¶ 34). A "Claim Free Warranty Statement" dated August 26, 2022, signed by Mitchell as CEO forms a part of the Policy and stated, "No person or entity proposed for coverage is aware of any fact, circumstance or situation which he or she has reason to suppose might give rise to a future claim that would fall within the scope of any of the proposed coverage part limit of liability stated above…." (*Id.* at ¶ 35). Similarly, Scott has testified that he is not aware of any notice of claim or potential claim being provided to MAIC prior to the first notice of the Florida Action in November or December 2022. (*Id.* at ¶ 36).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'" *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (citation omitted). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the Court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Id.* at 322. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. Moreover, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

## III. DISCUSSION

Under Florida law, ordinary contract principles apply to the interpretation and construction of insurance contracts, and as with all contracts, the interpretation is a question of law. *See Graber v. Clarendon Nat'l Ins. Co.*, 819 So.2d 840, 842 (Fla. 4th DCA 2002). When the insurance policy language is unambiguous, the contract must be enforced as written. *Siegle v. Progressive*

*Consumers Ins. Co.*, 819 So.2d 732, 734–35 (Fla.2002). When interpreting insurance contracts, courts "start with the plain language of the policy, as bargained for by the parties." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F. 3d 1226, 1230 (11th Cir. 2004) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). Under the "plain meaning" rule, courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect. *See Auto Owners Ins. Co v Anderson*, 756 So.2d 29 (Fla. 2000); *First Professionals Ins. Co. v McKinney,* 973 So.2d 510 (Fla. 1st DCA 2007). If insurance policy provisions are ambiguous and cannot be reasonably reconciled, then well-established rules of construction must be applied. *Discovery Property & Cas. Ins. Co. v Beach Cars of West Palm, Inc*., 929 So.2d 729, 732 (Fla. 4th DCA 2006). One such basic tenet is that ambiguous policy provisions are to be liberally construed in favor of the insured and against the insurer, as drafter of the contract, under the rule of *contra proferentem*. *Dickson v Economy Premier Assur. Co.*, 36 So. 3d 789 (Fla. 5th DCA 2010). Policy language is considered ambiguous within the ambit of this rule if it is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage. *Garcia v Federal Ins. Co.*, 969 So.2d 288 (Fla. 2007); *Flores v Allstate Ins. Co.*, 819 So.2d 740 (Fla. 2002).

Also relevant to this dispute is Florida's "eight-corners" rule. Under the "eight-corners" rule, the duty to defend is measured by comparing the four corners of the underlying complaints to the four corners of the Policy. *See Composite Structures, Inc. v. Cont'l Ins. Co.*, F. App'x 861, 865 (11th Cir. 2014) ("In Florida… an insurance company's duty to defend is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured….") (internal quotation and citation omitted). This rule is not absolute. "[T]here are some natural exceptions to this standard where an insurer's claim that there is no duty

to defend is based on factual issues that would not normally be alleged in the complaint." *Higgins v. State Farm Fire and Cas. Co*., 894 So.2d 5, 10 n. 2 (Fla.2005). *See also Nationwide Mut. Fire Ins. Co. v. Keen*, 658 So.2d 1101, 1103 (Fla. 4th DCA 1995) (permitting consideration of uncontroverted fact not contained in underlying complaint; "if uncontroverted evidence places the claim outside of coverage, and the claimant makes no attempt to plead the fact creating coverage or suggest the existence of evidence establishing coverage, we think the carrier is relieved of defending.").

Plaintiffs suggest that the exceptions to the general rule do not apply because the application of a policy exclusion was not obvious. (DE 173 at 21). I disagree. As will be discussed below, several of the Pre-Policy Notices fit comfortably within the Claims definitions excluded from coverage. Moreover, the facts surrounding these Pre-Policy Notices are not disputed, but rather only their characterizations, which as noted earlier, such characterizations are a legal question for me to decide. In other words, the evidence isn't conflicting, the Parties' arguments as to whether they amount to exclusion under the Policy are in dispute. Accordingly, I find it appropriate to consider the facts of the Pre-Policy Notices in determining whether coverage applies.

**A. Certain pre-Policy notices constitute "Claims"**

A central question in this dispute is whether MAIC is required under the Policy to provide coverage for the Florida Action, or whether it is related to a series of potential "Claims" made prior to the inception of the Policy. And a "claims[-]made policy" provides coverage only if a claim is first made against an insured during the policy period. *First Pros. Ins. Co. v. McKinney*, 973 So. 2d 510, 514–15 (Fla. Dist. Ct. App. 2007).

Defendant contends that the various notices constitute "Claims" as defined under the Policy, such that the date that the "Single Claim" was first made was in late 2019 and no later than March 11, 2020 (the date of the first H&K letter acknowledging receipt of the 2019 DBPR Complaint on behalf of MV Realty). (DE 152 at 12). Plaintiffs, on the other hand, contend that Defendant's Motion "rests on a single premise: that MV Realty received 41 'Claims'" and argues that this premise is flawed, in part, because "[t]he items collected in MAIC's chart… are … not Claims at all…." (DE 173 at 2).

Under Florida law, the interpretation of an insurance policy is a question of law for the court. *Technical Coating Applicators, Inc. v U.S. Fidelity & Guaranty Co.,* 157 F.3d 843 (11th Cir. 1998); *Arnold v Life Ins. Co. of North America*, 894 F.2d 1566 (11th Cir. 1990)*; Penzer v Transportation Ins. Co.*, 29 So.3d 1000 (Fla. 2010). As a basic premise in this exercise, clear and unambiguous policy terms should be given their plain, ordinary and generally accepted meaning. *Taurus Holdings, Inc. v U.S. Fid. & Guar. Co.*, 913 So.2d 528 (Fla. 2005); *Union American Ins. Co. v Maynard*, 752 So.2d 1266 (Fla. 4th DCA 2000).

As a broad principle, communications that threaten only possible future action is unlikely to amount to a "Claim," whereas communications seeking a specific demand for the Insured to rectify some legally cognizable damage created by its wrongful act would amount to a "Claim." *See Certain Underwriters at Lloyds, London v. Anchor Ins. Holdings, Inc.*, 2024 WL 4836693 (11th Cir. Nov. 20, 2024). Moreover, under the Policy, the definition of a "Claim" includes five characterizations. Taking those invoked in turn, several of the pre-Policy notices fit within each of these characterizations, and consequently amount to "Claims" that bar coverage.

The first definition of a "Claim" is a written demand against an Insured for monetary damages or non-monetary relief, including a written demand that an Insured toll or waive a statute

of limitations, commenced by such Insured's receipt of such written demand. (DE 151 at ¶ 4). As to this first characterization, Defendant points the Court towards what can only be described as a "demand letter" wherein counsel for an individual by the name of Leonor Chaviano addresses MV Realty PBC, LLC. (DE 151-5 at 34). In this letter, counsel explicitly argues the HBA is substantively unconscionable and "demand[s] the immediate rescission of the [HBA] and the recording of a termination and release in the public records. Failure to do so shall explore MV Realty to a claim for damages for slander of tile." (*Id.* at 35). Plaintiffs suggest that "the consumer's complaint was fully and completely resolved" – i.e., that "[t]he issue was resolved favorably to MV Realty when the consumer wired a $7,980.00 termination fee to MV Realty on September 16, 2020, in exchange for an unconditional release from the consumer's HBA." – and therefore "[a] concluded inquiry cannot give rise to any future claim." (DE 172-1 at 3, DE 173 at 4). However, I agree with the Defendant that the mere fact that a claim has been resolved does not operate to "unmake" the claim or relieve the Insured of representing its existence in a claims-made Policy. (DE 179 at 8). It is too myopic to read the Claims Free Warranty Statement as pertaining only to live claims, rather than a set of circumstances that may spur similar actions elsewhere. This "Claim" put Plaintiffs on notice regarding the controversial nature of their Homeowners Benefit Program. Moreover, the existence of a past Claim is entirely the purpose of a Claims-Made Policy, that covers Claims first made during the Policy Period, bound together by the Interrelated Wrongful Act provision, discussed *infra*.

Defendant also invokes the third characterization of a "Claim," which defines it as "[a] criminal proceeding against an Insured commenced by such Insured's receipt of an indictment, information or similar document." (DE 151 at ¶ 4). Defendant points to a Subpoena Duces Tecum issued on February 15, 2022, by the Office of the State Attorney Sixth Judicial Circuit of Florida

for Pasco and Pinellas Counties. (DE 151-5 at 7, 287). Therein, it explains that "[p]ursuant to an official criminal investigation currently being conducted, it is requested that you furnish the records requested in the attached subpoena." (*Id.* at 288). In response, Plaintiffs contend that a subpoena is not an indictment, notice of charges, or similar document, and a criminal investigation does not amount to a proceeding. (DE 172-1 at 24). On this point, I agree with the Plaintiffs that a subpoena does not constitute a triggering document within the scope of the third definition.

Still, Plaintiff cannot overcome the significant number of claims that fit comfortably within the fourth and fifth definitions. The fourth definition includes "[a]n administrative or regulatory proceeding against an Insured commended by such Insured's receipt of a notice of charges or similar document." (DE 151 at 3). Here, Defendant points to several notices and complaints from the DBPR and letters informing Plaintiffs of a complaint from the Florida Department of Agriculture and Consumer Services. With respect to DBPR, the Plaintiffs argue that "[t]his does not reflect a 'proceeding' against anyone. It is an 'official notice' from the Florida DBPR of its receipt of a consumer complaint and that 'an investigation has been initiated regarding the allegations in the complaint'" whereas Plaintiffs suggest that "Claim Definition 4 does not consider an investigation akin to a 'proceeding' because Definition 4 requires some form of charges be brought." (DE 172-1 at 20).

However, Plaintiffs' argument is unavailing. As an example of the various DPBR claims, Complaint Number 2019063900, filed on December 23, 2019, arises out of the HBA controversy. (DE 151-5 at 15). As Defendant points out, the statute referenced in the first sentence of the letter is 455.225 Fla. Stat. (DE 179 at 9, DE 151-1 at 16). Titled "Disciplinary Proceedings" explains that "[t]he department, for the boards under its jurisdiction, shall cause to be investigated any complaint that is filed before it if the complaint is in writing, signed by the complainant, and legally

sufficient... When an investigation of any subject is undertaken, the department shall promptly furnish to the subject or the subject's attorney a copy of the complaint or document that resulted in the initiation of the investigation." Fla. Stat. § 455.225(1)(a), (b). In a similar matter, the Eleventh Circuit upheld summary judgment in favor of an insurer where the insurer denied coverage where the claim definition included "any administrative proceeding" and a filing of a charge of discrimination with the Equal Employment Opportunity Commission constituted such a proceeding. *See PMTD Rest. v. Houston Cas. Co.*, 2023 WL 4488189 (11th Cir. July 12, 2023). In arriving at its conclusion, the Court explained that "[t]he phrase 'administrative proceeding' is defined as '[a] hearing inquiry, *investigation*, or trial before an administrative agency…." *Id.* at *3 (citing Black's Law Dictionary (11th ed. 2019) (italics in original). Accordingly, Plaintiffs' attempt to narrow the definition of "proceeding" to only the most consequential definition, akin to a trial, is unpersuasive.

Likewise, the Florida Department of Agriculture and Consumer Services fits comfortably within Definition 4. There, the letter explains that "[a]fter reviewing the enclosed complaint, you have 30 days from the date of this letter to respond to the Department stating your position, and the action you will take to resolve the complaint… Failure to respond to this complaint will result in a final case disposition of 'Closed No Response.'" (DE 151-5 at 157). Plaintiffs again seem to suggest that the complaint in this matter does not amount to a "notice of charges or similar document" that would trigger a proceeding. (DE 172-1 at 12, 13). I disagree. It appears to me to operate as a straightforward inquiry with a public record case adjudication. Additionally, the Department is tasked with reporting "to the appropriate law enforcement officers any information concerning violation of consumer protection laws" suggesting in no uncertain terms its role as an investigative agency. Fla. Stat. § 570.544(3)(f).

Finally, Defendant points to several persuasive examples of notices that fit within the fifth characterization. The fifth characterization includes "[a] civil, criminal, administrative or regulatory investigation of an Insured Person commenced by the service upon or other receipt by such Insured Person of a target letter or other written notice from the investigating authority identifying by name such Insured Person as an individual against whom a proceeding may be commenced." (DE 151 at 3). One example that Defendant relies upon includes the March 22, 2022, Florida Office of Attorney General Consumer Protection Investigative Subpoena Duces Tecum directed towards MV Realty PBC, LLC, Anthony Mitchell and Amanda Zachman. (DE 151-5 at 350). Quite explicitly, the letter states that it was issued "in the course and authority of an official investigation." (*Id.*). Plaintiffs' counter that this does not constitute a "target letter," in an official sense, which they suggest is sent when an investigation has reached a point where the recipient has become a "putative defendant." (DE 172-1 at 29). In support of this argument, Plaintiffs cite the DOJ Justice Manual, Section 9-11.151, which states: "[i]t is the policy of the Department of Justice to advise a grand jury witness of his or her rights if such witness is a 'target' or 'subject' of a grand jury investigation. A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." (DE 172-1 at 29).

But a formal target letter serves as but one example of a notifying document. The mere fact that the March 22, 2022 subpoena also requires information to be provided does not negate its fit under "other written notice from the investigating authority." (DE 151 at 3). Additionally, with respect to this notice and others that Defendant characterizes as within Definition 5, Plaintiffs argue that "No such document was served on any Insured, let alone an Individual Insured before the Policy Period." (DE 172-1 at 30). More specifically, Plaintiffs suggest that "Category 5

requires a target letter or similar [correspondence] 'identifying by name' an Insured Person 'as an individual against whom a proceeding may be commenced,' received by that person." (DE 173 at 15). Instead, Plaintiffs suggest that the subpoenas and civil investigative demands are directed towards MV Realty PBC, LLC. (*Id.*, *See e.g.*, DE 151-5 at 350). But a review of the contractual language reveals that this distinction is of no moment. As Defendant points out, the Policy's Directors and Officers and Company Liability Coverage Part defines "Insured" broadly and interchangeably:

> Insured, whether in the singular or plural, means the Insured Persons and, solely with respect to INSURING AGREEMENTS B., INSURING AGREEMENTS C. AND INSURING AGREEMENTS D., the Company.

(DE 50-5 at 35). Ultimately, any of these examples operate to serve as a potential "Claim" under the Policy and preclude Plaintiff from coverage.[4]

[4] The Parties also dispute a host of Policy Exclusions. Several of the exclusions would likewise bar coverage under the Policy. This includes the Professional Services Exclusion, which provides that the Insurer is not liable to defend any Claim based upon, arising out of, or in any way involving any actual or alleged error or breach of duty in connection with the rendering or failure to render any professional service. (DE 50-5 at 59). Plaintiffs suggest that the HBP is not a professional service because the litigation surrounding it did not involve the sale, lease, rental or appraisal of real estate. But Plaintiffs cannot escape the fact that the issues that led to the litigation arise out of the marketing and implementation premises underlying the Program—the requirement that MV Realty serve as the listing agent and transaction broker. Likewise, Exclusion J of the Policy, specifying that the Insurer is not liable to pay any Loss based upon or arising out of an Insured Person gaining any profit renumeration or financial advantage to which such Insured was not legally entitled, is likely to apply and consequently bar coverage. (DE 152 at 32, DE 50-5 at 36, 52). To refute this Exclusion's applicability, Plaintiffs suggest that nothing in the record establishes that any natural person personally gained profit, remuneration, or financial advantage to which he or she was not legally entitled. But this argument flies in the face of undisputed record evidence. The Florida Court held that FDUPTA operates to prevent overreaches by one party to gain an unjust and undeserved advantage which it would be inequitable to permit him to enforce. Notably, the State Order on the Cross Motions for Summary Judgment (DE 50-3) establishes that "Between 2018 and 2023, MV Realty harvested $18,434,805.12 in Early Termination Fees from consumers – which stood at approximately 41% of MV Realty's total revenue." (DE 50-3 at 4). These findings were expressly incorporated into the "Consent Final Judgment as to the Individual Defendants" on December 19, 2025. (DE 151-4, at 3) ("This Consent Judgment does not affect, change or amend

**B. Interrelated Wrongful Acts and Policy Renewal**

Plaintiffs also argue in both their Reply in support of their Motion for Partial Summary Judgment (DE 181 at 2) and their Response to Defendant's Motion for Summary Judgment (DE 173 at 4) that Defendant characterization of "interrelated wrongful acts" is far too broad.

The Policy provides that a "Single Claim" is defined as "[a]ll Claims which arise out of the same Wrongful Act or Interrelated Wrongful Acts of the Insured shall be deemed one Claim, and such Claim shall be deemed to be first made on the date of the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period…." (DE 151 at 3). "Wrongful Acts" is defined as " (1) [a]ny actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by any Insured Person in their capacity as such or in an Outside Position, or with respect to Insuring Agreement C, by the Company; or (2) Any matter claimed against any Insured Person solely by reason of their serving in such capacity or in an Outside Position." (DE 50-5 at 36, DE 156 at ¶ 22). Finally, "Interrelated Wrongful Acts" is defined as "all Wrongful Acts, including all Wrongful Employment Practices, that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." (DE 50-5 at 17, DE 151 at ¶ 6).

The upshot of Plaintiffs' argument is that "at a high enough generality, every claim ever brought against an insured shares some fact in common with every other claim. A definition that sweeps that broadly cannot be applied literally, or it would swallow the claims-made structure of

---

the terms of this Court's prior Orders, including but not limited to, this Court's Order on Cross Motions for Summary Judgment dated September 24, 2024, and this Court's Partial Summary Judgment on Injunctive Relief Order dated February 12, 2025. All findings, decisions and injunctive relief entered by this Court expressly survive the conclusion of the litigation and are incorporated into this Consent Judgment as if fully restated herein.").

the Policy entirely." (DE 173 at 4, 5). To support this proposition, Plaintiffs cite the reasoning in *Hrobuchak v. Fed. Ins. Co.*, 2010 WL 4237435, where the district court in Pennsylvania asserted that "[o]ne suit over your business practices in one state [] cannot mean that your insurer is forever immune from having to extend coverage in future suits." 2010 WL 4237435 at *4 (M.D. Pa. Oct. 21, 2010). Moreover, with respect to the variety of complaints—ranging from consumer complaints to investigative subpoenas--Plaintiffs suggest that a shared industry, product, or business practice is not the kind of factual or transactional link the term requires.

This matter, however, is not the first time a court has been tasked with interpreting policy language bearing such similarity with the "Interrelated Wrongful Acts" provision in the Policy. Several courts have interpreted this language more broadly than the Plaintiffs suggest. Where there is a single discrete cause that is alleged to have resulted in injuries to numerous plaintiffs, the claims brought by such plaintiffs are also considered to have been based on one transaction or cause for policy purposes. *See Home Indemn. Co. v. City of Mobile,* 749 F.2d 659, 663 (11th Cir.1984) ("Therefore, we agree with the district court that, under Alabama law, the 'occurrence' to which this policy refers is the 'events or incidents for which the City is liable;' that is, a single 'occurrence' encompasses all damage proximately resulting from each incident or series of incidents of negligence which create the City's liability for flooding.").

First, although I agree that as a general matter, it may not be appropriate to impute suits against the insured in one state as a means to deny a claim for coverage relating to suits in a different state, it is a question of degree, not a binary as the Plaintiffs seem to suggest. For example, it may be the case that the Massachusetts Complaint against MV Realty of Massachusetts, LLC (DE 151-5 at 278) may be too attenuated to characterize this complaint as an interrelated wrongful act attributable to MV Realty PBC, LLC and its officers. But we need not deal with the outliers

where several of the Pre-Policy Notices constituting Claims reside directly within the scope of an Interrelated Wrongful Act. First, each of the Claims discussed above concern one central business practice: the Homeowner's Benefit Program and the specific scheme laid out in the HBA. The Program existed before the subject Policy and was the subject of several allegations, complaints, and investigations. The Program continued through the Policy period, when the Complaint in the Florida Action was filed. On this point, *Certain Underwriters at Lloyd's of London v. Fed. Deposit Ins. Corp. for Omni Nat'l Bank* is instructive. 723 F. App'x 764 (11th Cir. 2018). In *Certain Underwriters*, the FDIC sought coverage for bank directors' post-policy-period expenditures to rehabilitate and hold foreclosed properties, following the bank's downgrade to a failing financial condition, despite earlier unsound lending practices that had occurred before the policy period. The Eleventh Circuit held that the post-policy expenditures were independent wrongful acts because they resulted from a new business decision made after the directors learned of the bank's impending failure, and therefore were not "interrelated wrongful acts" with the earlier lending practices. Here, however, all of the Claims discussed above concern the same Program, the same HBA, and substantially the same alleged conduct, only with respect to different consumers.[5] The

[5] Plaintiffs read *Certain Underwriters* differently and their argument rests on a rule that the decision did not establish. Instead, they argue that "Wrongful acts are 'interrelated' only when the later act is inextricably linked to the earlier one – meaning an *essential element* of what makes the later conduct wrongful necessarily depends on the earlier act or acts." (DE 173 at 7 (emphasis in original)). *Certain Underwriters* did not hold that Wrongful Acts are "interrelated" only when the wrongfulness of a later act necessarily depends upon an earlier act. Rather, the Eleventh Circuit distinguished the case relied upon by the Plaintiff-Appellants based in part on materially different policy language and, alternatively, because the later expenditures at issue there resulted from an independent business decision that constituted an independently wrongful act. *See Certain Underwiters*, 723 F. App'x at 768 (distinguishing *Zucker v. U.S. Specialty Insurance Company*, 856 F.3d 1343 (11th Cir. 2017)). Here, by contrast, the pre-Policy notices and the Florida Action concern the same Homeowner Benefit Program and substantially the same alleged misconduct, which had already generated consumer complaints and governmental investigations before the Policy Period. Under the Policy's express definition, which encompasses Wrongful Acts sharing a "common nexus" of facts, circumstances, situations, events, transactions, or causes, Plaintiffs

Florida Action isn't alleging that Plaintiffs suddenly made a new, independent decision in 2022 that became wrongful because of some intervening event. Rather, the theory appears to be that the HBA Program itself was deceptive and unlawful. And that Program existed, and was generating consumer complaints and regulatory scrutiny, years before the Policy began.

Reviewing the Policy language, it provides that any Claim arising out of any of these Interrelated Wrongful Acts shall be deemed one Claim, and such Claim shall be deemed to be first made on the date the earliest Claim is first made. This appears to be the 2019 DBPR Complaint I have previously identified as a Claim. But even under the narrowest approach, Plaintiffs cannot escape the fact that two formal investigations undertaken by the Florida Attorney General were directed towards MV Realty on May 11, 2021 (15 months prior to the inception of the Policy) (DE 151 at ¶ 39) and on March 22, 2026, (5 months prior to the Policy inception date) (DE 151-8 at 2). We need not settle for the outliers among the 41 pre-Policy notices when these two investigations constitute Claims and each concerns the Homeowner's Benefit Program and the HBA scheme.

Plaintiffs attempt to suggest that because this was a renewal policy that included terms and conditions as the prior policy period, Defendant should have analyzed coverage of the pre-Policy Notices under the prior Policy period based on the extended reporting provision. (DE 155 at 8). But "[t]he general rule in Florida is that upon each renewal of an insurance policy an entirely new and independent contract of insurance is created." *Marchesano v. Nationwide Ins*., 506 So. 2d 410, 413 (Fla. 1987). Plaintiffs point to the Eleventh Circuit's decision in *Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298 (11th Cir. 2003). There the Court faced what it called an "alarming scenario" where "[f]aced with two consecutive insurance policies that created apparently seamless

cannot establish as a matter of law that the Florida Action is unrelated to those pre-Policy Wrongful Acts merely because the Florida Action asserts a later or independently actionable injury.

coverage over two policy periods, the court nevertheless found that a claim accruing within the two periods was somehow not covered by either policy." *Cast Steel*, 348 F. 3d at 1301. The situation in *Cast Steel* involved a claim which accrued late in the first policy period but was not reported until early in the second. *Id.* at 1302. Those circumstances are wholly different from the present dispute, which unlike *Cast Steel* does not turn on the extended reporting period provision. Here, claims (the various Pre-Policy Notices) accrued in the first Policy period were *never* reported. Instead, the Florida Action was commenced by a complaint filed on November 29, 2022, and reported days later, on December 2, 2022. All of the Claims are deemed to be one Claim first made on the date the earliest of such Claims is first made, "regardless of whether such date is before or during the Policy Period or any Extended Reporting Period." (DE 50-5 at 22). In other words, *Cast Steel* does not compel a different result because that case involved a claim that was actually reported during the second policy period and therefore presented a question about which of two consecutive policies covered a claim that had accrued during the first period. Here, by contrast, there is no gap in coverage to be remedied: the Pre-Policy Notices were never reported, and the only Claim reported to Defendant was the Florida Action, which was first made and reported during the second Policy Period. Accordingly, Defendant was not required to analyze the Pre-Policy Notices under the prior policy's Extended Reporting Period provision.

**C. Claim Free Warranty Statement**

Plaintiffs attempt to manufacture a fact issue with respect to the Claim Free Warranty Statement. CEO David Mitchell signed the Warranty Statement on August 26, 2022, which stated, in pertinent part:

> No person or entity proposed for coverage is aware of any fact, circumstance or situation which he or she has reason to suppose might give rise to a future claim that would fall within the scope of

> any of the proposed coverage part limit of liability stated above, except: None or
>
> [space included to list potential claims]
>
> Without prejudice to any other rights and remedies of the Insurer, the Applicant understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed above, any claim or action arising from any such fact, circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Insurer.

(DE 170 at ¶ 73). Here, Plaintiffs explain that MV Realty and its officers "had no reason to believe any of the regulatory inquiries or consumer complaints would give rise to a claim and were repeatedly assured by their counsel at Holland & Knight – the architects of the HBA program – that there was no systemic issue warranting escalation… Whether that understanding was reasonable is – at most – a question for the trier of fact, not a question this Court can resolve on a paper record…" (DE 173 at 17, 18). But in light of the Policy's express language, any such dispute is not material. The Policy language states that "the Applicant understands and agrees that if any such fact, circumstance or situation exists, whether or not disclosed above, any claim or action arising from any such fact, circumstance or situation is excluded from coverage…." (DE 170 at ¶ 73). Applied to the facts of this case, it does not matter whether the signatory disclosed the claims or not, or even whether he had reason to know that he should have reported the claims. The Policy's exclusions turn on the simple fact of whether a claim arises during the Policy Period that relates back to a set of facts that should have been raised in the Warranty Free Statement.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1) Defendant/Counter-Plaintiff Markel American Insurance Company's Motion for Summary Judgment (DE 152) is **GRANTED.** A final Judgment order will be entered separately.

2) Plaintiffs/Counter-Defendants' Motion for Partial Summary Judgment (DE 155) is **DENIED.**

**SIGNED** in Chambers in West Palm Beach, Florida, this 1st day of September 2026.

Donald M. Middlebrooks
United States District Judge

cc.

Counsel of Record